1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
     - - - - - - - - - - - - - - X
3    UNITED STATES OF AMERICA,   :
                                 :
4                    Plaintiff,  :     CR-06-285
                                 :
5          -against-             :     United States Courthouse
                                 :
6                                :     Brooklyn, New York
                                 :
7    JOSEPH YOUNG,               :
                                 :
8                    Defendant.  :     October 16, 2008
                                 :     9:30 a.m.
9    - - - - - - - - - - - - - - X

10                        TRANSCRIPT OF TRIAL
                  BEFORE THE HONORABLE ALLYNE R. ROSS
11             UNITED STATES DISTRICT JUDGE, and a jury

12   APPEARANCES:

13   For the Plaintiff:      BENTON J. CAMPBELL, ESQ.
                             United States Attorney
14                           BY:  WINSTON CHAN, ESQ.
                                  JACK DENNEHY, ESQ.
15                                WILLIAM SCHAEFFER, ESQ.
                             Assistant United States Attorneys
16

17   For the Defendant:     ROTHMAN, SCHNEIDER, SOLOWAY & STERN
                            BY:  ROBERT A. SOLOWAY, ESQ.
18

19


20
     Court Reporter:        FREDERICK R. GUERINO, C.S.R.
21                          225 Cadman Plaza East
                            Brooklyn, New York
22                          718-330-7687

23


24   Proceedings recorded by mechanical stenography, transcript
     produced by CAT.
25

        FREDERICK R. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

Buoninfante - Direct/Dennehy

1          Case on trial: United States of America v. Young.

2          (Judge Ross enters the courtroom at 9:30 a.m.)

3          THE COURT:  Is everyone ready?

4          MR. CHAN:  Just to give your Honor an idea what is

5    going on for the morning.  We have one short witness, then

6    followed by the cooperating witness.  So we need to take a

7    break to bring in the cooperating witness.

8          THE COURT:  That's fine.

9          (The jury enters the courtroom at 9:32 a.m.)

10          THE COURT:  Good morning, ladies and gentlemen.

11          THE JURY:  Good morning.

12          THE COURT:  Mr. Chan.

13          MR. DENNEHY:  The government calls Alfonso

14   Buoninfante.

15   A L F O N S O    B U O N I N F A N T E,

16          called as a witness, having been first duly sworn,

17          testifies as follows:

18          THE COURT CLERK:  Please state and spell your name

19   for the record.

20          THE WITNESS:  Alfonso Buoninfante, A-l-f-o-n-s-o,

21   B-u-o-n-i-n-f-a-n-t-e.

22   DIRECT EXAMINATION

23   BY MR. DENNEHY:

24   Q    Good morning, sir.

25   A    Good morning.

Buoninfante - Direct/Dennehy

1    Q     By whom are you employed?

2    A     The New York City Fire department.

3    Q     In which division?

4    A     EMS.

5    Q     Which stands for what?

6    A     Emergency Medical Services.

7    Q     What is your position there?

8    A     I'm an emergency medical technician.

9    Q     Have you received any specialized training in emergency

10   medicine?

11   A     Yes.  I have a state certification from the State of New

12   York.

13   Q     And what does that entail?

14   A     Basically it is a three to six-month course, a certain

15   amount of hours that we have to provide prehospital care to

16   the sick and injured.

17   Q     For how long have you been a member of the New York City

18   Fire Department EMS?

19   A     Since February 2000.

20   Q     Back in May of 2005, where were you working?

21   A     Staten Island.

22   Q     What were your duties and responsibilities back in May

23   of 2005?

24   A     I was are inside an ambulance and provided prehospital

25   care to the sick and injured.

Buoninfante - Direct/Dennehy

1    Q    Did you get those various calls through the 911 system?

2    A    Yes, only through the 911 system.

3    Q    I would like to direct your attention to May 12, 2005,

4    about 9:30 in the morning.

5         Were you working at that time?

6    A    Yes, I was.

7    Q    Were you working in an ambulance with a partner?

8    A    Yes, I was.

9    Q    At approximately 9:30, did you receive a call over the

10   911 system?

11   A    Yes, I did.

12   Q    What type of call was it?

13   A    The call came over as an injury.

14   Q    Where was the location of the call?

15   A    12 Andros.

16   Q    On Staten Island?

17   A    Yes, sir.

18   Q    Did you respond to that location?

19   A    Yes, we did.

20   Q    What type of location was that?

21   A    That was an auto body shop.

22   Q    When you arrived on the scene with your partner, did you

23   see the person who was in need of treatment?

24   A    Yes, we did.

25   Q    Did you later learn that man's name?

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

Buoninfante - Direct/Dennehy

1    A      His name is Rafael Camacho.

2    Q      For the record, are you viewing something to refresh

3    your memory?

4    A      Yes.  I'm looking at the Ambulance Report.

5    Q      And when you first saw Mr. Camacho, describe for the

6    jury how he looked?

7    A      He was in a seated position.  He was beaten up pretty

8    bad.  He was Spanish-speaking, so a translator stated he was

9    beaten up with a crowbar, had several injuries to his head

10   neck, arms, legs.

11   Q      Was he bleeding?

12   A      Yes, he was.

13   Q      From which parts of his body?

14   A      He was bleeding from his head, from his legs, from his

15   arms.  Basically, he had big lacerations and blunt blows all

16   over.

17   Q      How did you characterize his injuries medically

18   speaking?

19   A      He was in pretty potentially serious condition, if he

20   wasn't taken to the hospital.

21   Q      What were the most serious of his injuries at that time?

22   A      He lost consciousness, and he was extremely dizzy, which

23   is an indicator of high trauma caused possibly by brain

24   swelling, and he needed to have serious medical treatment

25   immediately.

Buoninfante - Direct/Dennehy

1    Q    So what steps did you take at the scene to get him

2    emergency transported to the hospital?

3    A    We immobilized him.

4    Q    What does that mean?

5    A    Put a cervical collar on him and put him on a run board.

6    Q    Why do you do that?

7    A    In the event we want to prevent any spinal cord

8    injuries.

9    Q    So you put a collar on his neck and actually you tape

10   him to the board?

11   A    Yes.  To control bleeding on his head, you put a collar

12   on his neck and put him on a run board, and anywhere where he

13   had kind of bleeding, we controlled the bleeding and

14   administered oxygen.

15   Q    Why do you do that?

16   A    Well, it helps with head trauma.  It helps people who

17   lost consciousness to give them more purified oxygen.

18   Q    What other parts of his body did you treat?

19   A    He had a fracture to his right tibia and fibula.

20   Q    What is that?

21   A    It is actually part of his right knee, under his knee,

22   his shin area.  It was broken.

23   Q    How did you know that just by looking at him?

24   A    It was deformed, severely deformed when it sticks out a

25   certain way.  Basically by deformities you notice.

Buoninfante - Direct/Dennehy

1    Q    What other injuries did Mr. Camacho suffer?

2    A    He also had injury to his left arm as well.  And he had

3    three big lacerations on top of his head.

4    Q    After dressing those wounds and immobilizing his neck,

5    what did you do?

6    A    We expedited transport to the hospital.

7    Q    Which hospital did you take Mr. Camacho to?

8    A    St. Vincent's.

9    Q    Once you got there, what did you do with the patient?

10   A    We gave the patient's care over to the staff at St.

11   Vincent's.

12   Q    Did that end your involvement in this case?

13   A    Until now.

14        MR. DENNEHY:  I have no further questions.

15        MR. SOLOWAY:  No questions, your Honor.

16        THE COURT:  Thanks very much.  You are excused.

17        THE WITNESS:  Thank you, ma'am.

18        THE COURT:  Ladies and gentlemen, we'll take a brief

19   break, probably just a few minutes.  Go back to the jury

20   room.

21        The jury leaves the courtroom for a brief recess at

22   9:40 a,n,.

23        (John Tufarelli enters the courtroom and takes the

24   witness stand at this time.)

25        (The jury enters the courtroom at 9:47 a.m.)

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1          THE COURT:  Mr. Chan.

2          MR. CHAN:  The government calls John Tufarelli to

3    the stands.

4    J O H N    T U F A R E L L I,

5               called as a witness, having been first duly sworn,

6               testifies as follows:

7          THE COURT CLERK:  Please state and spell your name

8    for the record.

9          THE WITNESS:  John Tufarelli, J-o-h-n,

10   T-u-f-a-r-e-l-l-i.

11         THE COURT CLERK:  Please have a seat.

12   DIRECT EXAMINATION

13   BY MR. CHAN:

14   Q    Mr. Tufarelli, are you known by any nicknames?

15   A    Yes, Little John.

16   Q    How old are you?

17   A    Twenty-eight.

18   Q    Where were you born?

19   A    Where was I born?

20   Q    Yes?

21   A    Queens.

22   Q    Have you lived in the New York area your whole life?

23   A    Yes.

24   Q    What parts?

25   A    Queens, Ozone Park and Staten Island.

J. Tufarelli - Direct/Chan

1    Q    Where did you live most recently?

2    A    Staten Island.

3    Q    How far did you get in school?

4    A    Ninth grade.

5    Q    What high school did you go to?

6    A    Tottenville.

7    Q    Is that in Staten Island?

8    A    Yes.

9    Q    Why did you stop going to high school?

10   A    I didn't like school.

11   Q    As of today, can you easily read?

12   A    No.

13   Q    Left you left school, did you work?

14   A    Yes.

15   Q    What kinds of jobs did you have?

16   A    Construction, security worked at the New York Post, and

17   at a dealership.

18   Q    What kind of dealership?

19   A    Used cars.

20   Q    You said you worked at the New York Post.

21        What did you do there?

22   A    Delivery truck driver.

23   Q    What did you deliver?

24   A    Newspapers.

25   Q    In the course of your life, did you earn money through

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1    crime?

2    A     Yes.

3    Q     How old were you when you first started committing

4    crimes?

5    A     Sixteen.

6    Q     When you first started doing crimes, what types of

7    crimes were they?

8    A     Robbery, burglary, counterfeit money, loansharking, drug

9    sales.

10   Q     What did you sell?

11   A     Cocaine, pot, prescription pills.

12   Q     Did you do that in the course of your life?

13   A     Yes.

14   Q     You said robbery.

15         What did you rob?

16   A     Money, cars, houses.

17   Q     You robbed things from houses?

18   A     Yes, burglary.

19   Q     Were people home, when you did that?

20   A     No.

21   Q     When you stole cars, were people in the cars?

22   A     No.

23   Q     Were you ever arrested for stealing a car?

24   A     Yes.

25   Q     What happened?

J. Tufarelli - Direct/Chan

1    A     Got dismissed.  I was under age.

2    Q     What did you do in terms of the crime?

3    A     We stole the car from Staten Island, drove it to Queens,

4    we got arrested in Queens, and I got released out of the

5    precinct.

6    Q     How old were you?

7    A     About 16.

8    Q     What happened to that case?

9    A     That got dismissed.

10   Q     Why?

11   A     Under age.

12   Q     Nevertheless, were you guilty of that crime?

13   A     Yes.

14   Q     Did you ever commit assault?

15   A     Yes.

16   Q     Were you ever arrested for assault?

17   A     Yes.

18   Q     Tell us what happened on the assault?

19   A     Me and my friends we had a situation over an

20   ex-girlfriend and I wound up punching him in the face.  He

21   had gotten me locked up.

22   Q     Were you arrested?

23   A     Yes.

24   Q     Where?

25   A     In Staten Island.

J. Tufarelli - Direct/Chan

1   Q     What happened to that case?

2   A     It got dismissed.  He didn't press the charges.

3   Q     Did you have anything to do with that?

4   A     No.

5   Q     Were you still guilty of that assault?

6   A     Yes.

7   Q     How old were you?

8   A     Twenty-one.

9   Q     You also engaged in fraud during the course of your

10  life?

11  A     Yes.

12  Q     What did you do?

13  A     Credit card and insurance fraud in a car accident.

14  Q     What did the insurance fraud consist of?

15  A     Somebody hit me from behind.  I was trying to claim

16  injuries that I already had in that accident.

17  Q     Did you get money?

18  A     No.

19  Q     Have you ever used a fake name?

20  A     Yes.

21  Q     Whose?

22  A     My brother's name.

23  Q     How did you do that?

24  A     I had got pulled over.  I used his name because I had a

25  suspended license at the time, so not to get locked up.

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1   Q    So you gave the police officer your brother's name?

2   A    Yes.

3   Q    Did you have to go to court for that case?

4   A    Yes.

5   Q    What did you do in court?

6   A    Basically paid fines under my brother's name.  When my

7   judge asked for my brother's name, I stood up.  He asked me

8   why I was there.  I said, I didn't know, I was here too pay

9   fines.

10  Q    Did you pay the fines on that ticket?

11  A    Yes.

12  Q    But you pretended to the judge you were your brother?

13  A    No.  I told him who I was, but he just -- he didn't

14  understand at the time why I was there, and that was that.

15  Q    Are you currently incarcerated?

16  A    Yes.

17  Q    Have you ever violated prison rules while in prison?

18  A    Yes.

19  Q    What did you do?

20  A    I falsified my girlfriend's name down to my sister's to

21  try to get her approved.

22  Q    For a visit?

23  A    For a visit.

24  Q    What else did you do?

25  A    I've taken food out of the kitchen.

J. Tufarelli - Direct/Chan

1  Q    Over the course of your life, have you used illegal

2  drugs?

3  A    Yes.

4  Q    What kinds of drugs?

5  A    Cocaine, pot, prescription pills.

6  Q    Were you ever arrested for drug possession?

7  A    Yes.

8  Q    What?

9  A    Marijuana.

10  Q    When?

11  A    From like 18 to like 23.

12  Q    When is the last time you used illegal drugs?

13  A    Around 2003, 2004.

14  Q    Did you ever commit crimes as part of an organized crime

15  family?

16  A    Yes.

17  Q    As part of one family or more than one family?

18  A    More than one.

19  Q    Which families?

20  A    The Colombos and the Bonannos.

21  Q    Other than the Colombos and Bonannos, are there other

22  organized crime families?

23  A    Yes.

24  Q    Which ones?

25  A    Gambinos, Genovese.

J. Tufarelli - Direct/Chan

1   Q     Any others?

2   A     Luchese.

3   Q     What is the goal in an organized crime family?

4   A     Make money.

5   Q     How do they make money?

6   A     Loansharking, robbery, drug dealing,.

7   Q     Where are the Colombo and Bonanno families located?

8   A     All over.

9   Q     All over the united States?

10  A     Yes.

11  Q     Are there different positions within organized crime

12  families?

13  A     Yes.

14  Q     What other positions, starting from the top down?

15  A     You got the Boss, Underboss, the Consigliere, Captains,

16  Soldiers and Associates.

17  Q     Is there a term made man?

18  A     Yes.

19  Q     What is a made man?

20  A     A made man is underneath the captain.

21  Q     Can anyone be a made man?

22  A     No.

23  Q     What do you have to be?

24  A     Italian.

25  Q     How about an associate?

J. Tufarelli - Direct/Chan

1   A      Anybody can be.

2   Q      What is the term "crew," what does that mean?

3   A      Basically a bunch of guys that do things for each other.

4   Q      Do what kinds of things?

5   A      Anything for each other.

6   Q      Criminal?

7   A      Criminal.

8   Q      Are there terms for made man?

9   A      Soldier.

10  Q      Who is the head of a crew?

11  A      Excuse me?

12  Q      Who heads a crew?

13  A      Most likely, it will go from captain down to the made

14  member, then associates.

15  Q      What is the responsibility of the person who heads the

16  crew to the associates in the crew?

17  A      Basically to take care of situations we can't handle on

18  our own.

19  Q      Are there certain situations that an associate can't

20  handle on their own?

21  A      Yes.

22  Q      Like what?

23  A      Basically sit-downs.

24  Q      What is a sit-down?

25  A      A sit-down would be if you have a situation with a made

J. Tufarelli - Direct/Chan

1   member or captain, you go to your made guy or captain and he

2   will have a sit-down and discuss the problem you guys had.

3   Q    In return for what the head of crew does for his guys,

4   what did the associates owe the head of the crew?

5   A    Basically anything that we are asked to do.

6   Q    What about money-wise?

7   A    Yes, for birthdays, Christmas, commissary money.

8   Q    Is there a term "kicking up" ?

9   A    Yes.

10  Q    What is kicking up?

11  A    Kicking up would be if we committed a crime, we would

12  kick up to our captain or made guy to our crew.

13  Q    You mentioned commissary, what is that?

14  A    A commissary is when you are in prison, you need money

15  to buy food and everything.

16  Q    What is the associate's responsibility with respect to

17  the commissary?

18  A    To make sure they have money in their commisary for

19  spending.

20  Q    In whose account?

21  A    The guys in our crew that are locked up.

22  Q    What position were you in in organized crime?

23  A    Associate.

24  Q    Did you have anyone in your own family, your blood

25  family, that was in organized crime, too?

J. Tufarelli - Direct/Chan

1   A    Yes.

2   Q    Who?

3   A    My stepfather.

4   Q    What family?

5   A    The Gambinos.

6   Q    You said you were associated with the Colombos and

7   Bonannos.

8        Which one was first?

9   A    The Colombos.

10  Q    What year did you first become associated with the

11  Colombo family?

12  A    Around '98, '99.

13  Q    Were you associated with any particular crew in the

14  Colombos?

15  A    Yes.

16  Q    Who?

17  A    Nicky Rizzo.

18  Q    Anyone else in that crew?

19  A    Nicky Lanza.

20       MR. CHAN:  Your Honor, may I approach?

21       THE COURT:  Yes.

22  Q    Showing you what is marked as Government Exhibits 22 and

23  23.

24       Do you recognize the person in 22?

25  A    Yes.

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1   Q    Who is that?

2   A    That's Nicky Rizzo.

3   Q    And 23?

4   A    Nicky Lanza.

5        MR. CHAN:  Your Honor, I offer 22 and 23.

6        THE COURT:  Admitted.

7        (Whereupon, Government's Exhibits 22 and 23 were

8   received and marked into evidence, as of this date.)

9        MR. CHAN:  Thank you.

10  BY MR. CHAN:

11  Q    Mr. Tufarelli, who is in Government's Exhibit 22?

12  A    Nicky Rizzo.

13  Q    What was his position in the Colombo family?

14  A    Captain.

15  Q    And Exhibit 23?

16  A    Nicky Lanza.

17  Q    His position?

18  A    Associate.

19  Q    Did Nicky Lanza have a nickname?

20  A    Yes, "Little Nicky" .

21  Q    Tell the jury how it was that you became associated with

22  that crew?

23  A    A friend of mine, Anthony Mastrioanni, had a situation

24  with a kid, Nick Galante, in a loansharking debt.  He came to

25  me to see if I had anything to take care of it because they

J. Tufarelli - Direct/Chan

1    were threatening him if he didn't pay.

2          I went to Michael Campizzo, who is friends with Nicky

3    Lanza.  We all sat down at a meeting and explained the

4    situation that he owed money to Nick Galante.  He told me he

5    was going to take care of it for $10,000.  He set up a

6    meeting with him and he wound up taking care of it.  Came to

7    an agreement for a knock down.  He would pay every week to

8    for mean.

9    Q    Let me stop you there.

10         You had a friend?

11   A    Yes, Anthony Mastrioanni.

12   Q    He had a problem?

13   A    Yes.

14   Q    What was his problem?

15   A    He owed money to Nick Galante.

16   Q    Who is Nick Galante?

17   A    He's a guy with the Gambinos.

18   Q    When this friend of yours, Anthony Mastrioanni, owed

19   money to Nick Galante, what kind of money was it?

20   A    A loansharking debt.

21   Q    So what was the problem that your friend was facing?

22   A    He basically told me they were going to beat him up if

23   he doesn't pay.

24   Q    What did you and Anthony Mastrioanni have to do?

25   A    We went to Nicky Lanza to talk to the guy Nick Galante

J. Tufarelli - Direct/Chan

```
 1   about a knock down, to leave him alone to pay off the money

 2   that he owed.

 3   Q    What is a knock down?

 4   A    A knock down?  He owed $30,000, and every time he paid,

 5   that money would come off the 30,000.

 6   Q    Did Nicky Lanza agree to help you guys?

 7   A    Yes.

 8   Q    What happened?

 9   A    They wound up meeting.  They spoke.  They came up with

10   an agreement on a certain amount to give weekly and that was

11   that.

12   Q    As a result of his assistance, did you guys owe Nicky

13   Lanza something, then?

14   A    You can say that.  We hung around him.  We started doing

15   business with him now.

16   Q    Did you start doing crimes with him?

17   A    Yes.

18   Q    Showing you another photograph.

19        May I approach?

20        THE COURT:  Yes?

21   Q    As Government's Exhibit 2.

22        Do you recognize this person?

23   A    Yes.

24   Q    Who is that?

25   A    Mike Maggio.
```

J. Tufarelli - Direct/Chan

1        MR. CHAN:  I offer Government's Exhibit -- actually, it

2   is already in evidence.

3   Q    Was Michael Maggio in your crew?

4   A    Yes.

5   Q    Nicky Lanza's crew?

6   A    Yes.

7   Q    Later on did he switch crews?

8   A    Yes.

9   Q    What did he switch to?

10  A    To the Bonanno.

11  Q    When he switched to the Bonanno family, did he switch to

12  a particular crew in the Bonanno family?

13  A    Yes.

14  Q    Whose?

15  A    Gino Galestro.

16  Q    Showing you what is in evidence as Government's Exhibit

17  1.

18       Who is that?

19  A    Gino Galestro.

20  Q    Did the two of them have a preexisting family

21  relationship?

22  A    Yes.

23  Q    What was that?

24  A    Brother-in-laws.

25  Q    Who was married to who?

J. Tufarelli - Direct/Chan

1   A     Their wives were sisters.

2   Q     What position did Gino Galestro have in the Bonanno

3   family?

4   A     Made member.

5   Q     What happened to cause Mike Maggio to switch from the

6   Colombo family to the Bonanno family underneath Gino

7   Galestro?

8   A     Mike Maggio and Nicky Lanza had met in a parking lot,

9   and it was a situation where Joey Diana punched Mike Maggio

10  in the face, and Mike Maggio went and told Gino.  Gino didn't

11  like that idea no one would help him out.  After that

12  situation, they wanted him to be left alone.

13  Q     Well, approximately what year did that change happen?

14  A     Maybe about 2000, 2002, around there.

15  Q     Then did you, yourself, follow Mike Maggio to Gino

16  Galestro's crew?

17  A     Yes.

18  Q     Approximately when?

19  A     Around 2002, 2003.

20  Q     Beginning from 2002 and 2003, for how long were you

21  associated with Gino Galestro?

22  A     From 2003 to 2006.

23  Q     Now, you testified that you worked at the New York Post?

24  A     Yes.

25  Q     As a delivery driver?

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

```
 1   A     Yes.

 2   Q     Did anybody help you get that job?

 3   A     Yes.

 4   Q     Who?

 5   A     Mike Maggio, Gino Galestro and Angelo Galestro.

 6   Q     Who is Angelo Galestro?

 7   A     Mike Maggio's -- Gino Galestro's father.

 8   Q     Showing you what is in evidence as Government's Exhibit

 9   20.

10         Who is that?

11   A     That's Angelo Galestro.

12   Q     What did those individuals do to help you get that job

13   at the New York Post?

14   A     They made a phone call down to the New York Post telling

15   them they had a friend coming down for a job.

16   Q     Did you go?

17   A     Yes.

18   Q     Did you get the job?

19   A     Yes.

20   Q     How quickly did you get that job?

21   A     That day.

22   Q     Is that normal?

23   A     No.

24   Q     How do you know that?

25   A     From just talking to other people.
```

J. Tufarelli - Direct/Chan

1    Q    I will show you some photographs.  Tell me if you

2    recognize them.  If you do, what their names are and whether

3    or not they had any position in organized crime.

4    A    Okay.

5    Q    You already mentioned Government Exhibit 1.

6         Who is that?

7    A    Gino Galestro.

8    Q    Position?

9    A    Made member.

10   Q    Bonannos?

11   A    Yes.

12   Q    Government's Exhibit 2?

13   A    Mike Maggio.

14   Q    Position?

15   A    Made member.

16   Q    Of what family?

17   A    The Bonannos.

18   Q    Exhibit 13?

19   A    John Tufarelli.

20   Q    Position?

21   A    Associate in the Bonannos.

22   Q    Government's Exhibit 14?

23   A    Joe Young.

24   Q    Position?

25   A    Associate in the Bonannos.

J. Tufarelli - Direct/Chan

1   Q     Do you see Joseph Young in the courtroom today?

2   A     Yes.

3   Q     Please point him out and describe what he's wearing?

4   A     He's sitting over there with a peach tie and white shirt

5   with glasses.

6               THE COURT:  Indicating the defendant.

7               MR. CHAN:  Thank you, your Honor

8   BY MR. CHAN:

9   Q     Government's Exhibit 3?

10  A     Stefan Cicale.

11  Q     Position?

12  A     Associate in the Bonanno family.

13  Q     Which crew in the both Bonanno family for Stefan Cicale?

14  A     Gino Galestro.

15  Q     And Exhibit 4?

16  A     Ronnie Escobar, associate in the Bonannos.

17  Q     Whose crew?

18  A     Gino Galestro.

19  Q     No. 7?

20  A     Jose Garcia, associate in the Bonannos with Gino

21  Galestro.

22  Q     No. 10?

23  A     Robert McKelvey, associate in the Bonannos with Gino

24  Galestro.

25  Q     No. 12?

J. Tufarelli - Direct/Chan

1   A    Daryl Rosenblatt, associate in the Bonannos with Gino's

2   crew.

3   Q    No. 5?

4   A    Joseph Ferrara, an associate of the Bonannos with Gino

5   Galestro.

6   Q    No. 8?

7   A    Joseph Lamattina, associate with the Bonannos with Gino

8   Galestro.

9   Q    Did he have any nicknames?

10  A     "Joe Lemon" .

11  Q    Anything else?

12  A     "Joe Reliable".

13  Q    Government's Exhibit 9?

14  A    Jayson MacConnell, associate in the Bonannos with Gino

15  Galestro's crew.

16  Q    Did he have a nickname?

17  A    "Ox."

18  Q    Government Exhibit 11?

19  A    John Mergen, associate in the Bonannos with Gino

20  Galestro.

21  Q    Did he have a nickname?

22  A     "The Turk" .

23  Q    Why was he called "the Turk" ?

24  A    Because he was Turkish.

25  Q    Of the people in Gino Galestro's crew, was anybody

J. Tufarelli - Direct/Chan

```
 1   especially close to him?

 2   A    Yes.

 3   Q    Who was that?

 4   A    Mike Maggio.

 5   Q    What was Mike Maggio's role in the crew?

 6   A    His right-hand man.

 7   Q    Whose right-hand man?

 8   A    Gino Galestro's.

 9   Q    Was there a rule or protocol if someone in the crew

10   wanted to talk to Gino?

11   A    Yes.

12   Q    What was that?

13   A    They had to go through Mike Maggio.

14   Q    How long were you, Gino Galestro and Mike Maggio

15   together?

16   A    All the time.

17   Q    Where did they live in relationship to each other?

18   A    Staten Island, next door neighbors.

19   Q    What street did they live on?

20   A    I am not too sure of the street.

21   Q    What kind of street?

22   A    Like a cul-de-sac development.

23   Q    Did they call that street a particular term?

24   A    I'm not too sure.

25   Q    During the time that you were associated with Gino
```

J. Tufarelli - Direct/Chan

 1   Galestro, did he have a pending criminal case?

 2   A    Yes.

 3   Q    As part of that case, did he have court appointments?

 4   A    Yes.

 5   Q    Who drove him to the court appointments?

 6   A    Mike Maggio.

 7   Q    At some point did Gino Galestro have to go to prison on

 8   those charges?

 9   A    Yes.

10   Q    When?

11   A    Say sometime in '04, '05.

12   Q    Who drove him to prison?

13   A    Mike Maggio.

14   Q    Which prison?

15   A    Ft. Dix.

16   Q    Where is that?

17   A    In Jersey.

18   Q    During the time that Gino Galestro was in prison, would

19   Mike Maggio visit him?

20   A    Yes.

21   Q    Often?

22   A    Every Monday.

23   Q    Why?

24   A    To let him know what was going on with us on the street.

25   Q    Did you ever have to pay him, Gino Galestro, regular

J. Tufarelli - Direct/Chan

1    payments?

2    A      Yes.

3    Q      What kind of regular payments?

4    A      Commissary.

5    Q      We already talked about that.

6           Anything else?

7    A      No.

8    Q      How about during the holidays?

9    A      Yes, during the holidays we gave him Christmas money.

10   Q      Is that called tribute?

11   A      Yes.

12   Q      As part of your association with organized crime, what

13   was some of the crimes that you committed?

14   A      Loansharking, extortion, shootings, arsons, robbery.

15   Q      Let's start with robbery.

16          Was there a robbery that you did with Gino Galestro's

17   approval?

18   A      Yes.

19   Q      What robbery was that?

20   A      We robbed money from a delivery truck driver at Eagle

21   Cheese.

22   Q      What is Eagle Cheese?

23   A      An Italian deli.

24   Q      Where?

25   A      Brooklyn.

J. Tufarelli - Direct/Chan

1    Q    When did you do this?

2    A    Late '03.

3    Q    Who took part in the actual robbery?

4    A    Me, Mike Maggio and Tommy Carbone.

5    Q    How did the robbery happen?

6    A    We parked out front waiting for the delivery truck

7    driver to come.  Once he came, we went inside.  Tommy Carbone

8    got out of the truck and got into his truck on the

9    passenger's side.  The guy came back out, got his stuff out

10   of the back and delivered it to the store.  Tommy was still

11   in the truck.  When he had came out and got back in, Tommy

12   had got up and told him to get down and give him the money.

13   Q    How much money was there?

14   A    About 25-, $30,000.

15   Q    In cash?

16   A    Yes.

17   Q    How did you know there was going to be 25- to $30,000 in

18   cash with that delivery driver?

19   A    The owner of the store set it up for us.

20   Q    The owner of Eagle Cheese?

21   A    Yes.

22   Q    Who was that?

23   A    Margaret -- no, Millie.

24   Q    Do you know her last name?

25   A    No.

J. Tufarelli - Direct/Chan

1   Q    Of that 25- to 30,000, how was that split up?

2   A    I got 2500, Tommy Carbone got 15, Mike Maggio took his

3   end, and then brought some over to Gino's house.

4   Q    That woman who helped set up the robbery, did she have a

5   daughter?

6   A    Yes.

7   Q    What was her name?

8   A    Margaret.

9   Q    Showing you what is in evidence as Government's Exhibit

10  29.

11  A    That's Margaret.

12  Q    Did she have a relationship to Mike Maggio?

13  A    Yes.

14  Q    What was that?

15  A    They were engaged.

16  Q    Was he also separately married?

17  A    Yes.

18  Q    Did Margaret buy anything for Mike Maggio?

19  A    Yes.

20  Q    What is that?

21  A    A truck.

22  Q    What kind of truck?

23  A    A Cadillac Escalade.

24  Q    What color?

25  A    Pearl white.

J. Tufarelli - Direct/Chan

1   Q    Did Mike Maggio have any other women besides Margaret?

2   A    Yes.

3   Q    Who is that?

4   A    He had a girl named Maria, and a girl named Angela.

5   Q    Who is in Government's Exhibit 28?

6   A    That's Maria.

7   Q    And Government's Exhibit 32?

8   A    Angela.

9   Q    Did they buy him anything?

10  A    Yes.

11  Q    What?

12  A    Maria had gotten him a cell phone, and Angela had gotten

13  him a cell phone and a car.

14  Q    What kind of car?

15  A    Chrysler 300.

16  Q    Color?

17  A    Black.

18  Q    What did Angela live?

19  A    Catskills.

20  Q    You also mentioned that you were involved in

21  loansharking.

22       What is loansharking?

23  A    Loansharking is where I lend you money and you pay me a

24  vig on it.

25  Q    What is a vig?

```
 1   A     A vig is basically like a point system.  If I give you a
 2   thousand dollars, I charge you five points, which would be
 3   $50 a week until you pay me back the thousand.
 4   Q     And what happens if someone doesn't pay you back?
 5   A     Could result in injuries.
 6   Q     Did you ever have to use threats or violence to pay back
 7   loans?
 8   A     Yes.
 9   Q     Did anybody provide you with money to make your
10   loansharking loans?
11   A     Yes.
12   Q     Who was that?
13   A     Mike Maggio and Gino Galestro.
14   Q     Did you ever commit any crimes personally for Gino
15   Galestro?
16   A     Yes.
17   Q     What crimes did he personally ask you to do?
18   A     Personally asked me to do was I got them through Mike.
19   Q     What was that?
20   A     Breaking windows on a car, burning the car and shooting
21   up a pizzeria.
22   Q     Starting with the shooting of the pizzeria.
23         What were you asked to do?
24   A     Mike came over to me and told me about a situation with
25   a guy in a pizzeria.  He told me to shoot up the place to
```

J. Tufarelli - Direct/Chan

```
1   send him a message.

2   Q    Did you do it?

3   A    Yes.

4   Q    Did you do it with anyone else?

5   A    Yes.

6   Q    Who?

7   A    Daryl Rosenblatt.

8   Q    What time of day did you do this?

9   A    Two in the morning.

10  Q    Where was the pizza place?

11  A    Staten Island, off of Amboy Road.

12  Q    Was there anyone in the restaurant when you did this?

13  A    No.

14  Q    You mentioned breaking windows.

15       What were you asked to do?

16  A    Break these windows on a car, which is his neighbor's

17  from his house because he said he had a situation with the

18  guy.

19  Q    Who had a situation with the guy?

20  A    Gino Galestro.

21  Q    Where did that guy live?

22  A    Their backyards met in the development.

23  Q    So what were you asked to do to Gino Galestro's

24  neighbor?

25  A    Break the windows in his car.
```

J. Tufarelli - Direct/Chan

1   Q    Did you do it?

2   A    Yes.

3   Q    Who did you do it with?

4   A    I did it with Joe Lamattina and Greg Wildchuck.

5   Q    What did you do to the car?

6   A    We broke the windows and slashed the tires.

7   Q    Was anyone in the car?

8   A    No.

9   Q    Where was the car in relation to the neighbor's house?

10  A    In front of the house.

11  Q    Did you do anything more to that neighbor?

12  A    Yes.

13  Q    What did you do?

14  A    Then we had burned one of his cars in front of his

15  house.

16  Q    The same day?

17  A    No.

18  Q    When?

19  A    A couple of months down the line.

20  Q    Who did you burn that car with?

21  A    Joe Lamattina and Joe Ferrara.

22  Q    When you burned that neighbor's car, where was it?

23  A    In front of his house.

24  Q    Did you ever help Gino Galestro extort money from

25  somebody?

J. Tufarelli - Direct/Chan

1    A    Yes.

2    Q    What did you do?

3    A    The collected the payments.

4    Q    From whom?

5    A    Joe Ferrara.

6    Q    Joe Ferrara in Government's Exhibit 5?

7    A    Yes.

8    Q    Tell us what happened that caused him to owe money to

9    Gino Galestro?

10   A    There was an insurance job that we were asked to do, and

11   I wound up giving it to Joe Ferrara to where he had to burn a

12   truck.

13        He had taken a truck that night, and I got a call the

14   following morning from Joe Ferrara that the truck was left on

15   the street, the cops found it, and he didn't get a chance to

16   burn it.

17        So then Mike Maggio picked me and Joe Ferrara up.  We

18   went to meet Gino Galestro.  He was talking to Joe Ferrara

19   telling him that if these people get in trouble, if they find

20   out it was an inside job, that his mother would be paying for

21   a funeral.

22   Q    Whose mother would be paying for what funeral?

23   A    Joe Ferrara's.

24   Q    What else did Gino Galestro say to Joe Ferrara?

25   A    Depending on the damages and what was left of the truck,

J. Tufarelli - Direct/Chan

1  he was going to have to pay him.

2  Q    How much?

3  A    Well, at the end, maybe a week or two down the line,

4  Gino Galestro called him.  They met.  He told him he had to

5  give him $10,000.

6  Q    Did he do that?

7  A    Yes.

8  Q    Did you help collect some of those payments?

9  A    Yes.

10  Q    Robert McKelvey, Government Exhibit 10.

11       Did you know what crimes he was involved in for the

12  crew?

13  A    Assault.

14  Q    Who did he assault?

15  A    Nicky Lanza.

16  Q    Government's Exhibit 23?

17  A    Yes.

18  Q    The guy whose crew you used to be in?

19  A    Right.

20  Q    How did you know that he -- that Robert McKelvey

21  assaulted him?

22  A    Mike had told me, and then Bobby had told me, also.

23  Q    Did you know in advance that that assault was going to

24  happen?

25  A    Yes.

J. Tufarelli - Direct/Chan

1    Q    How did you know that?

2    A    I was asked to get people to do it.

3    Q    By whom?

4    A    By Mike Maggio.

5    Q    Did you do that?

6    A    Yes.

7    Q    Who did you get?

8    A    I asked Daryl Rosenblatt and Jayson MacConnell.

9    Q    Did they do it?

10   A    No.

11   Q    What happened?

12   A    I told Mike that I was iffy about them doing it and I

13   would look around for other people.

14   Q    In the meantime, did the assaults occur?

15   A    Yes.

16   Q    So, how did you learn that Robert McKelvey was the one

17   who did the assault?

18   A    They had told me, Mike Maggio and Robert.

19   Q    The day of the assault, did you go to the crime scene?

20   A    Yes.

21   Q    Why did you go there?

22   A    I got a call from Joe Lamattina telling me Nicky got

23   beat up.  I went to the house.  When I got out of the truck,

24   I walked to the front of the house and there was blood all

25   over the floor and the front of his car was broken up.

J. Tufarelli - Direct/Chan

1    Q    How badly was Nicky Lanza hurt?

2    A    Pretty bad.

3    Q    Afterwards, did you speak to Mike Maggio?

4    A    Yes.

5    Q    What did he tell you?

6    A    He sent me over to Margaret's house to find out his

7    condition in the hospital, because she worked there.

8    Q    Who was Margaret?

9    A    Mike Maggio's fiancee.

10   Q    Which hospital did she work at?

11   A    I'm not too sure the name of the hospital.  I know it

12   was the one closest to the bridge in Staten Island.  There's

13   two of them.

14   Q    Did you talk to her?

15   A    Yes.

16   Q    What did she tell you?

17   A    She told me he was in ICU right now waiting to go into

18   surgery.

19   Q    What did Mike tell you how Robert McKelvey ended up

20   doing the beating?

21   A    Why did he do it?

22   Q    How he ended up doing it?

23   A    He asked him to.

24   Q    Who asked him to?

25   A    Mike Maggio.

J. Tufarelli - Direct/Chan

1    Q    Did Mike explain to you how it happened?

2    A    Yes.

3    Q    What did he say?

4    A    He said that a guy Frankie went and knocked on the door,

5    had a bat on the side of the door, and asked Nicky if he

6    could see his car, because he had a for sale sign on it.

7    Nicky went back inside to get the keys.  When he came out, he

8    passed him and Frankie started hitting him over the head with

9    the bat.

10   Q    Where was Robert McKelvey?

11   A    He was the driver.

12   Q    What was the relationship between McKelvey and this guy

13   Frankie?

14   A    They lived together.  They were friends.

15   Q    When you spoke to Mike Maggio, did he tell you why this

16   was done?

17   A    Yes.

18   Q    What did he say?

19   A    Over the situation that happened in the parking lot

20   where the Joe '83 Guyana of why he switched over to the

21   Bonannos.

22   Q    Did he tell you what the goal of the assault was?

23   A    To chase him out of Staten Island.

24   Q    Did he speak to you about Gino Galestro?

25   A    Yes.

J. Tufarelli - Direct/Chan

1    Q     What did he say?

2    A     That he ran it by him and it was okay.

3    Q     After Nicky Lanza was beaten up, did anything more

4    happen to him?

5    A     Yes.

6    Q     What happened?

7    A     They fire bombed his house.

8    Q     Who is they?

9    A     The first time was Bobby and Frankie.

10   Q     What happened the first time?

11   A     One of them went down the driveway and one of them hit

12   the back of his car.

13   Q     Did it work?

14   A     No.

15   Q     When you say one of them, what does that mean?

16   A     A fire bomb.

17   Q     In your experience, what is the typical way to make a

18   fire bomb?

19   A     Get a glass bottle with gas in it with a rag and light

20   the rag on fire.

21   Q     You said there was more than one arson?

22   A     Yes.

23   Q     What happened the next time?

24   A     The second time they hit the front of the house and

25   caught the front of the house on fire.

J. Tufarelli - Direct/Chan

1   Q     Who is they?

2   A     A guy Jack.

3   Q     Do you know Jack's nickname?

4   A     No.  I knew they called him "Jack the Plumber" .

5   Q     What ultimately happened to Nicky Lanza after those

6   arsons?

7   A     He wound up moving out of Staten Island.

8   Q     When you met Robert McKelvey, who introduced you?

9   A     To Robert?

10  Q     Yes?

11  A     Mike Maggio.

12  Q     Did he tell you how Mike Maggio had met Robert McKelvey?

13  A     Yes, Gino gave it to him.

14  Q     What does that mean to give it to him?

15  A     For him to hang around with him.

16  Q     What was Robert McKelvey's personality like?

17  A     Obnoxious.

18  Q     Did he talk?

19  A     Yes, he would talk a lot when he wasn't really supposed

20  to.

21  Q     About what?

22  A     Just in general about crimes, people in the crew.

23  Q     Had you been to Robert McKelvey's house?

24  A     Yes.

25  Q     Where was his house?

J. Tufarelli - Direct/Chan

1    A    Somewhere off of Hylan Boulevard in Staten Island.

2    Q    Did he have any dogs?

3    A    Yes.

4    Q    What kind of dogs?

5    A    It was in-between a pit bull and a boxer.

6    Q    At some point did you stop seeing Robert McKelvey

7    around?

8    A    Yes.

9    Q    Approximately when was that?

10   A    I'm not too sure of the time.

11   Q    Did anyone say anything about Robert McKelvey not being

12   around anymore?

13   A    Mike Maggio, when I asked him where Bobby was, he told

14   me he was gone.

15   Q    Did you have anything to do with that murder?

16   A    No.

17   Q    Did Gino Galestro's crew have any particular hangouts?

18   A    Yes.

19   Q    Where?

20   A    Fresca's on the Bay, Bistro, Hips.

21   Q    What is Hips?

22   A    A topless place.

23   Q    And Fresca's on the Bay, what was that?

24   A    A restaurant.

25   Q    Who owned that restaurant?

J. Tufarelli - Direct/Chan

1   A      Frank Fresca.

2   Q      Showing you what is in evidence as Government's Exhibit

3   19.

4          Who is that?

5   A      Frank Fresca.

6   Q      Did Frank Fresca have a relationship to anyone in the

7   crew?

8   A      Mike Maggio.

9   Q      What?

10  A      Cousins.

11  Q      Did anyone in the crew work at Fresca's?

12  A      Yes.

13  Q      Who is that?

14  A      Daryl Rosenblatt and Joseph Young.

15  Q      What did those two do at Fresca's?

16  A      Security.

17  Q      What year did you first meet Joseph Young?

18  A      Anywhere between late '05 and mid -- '04, '05.

19  Q      Who introduced you to him?

20  A      Mike Maggio.

21  Q      Did Joseph Young call him by any name?

22  A      Yes.

23  Q      What?

24  A      Chief.

25  Q      Did you talk to Joseph Young about what he did before

J. Tufarelli - Direct/Chan

1   working at Fresca's?

2   A     Yes.

3   Q     What?

4   A     He said he was in the Marines, a fireman, and that's

5   basically it.

6   Q     Had you been to his house?

7   A     Yes.

8   Q     How many houses?

9   A     Two.

10  Q     Which house?

11  A     The first one where I first met him was a house off

12  Arthur Kill Road, the Mansion.

13  Q     Then after that?

14  A     Another house off Amboy Road.

15  Q     The house -- the Mansion, did the defendant tell you

16  what he did there?

17  A     Yeah.  He was the grounds keeper.

18  Q     What kind of car did you last know Joseph Young to

19  drive?

20  A     A BMW.

21  Q     What kind of plates?

22  A     Pennsylvania.

23  Q     What color?

24  A     Blue.

25  Q     When is the last time you saw him with that car?

J. Tufarelli - Direct/Chan

1    A    Until around '06.

2    Q    '06?

3    A    Yes.

4    Q    Did you ever ask him to borrow his car?

5    A    Yes.

6    Q    What did he say?

7    A    Yes, but it was stolen.

8    Q    Those were his words?

9    A    Yes.

10    Q    What did you say?

11    A    I said that's okay, I'll still take it.

12    Q    Do you know if the defendant sold anything to John the

13    Turk?

14    A    Yes.

15    Q    What?

16    A    I was told a 9mm gun and a bulletproof vest.

17    Q    Who told you that?

18    A    The 9mm gun, John told me; and the bulletproof vest, I

19    was present for.

20    Q    Had you seen that 9mm gun before?

21    A    Yes.

22    Q    Where?

23    A    I seen it actually at his house when he shot it in his

24    basement, and then in Brooklyn, he had it with him when we

25    went to meet Mike Maggio's brother Tommy.

J. Tufarelli - Direct/Chan

1    Q     Let me stop you there.

2          Besides the 9mm, did you see any other guns?

3    A     Yes.

4    Q     What gun?

5    A      .380, he told me.

6    Q     Did he tell you where he got his guns?

7    A     Yes.

8    Q     Where?

9    A     Pennsylvania.

10   Q     Did he tell you if he altered the guns in any way?

11   A     Yes.  He had showed me that he had filed the numbers off

12   of one of them.

13   Q     What numbers?

14   A     I guess the registration numbers for the gun.

15   Q     Were you ever involved in a shooting with the defendant?

16   A     Yes.

17   Q     Where?

18   A     In Staten Island.

19   Q     When?

20   A     Say late '05.

21   Q     Now, was the shooting in response to something before

22   that?

23   A     Yes.

24   Q     What happened before the shooting?

25   A     Franks Fresca got beat up.

J. Tufarelli - Direct/Chan

1   Q     Who did he get beat up by?

2   A     I'm not sure.  A couple of guys came in the place to

3   beat him up.

4   Q     When is first time you learned he had gotten beat up?

5   A     I got a call around 11:30, 12:00 at night.  Stefan

6   Cicale told me.

7   Q     What did you do?

8   A     I didn't do anything.  I stayed in my house.  Mike was

9   going to get back to me.  Mike called and said leave your

10  phone on, we'll see what we'll do.  I just shut the phone off

11  figuring we were going to deal with it in the morning.

12  Q     Was there something said about it in the morning?

13  A     He said, once we find out what is going on, we'll

14  retaliate.

15  Q     Were you told what the reason for this assault was?

16  A     Yes.

17  Q     What was the reason?

18  A     He was dating this guy's wife.

19  Q     Was there a plan from him as to how to retaliate?

20  A     At the time, no, but then we got one together.

21  Q     What was that plan?

22  A     I called down to Fresca's.  We were going to burn the

23  cars in front of the guy's house.  But then I had told them,

24  if they came in the place with guns, we should go back with

25  guns.  I went to my house and I got my gun.  When I got back,

J. Tufarelli - Direct/Chan

1   Mike Maggio told me to give it to Joe Young.

2   Q    Why did Mike say that he wanted it to be given to Joe

3   Young?

4   A    Because he was a professional shooter in the military.

5        THE COURT:  Ladies and gentlemen, I believe I gave you

6   an instruction about this particular testimony.  This is not

7   a crime that is charged against the defendant.  The only

8   purpose of allowing you to hear the evidence is for you to

9   weigh it in making a determination regarding the existence of

10  an enterprise and the defendant's association with the

11  enterprise.

12       MR. CHAN:  Thank you, your Honor.

13  BY MR. CHAN:

14  Q    After you brought the gun back from your house -- what

15  kind of gun was it, by the way?

16  A    A .380.

17  Q    After you brought the gun back, did you guys go

18  somewhere?

19  A    After I brought -- after the incident?

20  Q    No, after you brought the gun from your house to Fresca,

21  did you go somewhere?

22  A    Yes.

23  Q    Where?

24  A    We went to the guy's house that beat up Frank.

25  Q    Who knew where that guy lived?

J. Tufarelli - Direct/Chan

1    A     Ron Escobar.

2    Q     Who was it that went together to do the shooting?

3    A     It was me, Jose Garcia and Joe Young in Jose Garcia's

4    car, and Mike Maggio, Stefan Cicale, Ronnie Escobar in a

5    truck.

6    Q     Tell us what was going on?

7    A     Driving to the house following Mike Maggio, as we passed

8    the house, they pointed at it.  About a block and a half they

9    told us that that was the house.  As we turned around and

10   started coming back down, driving down towards the house, Joe

11   Young had rolled down the back window on the passenger's side

12   and started shooting at the house about four or five times.

13   Q     What part of the house?

14   A     The side.

15   Q     What part of the house faced the street?

16   A     The side of the house.

17   Q     What time did the shooting happen?

18   A     Maybe about one o'clock in the morning.

19   Q     Do you know if anybody was home?

20   A     No.

21   Q     You don't know or?

22   A      -- no, I don't know if anybody was home.

23   Q     Did you care?

24   A     No.

25   Q     What happened after the shooting?

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1  A    They had drove me back to my house.  I dropped the gun

2  off.  Then they dropped me back off at Fresca's to get my

3  truck and I had went home.

4  Q    After the shooting, did you learn there had been a

5  mistake?

6  A    Well, I heard on the street that people were saying it

7  was the wrong house.

8  Q    Following the shooting, were any precautions taken for

9  the crew?

10  A    Yes.

11  Q    What happened?

12  A    We stood around at the restaurant a lot with guns, and

13  Frank Fresca had hired a retired cop to stay around, which is

14  a friend of his.

15  Q    Turning your attention now to the spring of 2005.

16       Did you ever hear the defendant discuss an assault?

17  A    Yes.

18  Q    What did you hear him say?

19  A    That he had went into a body shop with Jose Garcia and

20  beat one of the guys down with a pipe.

21  Q    Which guy?

22  A    One of the workers.

23  Q    What was the name of that body shop?

24  A    Dunrite.

25  Q    Do you know if anything happened to at Dunrite after the

J. Tufarelli - Direct/Chan

1    assault?

2    A    They had moved.

3    Q    Who moved?

4    A    Dunrite, the body shop.

5    Q    Did anyone move into that spot?

6    A    Yes.

7    Q    Who?

8    A    I'm not too sure of the name, but it was a transmission

9    shop friend of Mike Maggio and Gino Galestro.

10        MR. CHAN:  Your Honor, may I approach?

11        THE COURT:  Yes.

12   Q    Showing you what is marked as Government's Exhibits 16

13   and 17.

14        Do you recognize these people?

15   A    Yes.

16   Q    Who is in 16?

17   A    He's the guy that runs the transmission shop.

18   Q    And 17?

19   A    I recognize him from the Post, and he's partners with

20   him in the transmission shop.

21        MR. CHAN:  I offer 16 and 17.

22        THE COURT:  Admitted.

23        (Whereupon, Government's Exhibits 16 and 17 were

24   received and marked into evidence, as of this date.)

25   BY MR. CHAN:

544

J. Tufarelli - Direct/Chan

1    Q    Again, who is in 16?

2    A    The worker -- the owner of the transmission shop.

3    Q    That moved into the Dunrite space?

4    A    Yes.

5    Q    After the assault?

6    A    Yes.

7    Q    What was his relationship to Gino Galestro?

8    A    His friend.

9    Q    Do you know if there was a financial relationship?

10   A    Yes.

11   Q    What?

12   A    Loansharking.

13   Q    How do you know that?

14   A    I collected a couple of times with Mike Maggio.

15   Q    From?

16   A    From that guy.

17   Q    Government's Exhibit 17, what was his relationship to

18   the new body shop?

19   A    He was owners with the other guy.

20   Q    Did he work anywhere else?

21   A    At the New York Post.

22   Q    As what?

23   A    As the driver.

24   Q    What was next to Dunrite?

25   A    Mike Maggio's body shop.

FREDERICK P. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1   Q     What was that called?

2   A     Sonny's Auto Body.

3   Q     Turning your attention now to late 2005.

4         Did you hear the defendant discuss something about a

5   message parlor?

6   A     Yes.

7   Q     What did he hear him say?

8   A     We were at Fresca's, me and Mike Maggio, and Joe Young

9   and Jose Garcia came.  We walked out front and they were

10  explaining to Mike that Joe Young's girlfriend had an inside

11  scoop on how to rob the place.

12  Q     What kind of place was it?

13  A     A massage parlor.

14  Q     Was it a normal massage parlor?

15  A     No, it was illegal.

16  Q     Where was this massage parlor?

17  A     In Jersey.

18  Q     Was that the only discussion you overheard?

19  A     No.

20  Q     What other times did you hear the defendant talking

21  about this massage parlor?

22  A     One time that they had went there, they were standing in

23  the alleyway of wherever this place was in Jersey, Joe Young

24  and Jose Garcia are about to go in and rob the place and a

25  car had passed them.  They had gotten spooked.  They thought

J. Tufarelli - Direct/Chan

1    they were seen and left.

2    Q    Who was telling you that?

3    A    Joe Young.

4    Q    Did you also --

5    A    He was telling Mike Maggio, and I was there.

6    Q    Where was the discussion?

7    A    I don't remember.

8    Q    Was there a third discussion?

9    A    Yes.

10   Q    When?

11   A    After the robbery, I was with Mike Maggio the next

12   morning when they went to go do it that night.  I was with

13   Mike.  They said they were supposed to call him, and they

14   wound up calling him sometime in the morning time.  They were

15   in a place called the Golden Gate in Brooklyn, a hotel,

16   saying they got it done and will talk to him when he gets

17   back.

18        They came in Staten Island and met Mike.  When Mike got

19   back in the car, they told him they only got $1500 from the

20   robbery.

21   Q    What was Mike Maggio's reaction with that?

22   A    He was aggravated.

23   Q    What did he say?

24   A    He couldn't understand why there was only $1500 there.

25   Q    During any of the times that you heard the defendant

J. Tufarelli - Direct/Chan

1    discussing this robbery, did anyone say anything about

2    whether or not they were armed?

3    A    Yes.

4    Q    Who said what?

5    A    Joe Young.

6    Q    What did he say?

7    A    He said he had a gun.

8    Q    Does you speak to the defendant in more detail about how

9    the actual robbery occurred?

10   A    Yes.

11   Q    What did he say?

12   A    Later on down the line we would just sit around, hanging

13   around Fresca, and a conversation came up that basically his

14   girlfriend gave him the inside scoop of where the money box

15   was going to be, where cameras were, and around how many

16   people were in there.  They sent in, took the control of the

17   situation, people on the floor, covering the cameras, and

18   knew where the money box was.

19   Q    Where was that money box?

20   A    Behind like a counter, on the floor.

21   Q    Did he tell you if anyone was armed?

22   A    He was.

23   Q    What was his girlfriend's relationship to the massage

24   parlor?

25   A    She worked there.

J. Tufarelli - Direct/Chan

1   Q    Showing you Government's Exhibit 27 that is in evidence.

2        Do you recognize that person?

3   A    Yes.

4   Q    Do you know that person's name?

5   A    No.

6   Q    Did you ever help try to collect money from that person?

7   A    Yes.

8   Q    Where?

9   A    In Long Island.

10  Q    Where in Long Island?

11  A    I'm not too sure where.  It was in a pizzeria.

12  Q    Do you know the name of the pizzeria?

13  A    No.

14  Q    Approximately when does this happen?

15  A    Sometime in '05.

16  Q    What kind of money did this person owe?

17  A    I'm not too sure of the amount.

18  Q    Prior to you going to collect money from this person,

19       had you met him before?

20  A    Yes.

21  Q    Where?

22  A    At his wedding.

23  Q    Who was there with you at his wedding?

24  A    Me and Mike Maggio.

25  Q    Who was it that got you involved in collecting money

J. Tufarelli - Direct/Chan

1    from this person?

2    A    Mike Maggio.

3    Q    What did he do?

4    A    He had called me up and told me to get a couple of guys

5    together, we had a situation in Long Island.

6    Q    Did you do that?

7    A    Yes.

8    Q    Who did you get?

9    A    Daryl Rosenblatt and Jayson MacConnell.

10   Q    Did you meet up with Mike Maggio?

11   A    Yes.

12   Q    Were there other people who met up?

13   A    Yes.

14   Q    Who?

15   A    Me, Daryl Rosenblatt, John Mergen, Jayson MacConnell,

16   Mike Maggio, Stefan Cicale, Jose Garcia, and Joe Young.

17   Q    How did all of you get there?

18   A    We drove.

19   Q    How many cars?

20   A    Two separate cars.

21   Q    Which cars?

22   A    We drove down in the Cadillac Escalade and John

23   Mergens's infinity.

24   Q    Who was in the cars?

25   A    It was me, Daryl, Jayson MacConnell and John Mergen in

J. Tufarelli - Direct/Chan

1   the truck, and Jose Garcia, Stefan, Mike and Joe Young in

2   John's car.

3   Q     Did anyone have a gun that night?

4   A     Yes.

5   Q     Who?

6   A     Joe Young.

7   Q     How do you know that?

8   A     They had told me.

9   Q     Who is they?

10  A     Mike Maggio and Joe.

11  Q     Did anything happen to the cars on the drive over?

12  A     Yes.  We had got pulled over.

13  Q     By who?

14  A     Highway patrol.

15  Q     For what?

16  A     Our taillight.

17  Q     Anything more happen than that?

18  A     No.

19  Q     Did the police let you go?

20  A     Yes.

21  Q     Did you continue on your way?

22  A     Yes.

23  Q     What happened when you arrived at the place?

24  A     We got there, sat down, and we ate waiting for this guy

25  to show up.

J. Tufarelli - Direct/Chan

1    Q      Did he?

2    A      Yes.

3    Q      What happened when he arrived?

4    A      He sat down at a table next to us with Mike Maggio and

5    another guy.

6    Q      How long did they talk?

7    A      They spoke for about 20 minutes.

8    Q      Then?

9    A      Then they had gotten up, where Mike Maggio, that guy and

10   Joe Young walked to the back, and I was told to stand in the

11   hallway by the back door with Stefan Cicale.

12   Q      To do what?

13   A      To make sure if he came out that he wouldn't runaround.

14   Q      How long did you guard the back?

15   A      About 25 minutes, half-hour.

16   Q      Then what happened?

17   A      Well, they had went to the back, Joe Young and Mike

18   Maggio with that guy to discuss the money situation.  When

19   they had came out, Mike Maggio told me they had put a gun in

20   his mouth to threaten him.

21   Q      What happened after that?

22   A      The guy wound up leaving.

23   Q      Do you know if he ended up paying his debt?

24   A      No, I'm not sure.

25   Q      Now, that same place where this money collection

J. Tufarelli - Direct/Chan

1  happened, do you know if anyone tried to rob it?

2  A   Yes.

3  Q   Who?

4  A   Daryl Rosenblatt and Joe Young.

5  Q   How do you know that?

6  A   Mike Maggio had told me and Daryl.

7  Q   What did they tell you?  What did Mike tell you,

8  firstly?

9  A   Mike told me that they were looking to rob this place.

10  So he had told me he sent Joe Young and Daryl.

11  Q   Did you speak to Daryl, too?

12  A   The following morning I went to Daryl's house and he

13  explained to me what happened.

14  Q   What did Daryl say?

15  A   He was told to meet them at Fresca's.  He met them there

16  and left with Joe Young to go to Long Island to rob the guy.

17  When they had got there, they were waiting in the parking

18  lot.  There was a security guard running the parking lot and

19  it just didn't happen.  The timing was not right, is what he

20  told me when he came back.

21  Q   Did Daryl say anything about a weapon?

22  A   I'm not too sure.

23  Q   Now, after Daryl told you that, did you do anything

24  about this robbery?

25  A   Yes.

J. Tufarelli - Direct/Chan

1    Q      What did you do?

2    A      I took Daryl off the robbery and I put Jayson MacConnell

3    on with Joe Young.

4    Q      Do you know if Jayson MacConnell and Joe Young did

5    anything?

6    A      Yes.  They had went down there.

7    Q      How do you know that?

8    A      Jayson had told me Joe Young picked him up at his house

9    and they had drove down there.  They wound up getting down

10   there late, they said, because of the rain, and I think they

11   had just missed the guy, the timing to get him on the street.

12   They wound up following him to his house, and it didn't go

13   down either.

14   Q      Did Jayson McKelvey tell you if anyone was armed?

15   A      Jayson said he had a gun and also Joe Young.

16   Q      Do you know if anybody did surveillance?

17   A      I'm not too sure.  I know he told me about surveillance,

18   that Joe Young had a laptop with all escape routes how to get

19   out of there after the robbery.

20   Q      Who told you that?

21   A      Jayson MacConnell.

22   Q      Did you know if that robbery actually happened?

23   A      I'm not sure.

24   Q      Turning your attention now to January of 2006.

25          Do you know if the defendant was involved in an arson at

J. Tufarelli - Direct/Chan

1    that time?

2    A    Yes.

3    Q    Where?

4    A    Somewhere off of Hylan Boulevard in Staten Island.

5    Q    Whose house was it?

6    A    It was -- I'm not too sure who the guy was, but it was a

7    situation between a guy that had spoken to Mike, that Mike --

8    guy John had a problem with and Mike took on the job to

9    handle this guy.

10   Q    Showing you what is marked for identification as

11   Government's Exhibit 18.

12        May I approach, your Honor?

13        THE COURT:  Yes?

14   Q    Who is in Government's Exhibit 18?

15   A    John.

16        MR. CHAN:  I offer it.

17        THE COURT:  Admitted.

18        (Whereupon, Government's Exhibit 18 was received and

19   marked into evidence, as of this date.)

20   BY MR. CHAN:

21   Q    Do you know John's last name?

22   A    No.

23   Q    How is it that you came to meet John?

24   A    He's Daryl Rosenblatt's boss.

25   Q    What kind of company?

J. Tufarelli - Direct/Chan

```
 1   A      Like a painting and construction company.

 2   Q      Do you know the name of it?

 3   A      Brush Strokes.

 4   Q      How is it that you ended up meeting John?

 5   A      How we met John was, one night in a restaurant we had

 6   got a phone call from Daryl to come and meet him over a

 7   situation he had with a guy.  I'm not too sure if he stole

 8   money from him or jewelry.

 9   Q      Who had this situation?

10   A      That guy John.

11   Q      With whom?

12   A      I'm not too sure of the guy's name, but the guy who got

13   burned --

14          MR. SOLOWAY:  Objection.  Whose "we" that got a phone

15   call?

16          MR. CHAN:  I will clarify.

17   Q      Who got the phone call?

18   A      I got a phone call from Daryl for me and Mike Maggio to

19   meet him at a restaurant on Richmond Road.

20   Q      When you received this phone call, were you with Mike

21   Maggio?

22   A      Yes.

23   Q      Where were you together?

24   A      We were at a club called 2110.

25   Q      When you received this phone call, was this the first
```

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1   you ever heard of John?

2   A    I heard of him.  This is the first time I actually sat

3   down and talked to him.

4   Q    After the phone call, did you go meet him?

5   A    Yes.

6   Q    With who?

7   A    Mike Maggio.

8   Q    Where did you go to meet John?

9   A    An Italian restaurant off Richmond Road.

10  Q    On Staten Island?

11  A    Yes.

12  Q    What was going on in the restaurant when you got there?

13  A    They were having a Christmas party, him and his workers.

14  Q    What did you do when you arrived?

15  A    When we arrived, we parked the car, went in.  Daryl came

16  to the door.  We got introduced to John.  I sat down while

17  Mike Maggio and John discussed the situation.

18  Q    After Mike Maggio and John had their discussion, did you

19  meet up with Mike again?

20  A    We left together.

21  Q    Does you discuss things with Mike?

22  A    He basically told me what the guy John spoke to him

23  about.  That he had a guy that owed money.  The guy was a

24  drug addict, he robbed jewelry from this guy John's sister's

25  house and he wanted something done.

J. Tufarelli - Direct/Chan

1    Q    Let's take that one step at a time.

2         What was John's problem with this other guy?

3    A    What was John's problem with the guy?

4    Q    Whose house was burned, yes?

5    A    From what I was told from Mike, they had a problem with

6    -- he either stole money from him or stole jewelry out of his

7    sister's house, there was an incident with his family.

8    Q    Where did the sister live?

9    A    I'm not too sure.

10   Q    How far in advance of the arson was this meeting with

11   John?

12   A    Say about maybe five months.

13   Q    During that conversation you had with Mike, after the

14   meeting with John, did he talk to you about money?

15   A    Yes, that he was going to pay him for it.

16   Q    Who was going to pay who?

17   A    The guy John was going to pay for whatever they

18   discussed, was going to get done.

19   Q    Done to who?

20   A    To the guy, I don't know his name.

21   Q    Do you know if money actually changed hands?

22   A    Yes.

23   Q    How?

24   A    Daryl had dropped of a thousand dollars to Mike Maggio

25   at a Dunkin' Donuts on Hylan Boulevard.

FREDERICK P. GUERINO, C.S.R.      OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1    Q     Was this thousand dollars full payment or partial

2    payment?

3    A     Partial payment.  He was also doing work at his house.

4    Q     Who was doing work at whose house?

5    A     The guy John was doing work at Mike's house as a

6    payment.

7    Q     Did Mike Maggio agree to do something to this kid?

8    A     Yes.

9    Q     What did he agree to do?

10   A     I wasn't too sure what they agreed to do, what the

11   financial result was, but it was burning the house.

12   Q     Were there discussions on what to do, before burning the

13   house, to the kid?

14   A     They were supposed to beat him up.

15   Q     That changed?

16   A     That changed.

17   Q     How did you learn that the plan was to burn the house?

18   A     The day before I -- actually, that day I had seen Mike

19   Maggio at Margaret's house and he had asked me if I wanted to

20   burn a house.  I told him I don't know, I will get back to

21   him, and I had left.

22   Q     Does you get back to him?

23   A     No.

24   Q     In the interim, did something happen?

25   A     No.

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1    Q    How did you learn that the arson took place, then?

2    A    The following morning I had gotten a phone call from

3    Mike where Joe Young was getting locked up.

4    Q    What did Mike tell you?

5    A    He was on the way to Joe's house and seen all of the

6    commotion with the cops arresting him and he had left and he

7    drove off.

8    Q    Did Mike tell you where he had seen this commotion?

9    A    No.

10   Q    Did you speak to Mike again?

11   A    Yes.

12   Q    When?

13   A    Maybe half-hour later he had called me and told me he

14   was leaving and he would let me know where his car was going

15   to be.  Then he called me back later on that day and told me

16   he had left his car in the parking lot off of a highway in

17   Jersey and I had went there to pick it up.

18   Q    Did you go by yourself?

19   A    No, I went with Daryl Rosenblatt and Mike Maggio's wife.

20   Q    What kind of car was it that you had to go pick up?

21   A    A four-door Mercedes.

22   Q    Model?

23   A    CLS 55 AMG.

24   Q    Color?

25   A    Silver.

J. Tufarelli - Direct/Chan

1    Q    When Mike told you he had to leave, what did you

2    understand that to mean?

3    A    That he wanted to leave town before the cops arrested

4    him.

5    Q    Did you pick up that car?

6    A    Yes.

7    Q    What did you do with it?

8    A    I drove it back to his house.

9    Q    After you drove the car back to his house, what did you

10   do?

11   A    Picked up Daryl -- actually, I was with Daryl, and we

12   went to a place Hylan Plaza on Hylan Boulevard to meet his

13   boss John, to let him know and discuss what happened.

14   Q    What happened at that meeting with John and Daryl?

15   A    When he showed up, he found it funny.  He wasn't too

16   worried about the cops coming after him.  That he showed me

17   paperwork.  Every time he met with Mike was business only,

18   had all types of receipts.  So he wasn't too worried about

19   what would happen.

20   Q    When you say he found it funny, found what funny?

21   A    About the house being burned.

22   Q    Did John say anything else about the conversations that

23   he had with Mike?

24   A    No.

25   Q    Was he worried about the conversations he had with Mike?

J. Tufarelli - Direct/Chan

1    A    No.  He said he wasn't worried because he had showed me

2    all of the receipts and paperwork.  Anytime he met Mike was

3    just for business only.

4    Q    Who was the victim of the arson?

5    A    I'm not too sure.

6    Q    It was the kid that was talked about before?

7    A    Right.  I never met him.

8    Q    At that meeting, did John also talk to you about a

9    security video?

10   A    Yes.

11   Q    What did he say?

12   A    He said that the fire marshal had came to his house and

13   looked over his camera, and all they had seen was a shadow of

14   somebody walking somewhere.  So there wasn't really too much

15   to worry about.

16   Q    At some point did you see Mike Maggio again?

17   A    Yes.

18   Q    Where and when?

19   A    I had met him back at his house.  He had told me he had

20   spoken to the F.B.I., that he was going to turn himself in

21   that following morning.  And I had drove him to 26 Federal

22   Plaza and dropped him off.

23   Q    When he said that he was turning himself in, what did

24   you understand that to mean?

25   A    They told him that he was being charged with arson and

J. Tufarelli - Direct/Chan

1    another crime, so turning himself in would be turning himself

2    into the F.B.I. to face these charges.

3    Q    You drove him there?

4    A    Yes.

5    Q    During the meeting that you had with him before you

6    drove him to the F.B.I. to turn himself in, did he talk about

7    what happened during the arson?

8    A    Yes.

9    Q    What did he tell you?

10   A    He told me that it was him, Joe Young and John Mergen

11   had drove to Jersey to get the gas and came back to Staten

12   Island to do it.  Mike was like a block away in his car, and

13   it was John and Joe Young in John's truck.  John had parked

14   on the corner and Joe had walked down, poured the gas on the

15   house, and lit it on fire.

16   Q    Later on were you, yourself, arrested?

17   A    Yes.

18   Q    By who?

19   A    The F.B.I.

20   Q    When?

21   A    May 11, '06.

22   Q    On what charges?

23   A    Racketeering, loansharking, extortion, and robbery.

24   Q    Were you granted or denied bail?

25   A    Denied.

J. Tufarelli - Direct/Chan

```
 1   Q    Have you been in prison ever since?

 2   A    Yes.

 3   Q    Did you initially decide to fight your case?

 4   A    Yes.

 5   Q    Did you look over the discovery in your case?

 6   A    Not really, just one tape.

 7   Q    You listened to the tape?

 8   A    Yes.

 9   Q    Did you read any transcripts?

10   A    No.

11   Q    What did that tape have to do with?

12   A    Me and John Mergen talking about a kilo of cocaine.

13   Q    Did you attend court proceedings?

14   A    Yes.

15   Q    Was the defendant Joseph Young one of your codefendants?

16   A    Yes.

17   Q    During those court appearances, did the defendant ever

18   discuss the evidence against him?

19   A    Yes.

20   Q    What did he say?

21   A    Basically when we came down from a court hearing one

22   day, in the bus it was me, Joe Young, Stefan Cicale, Jose

23   Garcia, he turned to them to speak to them about the

24   evidence.  He says, don't worry about it too much because I

25   made believe I broke the furnace, so that is out of the
```

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Direct/Chan

1    house.

2    Q    Did he say anything about the assault?

3    A    The assault?  He said he turned around and told them,

4    don't worry about the assault, he wore a mask.

5    Q    Did you ultimately decide to proceed differently with

6    your case?

7    A    Yes.

8    Q    What did you decide to do?

9    A    Cooperate.

10   Q    As a result, did you have meetings with an Assistant

11   U.S. Attorney and F.B.I. agents?

12   A    Yes.

13   Q    Was your attorney present?

14   A    Yes.

15   Q    How many times did you meet before you pled guilty?

16   A    Quite a few times.

17   Q    What was discussed at these meetings?

18   A    Crimes that I had done and crimes that I had known

19   about.

20   Q    Did you admit to all of the crimes in your life?

21   A    Yes.

22   Q    Even the dismissed ones we talked about today?

23   A    Yes.

24   Q    You admit to crimes that you believe the government

25   didn't even know about?

J. Tufarelli - Direct/Chan

1    A    Yes.

2    Q    What did you plead guilty to?

3    A    RICO, extortion, arson, gun charge, robbery, and drugs.

4    Q    Before a federal judge in this district?

5    A    Yes.

6    Q    After you pled guilty, did you continue to meet with the

7    government?

8    A    Yes.

9    Q    Approximately how many times?

10   A    I'm not too sure.

11   Q    Many?

12   A    Yeah.

13   Q    At anytime during these meetings, were you shown

14   evidence from this trial?

15   A    No.

16   Q    Were you told who the other witnesses would be?

17   A    No.

18   Q    Since you pled guilty, have you spoken or met with

19   anyone on that board?

20   A    No.

21   Q    When you pled guilty, would you explain the maximum

22   penalties you face?

23   A    Yes.

24   Q    What is that?

25   A    Life.

J. Tufarelli - Direct/Chan

1   Q    What about the maximum fine?

2   A    $2 million.

3   Q    Would you be required to pay restitution to the victims

4   at the time of sentencing?

5   A    Yes.

6   Q    Did you plead guilty pursuant to a written agreement?

7   A    Yes.

8        MR. CHAN:  Your Honor, may I approach?

9        THE COURT:  Yes.

10  Q    Showing you what is marked as 3500-JT-6.

11       Do you recognize this document?

12  A    Yes.

13  Q    What is it?

14  A    Cooperation agreement.

15  Q    Yours?

16  A    Yes.

17       MR. CHAN:  Your Honor, I offer this.

18       THE COURT:  Admitted.

19       (Whereupon, Government's Exhibit 3500-JT-6 was

20  received and marked into evidence, as of this date.)

21       MR. CHAN:  Thank you.

22  BY MR. CHAN:

23  Q    What is your understanding of what your obligations are

24  under this agreement?

25  A    To tell them about all of the crimes that I had done

J. Tufarelli - Direct/Chan

1    that I know about and not to lie.

2    Q    And what will the government do for you if you honor

3    your obligations, according to your understanding?

4    A    Write me a 5K1 letter.

5    Q    What is a 5K1 letter?

6    A    A 5K1 letter is to the judge to let him know what I had

7    helped them with and also the crimes that I had done.

8    Q    All of the crimes in your life?

9    A    Yes.

10   Q    Is the letter important to you?

11   A    Yes.

12   Q    Why?

13   A    Hopefully it gets me out of prison.

14   Q    Is you getting a 5k1 letter depends on the success of

15   any trial you testify at?

16   A    No.

17   Q    Even if the government writes that letter for you, is

18   the judge required to give you a lesser sentence?

19   A    No.

20   Q    Who is it that will determine your sentence at the end?

21   A    The judge.

22   Q    What happens if you lie here today?

23   A    I wouldn't get a 5K1 letter.

24   Q    Can you withdraw your guilty plea?

25   A    No.

J. Tufarelli - Direct/Chan

1          MR. CHAN:  I have no further questions.

2          THE COURT:  Okay.  We'll take a very brief break,

3     ladies and gentlemen, and Dennis will get your orders for

4     lunch.

5          (The jury leaves the courtroom for a recess at 10:50

6     a.m.)

7          THE COURT:  Could I have a brief side bar.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR

1          (Side bar)

2          THE COURT:  About how long do you think you'll be?

3          MR. SOLOWAY:  I think probably between 30 and 45

4    minutes

5          THE COURT:  Okay.  Then we'll be able to go on to

6    other witnesses before the lunch break.

7          MR. CHAN:  Yes, we have other witnesses.

8          THE COURT:  That's fine.

9          When should we have the lunch break?

10         MR. SCHAEFFER:  Let's figure it out to get it right.

11         MR. DENNEHY:  I think one of the firemen are here.

12         MR. SCHAEFFER it is safe to do it at 12:30.

13         THE COURT:  12:30?

14         MR. SCHAEFFER:  Yes.

15         THE COURT:  Okay.

16         (Side bar ends)

17

18

19

20

21

22

23

24

25

1          (A recess is taken at this time.)

2          (Continued on the next page.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. Tufarelli - Cross/Soloway

1           (Judge Ross enters the courtroom at 11:05 a.m.)

2           THE COURT:  Are we ready?

3           (The witness, John Tufarelli, resumes the stand at

4    this time.)

5           (The jury enters the courtroom at 11:08 a.m.)

6           THE COURT:  Mr. Soloway.

7    CROSS-EXAMINATION

8    BY MR. SOLOWAY:

9    Q    Mr. Tufarelli, how old did you say you are?

10   A    Twenty-eight.

11   Q    You were born like 1980, 1981, something like that,

12   right?

13   A    '80.

14   Q    And you described on direct examination basically the

15   life of crime that you lead that started when you were in

16   your teens, right?

17   A    Right.

18   Q    And you said that there came a time in May 2006 that you

19   got arrested by the F.B.I., right?

20   A    Yes.

21   Q    Before that day you got arrested by the F.B.I., you were

22   living that same life of crime that you had been living since

23   you were a teenager, right?

24   A    Right.

25   Q    And it was sometime after you got arrested by the F.B.I.

J. Tufarelli - Cross/Soloway

1   that you entered into this agreement, this cooperation

2   agreement, that obligates you in a letter to tell the truth,

3   right?

4   A    I'm not too sure of the question.

5        What do you mean by obligates?

6   Q    An obligation is something that you are required to do.

7        I'm saying that when you got arrested, you said that you

8   met with the government a bunch of times, right?

9   A    Right.

10  Q    And that series of meetings resulted in a cooperation

11  agreement, right?

12  A    Right.

13  Q    And that cooperation agreement is in the form of a

14  letter, right?

15  A    Right.

16  Q    And it's a letter that you had an opportunity to see,

17  right?

18  A    No.

19  Q    You never saw --?

20  A    The day I pled guilty, yes.

21  Q    Okay.

22  A    But not while I was meeting with them.

23  Q    No, I'm talking about at the end.

24  A    Oh.

25  Q    When you actually got and entered into and signed your

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Cross/Soloway

1   cooperation agreement, you actually saw the agreement, right?

2   A    The day I pled guilty.

3   Q    Okay.

4        And you signed it, right?

5   A    Right.

6   Q    You don't have any doubt about that, right?

7   A    About signing it?

8   Q    Right.

9   A    No.

10  Q    And the government just put it into evidence, that was

11  the last thing that happened on your direct examination

12  before we just took a break, right?

13  A    Right.

14  Q    And the agreement that was signed by you was also signed

15  by the government, right?

16  A    Right.

17  Q    And that agreement obligates, it requires, it has

18  certain things in it that you are supposed to do and the

19  government is supposed to do, right?

20  A    Right.

21  Q    You know that, right?

22  A    Right.

23  Q    It is kind of like a contractor, an agreement, right?

24  A    Right.

25  Q    And you understand what I'm saying, right?

FREDERICK P. GUERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Cross/Soloway

1  A      Right yes.

2  Q      And you had an opportunity, I mean you are saying you

3  never saw it, actually saw the agreement, until the day that

4  you went into court and pled guilty, right?

5  A      Right.

6  Q      And you remember that day, right?

7  A      Yes.

8  Q      And you are saying that that is the day that you

9  actually signed the agreement, right?

10  A      Right.

11  Q      But you understand, basically, what you're supposed to

12  do and what the government is supposed to do, right?

13  A      Right.

14  Q      And you had an opportunity to discuss any questions

15  about that agreement before you signed it with your lawyer,

16  right?

17  A      What do you mean by discuss?  Discuss what?

18  Q      If you had any questions, something that you didn't

19  understand about what you were getting yourself into before

20  you pled guilty -- you had a lawyer, right?

21  A      Right.

22  Q      And did you have an opportunity, if go you wanted, to

23  discuss any questions or any doubts or anything about the

24  agreement that you were entering into with your lawyer?

25  A      Right.

J. Tufarelli - Cross/Soloway

1    Q     And do you feel like you had a basic understanding, when

2    you pled guilty, of what you were agreeing to do?

3    A     Right.

4    Q     You said on your direct that what you are agreeing to do

5    was to tell the truth, right?

6    A     Right.

7    Q     In the hope that you would get a sentence reduction from

8    the amount of time that you were facing in jail, right?

9    A     Right.

10   Q     Okay.

11         So after all of that, right, basically what I'm coming

12   back to asking you is that your understanding of what you've

13   agreed to do, what you've agreed to do in this written

14   agreement that you signed is to tell the truth, right?

15   A     Right.

16   Q     Now, this agreement also shows a decision that you've

17   made, right?  You made a decision to enter into this

18   agreement and to tell the truth, right?

19   A     Right.

20   Q     You thought about it, right, before you did it?

21   A     Right.

22   Q     And all of this stuff happened, that is, you thinking

23   about these things, sometime after you got arrested in May of

24   2006, right?

25   A     Right.

J. Tufarelli - Cross/Soloway

1    Q    Now, before you got arrested in May of 2006, you said

2    you were just living your life, right?

3    A    Right.

4    Q    That same old life, right?

5    A    Right.

6    Q    That you described.  And, by the way, you haven't told

7    us about all of the crimes that you committed in the hour or

8    hour and 15 minutes that you testified on direct, right?

9    A    Probably not every single one.

10   Q    You need more time, right?

11   A    Right.

12   Q    But you said you told the government in these meetings

13   that you had, you know, all of the crimes, you know, from the

14   beginning, you know, when you went and sat down and met with

15   the government, right?

16   A    Right.

17   Q    And that's with the prosecutors and F.B.I. agents,

18   right?

19   A    Yes.

20   Q    Now, you didn't wake up one day in 2005 or early 2006

21   and decide I'm going to go in, going to change my life, I'm

22   going to confess all of the crimes that I committed to the

23   F.B.I. or to the police right now without ever getting

24   arrested, that didn't happen, right?

25   A    No.

J. Tufarelli - Cross/Soloway

1  Q    What happened is that you made this agreement one day

2  after you found yourself in jail facing basically spending

3  maybe the rest of your life in jail, right?

4  A    Right.

5  Q    Now, the agreement that you entered into, you know, it

6  talks about all of the -- lists a whole bunch of crimes that

7  you committed, right?

8  A    Right.

9  Q    And says that, you know, part of the agreement is that,

10  you know, you will plead guilty to some of the things that

11  you did, and some of the things the government just won't

12  prosecute you for anymore, right?

13  A    Right.

14  Q    And some of the things that the government is not going

15  to prosecute you for anymore is the robbery of the delivery

16  driver at the Eagle Cheese robbery, right?

17  A    No.

18  Q    Did you plead guilty to that?

19  A    Yes.

20  Q    And your plea of guilty to that ends any -- you pled

21  guilty to that before the judge and that's the end of that

22  case, right, as far as you know?

23  A    No.

24  Q    Well, after you pled guilty on it and you get sentenced

25  on it, you will not be prosecuted for it anymore, right?

J. Tufarelli - Cross/Soloway

1    A    No.

2    Q    Is that no, that's not correct?

3    A    Well, once I plead guilty to it and prosecuted for it,

4    will I be charged with it again?

5    Q    Right?

6    A    I don't think so.

7    Q    That will be the end of it, right?

8    A    Right.

9    Q    This will be the end right here of all of the crime that

10   you have committed and all of the crimes that you have told

11   the government about, you will no longer be prosecuted for

12   those things, they will be over, and you will serve whatever

13   time you will have to serve and that will be the end of it,

14   right?

15   A    Right.

16   Q    Now, you said that there came a time that you

17   participated in this retaliatory shooting that followed the

18   Frank Fresca beating, right?

19   A    Rights.

20   Q    And you knew that -- you said it had something to do

21   with something, that Frank Fresca was dating some married

22   woman, right?

23   A    Right.

24   Q    And Joseph Young was close to Frank Fresca, right?

25   A    Yes.

J. Tufarelli - Cross/Soloway

1   Q     Did he work at Fresca's, Joseph Young?

2   A     Yes.

3   Q     Security, right?

4   A     Yes.

5   Q     He worked the door, right?

6   A     Yes.

7   Q     Did he tend bar sometimes?

8   A     I'm not too sure.

9   Q     You said he fired a gun into the house of some people

10  that you guys believed were involved in Frank Fresca's

11  beating, right?

12  A     Right.

13  Q     And when it was being discussed, is it fair to say that

14  it was discussed by Mike Maggio that a good idea in this

15  situation would be to torch the guy's house, right?

16  A     The cars.

17  Q     Okay.

18        The people's cars that were responsible for the beating?

19  A     Right.

20  Q     And was it your idea, was it your idea to say, no, no

21  let's not torch the cars, let's respond with guns and shoot

22  into the house?

23  A     Yes.

24  Q     And after that idea, that idea of yours was put out

25  there, is it fair to say that you went to your house, got a

J. Tufarelli - Cross/Soloway

1    gun, and brought it back to Fresca's?

2    A    Yes.

3    Q    And you were driven to your house by Jose Garcia, right?

4    A    Yes.

5    Q    And you came back to Fresca's with your gun and you said

6    that's the gun that was used by Joseph Young to fire into the

7    house, right?

8    A    Yes.

9    Q    And after Joseph Young fired into the house, is it

10   correct that the gun was given back to you?

11   A    Yes.

12   Q    And that was a gun that you later -- you ultimately

13   sometime later sold to someone named Peter, right?

14   A    Yes.

15   Q    Now, that's not the only time you said that you were

16   involved in this kind of thing, meaning shooting guns into

17   locations, like houses and stores and things like that,

18   right?

19   A    Right.

20   Q    In fact, you did a shooting into someone's house by the

21   name of Tom, right?

22   A    Yes.

23   Q    You were having a problem with someone named Tom because

24   he was using drugs or something with your brother, right?

25   A    Correct.

J. Tufarelli - Cross/Soloway

1    Q    Correct, right.

2         At that time, because this guy Tom was using drugs with

3    your brother, you took some shots at his house, right?

4    A    Correct.

5    Q    The house is like on Hylan Boulevard and King Street,

6    right?

7    A    Correct.

8    Q    And that was your way of responding to the fact that

9    this guy Tom was doing something you didn't like with your

10   brother, right?

11   A    Right.

12   Q    And when was that, roughly?

13   A    Maybe '99, 2000, I'm not too sure.

14   Q    So when you were about eighteenish?

15   A    Around there.

16   Q    Nineteen?

17   A    Right.

18   Q    And when you did that, you were in a car, right?

19   A    Right.

20   Q    With someone else, right?

21   A    Right.

22   Q    Someone named Doug?

23   A    Yes.

24   Q    And were you trying to kill Tom that day?

25   A    No.

FREDERICK P. CHERINO, C.S.R.        OFFICIAL COURT REPORTER

J. Tufarelli - Cross/Soloway

1    Q    Were you trying to kill anyone in his family?

2    A    No.

3    Q    Any of his pets?

4    A    No.

5    Q    Any of his neighbors?

6    A    No.

7    Q    It is just the way you did it, right, in that situation

8    with this guy Tom that you were happy about, right?

9    A    Right.

10   Q    Now, you said you knew somebody by the name of Stefan

11   Cicale, right?

12   A    Yes.

13   Q    And Cicale was a guy that you knew from the street,

14   right?  You identified him as someone in this crew that you

15   were involved in, right?

16   A    Right.

17   Q    A guy that you did crimes with, right?

18   A    Right.

19   Q    A guy that you socialized with, right?

20   A    Yes.

21   Q    A guy that you knew for years and years, right.

22        How many years did you know him?

23   A    Maybe three or four years.

24   Q    Okay.

25        And was he a friend of yours?

J. Tufarelli - Cross/Soloway

1   A      Year.

2   Q      Now, is it fair to say that in 2005 -- you said you got

3   arrested in May 2006, right?

4   A      Year.

5   Q      So, in 2005 Stefan Cicale was someone you knew, were

6   pretty friendly with, and did things with, right?

7   A      Yes.

8   Q      Not only did you do crimes with him with, but you went

9   to bars with him and strip clubs with him and things like

10  that, right?

11  A      Yes.

12  Q      Now, you described how, in the beginning of your

13  testimony when the prosecutor was asking you about the people

14  and their different roles, you said this person is a made guy

15  and this guy is an associate in Gino Galestro's crew.  You

16  remember that testimony, right?

17  A      Yes.

18  Q      And you said that the crew is set up for people to do

19  things together, right, and for each other, right?

20  A      Right.

21  Q      But is it correct that among the people that you were

22  hanging around with, you weren't always loyal to them, were

23  you?

24  A      No.

25  Q      You weren't always honest with them, were you?

J. Tufarelli - Cross/Soloway

1    A    No.

2    Q    In fact, there were times when you would steal from the

3    people that you were socializing with and committing crimes

4    with, right?

5    A    Right.

6    Q    And, in fact, with respect to Stefan Cicale in January,

7    2006, you decided to steal some watches from him, right?

8    A    Right.

9    Q    You learned of that because he showed you that he had

10   some imitation Rolex watches, right?

11   A    Right.

12   Q    And you and John Mergen decided to steal them, right?

13   A    Right.

14   Q    Because you wanted them, right?

15   A    Right.

16   Q    Now, had Cicale done something in particular to you to

17   make you mad at him?

18   A    No.

19   Q    So what you did was you went to his girlfriend's house

20   one night, right?

21   A    Right.

22   Q    And you took a pipe, right?

23   A    Right.

24   Q    And you took the pipe to one of the windows of his

25   truck, right?

J. Tufarelli - Cross/Soloway

1    A     Right.

2    Q     And you looked around in his truck for those watches,

3    right?

4    A     Right.

5    Q     And initially you couldn't find them, right?

6    A     Not the first time.

7    Q     But you found a briefcase, so you took that, right?

8    A     I don't know if it was a briefcase.  I went back the

9    second time and they were in the center console.

10   Q     The second time you went back you found the watches,

11   right?

12   A     Yes.

13   Q     And you took those?

14   A     Right.

15   Q     And not only did you take the watches and you kept them,

16   right, you and Mergen split them up, right?

17   A     Right.

18   Q     And there came a time that you were asked about what

19   happened to Cicale's truck and to Cicale's watches by Mike

20   Maggio, right?

21   A     Right.

22   Q     Mike Maggio asked you, do you know anything about it,

23   right?

24   A     Yes.

25   Q     And you told him you had no idea, you didn't have

J. Tufarelli - Cross/Soloway

1    anything to do with it, and you knew nothing about it, right?

2    A    Right.

3    Q    That's when Mike Maggio asked you, that's what you said

4    to him, right?

5    A    Right.

6    Q    That wasn't true, right, what you said to Maggio?

7    A    No.

8    Q    Now, did you know Mike Maggio to own and possess guns?

9    A    Just the one I sold him.

10   Q    Okay.

11        So in 2000, you sold Mike Maggio the gun, right?

12   A    Not in 2000.  Maybe 2003.

13   Q    It is a gun that you got from Daryl's uncle?

14   A    Yes.

15   Q    That guy Daryl who you identified when talking on

16   direct

17   A    Yes?

18   Q    Got a gun from Daryl that you sold to Maggio, right?

19   A    Yes.

20   Q    How much did you sell it to him for?

21   A    Approximately about $500.  I don't remember, clearly.

22   I'm not too sure.

23   Q    Now, you talked about the robbery of the Eagle Cheese

24   Store, right?

25   A    Right.

J. Tufarelli - Cross/Soloway

1   Q      Do you remember that?

2   A      Yes.

3   Q      And you were personally involved in that you said,

4   right?

5   A      Yes.

6   Q      And you said that other people that were personally

7   involved with it were Maggio's kind of fiancee Margaret

8   Mazzola, right?

9   A      Right.

10  Q      And her mother Millie, right?

11  A      Yes.

12  Q      Millie was the owner of that cheese store, right?

13  A      Right.

14  Q      And you said that was a robbery that was planned,

15  including the owner of the cheese store, right?

16  A      Right.

17  Q      Well, is it fair to say that the way that that -- you

18  said you got about $25,000, right?

19  A      Around that.

20  Q      You knew the way that that was done was that Millie had

21  deliberately not paid, not paid one of her suppliers for a

22  period of time, so that the amount she owed would build up to

23  a large amount, like $25,000, right?

24  A      Correct.

25  Q      And then after she had built up this big tab, this big

FREDERICK P. CHERINO, C.S.R.          OFFICIAL COURT REPORTER

J. Tufarelli - Cross/Soloway

1    bill that she owed to this supplier, and you knew that she

2    was going to pay, that big bill that she had built up, that

3    was the day that you would do the robbery, right?

4    A    Right.

5    Q    Because there would be a lot of money, right?

6    A    Right.

7    Q    So that was all planned over a period, right?

8    A    Right.

9    Q    Including all of these people, right?

10   A    Including all of what people?

11   Q    You, Millie, Mike Maggio, Mazzola, all of these people,

12   right?

13   A    Right.

14   Q    Now, one of the things that you said when testifying on

15   direct was that you had wanted to have visits from a woman

16   who wasn't able to visit you when you were in jail, right?

17   A    Correct.

18   Q    And was that a girlfriend of yours?

19   A    Yes.

20   Q    And you said that you represented to the Bureau of

21   Prisons that she was your sister, right?

22   A    Correct.

23   Q    And that was because the rules would allow your sister

24   to come visit you, but not her, the one you wanted to come

25   visit you, right?

J. Tufarelli - Cross/Soloway

1   A    Yes.

2   Q    And at that point -- now, when was that; when did that

3   happen?

4   A    Maybe it would have been the first two or three months

5   of me being locked up.

6   Q    Now, there came a time that you said that while sometime

7   while you were locked up that you were that you decide to do

8   cooperate, right?

9   A    Correct.

10  Q    Now, how long after you were arrested in May 2006 was it

11  before you decided to try and do that?

12  A    Was what before?

13  Q    When you decided to cooperate, how long was it while you

14  were sitting in jail, how long was it before you decided to

15  cooperate?

16  A    Maybe the first two or three months.

17  Q    Now, you pled guilty, is it fair to say, in August of

18  2006, right?

19  A    Yes.

20  Q    Right.

21       And you were arrested in May of 2006, right?

22  A    Yes.

23  Q    And by the time you pled guilty, you had already been

24  meeting with the government for a period of time, right?

25  A    Right.

FREDERICK P. GUERINO, C.S.R.          OFFICIAL COURT REPORTER

J. Tufarelli - Cross/Soloway

1    Q    You didn't decide to cooperate one day and plead guilty

2    that same day, right?

3    A    No.

4    Q    You had to have a series of meetings before the time

5    came that you were given a cooperation agreement and you went

6    to court and pled, right?

7    A    Right.

8    Q    So, it was pretty shortly after you were arrested on May

9    11, 2006, that you decided to cooperate; isn't that right?

10   A    Right.

11   Q    Didn't take very long all, right?

12   A    No.

13   Q    When arrested, you were shown what the charges were that

14   you were facing, right?

15   A    Yes.

16   Q    And there were a lot of charges, right?

17   A    Yes.

18   Q    Do you remember how many charges in the indictment you

19   were facing?

20   A    I want to say about four.

21   Q    Okay.

22        Well, you were facing racketeering, right?

23   A    Yes.

24   Q    You were facing the Eagle Cheese robbery, right?

25   A    Yes.

J. Tufarelli - Cross/Soloway

1    Q    You were facing a separate charge for having a gun at

2    the Eagle Cheese robbery, right?

3    A    Yes.

4    Q    You were facing extortion charges, right?

5    A    Yes.

6    Q    And more than one extortion charge, right?

7    A    I think so.

8    Q    You think so.

9         You really don't remember exactly, as you sit here

10   today, right?

11   A    I don't know how many extortion charges.  I could have

12   sworn it was just one.

13   Q    Okay.

14        Now, when you decided to cooperate, you described how

15   before that, and before you were even arrested, you went with

16   Mike Maggio for him to turn himself in, right?

17   A    I drove him there, yes.

18   Q    Okay.

19        And at that point, Mike Maggio turned himself in and he

20   was arrested, right?

21   A    Right.

22   Q    And after that, have you ever seen him again?

23   A    No.

24   Q    And it was your understanding at that time that he was

25   being arrested for something to do with that arson you

J. Tufarelli - Cross/Soloway

1    described, right?

2    A    Yes.

3    Q    And you knew, also, that Joseph Young had been arrested,

4    right?

5    A    Yes.

6    Q    And then sometime after Michael Maggio was arrested, you

7    were arrested and charged with things that you were doing

8    with Mike Maggio, right?

9    A    Correct.

10   Q    And as far as you know, was Mike Maggio ever charged

11   with anything that you are aware of?

12   A    Nothing besides what he turned himself in on.

13        (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. SOLOWAY:  (Continued)

3    Q    When you were arrested and you saw the indictment in your

4    case, you had co-defendants on the case; right?

5    A    Right.

6    Q    Gino Galestro; right?

7    A    Right.

8    Q    Joseph Young?

9    A    Yes.

10   Q    Stefan Cicale?

11   A    Yes.

12   Q    Jose Garcia; right?

13   A    Yes.

14   Q    Was Michael Maggio one of your co-defendants?

15   A    No.

16   Q    And the things that you were charged with, you knew that

17   some of you had been involved in with Maggio; right?

18   A    The crimes that I had done, I done with Mike?

19   Q    Yeah.

20   A    Right.

21   Q    You know that; right?

22   A    Right.

23   Q    You looked at the indictment, you looked at the charges.

24        You knew some of those things you did with Mike

25   Maggio; right?

J. Tufarelli - Cross / Soloway          594

1   A     Right.

2   Q     Now, there will come a time, Mr. Tufarelli, you know that

3   there's going to come a time that you're going to be

4   sentenced; right?

5   A     Right.

6   Q     And you said that what you want to happen when you get

7   sentenced is, you want to get less time in jail than the

8   amount of time that you're facing; right?

9   A     Correct.

10  Q     You want to get less time in jail for your cooperation

11  than you would get without cooperating with the Government;

12  right?

13  A     I don't understand that question.

14  Q     Meaning, that you're hoping that your cooperation will

15  result in you getting less time than you would get if you did

16  not cooperate; right?

17  A     Correct.

18  Q     If you were just convicted of these things that you're

19  charged with, you would get a certain amount of time in jail;

20  right?

21  A     Right.

22  Q     A lot; right?

23  A     Right.

24  Q     And you want to get less; right?

25  A     Right.

1  Q     You want to get less than a lot; right?

2  A     Right.

3  Q     You want to get as little as possible; right?

4  A     Right.

5  Q     And you know that -- now, if at the end of the case when

6  it's time for you to be sentenced you get this letter that you

7  talked about on direct, who's going to write that letter?

8  A     The Government.

9  Q     And it's up to the Government to decide whether or not to

10  write that letter; right?

11  A     Correct.

12  Q     At the end of day, at the end of day, the agreement that

13  you've entered into says that if the Government is satisfied

14  that you're telling the truth, then their obligation is to

15  write this letter; right?

16  A     Right.

17  Q     So, you know that it's your, that if you convince or if

18  the Government is satisfied that you've told the truth, that's

19  when the letter will be written; right?

20  A     Right.

21  Q     And it's up to the Government to make that decision;

22  right?

23  A     I don't really know who it's up to you find out -- to

24  make the decision.

25  Q     Well, let me, I'm going to read something to you and you

J. Tufarelli - Cross / Soloway                    596

1    can tell me if you understand --

2    A    Okay.

3    Q    -- part of your agreement.

4    A    Okay.

5    Q    Which says that:  "It's understood that a good faith" --

6    well, okay.

7              "Now, it's understood that" -- it's a little bit of

8    legalese here, but I'm going read it anyway and then we'll see

9    where we're at.

10             "It's understood" --

11             MR. SOLOWAY:  Judge, I'm going to approach, if I

12   could, and show Mr. Tufarelli.

13             THE COURT:  That's fine.

14             MR. SOLOWAY:  Do you have a copy of his cooperation

15   agreement?

16             THE COURT:  That's fine.

17             MR. SOLOWAY:  Do you have a copy of the one that's

18   in evidence?

19             MR. CHAN:  Yes.

20             THE COURT:  Is it up here?

21             MR. SOLOWAY:  I'm going to hand this to you and ask

22   you to take a look at page eight.  Just take a look at page

23   eight, all right?

24             (Handing.)

25   Q    At the top there, you see page eight; right?

1          Are you there?

2   A    Not yet.

3          Now I'm there.

4   Q    Yeah.  At the top there, it says -- okay.  Go back.  I'm

5   sorry, page seven.  Page seven at the bottom.

6          At the bottom of the page there it says:  "On such a

7   motion".

8          Do you see that?

9   A    No.

10  Q    At the bottom of page seven?

11  A    Right.

12  Q    The last line?

13  A    I don't see that.

14         MR. SOLOWAY:  All right.  I'm going put this on the

15  screen, Judge, if I could.

16         (The above-referred to exhibit was published to the

17  jury.)

18         MR. SOLOWAY:  How do I zoom in on this page?

19         MR. CHAN:  Here.

20         MR. SOLOWAY:  Okay, thank you.

21  Q    All right, directing your attention to the bottom it

22  says:  "Such a motion".

23         Do you see that?

24  A    Okay, yeah.  Yes.

25  Q    Are you with me on that?

J. Tufarelli - Cross / Soloway                    598

1    A    Yes.

2    Q    It says:  "Such a motion will allow the Court in applying

3    the advisory guidelines".

4         You know what the guidelines are; right?

5    A    Yes.

6    Q    What are they?

7    A    Sentencing guidelines.

8    Q    And those are the rules; right?

9         Those are the rules that control what sentence you

10   get for a particular crime; right?

11   A    Yes.

12   Q    "Such a motion will allow the Court in applying the

13   advisory guidelines to consider a range below the guidelines

14   range that would otherwise apply".

15        Do you see that?

16   A    Yes.

17   Q    And the range that's referred to there is the sentencing

18   range; right?

19   A    Right.

20   Q    Because the guidelines provide for sentences in a range;

21   right?  Like 36 to 47 months, things like that; right?

22   A    Right.

23   Q    Different ranges for different crimes figured in months;

24   right?

25   A    Right.

J. Tufarelli - Cross / Soloway                 599

1   Q    So, it says:  "In this connection" -- right?

2        "Regarding this application of the guidelines and

3   this motion to the Court it's understood that a good faith

4   determination by the office as to whether the defendant has

5   cooperated fully and provided substantial assistance and has

6   otherwise complied with the terms of this agreement and the

7   office's good faith assessment of the value, truthfulness,

8   completeness, and accuracy of the cooperation shall be binding

9   on him".

10       Do you follow that?

11  A    Yeah.

12  Q    And doesn't that mean that you, Mr. Tufarelli, will be

13  bound about any decision that the Government makes as to

14  whether you've told the truth or not?

15       Is that your understanding of that?

16  A    Yeah.

17  Q    I mean, I started out asking you whether or not you knew

18  who it was that had to decide you were telling the truth

19  before you would get that letter.

20       And you said you weren't sure; right?

21  A    Right.

22  Q    Now, I'm asking you whether you know that it's the

23  Government that has to decide whether you're telling the truth

24  in order for you to get that 5-K letter.

25  A    Correct.

1    Q    Okay.  So, having discussed this now, is it true that

2    it's your understanding that you have to get this letter that

3    will get you a lower sentence from the Government?

4    A    If I tell the truth, yes.

5    Q    Right.  Right.

6         And if you Government decides that you're not going

7    to get that letter, well, that's pretty much tough according

8    to the agreement that you signed; right?

9    A    Right.

10   Q    It's up to them; right?

11   A    Right.

12   Q    Now, in your life, in your life, is it fair to say that

13   you've spent a lot of time doing crimes and then trying to get

14   away with them; right?

15   A    Yes.

16   Q    I mean, when you did crimes.  It wasn't the kind of thing

17   that you did and wanted to get caught for; right?

18   A    No.

19   Q    You did things that you knew were wrong.  You did things

20   that you knew were wrong and you took the risk that you would

21   get caught; right?  That you would not get -- I'm sorry.

22        And you took the risk that you might get caught;

23   right?

24   A    Right.

25   Q    If you did something wrong, one of the possibilities was

1    that you might get caught and have to pay for it, be punished

2    for it; right?

3    A    Right.

4    Q    And so, you were used to, in order to get the things that

5    you wanted in life, doing things that were wrong and taking

6    the risk that you might one day get caught; right?

7    A    Right.

8    Q    And that was kind of a regular thing and a pretty regular

9    way that you were living your life; isn't that fair to say?

10   A    Right.

11   Q    And now you say that that's all changed; right?

12   A    What's change?

13   Q    Well, you say that now you're here and the thing that

14   you're doing, and the thing that you're trying to do, and the

15   thing that you're spending your time doing, is telling the

16   truth; right?  About everything that you've testified to?

17   A    Right.

18   Q    And telling the truth to the Government about everything

19   that you've done?

20   A    Correct.

21   Q    And everything that you know?

22   A    Right.

23   Q    And that you're not spending your time now telling the

24   Government what you feel like telling them and hoping that

25   you'll get away with it.

J. Tufarelli - Cross / Soloway                602

1            You're not doing that; right?

2    A    I don't understand what you mean.  Telling them what?

3    Q    Telling them things that are not true.

4    A    Am I telling them things that are not true?

5    Q    Yeah, are you telling them things that are not true;

6    right?

7    A    No, I'm telling them the truth.

8    Q    Right.  You're telling them the truth.

9            You're not telling them things that are not true and

10   just hoping that you'll get away with it; right?

11   A    I don't understand that.

12           Telling them that are not true and hoping to get

13   away with it?

14   Q    Yeah, I mean, there have been times in your life,

15   Mr. Tufarelli, right?  Many times when you told people things

16   that not true and hoped that you would not get caught; right?

17   A    Told people things that were not true then.  And hope I

18   didn't get caught?  Right.

19   Q    Yeah.

20   A    Right.

21   Q    Absolutely right.  There's no doubt in your mind about

22   that; right?

23   A    Yeah.  Then.

24   Q    Then.  Right.  Then.

25           And your testimony is that now things have changed;

J. Tufarelli - Cross / Soloway                603

1   right?

2   A    What do you mean by change?  I just told hem everything

3   that I know and the truth of everything.

4   Q    Right.  But what I'm asking you is:  That there was a

5   time in your life when you would tell people things that you

6   knew were not true; right?

7   A    Right.

8   Q    And some of those things that you told people that were

9   not true, there were risks.

10            Like if they found out that you were lying them, you

11   could have a problem; right?

12   A    Right.

13   Q    Like when you told Maggio a lie that you didn't know

14   anything about what happened with Cicale's watches, if he knew

15   that you were lying to him, that would be a problem for you;

16   wouldn't it?

17   A    Yes.

18   Q    You took a risk when you lied to Mike Maggio when he

19   asked you a direct question about something you knew about and

20   you lied to him; right?

21   A    Right.

22   Q    That was risky for you; right?

23   A    Right.

24   Q    If he found out about it, you would have had a problem;

25   wouldn't you?

J. Tufarelli - Cross / Soloway            604

1    A    Correct.

2    Q    Okay.  So, what I'm asking you now is that even though

3    there have been times in your life when you have told people

4    lies and risked getting in trouble, you're saying that that's

5    not true anymore, that you've changed.

6              And now when you say that, you are telling the

7    truth?

8    A    Correct.

9    Q    You're telling the truth; right?

10   A    Right.

11   Q    And you've changed; right?

12   A    Working on it.

13   Q    Working on it, okay.

14             So, you haven't gotten there yet?

15   A    No, it's a work in progress.

16   Q    And the change is based on this contract that you signed

17   with the Government; right?

18   A    No.

19   Q    Well, it's based on what you want to get at the end of

20   your case; right?

21   A    I don't think that has to do with changing, what I want

22   to get.

23   Q    No?  Well, did you sign this agreement with the

24   Government?

25   A    Right.

1    Q     Did you sign the agreement with the Government because

2    you're a changed human being now since May 11th of 2006, when

3    you got arrested?

4    A     No.

5    Q     Did you sign the agreement with the Government since

6    getting arrested on May 19th, 2006, because you want to get

7    the lowest possible number of years or months in jail that you

8    can get?

9    A     Correct.

10   Q     Okay.

11          MR. SOLOWAY:  I have nothing else.

12          MR. CHAN:  Just a couple questions.

13   REDIRECT EXAMINATION

14   BY MR. CHAN:

15   Q     Mr. Tufarelli, now that you have signed a cooperation

16   agreement, is it worth it to you to lie?

17   A     No.

18   Q     Why is it not worth it to you to lie now?

19   A     Because if I got caught lying, I wouldn't get a

20   cooperation agreement.

21   Q     How long do you think you'd go to prison?

22   A     Up to life.

23          MR. CHAN:  No further questions.

24          MR. SOLOWAY:  I have nothing else.

25          (Witness excused.)

Proceedings                                    606

1          THE COURT:  Okay.

2          Ladies and gentlemen, we're just going to take a

3   break for under five minutes.

4          (Jury is excused.)

5          (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                              607

1          (The following occurs outside the presence of the

2    jury.)

3              MR. SOLOWAY:   Could we have a five-minute break?

4              THE COURT:   Yes.

5              MR. SOLOWAY:   A ten-minute break?

6              THE COURT:   If you want ten minutes, you can have

7    ten minutes.

8          (Recess taken.)

9

10         (In open court.)

11             THE COURT:   Are we ready?

12             MR. CHAN:   Yes.

13         (Jury enters.)

14         (Continued on following page.)

15

16

17

18

19

20

21

22

23

24

25

A.  Brandefine - Direct / Schaeffer          608

1              (The following occurs in the presence of the jury.)

2              THE COURT:  Mr. Schaeffer.

3              MR. SCHAEFFER:  The Government calls Anthony

4    Brandefine.

5              (Witness enters and takes stand.)

6              COURTROOM DEPUTY:  Please, raise your right hand.

7    A N T H O N Y    B R A N D E F I N E,

8              called by the Government, having been

9              first duly sworn, was examined and testified

10             as follows:

11

12             COURTROOM DEPUTY:  Please, state your name and spell

13   it for the record.

14             THE WITNESS:  My name is Anthony Brandefine --

15   B-R-A-N-D-E-F-I-N-E.

16             COURTROOM DEPUTY:  Please, have a seat.

17             MR. SCHAEFFER:  Your Honor, may I enquire?

18             THE COURT:  Yes.

19             MR. SCHAEFFER:  Thank you.

20   DIRECT EXAMINATION

21   BY MR. SCHAEFFER:

22   Q    Good afternoon.

23             How old are you?

24   A    Thirty-one.

25   Q    Okay.  Where do you work?

1    A     I work at Scaran Heating and Air Conditioning.

2    Q     Where is that located?

3    A     I'm sorry, in Staten Island, New York.

4    Q     How long have you been working there?

5    A     Ten years.

6    Q     What are your responsibilities?

7    A     Currently, sales manager.

8    Q     And what does that mean?

9    A     I'm in charge of doing sales, going out and getting work

10   for the company and then managing that work after we get it.

11   Making sure, you know, as we planned.

12   Q     Who owns Scaran Heating and Oil?

13   A     There's co-owners.   Frank and Thomas Scarangello.

14   Q     Are they related to you?

15   A     Yeah, my uncles.

16   Q     Did you prepare an estimate for a house at 4500 Arthur

17   Kill Road in Staten Island?

18   A     Yes, I did.

19   Q     Do you recall when that was?

20   A     If I could refer to the paperwork, maybe I can.

21         THE COURT:   Yes.

22         MR. SCHAEFFER:   I'll hand you some documents for

23   your review.

24         (Handing.)

25         THE WITNESS:   Thank you.

A. Brandefine - Direct / Schaeffer                    610

1    Q    You can keep those.

2    A    Okay.

3              MR. SOLOWAY:   Can the witness identified what those

4    are?

5              MR. SCHAEFFER:   I'll ask the witness.

6    Q    And what did I give you?

7    A    These are documents that my company uses to -- there's a

8    quote, there's some billing information.  It's just, you know,

9    information from my company.

10             THE COURT:   Do you want the numbers?

11             MR. SOLOWAY:   Well, I guess he's getting to that,

12   Judge, but yes.

13             MR. SCHAEFFER:   There actually are no numbers on

14   there.

15             (Pause in the proceedings.)

16             THE COURT:   I'm sorry, I thought there were 3500

17   numbers.

18             They are not?

19             MR. SCHAEFFER:   You know what?  There are.  Give

20   me... here.

21             (Handing.)

22             MR. SOLOWAY:   It's fine, Judge, thank you.

23   Q    Mr. Brandefine, would the documents I gave you refresh

24   your recollection to the time period when you prepared an

25   estimate for the house at the 4500 Arthur Kill Road?

1   A     Yeah, it was December the 15th, 2005.

2   Q     Can you just describe for the jury what you did to

3   prepare the estimate?

4   A     Initially, I went to the home to survey the equipment.

5   And then, after I surveyed the equipment, I took that

6   information back with me.  And then I prepared an estimate for

7   the work that needed to be done there.

8   Q     Okay.  And when you surveyed the equipment, can you

9   describe what you remember about the equipment in the house?

10  A     I mean, it was an older furnace.  It was located in the

11  basement.

12          And I mean, outside of that, I just had to take note

13  of maybe how big it was and what we had to do to replace it.

14  I had to walk around the house, see how much heat the house

15  needed and make sure I put enough, enough back to sufficiently

16  heat.

17  Q     So that when you were going to get a new furnace, you

18  need to have one that's big enough to heat that house?

19  A     That's correct.

20  Q     Now, subsequent to doing this survey, did you prepare a

21  price quote?

22  A     Yes.

23  Q     And did you negotiate a contract with a representative of

24  the homeowner or the homeowner to replace the furnace?

25  A     Yes, I did.

A. Brandefine - Direct / Schaeffer                    612

1   Q    And so, at some point did you schedule to do work on the

2   house?

3   A    Yes, I did.

4   Q    And just getting back to the furnace itself.

5        Can you describe in a little more detail what you

6   remember; how big it is, what it was made of, how it operated?

7   A    At the time I was there the furnace was probably, I mean,

8   all in all of maybe, you know five or six feet in height.  It

9   was probably three to four feet in width.  When I saw it, it

10  was in its casing.  It was all completely put together and I

11  mean the -- it heated the home with gas.  It was a gas-burning

12  furnace at the time.

13  Q    And what was the furnace made of?

14  A    It was made out of some cast iron and steel.

15  Q    Were there any openings?

16  A    The furnace had a couple of openings in the front, yeah.

17  Q    And if you can describe what those were?

18  A    There was an opening where the burner actually sat into,

19  which was at the bottom.  And then, there was a door on top to

20  inspect the flame.

21  Q    So, a door you could actually open up and look in the

22  furnace?

23  A    Yeah.

24  Q    And about how big was that door?

25  A    The door was probably, maybe as big as one of these

A. Brandefine - Direct / Schaeffer                613

1    television monitors.

2    Q    Now, did the furnace appear to be operational when you

3    saw it?

4    A    When I was there, it was -- no, was it was not working.

5    Q    And could you describe its condition; old, anything that

6    was broken that you noticed?  Clean?  Dirty?

7    A    In relation to the age and shape of the house, the

8    condition, the furnace seemed to be -- it was an older

9    furnace, probably originally put in when the house was built

10   or shortly after.  And the furnace was clean.  It was in -- is

11   that what you mean?

12   Q    Yes.  Decent condition, nothing that appeared --

13   A    No, no, yeah, it was in decent condition.

14   Q    Now, you, mentioned that you surveyed the house.

15        How was the house being heated at that point?

16   A    There was individual heaters from room to room, like

17   plug-in type heaters.  Like...

18   Q    Space heaters?

19   A    Yeah, space heaters.

20   Q    At the point at which the homeowner agreed to do the

21   work, did you get somebody to remove the old furnace?

22   A    Yeah, I did.

23   Q    And who was that?

24   A    His name was Steven Taylor.

25   Q    And who was he?

A. Brandefine - Direct / Schaeffer                614

1    A    Steve Taylor's a gentleman that does some odd/end work

2    for the company.  You know, we pay him to remove boilers,

3    remove furnaces.

4    Q    And based on your paperwork and what you remember about

5    that incident in terms of preparing the estimate, do you

6    recall about what time he would have removed the furnace and

7    when the work was done to replace it?

8    A    Yeah, if I could -- I'm going to look through it.

9              (Pause in the proceedings.)

10   A    We invoiced the work on December 22nd, which means that

11   the work was probably performed between the 15th and the 22nd.

12   And I would have called Steven, you know, maybe two or three

13   days in advance to do the removal.

14             So, I mean, around the 18th maybe or 17th.  Maybe

15   later than that, actually.

16   Q    So, the work was done the 22nd, so maybe the 19th or the

17   20th?

18   A    Yeah, exactly.

19             MR. SCHAEFFER:  What I'd like to do is show you

20   what's been marked as Government's Exhibit Number 52.

21             (Handing.)

22   Q    Take a look at those two pages.

23             Do you recognize them?

24   A    Yes.

25   Q    And what do you recognize them to be?

A. Brandefine - Direct / Schaeffer          615

1    A     One is an invoice from our company, the top page.  And
2    then the second page is a copy of a check we would have cut to
3    Steve to do the work.
4    Q     And how much was the work to remove the furnace?
5    A     $500.
6              MR. SCHAEFFER:  I offer that into evidence.
7              MR. SOLOWAY:  No objection.
8              THE COURT:  Admitted.
9              (Government's Exhibit 52 was received in evidence.)
10             MR. SCHAEFFER:  I'll just place it quickly on the
11   screen.
12             (The above-referred to exhibit was published to the
13   jury.)
14   Q     The page you see is the invoice, $500?
15   A     That's correct.
16   Q     And the second sheet is the Scaran Oil Service check to
17   Steve for $500?
18   A     That's correct.
19   Q     Can you just describe what equipment you used on the 22nd
20   to do the work to actually replace the old furnace?
21   A     Sure.  We placed two furnaces, two of the largest size
22   furnaces we could get and we twinned them together to make,
23   you know, one larger furnace, if you will.
24   Q     So, you had to use two large furnaces.
25             And you called it, you say twinning, to hook it up

1  and work together?

2  A    Yeah, there's a device.  You put a twinning control that

3  would make both furnaces run at the same time.

4  Q    And the purpose of that was because it was a large house,

5  you needed a lot of heat?

6  A    Yeah, the amount of air flow we needed and heat that was

7  needed to heat the rooms, larger rooms, yeah, we needed two

8  big furnaces.

9  Q    To replace the old one?

10 A    Correct.

11            MR. SCHAEFFER:  Just one second.

12            (Pause in the proceedings.)

13            MR. SCHAEFFER:  I have no questions.

14            THE COURT:  Anything?

15            MR. SOLOWAY:  No.  Thank you, Your Honor.

16            THE COURT:  Thank you very much.  You're excused.

17            (Witness excused.)

18            MR. SCHAEFFER:  The Government calls Steven Taylor.

19            MR. SOLOWAY:  Judge, can we come up for one second?

20            THE COURT:  Yes.

21            (Sidebar.)

22

23            (Continued on following page.)

24

25

Sidebar                                              617

1            (Sidebar.)

2

3            MR. SOLOWAY:   Judge, I'm sorry to make everyone

4    assemble up here for this.

5            THE COURT:   That's all right.

6            MR. SOLOWAY:   I would appreciate it if when the

7    Government offers an Exhibit into evidence, that you ask me

8    whether or not rather than just saying it's admitted.

9            THE COURT:   I waited it beginning for that to happen

10   and you didn't.   So, I thought you didn't want me to.

11           MR. SOLOWAY:   Okay.   So, I'll try to be more alert.

12           THE COURT:   I thought you didn't wanted me to.

13           MR. SOLOWAY:   I'll try to do that more quickly.

14           (Sidebar end.)

15

16           (Continued on following page.)

17

18

19

20

21

22

23

24

25

S. Taylor - Direct / Schaeffer                618

1          (In open court.)

2          (Witness enters and takes stand.)

3          COURTROOM DEPUTY:  Please, raise your right hand.

4    S T E V E N     T A Y L O R,

5          called by the Government, having been

6          first duly sworn, was examined and testified

7          as follows:

8

9          COURTROOM DEPUTY:  Please, state your full name and

10   spell it for the record.

11         THE WITNESS:  Steven Taylor -- S-T-E-V-E-N,

12   T-A-Y-L-O-R.

13         Sit down?

14         THE COURT:  Yes.  Please, be seated.

15         MR. SCHAEFFER:  Your Honor, may I enquire?

16         THE COURT:  Yes.

17   DIRECT EXAMINATION

18   BY MR. SCHAEFFER:

19   Q    Good afternoon, Mr. Taylor.

20   A    Hi.

21   Q    What do you do for a living?

22   A    I work for New York Transit.

23   Q    Do you sort of have a side business?

24   A    I have a side business to remove oil tanks and boilers

25   out of basements.

1   Q     And to remove oil tanks and boilers out of basements, are

2   we talking residential properties?  Commercial properties?

3   A     Both.

4   Q     What equipment do you use for that?

5   A     Sawzall basically.  Bunch of hand tools.

6   Q     Sawzall, if you just could describe that?

7   A     Sawzall, it's like a hacksaw blade and you cut through

8   whatever.

9   Q     Electric?

10  A     Electric, yeah.

11  Q     It cuts through metal?

12  A     Yes.

13  Q     I'd like to direct your attention to December of 2005.

14            Were you contracted by Scaran Oil to remove a

15  furnace located at 4500 Arthur Kill Road?

16  A     Yes.

17  Q     And who asked to you do that?

18  A     Anthony Brandefine.

19  Q     And do you recall how much you were supposed to be paid

20  to take that furnace out?

21  A     I really can't recall.

22  Q     Were you paid by check?

23  A     Yes.

24  Q     Can you describe for the jury what happened when you went

25  to remove the furnace from the house?

1   A    The steps in taking it out like?  Or...

2   Q    Sure.

3   A    I go there, I take the -- there's a tin shell around it.

4   Take the shell off.  There's duct work, disconnect the duct

5   work.  Disconnect the -- this was a gas line gas line that was

6   going to it.  And take the oil burner out -- I'm sorry -- the

7   gas burner out, and take the blocks out and the bricks and

8   stuff.

9          And this one had a pipe coming out.  I had to cut

10  the pipe out to get it out of the basement.

11  Q    So, the furnace was in the basement?

12  A    Yes.

13  Q    And do you do this work by yourself or did you have

14  anybody helping you?

15  A    I had somebody help me.

16  Q    That particular day, you had one person helping you?

17  A    Yes.

18  Q    How did you get the furnace out of the house out of the

19  basement?

20  A    Hand-truck.

21  Q    And where did you take it?

22  A    To...

23  Q    I meant, where did you take it out of the basement?  How

24  did you get it from the basement outside of the house?

25  A    On a hand-truck.

1   Q    Up the stairs?

2   A    Oh, out the back.  The Bilco doors, you know.  The doors

3   that open up, the metal doors that open up.

4   Q    From the basement?

5   A    Yes, out to the outside of the house.

6   Q    All right.  And where do you put the furnace when you

7   take it on the hand-truck and now you're outside?

8   A    On the truck.

9   Q    And at that point, was there any -- you mentioned there

10  was some brick left over?

11  A    It's inside the boiler.

12  Q    And what did you do with what was left there?  The debris

13  that was left over?

14  A    I took most of it with me and I dumped some bricks out

15  back.

16  Q    All right.  So, when you say "out back" --

17  A    Behind the mansion.  Behind the house.

18  Q    Outside, behind the mansion?

19  A    Yeah.

20  Q    Now, you started to say that you then took the furnace in

21  your truck.

22        And then where did you bring it?

23  A    William Marine, Don-John Scrap Metal.

24  Q    Where is that located?

25  A    It's actually right down the block on Arthur Kill Road.

1  Q     When you get there with the furnace in your truck, what

2  do you do?

3  A     Dump it out and get weighed on the scale.  Dump the

4  furnace and get reweighed and go get paid for it.  Excuse me.

5  Q     So, what you got paid from Don-John for that furnace was

6  based on the weight of the furnace?

7  A     Yes.

8  Q     All right.

9            MR. SCHAEFFER:  Just one second.

10           (Pause in the proceedings.)

11           MR. SCHAEFFER:  I just want to show you Government's

12  Exhibit Number 197.

13           (Handing.)

14  Q     And ask you if you recognize this photograph?

15  A     From what it looks like, it looks like the right rear of

16  the house.

17  Q     You were talking about the mansion on Arthur Kill?

18  A     Yes, yes.  And that's the doors where I took it out.

19  These are the doors, Bilco doors.

20           MR. SCHAEFFER:  All right.  I would move that into

21  evidence.

22           MR. SOLOWAY:  I have no objection.

23           THE COURT:  It's admitted.

24           (Government's Exhibit 197 was received in evidence.)

25  (Bilco doors).

S. Taylor - Direct / Schaeffer          623

1          MR. SCHAEFFER:  I'm just going to place the

2    photograph on the computer screen in front of you.

3          (The above-referred to exhibit was published to the

4    jury.)

5          MR. SCHAEFFER:  And I'm circling those two doors of

6    that what you're referring to as Bilco doors.

7          THE WITNESS:  Yes.

8    Q    And you would have taken the furnace out of there and

9    wheeled it around to your truck?

10   A    Yes.

11   Q    And anything left, you walked kind of back and dumped

12   that in the back of the house?

13   A    Well, I take, I take -- there was some bricks that

14   wasn't, you know, I could get rid of at the scrap yard to

15   loosen stuff, you know what I mean?

16          And the bricks, it's harder to get rid of.  So, know

17   what I mean.

18   Q    So, loose debris?

19   A    Not bricks would put, I would put behind the building

20   most likely on that job.

21   Q    All right.

22          MR. SCHAEFFER:  I have no further questions.

23          MR. SOLOWAY:  No questions, Your Honor.

24          THE COURT:  You're excused.  Thank you very much.

25          THE WITNESS:  You're welcome.

Proceedings                                    624

1              (Witness excused.)

2              THE COURT:  We're close to 12:30, ladies and

3    gentlemen.  I understand your lunch should be here at 12:30.

4    So, we'll take a lunch break now and resume in half an hour.

5              (Jury is excused.)

6

7              (Continued on following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                     625

1              (The following occurs outside the presence of the

2    jury.)

3              THE COURT:   See you in an hour.

4              (Recess taken.)

5

6              (Continued on following page with AFTERNOON

7    SESSION.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Witte - Direct/Schaeffer

1                A F T E R N O O N   S E S S I O N

2              (Judge Ross enters the courtroom at 1:30 p.m.)

3              THE COURT:  Is everyone ready?

4              (The jury enters the courtroom at 1:35 p.m.)

5              THE COURT:  Yes.

6              MR. SCHAEFFER:  The government calls James Witte.

7    J A M E S      W I T T E,

8              called as a witness, having been first duly sworn,

9              testifies as follows:

10             THE COURT CLERK:  Please state and spell your name

11   for the record.

12             THE WITNESS:  James Witte, W-i-t-t-e.

13   DIRECT EXAMINATION

14   BY MR. SCHAEFFER:

15   Q    Good afternoon, Mr. Witte.

16        Where do you work?

17   A    I work at Donjon Iron and Metal Division of Donjon

18   Marine Co., Inc. on Staten Island.

19   Q    What does Donjon Iron and Metal do?

20   A    It is a recycler of scrap iron and metal materials.

21   Q    How long have you worked there?

22   A    About four and a half years.

23   Q    What are your responsibilities there?

24   A    I am the general manager, responsible for first and

25   foremost profit and loss, but personnel, equipment, new

Witte - Direct/Schaeffer

1    management, and customers in and out of the facility,

2    basically management business.

3    Q    Could you give the jury a description of the day-to-day

4    operations of the facility you manage?

5    A    Yes.  As I said, it is on Staten Island, New York.  We

6    purchase materials from the public and from businesses that

7    have agreements with us to buy iron and metal scrap.  It

8    comes in two ways.  It comes from clients who will bring the

9    materials to us.  We grade it, process it and pay them.  The

10   other way we bring materials in is we have a roll off

11   container service, that is a truck service, where we drop a

12   steel container, the typical industry in that regard where

13   they will fill it with different types of iron and metal.

14   Then they call us.  We go and switch the box, remove the box,

15   bring it is back to our plant, and process it the same way.

16   Q    Are you familiar with an individual named Steven Taylor?

17   A    Yes, I am.

18   Q    Who is he?

19   A    He's a customer of Donjon Iron and Metal.

20   Q    Can you describe the kind of business he does with your

21   company?

22   A    He's a small retail or peddler trade customer where he

23   has agreements with various folks where he goes out and does

24   removals of boilers, furnaces, things of that nature,

25   something he's been doing for a while, as I understand it.

Witte - Direct/Schaeffer

1  He's been using our facility, because I believe most of his

2  work is on Staten Island and it is convenient for him to come

3  to us with his materials after he's removed the scrap.

4  Q    Did you review, pursuant to a federal subpoena request,

5  Donjon's records relating to Steven Taylor's business with

6  your company from December 15, 2005 to December 31, 2005?

7  A    Yes, sir, I did.

8  Q    I would like to show you Government's Exhibit No. 53.

9        Take a look at that two-page document.

10       Do you recognize that?

11 A    Yes.

12 Q    What do you recognize that to be?

13 A    It is a report generated by our customer management

14 system.  It is called a Vendor Activity Detail where every

15 client - and, by the way, this is a legal requirement, plus a

16 business protocol of ours - that every client who brings us

17 scrap, we keep a record of what they bring us, when they

18 bring it.  That's basically what this is for Steven Taylor

19 for the month of December 2005.

20 Q    And you can say that's a printout from your company's

21 computer system?

22 A    Yes, I can.

23       MR. SCHAEFFER:  I would offer that into evidence.

24       MR. SOLOWAY:  No objection.

25       THE COURT:  Admitted.

Witte - Direct/Schaeffer

1      (Whereupon, Government's Exhibit 53 was received and

2   marked into evidence, as of this date.)

3   BY MR. SCHAEFFER:

4   Q    Take a look at your computer screen.

5      At the top it reads:  Vendor Activity Detail of Steven

6   Taylor.

7      Can you just briefly describe on the left column it

8   states ticket, number and date, what that means?

9   A    Okay.  Well, ticket number is just a transaction record.

10   Every client that brings us material, there's a process

11   whereby they weigh in.  They are directed to the proper

12   location to place their commodity scrap.  The material is

13   graded and they are given a ticket for payment.  We keep the

14   original copy, and the client gets the yellow ticket to get

15   paid.  So that would be the ticket number for each

16   transaction Mr. Taylor brought us in December of '05.

17      The date, obviously -- do you want me to keep going?

18   Q    No, that's fine, just the column that says commodity,

19   which refers to the type of metal processed that day?

20   A    In our industry, metals are a commodity.  There's

21   various standardized grading world weight -- actually,

22   there's these standard descriptions of what type of scrap was

23   brought in and how it was graded by our grading manager.

24   Q    So, depending upon the type of scrap and the weight is

25   how much you would pay somebody?

Witte - Direct/Schaeffer

1    A     Based on the market conditions on the day they sold it

2    to us.

3    Q     Now, if a furnace from a house was brought to Donjon,

4    generally, what type of metal commodity is that classified

5    as?

6    A     One of two things.  It is either typically number one

7    HMS unprepared, or cast iron or black cast, is the type of

8    cast, typically number one HMS.

9    Q     If somebody brings a furnace into Donjon, just briefly

10   describe what happens to the furnace once it enters your

11   recycling facility?

12   A     As I said, he comes into the main entrance.  In that

13   case they would go to the truck, same way in.  We identify,

14   A, if it is an existing client, in this case Mr. Taylor has

15   been a repeat client for years, so we knew who he was, goes

16   to the designated area and places it in the proper location

17   where he's aware because he comes to us all the time.

18        We have a policy of not accepting sealed units.

19   Furnaces can be sealed, so we have a procedure making sure it

20   is open.  And had this was the case for example, clients

21   bring scrap drums as well as furnaces, anything, we make sure

22   there's a hole to visibly look inside to make sure there is

23   no chemicals, hazardous materials, anything we shouldn't be

24   taking.  So that was done in this case.  I'm sure, assuming

25   our staff followed procedure, which I hope they do, it was

Witte - Direct/Schaeffer

1    dumped, given his grading ticket, goes back to the scale,

2    weighs out light, and that difference is what it's paid for.

3    Q    If it was just dumped on your property, what would

4    actually happen to the furnace?

5    A    If it is number one HMS, we have a portion of the yard

6    with that type of scrap, with other similar commodity.  When

7    we have enough, we make business decisions under contracts or

8    open orders on the market to sell it.  We then prepare,

9    process this material in accordance with the standard and

10   specification.  In other words, the boiler would come in too

11   large to be a standard prepared steel, that's why it is

12   unprepared.  So we have to cut it using torches or shears to

13   make it smaller pieces.  Once everything is generated as

14   homogenous process mix, we sell it on the open market or sell

15   it to the contractor with a mill or for export.

16   Q    How long would be the turnaround from the point at which

17   Steven Taylor brings a furnace in to it leaving the facility?

18   A    We turn our inventory over within a couple of weeks,

19   within thirty days maximum, everything.  Our inventory is

20   completely turned around for all metals.

21   Q    Looking at the document on the dates of December 20th

22   and 21st, and 23rd, is there an indication for HMS prepared

23   or HMS unprepared?

24   A    Yes, I see that.

25   Q    And the weight on the 20th, I will underline it, the

Witte - Direct/Schaeffer

1   21st would be 1020 pounds?

2   A      Yes, I see that.

3   Q      And also on the 23rd it would be 900 pounds?

4   A      Yes.

5   Q      Would that be the range in which you would expect an old

6   house furnace to weigh?

7   A      Yes, it could be.  I mean, furnaces are all different

8   weights.  I would tell you, if you said 70 pounds, no, that's

9   not a furnace.  But, yes, that's in the range of what it

10  would be.

11  Q      Just one last question.

12         So there is no indication here on which of these

13  particular commodities would actually have been the furnace?

14  A      That's correct.  Again, we look at it as a scrap

15  commodity, not for what it's designed, its purpose.  We are a

16  scrap processor, recycler, so everything is graded, as these

17  commodities I described.  We are not required to keep a

18  record, if this was a refrigerator, a furnace, copper pipe,

19  et cetera.

20         MR. SCHAEFFER:  I have no further questions.

21         MR. SOLOWAY:  I have no questions, your Honor.

22         THE COURT:  Thank you very much.  You are excused.

23         THE WITNESS:  Thank you.

24         MR. SCHAEFFER:  The government calls F.B.I. Special

25  Agent Elizabeth Rosato.

Rosato - Direct/Schaeffer

1   E L I Z A B E T H      R O S A T O,

2              called as a witness, having been first duly sworn,

3              testifies as follows:

4              THE COURT CLERK:  Please state and spell your name

5   for the record.

6              THE WITNESS:  Elizabeth Rosato, R-o-s-a-t-o.

7              MR. SCHAEFFER:  Your Honor, may I inquire?

8              THE COURT:  Yes.

9   DIRECT EXAMINATION

10  BY MR. SCHAEFFER:

11  Q     Good afternoon.

12        How long have been an FBI agent?

13  A     Twelve0 years.

14  Q     Where are you assigned?

15  A     To the New York office.

16  Q     What are your responsibilities there?

17  A     Currently I'm the coordinator of the Evidence Response

18  Team.

19  Q     What is the Evidence Response Team?

20  A     We are similar to a crime scene unit for the police

21  department, except that we respond for search warrants, crime

22  scenes, or forensic searches for all F.B.I. related cases.

23  Q     How is an Evidence Response Team set up?

24  A     The New York office has the largest team.  We have 40

25  members plus two full-time coordinators.  We are broken up

Rosato - Direct/Schaeffer

1    into five teams, each with a team leader and an assistant

2    team leader.

3    Q    How would a team receive a request for work?

4    A    Agents in the office know to either call me or we have a

5    web page for the New York office and they can request our

6    services.  They can describe the case that they have.  I will

7    then call them, discuss the case, see what type of forensic

8    needs they have, and then establish a date and time to go out

9    and walk the job.

10   Q    So as the coordinator, you would set up the actual

11   response to a request to search?

12   A    Yes, I would.

13   Q    Do you respond to a request to search a location, do you

14   actually go out yourself?

15   A    I do not in all cases, but generally I do.

16   Q    In April 5, 2006, did you coordinate the response to a

17   request to search a location at 500 Arthur Kill Road out on

18   Staten Island?

19   A    Yes, I did.

20   Q    Could you describe for the jury that location?

21   A    It is a private residence, an older Victorian home set

22   off the road, private residence, multi-room, basement, attic.

23   Q    At what part of Staten Island is that?

24   A    It is in the southern portion of Staten Island.

25   Q    And the property itself, including the house, could you

Rosato - Direct/Schaeffer

1   describe that?

2   A     It is an older Victorian home, and there's a wrought

3   iron gate and a long driveway entrance to the property, and

4   the house itself is set back on the property to the rear.

5   Q     And the landscaping?

6   A     Currently, the last time I was there, it is more

7   modernized.  There's some landscaping.  There's some tree and

8   wood lined areas in the back, and there's another shed out in

9   the back of the property.

10  Q     Can you describe the plan to search that location on

11  April 5, 2006?

12  A     Based upon the case information that we had, we were

13  going to that location in the home and in the shed area to

14  look for blood or other biological evidence of a crime.

15  Q     And what specific areas of the home were you targeting?

16  A     The kitchen and the basement area.

17  Q     Can you describe what happened when the search

18  commenced?

19  A     Due to the size of the property and the fact that there

20  was both researching of the basement and kitchen, and we also

21  had people in the back in the shed area, we split the team.

22  We had a large response that day and had a number of team

23  leaders assigned with evidence response team personnel to go

24  forward and to make visual inspection for blood or biological

25  evidence, then collect it.

Rosato - Direct/Schaeffer

1   Q    What forensic techniques do you use to look for the

2   biological evidence or blood?

3   A    To begin with on, the macral level, we do a visual

4   search.  We look for obvious stains in areas based upon case

5   information we believe them to be there.  Once we do that, it

6   is sort of on your hands and knees type of search, looking in

7   floor board tiles, grout, where we think a stain might be,

8   and then we have presumptive test kits to use to collect

9   specific items of interest.

10  Q    Could you describe the presumptive tests?

11  A    There's few we have.  One is called the hemastix, the

12  other is a phenolphthalein test.  These are simple

13  presumptive tests.  So I would swab a particular stain or

14  item, and if it turned a color, then I would collect that and

15  submit it for analysis it our lab.

16  Q    Any other tests to search for blood?

17  A    We have also used luminol.  We used that in the shed.

18  That is a test where you spray an area where you think blood

19  may have been or could have been cleaned up, and it will glow

20  like a bluish luminescent color, if the room is dark enough.

21  Q    Can you describe the results of the search of the shed?

22  A    The shed was filled with garbage, so first we had to by

23  hand take out about six or nine months worth of garbage,

24  collect it in there, spread it out on tarps, and go through

25  it by hand to see if we could find anything of evidentiary

Rosato - Direct/Schaeffer

1   value.  The fire department, they had to shorr up the roof of

2   the shed; the garbage was basically holding up the roof.  So

3   they came in and shorred up the roof so that we can safely go

4   in, collect all of the garbage, go through it by hand for

5   evidentiary items, go through it, and we used luminol in

6   there.

7   Q    And as a result of that hand search and luminol, was any

8   evidence recovered from the shed?

9   A    No.

10  Q    Now, generally speaking, if you had been able to

11  identify a blood stain, what would happen?

12  A    If we identify a stain, then we photograph it, document

13  it in our paperwork, and we would swab the stain, package it

14  and seal it for submission to the lab for analysis.

15  Q    Where is that laboratory?

16  A    Quanico, Virginia.

17  Q    Can you describe the search of the kitchen?

18  A    The kitchen was searched for blood and biological

19  evidence.  First, again through a larger visual search, then

20  using, you know, basic magnifying glass, hands, knees, going

21  through the tile, the grout, and checking the sink drains and

22  traps.

23  Q    Was any evidence recovered from the search of the

24  kitchen?

25  A    No.

Rosato - Direct/Schaeffer

1    Q    Now, moving on.  Can you describe the search of the

2    basement?

3    A    The basement was the primary area of search.  We are

4    were looking for human remains or possible human remains in

5    the furnace downstairs, as well as any blood evidence.

6    Q    What did you discover about the furnace?

7    A    The furnace had been -- a new furnace had been put in,

8    so we couldn't examine it for what we hoped to look for.

9    Q    So for the basement search, who searched the basement

10   stairs?

11   A    Special Agent Martha Berdote.

12   Q    Now, after the search of all of the areas of the

13   Mansion, including the basement area, what evidence was

14   taken?

15   A    A swab in the stairway leading to the basement.

16   Q    Were photographs taken of the Mansion and the

17   surrounding areas during the search?

18   A    Yes, there were.

19   Q    What I would like to do is show you several photographs

20   as Government Exhibits 62 through 67, and just take a look at

21   those photographs.

22        (Pause)

23

24   A    Okay.

25   Q    Do you recognize them?

Rosato - Direct/Schaeffer

1    A    Yes, I do.

2    Q    What can you recognize them to be?

3    A    They are the overall photos of the Kreischer Mansion,

4    the main entry way, the front door, the shed in the rear of

5    the property that we searched.

6    Q    And those photographs were taken on the date of the

7    search?

8    A    Yes, they were.

9         MR. SCHAEFFER:  I would offer them into evidence.

10         MR. SOLOWAY:  No objection.

11         THE COURT:  Admitted.

12         (Whereupon, Government's Exhibits 62 through 67

13    were received and marked into evidence, as of this date.)

14    BY MR. SCHAEFFER:

15    Q    Is that board a blowup of Government Exhibit 62?

16    A    Yes.

17    Q    All right.

18         If you can just go through all four pictures and

19    describe what you are looking at?

20    A    This is the front door entrance to the Mansion.  You can

21    see the interior, the front foyer leading off I believe into

22    a dining room, and an overall shot of the resident up top.

23    Q    So the three pictures on the bottom are the front foyer

24    and the front door?

25    A    That's correct.

Rosato - Direct/Schaeffer

1   Q      All right.

2          Exhibit 63, that's a blowup of the Exhibit 63 on your

3   computer screen?

4   A      That's correct.

5   Q      And describe those two pictures?

6   A      This is the shed that was in the rear of the property

7   that contained all of the garbage from the residence.

8   Q      And that's the shed the Fire Department had to shorr up?

9   A      Yes.

10  Q      Okay.  Move to the next board.

11         Take a look.  Is that board now on the easel a blowup of

12  Exhibit 64?

13  A      Yes, it is.

14  Q      What is the view of the Mansion in the picture on the

15  left?

16  A      This is a side view of the residence with the doorway

17  leading into the kitchen.

18  Q      And that's the white door that leads into the kitchen?

19  A      That's correct.

20  Q      And the picture on the right, what is that a picture of?

21  A      That is also the side door leading into the kitchen, but

22  with the pool or decorative pond on the side yard.

23  Q      Can you tell if there's water in there?

24  A      There was maybe about an inch on the bottom, but not

25  filled.

Rosato - Direct/Schaeffer

1    Q     And I will circle on the photograph, that's kind of a

2    yellow tape there.   That's the same picture of the side door?

3    A     That's correct.

4    Q     All right.   Moving on to Exhibit 65.

5          Is that a blowup of Exhibit 65?

6    A     That's correct.

7    Q     Starting at the top left or all of those pictures, can

8    you describe what you see?

9    A     These are the overall photos of the kitchen area of the

10   Mansion that was searched, with the utilities and the tile

11   floor.

12   Q     Now, just take a look at the top left picture.   I will

13   circle.   What is that?

14   A     That is a drain in the kitchen.

15   Q     Where does that lead?

16   A     It leads basically to the sewer or town water that was

17   there.

18   Q     Was the drain also searched?

19   A     Yes, it was.

20   Q     Was any presumptive testing done positive for anything

21   in the drain?

22   A     We got no positive on that.

23   Q     Moving on to Exhibit 66.

24         That board is also a blowup of Exhibit 66?

25   A     That is correct.

Rosato - Direct/Schaeffer

1   Q      And what do you see there?

2   A      Those are the stairs leading to the basement of the

3   Mansion.

4   Q      And the bottom two pictures?

5   A      There is the new furnace that we found there.

6   Q      All right.  And the last board would be 67.

7          That board is also a blowup of the photographs on your

8   computer?

9   A      That is correct.

10  Q      Now, what do you see there?

11  A      There is a photograph close-up and with scale of a stain

12  that was swabbed and collected.

13  Q      On the basement stairs?

14  A      Yes.

15  Q      How easy is it to eliminate blood stains?

16  A      It really depends on the time the sustain has been at a

17  particular location and the circumstances and the environment

18  that it is in.

19  Q      So, if you had a blood stain that you cut yourself and

20  you bled outside, what would effect the ability to later

21  collect evidence of that blood stain?

22  A      Heat, sunlight, exterior exposure, that all can degrade

23  any blood or biological evidence, so you wouldn't put it in a

24  plastic bag.  So the longer that a stain is kept cooler,

25  dryer, inside, you have a better likelihood of collecting a

Berdote - Direct/Schaeffer

1    stain that could be submitted for positive analysis.

2    Q    Can blood stains be washed away from surfaces?

3    A    They can.

4    Q    And there are circumstances where you can wash something

5    away and still find evidence of what you tried to wash away?

6    A    Absolutely.  In certain tests that even after it's been

7    washed or even put in the laundry with bleach, it still can

8    come up as positive for blood.

9         MR. SCHAEFFER:  I have no further questions.

10         MR. SOLOWAY:  No questions, your Honor.

11         THE COURT:  Thank you very much.

12         THE WITNESS:  Thank you.

13         MR. SCHAEFFER:  The government calls Martha Berdote.

14    M A R T H A     B E R D O T E,

15         called as a witness, having been first duly sworn,

16         testifies as follows:

17         THE COURT CLERK:  Please state and spell your name

18    for the record.

19         THE WITNESS:  Martha M. Berdote, B-e-r-d-o-t-e.

20         MR. SCHAEFFER:  Your Honor, may I inquire?

21         THE COURT:  Yes.

22    DIRECT EXAMINATION

23    BY MR. SCHAEFFER:

24    Q    Where do you work?

25    A    I'm currently assigned to F.B.I. headquarters.

Berdote - Direct/Schaeffer

1    Q    Are you an F.B.I. special agent?

2    A    Yes.  Right now I'm a supervisor special agent.

3    Q    What are your responsibilities?

4    A    I have a team that I supervise, and I also have agent

5    responsibilities as well.

6    Q    What kinds of investigations does the team you supervise

7    do?

8    A    Terrorist.

9    Q    How long have you been an F.B.I. agent?

10   A    Over six years.

11   Q    Prior to your supervisory responsibilities, where were

12   you working?

13   A    I was working at the Brooklyn/Queens Metropolitan

14   Residence Agency.

15   Q    In what unit?

16   A    Squad C-35, Securities Fraud.

17   Q    Did you have any additional responsibilities?

18   A    Yes.  I was on the Evidence Response Team.

19   Q    A member of the Evidence Response Team?

20   A    Correct.

21   Q    Where were you assigned in April of 2006?

22   A    To Squad C-35.

23   Q    April 5, 2006, were you assigned to join an Evidence

24   Response Team?

25   A    Yes.

Berdote - Direct/Schaeffer

1    Q    What were your responsibilities that day?

2    A    We were to search the Kreischer Mansion.

3    Q    Where is that?

4    A    Located in Staten Island.

5    Q    Can you describe for the jury what you did as part of

6    the Evidence Response Team that day?

7    A    Yes.  I was part of the search team that was responsible

8    for searching the basement and the stairs that led to the

9    upstairs area.

10    Q    And in more detail, describe what you were looking for

11    and what techniques you used, what you found?

12    A    We were looking for blood and DNA.  When I was assigned

13    to work on the staircase, I was using a flashlight and Q-tips

14    and two different types of presumptive blood tests.  One

15    required me to use a Q-tip.  If I saw a spot that looked like

16    blood, put a drop of distilled water on it, rub the spot, and

17    add phenolphthalein.  And then if there's a change in the

18    color of the actual Q-tip, that means that that substance

19    could possibly be blood.

20    Q    And what happened when you were testing the staircase?

21    A    I was working on several spots and I came upon a spot

22    where I obtained that chemical change.

23    Q    After getting that chemical change, what did you do?

24    A    Next, I used another presumptive test, Hemastix.  One

25    would take a Q-tip and add a drop of distilled water, rub the

Berdote - Direct/Schaeffer

1   spot, and then rub the hemastix, and if you received a change

2   in color on the stix, that also meant that that spot could

3   also mean blood.

4   Q    What happened after you did that on the spot?

5   A    I also received a change on the Hemastix.

6   Q    What did you do next?

7   A    I spoke to our assistant coordinator Mike Burns and told

8   him what I had found.  I believe he conducted another test at

9   that point.

10  Q    And then after he conducted the test, what happened

11  next?

12  A    A decision was made that we were actually going to

13  remove that piece of the staircase to send it down to our

14  F.B.I. laboratory for further analysis.

15  Q    Prior to removing it, was it photographed?

16  A    Yes.

17  Q    All right.

18       I would like for you to take a look at what is inside

19  this box.  It is Government's Exhibit 68.

20       Do you recognize what is inside the box?

21  A    Yes.

22  Q    What do you recognize it to be?

23  A    It is the three pieces of wood that made up the stair

24  tread.

25  Q    And those are the pieces of wood that you actually

Berdote - Direct/Schaeffer

1   tested with those tests you talked about?

2   A    Yes.

3            MR. SCHAEFFER:  I offer that into evidence.

4            MR. SOLOWAY:  No objection.

5            THE COURT:  Admitted.

6            (Whereupon, Government's Exhibit 68 was received and

7   marked into evidence, as of this date.)

8   BY MR. SCHAEFFER:

9   Q    If you could just come down from the witness chair over

10  to this podium and just put the three steps together or the

11  three pieces together.

12           (The witness complies)

13

14  Q    Is this basically the condition of the stair that you

15  worked on?

16  A    Yes.

17  Q    And why is it in the three pieces?

18  A    Because we removed it from the staircase.

19  Q    It had to be broken apart?

20  A    Yes.

21  Q    Could you just point to the stain that you saw that you

22  did the tests that were presumptively positive for blood?

23  A    Yes, right here, (indicating) .

24  Q    And there's just a number of markings, circles, numbers.

25           Is that your handwriting?

Moulder - Direct/Chan

1    A    No.

2    Q    What do they indicate?

3    A    They indicate a response that I tested.

4    Q    That was the only spot that you found that tested

5    positive on that staircase?

6    A    Yes.

7              MR. SCHAEFFER:  I have no further questions.

8              MR. SOLOWAY:  No questions, your Honor.

9              THE COURT:  Thank you very much.  You are excused.

10             THE WITNESS:  Thank you.

11             MR. SCHAEFFER:  Judge, for the record to indicate,

12   these are marked A, B and C, 68.

13             THE COURT:  Okay.

14             MR. CHAN:  The government calls Special Agent

15   Charles Moulder.

16   C H A R L E S    M O U L D E R,

17             called as a witness, having been first duly sworn,

18             testifies as follows

19             THE COURT CLERK:  Please state and spell your name

20   nor the record.

21                 THE WITNESS:  My name is Charles R. Moulder,

22   M-o-u-l-d-e-r, Jr.

23   DIRECT EXAMINATION

24   BY MR. CHAN:

25   Q    Special Agent Moulder, where do you work?

Moulder - Direct/Chan

1   A      I work with the F.B.I.

2   Q      Do you work for a particular part of the F.B.I.?

3   A      I work for the Special Operations Group out of the New

4   York office.

5   Q      What is the Special Operations Group?

6   A      We specialize in surveillances.  We do moving, physical

7   surveillance, and sometimes photography and video.

8   Q      Do you focus exclusively on surveillance?

9   A      Yes.

10  Q      So, are you assigned to your own cases to investigate?

11  A      No.

12  Q      You support your other cases through your surveillance?

13  A      Yes.

14  Q      Turning your attention to October 20, 2005.

15         Were you asked to provide surveillance support for a

16  case?

17  A      I don't remember exactly that day we were working.  If

18  we were working, we did surveillance.

19  Q      How many surveillances have you done in the course of

20  your career?

21  A      Thousands.

22  Q      Do you remember each and every one of those?

23  A      No.

24  Q      Do you prepare reports after you do a surveillance?

25  A      Yes.

Moulder - Direct/Chan

1    Q    Would seeing your report from a surveillance help you

2    remember what happened?

3    A    Yes, it would.

4    Q    Showing you what is marked for identification as

5    3500-CM-1.

6    A    Yes.

7    Q    I ask that you look at it as necessary.

8    A    Yes.  This is a transcript of a handwritten surveillance

9    log from that date.

10   Q    What time or what was your assignment that day,

11   surveillance-wise?

12   A    Our job was to conduct a surveillance starting at 16

13   Rigimar Court in Staten Island.

14   Q    And what time did you start that surveillance?

15   A    11:45.

16   Q    What did you see at 11:45?

17   A    Well, that's where we started at 11:45.  There was no

18   activity for a while, but that's where it started.

19   Q    What about 12:51 that day?

20   A    At 12:51, we saw an unknown male arrive in the area

21   there in a white Infiniti.

22   Q    What license plate?

23   A    New Jersey SAA-77Y.

24   Q    At some point did another car arrive?

25   A    Yes, another unknown male arrived in a black pickup

Moulder - Direct/Chan

1   truck which was New Jersey RXE-67D.

2   Q    What happened at 1:52 p.m.?

3   A    At 1:52, the white Infiniti departed that area with the

4   unknown male number one, which was the one who arrived in the

5   Infiniti; and then the unknown male number two who arrived in

6   the black SUV, which was a Cadillac Escalade.

7   Q    What did the white Infiniti do?

8   A    Well, they drove around in the while Infiniti for a

9   while, and the while Infiniti stopped briefly in the vicinity

10  of Rhett and Margaret and another male got into the Infiniti

11  with them and they departed.

12  Q    Ultimately, did that white Infiniti go to 16 Rigimar

13  Court?

14  A    Yes, it returned after they stopped again at the end of

15  a cul-de-sac on Archwood, where another male got into the

16  vehicle and they all departed, and they all arrived back at

17  Rigimar Court at 2:31.

18  Q    What about the white Escalade, was there a white

19  Escalade as well?

20  A    I think it was black -- I'm sorry, yes, there was a

21  white Escalade.

22  Q    What did you see the white Escalade do?

23  A    Okay.  He arrived at 2:40.  They got back at 2:31, and

24  then the white Escalade arrived at 2:40 p.m. in the vicinity

25  of 16 Rigimar Court, and that white Escalade was New York

Moulder - Direct/Chan

1   plate CMV-3448.

2   Q    At some point did the Escalade and Infiniti depart the

3   residence?

4   A    Yes.  About four minutes later, 2:44, they departed

5   together in tandem, the white Infiniti and white Escalade.

6   Q    How many people were in each car?

7   A    There were four people in each vehicle at that time.

8   Q    When those two cars left the area with the eight people

9   in total, how many cars were left parked in front of 16

10  Rigimar Court?

11  A    Well, we noted shortly after they departed, they left --

12  or somebody on our surveillance team, somebody else noted

13  this - we work with multiple people - a black pickup truck

14  parked there, New Jersey plate RXE-67D, a silver SUV with New

15  York plate DAW-6781, a black Mustang with a New York plate

16  BRH-7521, and a dark Lincoln with a New York plate CZT-9451.

17  Q    Where did the Infiniti and Escalade go after it left

18  Rigimar Court?

19  A    Shortly after that they pulled into a Getty gas station

20  and the white Infiniti went to the air pump and somebody put

21  air into one of the tires.  It looked like it was at Amboy

22  Road and Seguine.

23  Q    At some point did the vehicles get on the freeway?

24  A    Let's see.  They departed at 2:52 from the gas station,

25  and then I don't know the exact route that they took, but,

Moulder - Direct/Chan

1   yes, at some point they did.

2   Q    What road is that?

3   A    They were on the Southern State Parkway.

4   Q    Did anything happen to them on the Southern State

5   Parkway?

6   A    At 4:14 p.m., the Escalade was pulled over by New York

7   State troopers near Exit 18, and then the white Infiniti

8   stopped on the roadside a short distance passed that to wait.

9   Q    At some point did the two cars continue on the road?

10  A    Yes.  The white Escalade left the troopers at 4:47 p.m.

11  the troopers let them go.  They left in tandem at that point.

12  Q    What happened at 6:31 p.m.?

13  A    At 6:31 p.m., they pulled into the Home Depot Plaza,

14  Highway 112 and Route 25 in Coram, New York.

15  Q    Did they go to a particular location at that plaza?

16  A    Let's see.  Okay, everybody got out of the Escalade and

17  Infiniti, and they were seen -- at that time there were eight

18  in the vehicle, but we saw ten people, roughly, approximately

19  ten people entering the Bella Roma Pizzeria, which is close

20  to the Home Depot in the plaza.

21  Q    What time did they enter Bella Roma Pizza?

22  A    At 6:33 p.m.

23  Q    What time did they exit Bella Roma Pizza?

24  A    At they exited at 8:58.

25  Q    So about two hours later, a little bit more than two

Moulder - Direct/Chan

1  hours later?

2  A     Yes, almost two and a half.

3  Q     What were you doing while the individuals were inside

4  the pizza place?

5  A     Well, basically we were waiting for that them to move

6  again, and we tried to see what was going on inside the pizza

7  place, if we can.

8  Q     Did you?

9  A     I didn't, no.

10  Q     What happened after 8:58?

11  A     At 8:58, all of the people who went in had exited the

12  pizza place, the original ones who went in at 6:33, and they

13  all got in their vehicles and left, including another unknown

14  male who may have been accounted for one of the additional

15  bodies that we saw, and he was in a white sedan with New York

16  plate CVW-2183.

17  Q     Thereafter, did you terminate the surveillance?

18  A     Yes, we did.

19  Q     Approximately what time?

20  A     At 9:12 p.m.

21          MR. CHAN:  No further questions.

22          THE COURT:  Anything, Mr. Soloway?

23          MR. SOLOWAY:  Yes, a couple of questions.

24  CROSS-EXAMINATION

25  BY MR. SOLOWAY:

Moulder - Cross/Soloway

1    Q    Agent Moulder, you said when you get to this location

2    where the pizzeria is, that you personally weren't able to

3    see into the pizza place, is that right, into the pizzeria?

4    A    That's true.

5    Q    This is like a strip, what would be called a strip mall,

6    out on Long Island here?

7    A    To be honest, I don't remember.  I think it was like an

8    open plaza, I believe, with stores surrounding the edges, but

9    I'm not a hundred percent sure on that.

10   Q    Okay.  You don't really remember.

11        In terms of what you were looking at, do you remember

12   whether you were looking at the front of the pizza place,

13   when you were doing the surveillance?

14   A    Yes, but not directly through the front window to see

15   into the pizza place, not from where I was sitting, no.

16   Q    And there was also a -- were there other people looking

17   at the rear?  Was there a rear door to the pizza place as

18   well?

19   A    Yes.

20   Q    Okay.

21        Were there people from the F.B.I. positioned at a

22   location where they could see the rear of the pizza place?

23   A    I believe there were.  I don't recall it specifically,

24   but at some point I think I may have been back there myself.

25   Q    Okay.

Dinnan - Direct/Chan

1        Were any of the agents that were working that day with

2   respect to this particular surveillance taking any

3   photographs of any of the activities going on in or around

4   the pizza place?

5   A     I don't recall.

6        MR. SOLOWAY:  I have nothing else.  Thank you.

7        MR. CHAN:  No questions, Judge.

8        THE COURT:  Thank you very much.  You are excused.

9        THE WITNESS:  Thank you.

10        MR. CHAN:  The government calls Special Agent

11   Timothy Dinnan.

12   T I M O T H Y   D I N N A N,

13        called as a witness, having been first duly sworn,

14        testifies as follows:

15        THE COURT CLERK:  Please state and spell your name

16   for the record.

17        THE WITNESS:  Timothy C. Dinnan, D-i-n-n-a-n.

18   DIRECT EXAMINATION

19   BY MR. CHAN:

20   Q     Where do you work?

21   A     I work for the F.B.I.

22   Q     What is your position there?

23   A     Currently assigned to a surveillance squad, Special

24   Operations.

25   Q     And directing your attention to October 20, 2005.

Dinnan - Direct/Chan

1      Were you assigned a surveillance?

2  A    Yes, I was.

3  Q    Did you participate in that surveillance with Special

4  Agent Charles Moulder?

5  A    Yes, I did.

6  Q    Did that surveillance commence at a pizza parlor in Long

7  Island?

8  A    Yes, it did.

9  Q    Do you recall the specifics of that surveillance?

10 A    Generally.

11 Q    Okay.

12     Do you recall what, if anything, you did upon conducting

13 surveillance at the pizza place?

14 A    There came a time when I went inside.

15 Q    Why did you do that?

16 A    Primarily there was a possible concern that there might

17 have been some violence that day.

18 Q    So what did you do inside?

19 A    Just to see who was in there and whether anything was

20 happening.

21 Q    What did you do?

22 A    I stayed in there for a short period of time and just

23 observed what was happening inside.

24 Q    Do you recall what time it was that you entered the

25 pizza parlor?

Dinnan - Direct/Chan

1    A    It was sometime after eight.

2    Q    How were you dressed?

3    A    Casual, whatever I was wearing that day.

4    Q    Do you recall what you observed upon entering the pizza

5    parlor?

6    A    Several of the individuals that we had followed that day

7    were in like a dining room that was off to the right-hand

8    side.  They appeared to have the room to themselves.

9    Q    Did you do anything else while you were in there?

10   A    I was probably in there for maybe upwards of a

11   half-hour, and just observed who was coming and going, and

12   where they were positioned.

13   Q    What did you see?

14   A    At some point some of the individuals from the back room

15   moved from the room to I would describe it as a hallway,

16   basically where the pizza counter is and the hallway going

17   towards the back, and they appeared to conjugate in that area

18   as if to, you know, almost to block traffic or observance of

19   what was going on in the back room.

20   Q    Did you see what was going on behind them?

21   A    Not really.  It appeared that people were in

22   conversation, but I didn't see anything behind them.

23   Q    What were you doing inside the pizza parlor to stay

24   innocuous?

25   A    I was eating.

Dinnan - Direct/Chan

1    Q    At some point did you leave?

2    A    Yes, I did.

3    Q    About how long after you entered?

4    A    Again, I was probably in there for close to a half-hour,

5    then I left.

6    Q    Then after the surveillance was terminated?

7    A    Shortly thereafter, when the individuals also left.

8    Q    Turning your attention now to January 23, 2006.

9         Do you recall doing a surveillance on that date?

10   A    Yes, I do.

11   Q    Where were you asked to conduct surveillance?

12   A    We were in Staten Island.

13   Q    A particular place?

14   A    We were starting on two of the individuals involved in

15   the case.  One was on Amboy Road and the other one was on

16   Rigimar.

17   Q    Who were the individuals?

18   A    One was Joseph Young and the other one was Michael

19   Maggio.

20   Q    What time did you commence the surveillance?

21   A    I would have to check with my log.  I am not exactly

22   sure of the exact times.

23   Q    You created a log of that surveillance?

24   A    I created a log based on photographs that I had taken,

25   and there was also a log probably based on the surveillance

Dinnan - Direct/Chan

1    itself.

2    Q    Would that help refresh your recollection here today?

3    A    Yes, it would.

4         MR. CHAN:  May I approach?

5         THE COURT:  Yes.

6    Q    Showing you what is marked for identification as

7    3500-TD-1.  I will ask you some questions based on it.

8         What time did your surveillance commence?

9    A    This is the actual photo surveillance?  The surveillance

10   commenced at 1:50 that day.

11   Q    And what did you see, what did you do, what did you

12   follow?

13   A    Approximately 2:59, Joseph Young, we located where he

14   was and we followed him.

15   Q    What was he driving?

16   A    He was driving his BMW with a Pennsylvania tag.

17   Q    What color was it?

18   A    Blue.

19   Q    And what license plate was on the car?

20   A    It would be GBR-4046.

21   Q    Where did you follow him to?

22   A    They went -- he initially had an unidentified subject

23   with him, and they went to a cellular phone store.

24   Q    You mentioned you were taking pictures at the same time?

25   A    I took photographs when they arrived at that store.

Dinnan - Direct/Chan

1    Q    Do you always take photographs when you do surveillance?

2    A    When the opportunity presents itself, not always.

3         MR. CHAN:  Your Honor, may I approach?

4         THE COURT:  Yes.

5    Q    Showing you Government's Exhibit 97.

6         Do you recognize this?

7    A    Yes, I do.

8    Q    What are these?

9    A    Those are photographs that I took that day.

10        MR. CHAN:  I offer Government's Exhibit 97.

11        MR. SOLOWAY:  No objection.

12        THE COURT:  Admitted.

13        (Whereupon, Government's Exhibit 97 was received and

14   marked into evidence, as of this date.)

15   BY MR. CHAN:

16   Q    Where was the camera -- the cellular telephone store

17   located?

18   A    It was located by the intersection of Amboy and Page in

19   Staten Island.

20   Q    Starting with the picture on top left.

21        What is depicted in that picture?

22   A    It is Joseph Young.  At one point he came out by himself

23   and retrieved an item from the vehicle.

24   Q    The middle picture?

25   A    That would have been when he and the unidentified

Dinnan - Direct/Chan

1   subject or individual left that store going to the vehicle.

2   Q    By the way, can you estimate the age of the unidentified

3   individual?

4   A    Probably in his twenties.

5   Q    And the third photograph on the top?

6   A    That's as they entered the vehicle.

7   Q    After he reentered the BMW, where did the defendant go?

8   A    They drove off, and at one point they met up with

9   Michael Maggio.

10  Q    Did you take photographs of that as well?

11  A    Not the initial time.  They met with him.  They went to

12  some other locations, and then later in the day they met with

13  Maggio again.

14  Q    The photographs on the bottom are the second team that

15  they met?

16  A    That's correct.

17  Q    Starting with the bottom, what is depicted on the bottom

18  left?

19  A    That's Joseph Young as he was exiting the vehicle.

20  Q    Whose vehicle?

21  A    That would be the vehicle that Michael Maggio would

22  drive.

23  Q    What kind of vehicle was it?

24  A    It was a Mercedes with -- well, you can't see it, but

25  there's a temporary tag in the window.

Dinnan - Direct/Chan

1    Q    What kind of license plate was on the car?

2    A    Temporary New York tag, I believe.

3    Q    Do you know the make and model of that car?

4    A    I'm not very familiar with Mercedes.  It was a Mercedes,

5    but the exact model number I don't know.

6    Q    The middle bottom photograph?

7    A    These were taken almost one after the other while he was

8    exiting the vehicle.

9    Q    And I guess the same for the third?

10   A    Yes, sir.

11   Q    What happened after you saw this meeting?

12   A    After this meeting, he went off again with that

13   unidentified individual.

14   Q    He being the defendant?

15   A    The defendant left in his vehicle with that subject that

16   he was with initially.

17   Q    Thereafter, did you terminate the surveillance?

18   A    Sometime later that day.

19        MR. CHAN:  No further questions.

20        MR. SOLOWAY:  I have no questions, your Honor.

21        THE COURT:  Thank you very much.  You are excused.

22        MR. DENNEHY:  Your Honor, the government calls

23   Valerie Nieves.

24   V A L E R I E    N I E V E S,

25        called as a witness, having been first duly sworn,

Nieves - Direct/Dennehy

1          testifies as follows:

2          THE COURT:  Please state and spell your name for the

3    court report.

4          THE WITNESS:  Valerie Nieves, V-a-l-e-r-i-e,

5    N-i-e-v-e-s.

6    DIRECT EXAMINATION

7    BY MR. DENNEHY:

8    Q    Ms. Nieves, good afternoon.

9    A    Good afternoon.

10   Q    What type of work do you do?

11   A    Management in a real estate company.

12   Q    Move over to that microphone, we need to hear.

13   A    Management.

14   Q    Management of real estate companies?

15   A    Yes.

16   Q    For how long have you been doing that?

17   A    About 19 years.

18   Q    What borough do you reside in?

19   A    Staten Island.

20   Q    For approximately how long have you lived at your

21   current address?

22   A    About 11 years.

23   Q    And on what street is that?

24   A    Hamden Avenue.

25   Q    Showing you what is in evidence as Government Exhibit

Nieves - Direct/Dennehy

1    18.

2         Do you know the person depicted in that photograph?

3    A    Yes.

4    Q    What is his name?

5    A    John Jonason.

6    Q    How do you know him?

7    A    He's my next door neighbor.

8    Q    Was he your neighbor in 2005?

9    A    Yes.

10   Q    During that time, in December of 2005, was Mr. Jonason

11   performing any work on his house?

12   A    Yes.

13   Q    What type of work?

14   A    He was doing a roof raise.

15   Q    Literally raising the roof on the house?

16   A    He was building a second and third story.

17   Q    Is his house literally adjacent to yours?

18   A    Yes.

19   Q    Did he have any dogs at the time?

20   A    Yes.

21   Q    What type of business did you know Mr. Jonason to be in?

22   A    Painting.

23   Q    Do you know the name of his company?

24   A    Brush Strokes.

25   Q    Did you know a young man who lived diagonally across the

Nieves - Direct/Dennehy

1    street from you on Hamden Avenue?

2    A     Yes.

3    Q     So that the record is clear, on your street, on Hamden,

4    what is the nearest major thoroughfare?

5    A     Hylan Boulevard.

6    Q     What is on that corner of Hylan and Hamden?

7    A     On one corner there's a car wash, and the other corner

8    there's a Jiffy Lube.

9    Q     Jiffy Lube?

10   A     Yes.

11   Q     Back in December of 2005, did Mr. Jonason have any type

12   of security system in his home?

13   A     Yes.

14   Q     What did he have?

15   A     He had camera surveillance.

16   Q     Inside the house or outside?

17   A     Outside.

18         MR. DENNEHY:  May I approach the witness, your Honor?

19         THE COURT:  Yes.

20   Q     I would like to show you what I marked as Government's

21   Exhibit 102-E for identification.  It is three photographs.

22         Have you seen these before?

23   A     Yes.

24   Q     What is the depict in those three photographs?

25   A     The top one is the camera, the telephone pole.

Nieves - Direct/Dennehy

1    Q    The bottom left?

2    A    The bottom left is the corner where the car wash is.

3    Q    And the bottom right?

4    A    Is my house and John's house.

5    Q    So those photographs fairly and accurately depict the

6    way that block looked in January of 2006?

7    A    Yes.

8             MR. DENNEHY:  I offer 102-E, your Honor.

9             MR. SOLOWAY:  102 what?

10            MR. DENNEHY:  E, like Eddie.

11            MR. SOLOWAY:  No objection.

12            THE COURT:  Admitted.

13            (Whereupon, Government's Exhibit 102-E was received

14   and marked into evidence, as of this date.)

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

V. Nieves - Direct / Dennehy                  668

1   DIRECT EXAMINATION

2   BY MR. DENNEHY:   (Continued)

3           MR. DENNEHY:   I'd like to show you a photograph

4   which has been marked Exhibit 31 for identification.

5           (The above-referred to exhibit was published to the

6   jury.)

7   Q     Did you get a do you recognize the person in that

8   photograph?

9   A     Yes.

10  Q     Do you know his full name?

11  A     I just know him as Dominick.

12  Q     Does that photograph fairly and accurately depict the way

13  you few him back in 2006?

14  A     Yes.

15          MR. DENNEHY:   I offer 31, Your Honor.

16          MR. SOLOWAY:   No objection.

17          THE COURT:   Admitted.

18          (Government's Exhibit 31 was received in evidence.)

19  Q     Is this board, 102-E, simply the blow up of what I showed

20  you earlier, photographs of your block?

21  A     Yes.

22          MR. DENNEHY:   Showing the photograph in evidence as

23  Exhibit 31.

24          (The above-referred to exhibit was published to the

25  jury.)

1    Q    How did you come to meet this young man named Dominick?

2    A    He lives diagonally across the street from me.

3    Q    How did you first meet him?

4    A    Just on the block, saying hello, good-bye.

5    Q    Did you ever observe what he did with his time?

6    A    He was always in the street, either on his stoop, walking

7    around, in the wee hours of the morning.

8    Q    Would you see him outside in the front yard in the early

9    morning hours?

10   A    Yes.

11   Q    What else did you notice about what he did?

12   A    He just hung around.  It didn't seem like he had a job.

13   He just walked around and...

14   Q    Were there vehicles that came to his home?

15   A    Vehicles came and went.  A long time.

16   Q    Did he ever knock on your door after you moved in?

17   A    Yes.   Couple of times.

18   Q    What did he say?

19   A    He asked to borrow some money.  Five dollars here, ten

20   dollars there.

21   Q    In the beginning, did you give him money?

22   A    Yes.

23   Q    Did he ever come to you with some type of claimed

24   emergency for why he needed money?

25   A    One time he said that his father had a heart attack and

V. Nieves - Direct / Dennehy                    670

1    he had no way of getting there, so he needed money to catch a

2    cab to the hospital.

3              MR. DENNEHY:   There is water next to you, if you

4    need it.

5              THE WITNESS:   Thank you.

6    Q    As this developed over time, did he continue to ask you

7    for money?

8    A    After I found out that it wasn't true, the next time he

9    came to ask me for money, I told him no.

10   Q    What did you believe he was using the money for?

11   A    For drugs.

12   Q    Was that based on the way he acted and what you saw about

13   him?

14   A    The way he acted, how he looked.

15   Q    Did you discuss that with your neighbor, John?

16   A    Yes.

17   Q    Did you have a practice back in December of 2005

18   regarding your home, like what you left back at the house when

19   you went to work?

20   A    My cars were in the driveway because the bus is right

21   across the street.   So, I always left my cars in the driveway.

22   Q    And what about the lights in your home?

23   A    I would leave my side light on.

24   Q    Do you recall when the Transit Authority went on strike

25   that month, December of 2005?

1  A     Yes.

2  Q     What happened that day?

3  A     The day of the strike, I had to take my car to the train.

4  So, it was out of the driveway.

5  Q     What happened to the light on the side of your house that

6  day?

7  A     It happened to blow out.  It was working the night before

8  and it happened to blow out.

9  Q     That evening, did you go to a holiday party?

10 A     Yes, I did.

11 Q     At some point, did you get a notification from someone

12 that something had happened to your house?

13 A     My sister was due to fly in from Florida to stay with me

14 for the weekend and she took a cab to my house and said that

15 she thought somebody had broke in.

16 Q     Did you go home?

17 A     Yes, I told her to go to the nearest store and stay there

18 in case somebody was still in the house.  And when I got

19 there, it looked like somebody was in my house, yes.

20 Q     Why did you conclude that?

21 A     My side door was broken.  The whole frame was off on the

22 floor and when I looked around, all my jewelry was gone in my

23 bedroom.

24 Q     Approximately how much of your jewelry, about how much

25 was that, that was taken?

1    A    About 40,000.

2    Q    Did you report that to the police?

3    A    Yes.

4    Q    And did the police and detectives respond?

5    A    Yes.

6    Q    Did you tell your neighbor John about that?

7    A    Yes.

8    Q    Did John have the security system in place at the time

9    that this happened?

10   A    Yes, he did.

11   Q    What, if anything, did you do?

12   A    I was asked to see if he had any surveillance and I went

13   over to his basement and watched the surveillance with him.

14   Q    So, in --

15        MR. DENNEHY:  Let me just show you on 102-E, which

16   is in evidence this bottom right photograph.

17        (The above-referred to exhibit was published to the

18   jury.)

19   Q    Is that a view of Hamden Avenue at the time looking

20   towards Hylan?

21   A    Yes.

22   Q    And whose house is this?

23   A    That's my house.

24   Q    And this house that's under construction?

25   A    That's John's house.

V. Nieves - Direct / Dennehy                         673

1    Q    Is that the way the house looked back at that time in

2    early --

3    A    Yes.

4    Q    -- 2006?

5    A    Yes.

6    Q    Where is this photograph taken from?  Is that from

7    Dominick's --

8    A    That's --

9    Q    -- front lawn?

10   A    Yes.

11   Q    Turning to the bottom left-hand side of that Exhibit.

12        What is depicted in that photograph?

13   A    That's the corner where the car wash is.

14   Q    And the top photograph in 102-E?

15   A    That's the surveillance that's on the telephone pole.

16   Q    So, is this telephone pole in front of John's house where

17   he had installed those cameras?

18   A    Yes.

19   Q    And in this photograph here, on the bottom right-hand

20   side, can we see that telephone pole where the cameras are?

21   A    Yes.

22   Q    What did you see when you viewed his security system in

23   the basement?

24   A    You could see it was like a white SUV going up and down

25   my block, slowly, like canvassing the area.  And you actually

1  see like brakes, but not just someone stopping because the car

2  was slow, like signals.

3          And somebody, one person gets out and goes to my

4  front door.  And I guess then, after that, decides to go to my

5  side door.  And then, you don't see him at my side door, but

6  you see somebody else coming out of the white truck as if he

7  needed help to break the door down because he couldn't do it

8  himself.

9  Q    And then, what did you see?

10 A    Then a couple minutes later I saw them both walking out

11 my front door.

12 Q    Did you have a suspicion as to who it was that broke into

13 your home?

14 A    Yes.

15 Q    Who did you think did it?

16 A    Probably Dominick.

17 Q    And this happened after you told him you wouldn't give

18 him any more money?

19 A    Yes.

20 Q    Did that case with the Police Department ever get solved?

21 Were you ever notified of anyone's arrest?

22 A    No.

23 Q    Did you ever get your jewelry back?

24 A    No.

25 Q    Did there come a time sometime later when you were

1  contacted by the FBI in connection with this?

2  A    Yes.

3            MR. DENNEHY:  I have no other questions for

4  Ms. Nieves, Your Honor.

5            MR. SOLOWAY:  No questions for Ms. Nieves, Judge.

6            THE COURT:  You're excused.  Thank you very much.

7            THE WITNESS:  Okay.  Thank you.

8            (Witness excused.)

9            MR. DENNEHY:  The Government calls Greg Bruno.

10            (Witness enters and takes stand.)

11            COURTROOM DEPUTY:  Please, raise your right hand.

12  G R E G O R Y    B R U N O,

13            called by the Government, having been

14            first duly sworn, was examined and testified

15            as follows:

16

17            COURTROOM DEPUTY:  Please, state your full name and

18  spell it for the record.

19            THE WITNESS:  Gregory Bruno -- G-R-E-G-O-R-Y,

20  B-R-U-N-O.

21            COURTROOM DEPUTY:  Please, have a seat.

22            MR. DENNEHY:  May I enquire?

23            THE COURT:  Yes.

24  DIRECT EXAMINATION

25  BY MR. DENNEHY:

1  Q     Good afternoon.

2  A     Good afternoon.

3  Q     Sit up close to that microphone.

4        Tell the jury by whom you're employed.

5  A     New York City Fire Department.

6  Q     What do you do for the Fire Department?

7  A     I'm a fire-fighter.

8  Q     For how long have you been a fire-fighter?

9  A     Nine years.

10 Q     Prior to becoming a fire-fighter, what did you do?

11 A     I worked for New York City EMS.

12 Q     As what?

13 A     As a paramedic.

14 Q     What training and experience do you have in emergency

15 medicine?

16 A     Well, I've gone through emergency medical technician

17 school.  You have to do that prior to applying for paramedic,

18 which is a higher, advanced level of training for medical

19 training.

20        And then, I went to St. Vincent's paramedic school,

21 which is an accredited college course.  It's well over a

22 thousand hours of clinical rotations and anatomy, physiology,

23 for paramedic.

24        MR. SOLOWAY:  May we approach?

25        THE COURT:  Yes.

G.  Bruno - Direct / Dennehy                677

1              (Sidebar.)

2

3              (Continued on following page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Sidebar.)

2          MR. SOLOWAY:  You know, Judge, the Government has --

3    proving the arson which, to be perfectly frank, is not a count

4    in the indictment that I'm going to be vigorously defending in

5    terms of what happened since it's on a tape recording from

6    beginning to end.  And during the course of the arson we've

7    learned that the individual would owned the house, the father

8    of the individual who was just on the screen unfortunately

9    suffered a heart attack and had to be hospitalized.  We've

10   heard he had to be revived at the scene.

11          You know, I don't believe there's an element of this

12   crime that relates to physical injury, to causing physical

13   injury.  I think that I would say that I probably should have

14   sought to preclude in its entirety the evidence of the injury

15   to Dominick Poveromo.  It's Dominick, that's the father.

16          MR. DENNEHY:  Yes.

17          MR. SOLOWAY:  But I didn't do that.  And we're kind

18   of past that.  But I think continuing to highlight not the

19   fact that a fire was caused and that the defendant is accused

20   of it and evidence is being presented of it, but that someone

21   almost died as a result of that, you know, I object to that.

22          I object to the continuing, I guess, what I would

23   say focus on that.  And specifically, with respect to the

24   evidence that's about to the presented now that Mr. Poveromo's

25   medical records I think are already, they're already in

Sidebar                                        679

1    evidence.   And there has already been testimony about the fact

2    that he was, that he came out tried to put out the fire and

3    suffered a heart attack.   And that's enough.

4              MR. DENNEHY:   That testimony came from Dr. Gill

5    yesterday, Your Honor.

6              THE COURT:   Right.

7              MR. DENNEHY:   This fire-fighter actually responded

8    to the fire.   The house was on fire when he got there, which

9    is an element of the crime we must prove.   He smelled gasoline

10   when he fought the fire.

11             THE COURT:   Okay.

12             MR. DENNEHY:   And furthermore --

13             MR. SOLOWAY:   I have no objection to any of that.

14             THE COURT:   Right.

15             MR. DENNEHY:   And he also did resuscitate the

16   victim.

17             And it's our contention that this arson was done for

18   at reason of quote, "sending a message" to the people in the

19   house.   The fact that the father nearly died from fighting the

20   fire not only goes to how serious a fire it was, but also that

21   they did send the message to these people.   And it is relevant

22   evidence.

23             THE COURT:   I'm going to let you do it, but don't

24   unduly emphasize it.   Just bring it out and don't draw it out.

25   Okay?

Sidebar                                          680

1              MR. DENNEHY:   Correct.

2              THE COURT:   Okay.

3              (Sidebar end.)

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court.)

2    Q    Where is your current firehouse?

3    A    It's 3067 Richmond Road in Staten Island, New York.

4    Q    For how long have you worked there?

5    A    I've worked there since 1999, but then I was in Manhattan

6    for three or four years during 9/11.  And so, roughly, I would

7    say about six years I've worked in that firehouse.

8    Q    Which companies are housed in that firehouse?

9    A    Engine 165 and Ladder 85.

10   Q    Which company are you assigned?

11   A    Engine 165.

12   Q    What are the primary functions of the Engine Company

13   versus Ladder Company?

14   A    The Engine Company pretty much stretches a line to the

15   fire and puts the fire out.

16   Q    And the Ladder Company?

17   A    The Ladder Company's main purpose is to find the fire and

18   ventilate, and search for victims.

19   Q    Were you working on January 27th, 2006?

20   A    Yes.

21   Q    At approximately 3:03 in the morning, did you get an

22   alarm?

23   A    Yes.

24   Q    Was that of a house fire?

25   A    Yes.

G. Bruno - Direct / Dennehy                    682

1    Q    Do you recall the address?

2    A    I remember it was on Hamden Avenue.

3    Q    215 Hamden Avenue?

4    A    Yes.

5    Q    What was the nature of the call you received?

6    A    Structural fire at the location.

7    Q    Did you respond?

8    A    Yes.

9    Q    Describe for the jury what you saw when you got there.

10   A    We pulled up.  We saw heavy smoke pushing from the rear

11   of the dwelling and we saw visible flame coming from the

12   entire rear side of the house and heavy smoke.

13   Q    Was there another Engine Company on the scene before

14   yours?

15   A    Just before we arrived, Engine 159 took the hydrant, had

16   the hydrant closest to the fire.

17   Q    When you say "took the hydrant", what does that mean?

18   A    Usually if you're first, you want to take the closest

19   hydrant because you need to get water on the fire.  And being

20   in an Engine Company, you want to take the closest hydrant.

21   So, whoever is first will take the closest hydrant to the

22   fire.

23   Q    And is that what those fire-fighters were doing when you

24   pulled up?

25   A    Yes.

G. Bruno - Direct / Dennehy                    683

1    Q    Actually stretching the hose to the fire?

2    A    They started to stretch a hose, yes.

3    Q    Did there come a point when you were asked to do

4    something other than fight the fire?

5    A    Yes.   My captain, he went to the rear to assess where the

6    line needed to be placed and he noticed that there was a

7    gentleman that was down on the ground.

8    Q    What did you do?

9    A    He called for me because he knew I was a paramedic.   And

10   I went to where his location was and I saw a male on the

11   floor.

12   Q    Did you later learn that man's name?

13   A    Yes.

14   Q    What do you remember it?

15   A    Pavaro?  Pavarno?  Mr. Paravano?  Something like that.

16   Q    Something like that.

17   A    Mm-hmm.

18   Q    What did you notice about the gentleman?

19   A    He was apneic and pulseless, which means.   He wasn't

20   breathing.

21   Q    Spell that?

22   A    Apneic -- A-P-N-E-I-C.

23   Q    What does that mean?

24   A    He was not breathing.

25   Q    What did you do?

G. Bruno - Direct / Dennehy                    684

1    A     I merely called for one of my firemen in my company to

2    grab the medical equipment.

3            I opened his airway.  I looked, listened and feeled

4    for any kind of a pulse or respirations and there was none.

5    And by that time we started CPR.

6    Q     How did you do this?

7    A     We put an oropharyngeal airway.

8    Q     Spell that.

9    A     O-R-O-P-H-A-R-Y-N-G-E-A-L.

10   Q     That's to open up his airway?

11   A     It's a plastic device used to push the tongue away from

12   the trachea.

13   Q     Did you later use any type of equipment on this

14   gentleman?

15   A     We used an Ambu bag to ventilate the patient and we did

16   CPR.  And then we hooked up the defibrillator.

17   Q     Once you hooked it up, what did it tell you?

18   A     The patient was in ventricular fibrillation and -- which

19   means that the patient's heart was not functioning in a

20   capacity where -- to sustain life.

21   Q     So, what did you do?

22   A     We first analyzed.  Once we put the pads on and realized

23   he was in defib, we put the pads -- I mean, we first analyzed

24   the machine and it instructed us to shock.

25   Q     How many times did you shock him?

G. Bruno - Direct / Dennehy                          685

1    A      Twice.

2    Q      And then what happened?

3    A      Patient had spontaneous respiration and a pulse.

4    Q      Did he, in fact, then begin to talk?

5    A      Once we, once the ambulance arrived and they had him on

6    the stretcher, we moved him from the rear of the dwelling to

7    the sidewalk, and at that point he actually started to almost

8    try to sit up and he was talking.

9           MR. DENNEHY:  May I approach the witness,

10   Your Honor?

11          THE COURT:  Yes.

12          MR. DENNEHY:  I'd like to show you some photographs

13   that are marked for identification 102-A and B.

14          (Handing.)

15   Q      Have you seen these before?

16   A      Yes.

17   Q      Do you recognize what's depicted in those photographs?

18   A      This is the dwelling at Hamden Avenue that was on fire.

19   Q      Do they fairly and accurately depict some of the scenes

20   of that home after the fire?

21   A      Yes.

22          MR. DENNEHY:  I offer those, Your Honor.

23          MR. SOLOWAY:  No objection.

24          THE COURT:  Admitted.

25          (Government's Exhibit 102-A and 102-B were received

G. Bruno - Direct / Dennehy                    686

1    in evidence.)

2              (The above-referred to exhibit was published to the

3    jury.)

4              MR. DENNEHY:   I'm showing you 102-A in evidence.

5    Q    Is this the front of the dwelling?

6    A    Yes.

7    Q    And to the right, the top right photograph, does that

8    depict the area towards the rear of the house where the fire

9    started?

10   A    Yes.

11   Q    On the lower left-hand side is a closer picture of that?

12   A    Yes.

13   Q    Is this the area where the fire had started?

14   A    Yes.   Right at the rear there, there was an actual, there

15   was a door that led into the -- it was like a back door to the

16   home.

17   Q    As you were walking back there towards this person, did

18   you smell anything?

19   A    There was a smell of gasoline.

20   Q    You notice here on the house next-door, the siding is

21   warped.

22              Did you see that?

23   A    Yes.

24   Q    What does that indicate to you?

25   A    That means there was a heavy body of fire and it was

G. Bruno - Direct / Dennehy                           687

1    radiant heat that melted the side.  So, it was a pretty

2    advanced fire that was starting.

3    Q    And does this photograph on the bottom right of 102-A

4    depict the view of the rear of the house looking back towards

5    Hamden Avenue?

6    A    Yes.

7              MR. DENNEHY:  Showing you now what's in evidence as

8    102-B.

9              (The above-referred to exhibit was published to the

10   jury.)

11   Q    On the top left side, does that depict the part of the

12   home that was on fire when you got there?

13   A    Yes.

14   Q    The top right photograph as well?  The reverse angle?

15   A    Yes.

16   Q    And on the bottom right-hand photograph, what general

17   area of the house is this?

18   A    Yes.

19   Q    What part of the house do we see in this photograph?

20   A    This is the rear in the backyard, looking, looking at the

21   entrance to the home.  The back entrance of the home.

22   Q    What is this here in the picture?

23   A    That's an Ambu bag that was described before that was

24   used to breathe for the patient.

25   Q    And this here is which?

G. Bruno - Direct / Dennehy                    688

1    A    That's the garden hose that he was using to try to put

2    the fire out.

3    Q    Once EMS arrived and took the patient from you, did you

4    continue then until the fire was out?

5    A    Yes.

6    Q    And did that conclude your involvement in this particular

7    fire?

8    A    Yes.

9              MR. DENNEHY:  I have no other questions for Fireman

10   Bruno.

11             MR. SOLOWAY:  No questions, Judge.

12             THE COURT:  Thank you.  You're excused.

13             THE WITNESS:  Thank you.

14             THE COURT:  Do you want to take a five-minute break?

15             (Witness excused.)

16             THE COURT:  A ten-minute break?

17             MR. DENNEHY:  Whatever the jury wants.

18             THE COURT:  We'll make it a ten-minute break.

19             (Jury is excused.)

20

21             (Continued on following page.)

22

23

24

25

Proceedings                                    689

1              (The following occurs outside the presence of the

2    jury.)

3              THE COURT:   Again, just for purposes of the jury,

4    how late to you expect to go today?

5              MR. CHAN:   I think to the end of the day.

6              THE COURT:   It will go to the end of the day.

7              (Recess taken.)

8

9              MR. CHAN:   Can you turn the podium on?   I just want

10   to test to make sure it works.

11             COURTROOM CLERK:   The laptop?

12             MR. CHAN:   The laptop, yes.   And turn off the

13   button.

14             (Audio plays in courtroom.)

15             COURTROOM CLERK:   Do you want it louder or softer?

16             MR. CHAN:   I guess each recording is different so

17   you can hear what they're saying.

18             THE COURT:   Do we have the only control over that?

19   You have no control over it?

20             MR. CHAN:   Yes, because I'm maxed out here, but you

21   have a more detailed volume control on your system.

22             COURTROOM DEPUTY:   So, we'll put it on high here and

23   you adjust it over there.

24             MR. CHAN:   Okay.   That might be really, really loud.

25             COURTROOM DEPUTY:   You have on your computer a sound

Proceedings                           690

1   volume; right?

2          MR. DENNEHY:  Yes.

3          COURTROOM DEPUTY:  I'll just put it on high and

4   you can --

5          THE COURT:  You can start yours low and then

6   increase it.

7          MR. CHAN:  Right.

8          COURTROOM CLERK:  Are you running the transcript

9   while it's playing?

10         MR. CHAN:  No.

11         THE COURT:  Is everyone ready?

12         Okay, Dennis.

13         MR. DENNEHY:  Can we just switch it back?  We're

14  going to have the last witness use after a few documents and

15  then go to the audio.

16

17         (Continued on following page.)

18

19

20

21

22

23

24

25

P. McManus - Direct / Dennehy                    691

1            (Jury enters.)

2            (The following occurs in the presence of the jury.)

3            THE COURT:  Mr. Dennehy.

4            MR. DENNEHY:  Thank you, Your Honor.

5            The Government calls Paul McManus.

6            (Witness enters and takes stand.)

7            COURTROOM DEPUTY:  Please, raise your right hand.

8    P A U L    M c M A N U S,

9            called by the Government, having been

10           first duly sworn, was examined and testified

11           as follows:

12

13           COURTROOM DEPUTY:  Please, state your full name and

14   spell it for the record.

15           THE WITNESS:  Paul McManus -- P-A-U-L,

16   M-C-M-A-N-U-S.

17           COURTROOM DEPUTY:  Please, have a seat.

18           MR. DENNEHY:  Sit up close to that microphone.

19   Okay?

20           THE WITNESS:  Sure.

21   DIRECT EXAMINATION

22   BY MR. DENNEHY:

23   Q    Okay.  Good afternoon?

24   A    Good afternoon.

25   Q    Are you retired from the New York City Fire Department?

P. McManus - Direct / Dennehy          692

1    A    Yes, I am.

2    Q    When did you join the Fire Department?

3    A    I was hired July 11th, 1981.

4    Q    After that, did you work as a fire-fighter?

5    A    I worked as a fire-fighter for a little over 20 years.

6    Q    Where?

7    A    Ladder 118 right here in Brooklyn Heights and Ladder 114

8    in Sunset Park in Brooklyn.

9    Q    How many fires have you literally responded to?

10   Approximately?

11   A    Thousands.  I mean, thousands.

12   Q    At some point, did you get promoted to another rank?

13   A    Yes.  I was promoted to fire marshal December 1st, 2001.

14   Q    Was that after taking a written examination for

15   promotion?

16   A    Yes, it was.

17   Q    And after you got promoted to fire marshal, did you have

18   any specialized training?

19   A    There was a three-month course given by the Bureau of

20   Fire Investigations in determining, you know, learning how to

21   determine cause and origin of fires, building construction,

22   some electrical courses.

23   Q    Did you then have occasion to examine or investigate

24   suspicious fires under the supervision of another fire

25   marshal?

P. McManus - Direct / Dennehy          693

1  A     Yeah, when we were finished with the school, we went out

2  in the field.  For the first couple weeks we were out in the

3  field we had like, sort of like a mentor.  He would ride

4  around with us, or a supervising fire marshal, and kind of

5  point us in the right direction.

6  Q     And during the five years that you worked as a fire

7  marshal, approximately how many suspicious fires did you

8  investigate?

9  A     Personally, I was the lead investigator in 400 to 500

10 fires.

11 Q     And then how many approximately did you assist?

12 A     Almost equal the amount.

13 Q     Have you ever testified as an expert had court?

14 A     Yes, I have.

15 Q     On approximately how many occasions?

16 A     Twice.

17        MR. DENNEHY:  Your Honor, pursuant to Rule 702, I

18 would offer Mr. McManus in cause and origin of fires.

19        THE COURT:  You may proceed.

20        MR. DENNEHY:  Thank you.

21 Q     Were you working on January 27th, 2006?

22 A     Yes, I was.

23 Q     Do you recall that day?

24 A     I do.

25 Q     Why?

1   A     It's my birthday.

2   Q     When you got to work, what happened?

3   A     We were, at some point during the tour -- I worked the

4   day tour, it was a day tour -- at one point I was given a job

5   ticket, we call it, with the information about a particular

6   fire.

7   Q     Where had that fire occurred?

8   A     On Hamden Avenue in Staten Island.

9   Q     Now --

10  A     I think it's 215 Hamden.

11  Q     215 Hamden.

12        Who normally would request the presence of a fire

13  marshals after a fire?

14  A     Normally, it's the chief in charge of a fire.

15  Q     And is that what happened in this case?

16  A     Yes.

17  Q     Did you actually respond to 215 Hamden Avenue?

18  A     I did.

19  Q     And did you investigate the cause and origin of that

20  fire?

21  A     Yes.

22  Q     Just describe briefly for the jury what you did.

23  A     Well, in any case that you investigate you start by when

24  you arrive at the scene looking at the building and then work

25  your way towards the most fire damage, and in this case it

1    was -- excuse me -- in this case in the exterior of the

2    building along the right side of the building towards the

3    rear.

4    Q    At what time had that fire been reported approximately?

5    A    I think it was around 03:00.  3:00 a.m., somewhere around

6    there.

7    Q    Did you take photographs of the scene?

8    A    Yes.

9              MR. DENNEHY:  May I approach the witness?

10             THE COURT:  Yes.

11             MR. DENNEHY:  I'm showing you what's been marked

12   102-A, B, C, D and E and F.

13             (Handing.)

14   Q    Tell us if you recognize those photographs.

15             (Pause in the proceedings.)

16   A    Yes, I do.

17   Q    Do they fairly and accurately depict the scene as you

18   investigated it that day?

19   A    Yes.

20             MR. DENNEHY:  I offer 102-A through F, inclusive.

21             MR. SOLOWAY:  No objection.

22             THE COURT:  Admitted.

23             (Government's Exhibits 102-A, B, C, D and E and F

24   were received in evidence.)

25             MR. DENNEHY:  And the boards, which are blow-ups of

P. McManus - Direct / Dennehy                    696

1    the same.

2              THE COURT:  That's fine.

3    Q    When you examined that building, Mr. McManus, what did

4    you observe about it?

5    A    There was heavy fire damage on the right side of the

6    building towards the rear of the building.

7    Q    What, if anything, did you notice about the damage to the

8    building itself in determining the cause and origin of the

9    fire?

10   A    Well, in this particular case, there was a horizontal

11   burn, we would call it.  And basically, it's burned from the

12   ground up at the lowest point by the sidewalk.  And it almost

13   goes straight up the siding.

14             (The above-referred to exhibit was published to the

15   jury.)

16   A    And it's also on the sidewalk just below that area is

17   what we call like a pooling area where some kind of flammable

18   liquid was used.

19   Q    Now, have you been to fires both as a fire-fighter and as

20   an arson investigator where, let's say, a space heater catches

21   the wall on fire?

22   A    Yes, sure.

23   Q    And how would the pattern of burning look in something

24   like that?

25   A    Generally, in a fire like that, or any other combustible

1    material fire, it's usually a V pattern where you can almost

2    walk into a room and if the fire started, it's going to show

3    you by the damage where it originated or the area of origin.

4         Maybe not -- it might not be the exact point, but

5    generally it points right to the area of origin because fire

6    wants to travel up and out.  In this case, it was a

7    horizontal.

8         MR. DENNEHY:  And in this photograph on 102-B?

9         (The above-referred to exhibit was published to the

10   jury.)

11   Q    Is that the pattern you're indicating where the side of

12   the house is burned from top to bottom?

13   A    Yeah, you could see, you could see that the fire goes

14   almost straight up to the side of the window and also to the

15   far end of the building there, the corner.  And it's almost

16   like a straight line up, you know.  Four feet wide.

17        MR. DENNEHY:  I'm showing you what's in evidence as

18   102-C, the bottom right-hand corner.

19        (The above-referred to exhibit was published to the

20   jury.)

21   Q    What does that depict?

22   A    You can see on the concrete there, it looks like what we

23   would call a pooling area or some kind of liquid that was

24   laying on the concrete and was burning there.

25   Q    Now, does concrete typically just combust on its own?

1  A    No.

2         MR. DENNEHY:  Showing you what's in evidence as

3  102-D.

4         (The above-referred to exhibit was published to the

5  jury.)

6  Q    Did you find any evidence of potential accelerants that

7  were used to start this fire?

8  A    Yes.  I remember seeing that canister, which, you know,

9  to me it looked like a small propane cylinder, maybe something

10 used for camping or a lantern or something.

11 Q    And in the other side of 102-D, what's depicted here in

12 the rea?

13 A    That's the remains of a small gasoline container.

14 Plastic.

15 Q    And in the bottom corner?

16 A    That's the same one.

17 Q    Did you survey the scene of the block on Hamden Avenue as

18 well as the actual fire itself?

19 A    Yeah, we did.  We performed a canvass of the area and,

20 you know, we try and question neighbors if they saw anything.

21 Q    Did you learn here in Exhibit 102-E that one of the

22 neighbors on that block had a security camera?

23        (The above-referred to exhibit was published to the

24 jury.)

25 A    Yes, when we were doing our canvassing, we noticed the

1   security camera on a telephone pole in the front of the house.

2   Q     And in the lower hand corner of this Exhibit, is this the

3   house here that's under construction that had that security

4   camera?

5   A     Yes.  Yes, it is.

6   Q     What, if anything, did you do when you learned that?

7   A     We gained access to the house and viewed a video of the

8   from that camera.

9   Q     The homeowner let you watch his system?

10  A     Yes, he did.

11  Q     And what did you observe on that system when you reviewed

12  the tape?

13  A     I saw, you know, I have in my notes, I saw I made a

14  notation of a person -- can I review my notes?

15              THE COURT:   Yes.

16              MR. DENNEHY:   Would that refresh your memory?

17              THE WITNESS:   Yes.

18              THE COURT:   Just tell us what you're referring to.

19              THE WITNESS:   Okay.

20              (Pause in the proceedings.)

21  A     I have written down here at 02:50:08, which would be ten

22  to 3:00, an image of a person walking into the driveway with a

23  bag.

24  Q     Based on the distance from the camera to that home and

25  the time of day, was it possible to identify the person in any

1    way?

2    A    No, no.  It was very, it was a far distance and dark.

3    Q    The race of the person?

4    A    No.

5    Q    After you viewed that, did you then take another

6    photograph?

7         MR. DENNEHY:  Which I'll show you here as

8    Exhibit 102-F.

9         (The above-referred to exhibit was published to the

10   jury.)

11   A    Yes, we did.

12   Q    Why did you take this photograph?

13   A    That's a photo, I believe, directly below the video

14   camera pointing in the direction of the image or -- the fire

15   building and the image of the person I saw walking down the

16   driveway.

17   Q    Is this the house that actually caught fire?

18   A    Yes, it is.

19   Q    So, you stood under that camera and took a photograph of

20   what the camera would show?

21   A    Yes.

22   Q    And the part of the house that was burned, is it visible

23   in this view of what the security would show?

24   A    No, it isn't.

25   Q    It's blocked by the bigger house next door?

1   A     That's correct.

2   Q     And this is the camera here under which you stood to take

3   that photo?

4         (The above-referred to exhibit was published to the

5   jury.)

6   A     That's right.

7   Q     Did you interview the occupants of the house that had

8   been burned?

9   A     Yes, I did.

10  Q     Do you recall anybody's name that you interviewed?

11  A     I interviewed Dominick Poveromo, Junior, I believe.  And

12  Diane Poveromo.

13        MR. DENNEHY:  Showing you what's in evidence as

14  Government's Exhibit 31.

15        (The above-referred to exhibit was published to the

16  jury.)

17  Q     Do you recognize that person?

18  A     I believe that's Dominick.

19  Q     How did he seem to you when you spoke to him?

20  A     Dominick seemed, it was a tough interview because he was

21  hard to hold down in one place.  He seemed to be, you know,

22  off the charts.  That's the best I can describe it.

23  Q     Was he home at the time the fire started?

24  A     Yes, he was.

25  Q     Did you have a chance to interview his father?

P. McManus - Direct / Dennehy                    702

1   A     No, I did not.

2   Q     Why was that?

3   A     He was removed from the scene prior to my arrival.

4   Q     Do you recognize the person depicted in Government's

5   Exhibit 18?

6              (The above-referred to exhibit was published to the

7   jury.)

8   A     I think that that's the gentleman who let me into his

9   basement to view the video.

10             MR. DENNEHY:   And Government's Exhibit 102-C is a

11  photograph of the house next-door to the house that burned.

12             (The above-referred to exhibit was published to the

13  jury.)

14  Q     What, if anything, did you notice about the neighbor's

15  house?

16  A     Well, the vinyl siding, as you could see, is damaged from

17  radiant heat of the fire of the premise.

18  Q     And investigating the cause and origin of this fire, what

19  does the damage to the neighbor's house suggest to you?

20  A     Well, it was an intense fire, as far as heat, you know.

21  It radiated directly over and you could see that it's even

22  very low, also.  As low as can go, almost, on the siding.

23  Q     The fire literally started on the ground of the house?

24  A     Yes.

25  Q     And in 102-C here we see up into the roof and the rafters

1   of that building?

2   A     Correct.

3   Q     Was that caused by the fire or something else?

4   A     There might have been fire damage up there that was

5   removed or overhauled by the fire companies who arrived on the

6   scene.

7   Q     Just describe in one sentence what that means?

8   A     Overhaul is the process of removing or opening up walls

9   to see if there's extension into the building.

10  Q     Had this fire continued to burn up into those rafters,

11  what potentially could have happened?

12  A     Well, potentially you could lose the whole house.

13  Q     Were are the different types of cause and origin of a

14  fire?

15  A     There's three types.  There's natural, accidental and

16  nonaccidental.

17  Q     What would be an example of a natural fire?

18  A     Natural fire would be something caused by, let's say, an

19  earthquake or lightning, flood.

20  Q     What would be an example of an accidental fire?

21  A     An accidental fire could be an electrical fire.

22  Q     If someone left candles burning in the house?

23  A     That's actually an accidental fire also.

24  Q     And in this particular case, did you determine, based on

25  your review of the scene and the evidence, the cause and

1  origin of this fire?

2  A    I did.

3  Q    What was your conclusion as to the cause of this fire?

4  A    That it was nonaccidental.

5  Q    What did you base that on?

6  A    On the characteristics of the burn pattern and the

7  charring to the walls and the sidewalk.  And the high

8  intensity of the heat.

9  Q    If a person were to pour liquid gasoline along the

10  sidewalk three or four feet wide and then ignite it, would

11  that burn be consistent with the one you saw in this

12  particular case?

13  A    Yes.  It would burn the entire area that is covered by

14  the, you know, the flammable liquid.

15  Q    And would it burn straight up as wide as the puddle of

16  gasoline were itself?

17  A    Yes.  Yes, it would.

18        MR. DENNEHY:  I'd like to show you two Exhibits.

19        May I approach, Your Honor?

20        THE COURT:  Yes.

21        MR. DENNEHY:  This is marked as Government's

22  Exhibit 98 for identification.

23        (Handing.)

24  Q    Do you recognize what's in that bag?

25  A    It resembles the container that was at the scene.

1    Q    The red one?

2    A    The red one, yes.

3         MR. DENNEHY:  And showing you Government's

4    Exhibit 99 for identification.

5         (Handing.)

6    Q    Do you recognize what is in that bag?

7    A    This resembles the cylinder that was on the scene that I

8    thought could be a propane cylinder.

9    Q    On that particular day, in addition to the fire marshals

10   investigating this, did the New York City Police Department

11   also investigate it as a crime scene?

12   A    Yes, they did.  When I -- shortly after I arrived, there

13   was a Captain from NYPD, detective, captain of detectives.

14   And he declared it a crime scene because of the injury to the

15   homeowner.

16   Q    And so, was it the Police Department that took custody of

17   this evidence on that day?

18   A    Yes, it was.

19        MR. DENNEHY:  I have no other questions Your Honor.

20        THE COURT:  Anything, Mr. Soloway?

21        MR. SOLOWAY:  Yes.

22   CROSS-EXAMINATION

23   BY MR. SOLOWAY:

24        MR. SOLOWAY:  I just have a couple of questions.

25   Q    You said that the fellow that had the camera across the

P. McManus - Cross / Soloway                706

1   street let you look at it in his home, right?

2   A    Yes.

3   Q    And were you able to -- did you obtain a copy of that

4   particular image or the images that you saw there?

5   A    No, I did not.

6   Q    So, you looked at it.

7        And do you know whatever happened to that?  Was it a

8   video that could be --

9   A    Yeah, from what I can recall, it was, he didn't know how

10  to either download it or -- I don't remember if it was

11  computerized or what, but he didn't know how to work the

12  system other than to view it.

13       And I didn't have a clue.  And I believe, you know,

14  PD was involved with it also.  But I'm not a hundred percent

15  sure.

16  Q    All right.  But other than viewing it, you viewed it and

17  then you don't really know whether or not it was preserved in

18  any way after that?

19  A    I don't know.

20  Q    And you said that what happened after that involved

21  people who were who had declared it a crime scene.

22       And if it was going to be obtained or preserved in

23  any way, that wouldn't be something that you would get

24  involved in?

25  A    Well, I could get involved in it but, you know, that

P. McManus - Redirect / Dennehy                707

1  wasn't actually part of the crime scene, I don't believe.

2  But...

3  Q    In any event, you could have.

4        But in this particular situation you didn't?

5  A    That's correct.

6  Q    And --

7        MR. SOLOWAY:  That's all.  I have nothing further.

8  Thank you.

9        MR. DENNEHY:  May I, Your Honor?

10        THE COURT:  Yes.

11  REDIRECT EXAMINATION

12  BY MR. DENNEHY:

13  Q    When you viewed the tape the day of the fire, was it

14  possible to identify the person in the tape at all?

15  A    No.

16  Q    Did you tell the person -- could you tell the person's

17  race?

18  A    No.

19  Q    Age?

20  A    No.

21  Q    Height?

22  A    No.

23  Q    Clothing?

24  A    No.

25        MR. DENNEHY:  I also neglected to offer, Your Honor,

1    Exhibits 98 and 99.

2            THE COURT:  Any objection to 98 and 99?  That's the

3    cylinder --

4            MR. SOLOWAY:  No objection to that.

5            THE COURT:  Admitted.

6            (Government's Exhibits 98 and 99 were received in

7    evidence.)

8            MR. SOLOWAY:  Can I just ask a question from over

9    here, Judge?

10            THE COURT:  Yes.

11            MR. SOLOWAY:  Thank you.

12   RECROSS-EXAMINATION

13   BY MR. SOLOWAY:

14   Q    You said you couldn't identify the race or any of those

15   things that the prosecutor asked you.

16            So, what you were able to see on that video that you

17   saw, whatever kinds of images that were created, could you

18   describe what you were able to see?

19   A    As best I can remember, I just saw a person walking with

20   his back to the camera down the driveway to the house in

21   question.  The premises, the subject premises.

22   Q    And based on your recollection, other than -- did you see

23   the person stop at any point?

24   A    I don't recall.  I don't think so.

25   Q    Did you see where the person came from?  Did the person

1  get out of a car?  Like, could you tell any of that?

2  A    I don't think he got out of a car.  I just think he

3  appeared from possibly out of camera shot.  The camera was

4  pointed in a fixed position and he just appeared on the

5  camera.

6            MR. SOLOWAY:  That's all.  Nothing else.

7            THE COURT:  Thank you very much.

8            THE WITNESS:  Okay.

9            THE COURT:  You're dismissed.

10            (Witness excused.)

11            MR. CHAN:  The Government calls Special Agent

12  Anthony Zampogna.

13            (Witness enters and takes stand.)

14            COURTROOM DEPUTY:  Please, raise your right hand.

15  A N T H O N Y    Z A M P O G N A,

16            called by the Government, having been

17            first duly sworn, was examined and testified

18            as follows:

19

20            COURTROOM DEPUTY:  Please, state your full name and

21  spell it for the record.

22            THE WITNESS:  Anthony, middle initial L, last name

23  Zampogna -- Z-A-M-P-O-G-N-A.

24            MR. CHAN:  May I enquire?

25            THE COURT:  Yes, please.

1    DIRECT EXAMINATION

2    BY MR. CHAN:

3    Q     Agent Zampogna, where do you work?

4    A     I work for the Federal Bureau of Investigation.

5    Q     How long have you worked for the FBI?

6    A     For over 12 years.

7    Q     Where are you currently assigned?

8    A     To counter-terrorism division at FBI headquarters in

9    Washington, D.C..

10   Q     How long have you been there?

11   A     For a year-and-a-half.

12   Q     Prior to your move to D.C., where were you working?

13   A     The New York office of the FBI.

14   Q     What part of the New York office?

15   A     In the organized crime branch for the Squad C-10, Bonanno

16   Crime Family.

17   Q     How long were you on the Bonanno Crime Family squad?

18   A     For approximately seven years.

19   Q     Do you recall the last investigation you worked on while

20   you were part of the Bonanno squad?

21   A     Yes.

22   Q     What was that an investigation of?

23   A     It was an investigation of Gino Galestro, a soldier of

24   the Bonanno Cosa Nostra family and his crew of associates who

25   primarily lived in Staten Island, New York.

1    Q    Did you work on that investigation with anyone else?

2    A    I did.

3    Q    Who was that?

4    A    Special Agent Lauren Regucci.

5    Q    Is that her at the table?

6    A    That is her.

7    Q    Was that what you would call a proactive investigation?

8    A    Part of it was, yes.

9    Q    What's a proactive investigation?

10   A    It's an investigation where we attempt to collect

11   conversations and record them, real-time, with subjects of the

12   investigation.

13   Q    And what are the different techniques you use to get

14   real-time conversations of your subjects?

15   A    Either recording conversations, telephone calls or of --

16   using a body recorder to record live conversations between

17   people.

18   Q    Have you heard the term consensual recording?

19   A    I have.

20   Q    What does that mean, to make a consensual recording?

21   A    That's to have one party who's a party of that have

22   conversation to have knowledge of that recording occurring at

23   that time.  So, they have agreed to make that recording of

24   that conversation.

25   Q    Can that happen either through consent to make a

1  telephone recording of a telephone call or consent to make a

2  recording while the person's wearing a recording device on

3  their person?

4  A    That can happen in both cases, yes.

5  Q    If you don't have the consent of someone in the

6  conversation, what do you have to do to record a conversation?

7  A    We have to obtain the court order from a judge.

8  Q    In your investigation of the Gino Galestro crew on

9  Staten Island, did you use consensual recordings?

10 A    We did, yes.

11 Q    Who was it that made the consensual recordings for you?

12 A    A cooperating witness by the name of Volkan Mergen.

13 Q    Did he have a nickname?

14 A    Yes, "The Turk".

15        MR. CHAN:  Showing you what's in evidence as

16 Government's Exhibit 11.

17        (The above-referred to exhibit was published to the

18 jury.)

19 Q    Who is that?

20 A    That's Volkan Mergen.

21 Q    At the time that he agreed to wear a recording device for

22 you, did he have a pending criminal case?

23 A    He did not.

24 Q    Approximately what period of time did he make the

25 recordings for you?

1    A    For a year, from January of 2005 to January 2006.

2    Q    How many recordings?

3    A    Approximately 275.

4    Q    What kind of recordings were they?

5    A    They were both telephonic recordings and body recorders.

6    Q    Now, was Mr. Mergen originally part of this crew you were

7    investigating?

8    A    He was not.

9    Q    Did you work with him to come up with a cover story so he

10   could infiltrate the crew.

11   A    Yes, we did.

12   Q    What was that cover story?

13   A    He initially, he represented himself as someone involved

14   in fraudulent stock deals.  And later, he represented that he

15   was involved in fencing stolen goods or illegal products from

16   New York to Turkey.

17   Q    Was he from Turkey?

18   A    He was.

19   Q    Did he have any pre-existing connections or contacts with

20   some of the members of that crew?

21   A    He did, yes.

22   Q    Who did he know?

23   A    John Tufarelli, he had also met Mike Maggio.

24   Q    Socially?

25   A    Yes.

1  Q     Did you also incorporate an organized crime element into

2  his cover story?

3  A     Yes.  Mr. Mergen was on record with the Gambino Family at

4  one time and part of the story was that he was unhappy with

5  his representation in the Gambino Family and that he wanted to

6  move to the Bonanno Crime Family and have them represent him.

7  Q     Were there things you did to help him look more like a

8  successful criminal?

9  A     Yes, we did.

10  Q     What did you do?

11  A     We gave him flashy cars to drive.  We gave him spending

12  money so that when he went out and socialized he could buy

13  drinks and spend time with these individuals in a social

14  setting.

15  Q     You said you got him expensive cars.  What cars?

16  A     The first car we gave him was a white Infiniti.  And

17  then, later on, we changed that for a black Range Rover.

18  Q     Do you recall the license plates of those cars?

19  A     I do.  The Infiniti was a New Jersey license plate and

20  that was SAA-77Y.

21  Q     And the range rover?

22  A     Range Rover was also a New Jersey license plate.  That

23  was UCE-6OD.

24  Q     Did you supply him with a cell phone?

25  A     Yes, we did.

1    Q     What was the number for the cell phone?

2    A     (646) 546-1067.

3    Q     Where did you have him say he was based?  Where he was

4    living?

5    A     Hoboken, New Jersey.

6    Q     Now, in January of 2005, was he accepted into the crew

7    from the very beginning?

8    A     He wasn't.  It took time to work his way in.

9    Q     Approximately when during the investigation did he start

10   really hanging out with the members of the crew?

11   A     Approximately in July of 2005.

12   Q     Was there something that happened in July 2005 that made

13   that more possible?

14   A     Yes.  He actually got into a car accident with the car

15   that we provided to him and he had suggested that we let him

16   bring that car to Michael Maggio's auto body shop to have it

17   repaired.  And he did.

18   Q     And did things start rolling from there?

19   A     Yes.

20   Q     Did you have -- before he went and did this, did you have

21   discussions and give him instructions about what he was

22   supposed to do when someone he was talking to started

23   discussing past criminal activity?

24   A     We did.  We encouraged him to keep those conversations

25   going, but not to ask too many questions so as to bring

1    suspicion on himself.

2          From our experience in investigations of members of

3    organized crime, they're highly sensitive to people that

4    question them about their past criminal activity.

5    Q    What were your instructions to him if they started

6    talking about crimes they wanted to do in the future?

7    A    That he should elicit as much as he can about what they

8    were doing and that he should relate that information to us.

9    Q    Was he authorized to commit crime on his own?

10   A    He was not authorized to commit crime on his own.  He was

11   given authorization to commit certain types of crime, but he

12   had to get authorization from the FBI first and we would

13   advise them as to what he can actually do.

14   Q    And if some of those crimes resulted in money being paid

15   to him, what was he supposed to do with that?

16   A    Anything he received he had to turn over to the FBI.

17   Q    In terms of the protocol of his interactions with the

18   targets of the investigation, was there a rule about what he

19   had to report and what he didn't have to report?

20   A    I instructed him that any time that he met with these

21   individuals, he had to have a recording device with him.

22         We also provided him a recorder a cassette recorder

23   to record his telephone conversations with the understanding

24   that it would be difficult for him to always record incoming

25   phone calls because he could be caught off-guard, and he was

A. Zampogna - Direct / Chan                    717

1   living with a girlfriend who was unaware of his relationship

2   with the FBI.

3   Q    Can you explain to the jury when you had him going to a

4   meeting with a recording on his person, what was your

5   procedure both leading up to the meeting and following the

6   meeting?

7   A    We would meet with him before he went to the meeting and

8   we would initiate the recording device, turning it on.  We

9   would provide him the recording device.

10          He would leave, go to that meeting and then he would

11  call us when he was done and away from these individuals.  We

12  would meet with him, take the recording device back from him,

13  and then deactivate the recording device.

14  Q    How long could these meetings last?

15  A    They could last anywhere from a half-hour to ten to

16  12 hours.

17          There was also times when this recording device, the

18  battery did not run as long as the time that he was with these

19  individuals.  So, sometimes he would come back and that

20  recording device will have stopped.

21  Q    Now, is the recording device designed in such a way that

22  you would know if someone tampered with it during the middle

23  of a recording?

24  A    Yes.  The recorder that he was using as a body recorder

25  was a digital recorder.  And we would download the information

A. Zampogna - Direct / Chan                718

1   from the digital recorder and the software that we would down

2   load the recorder used to download the recorder would actually

3   identify how many times the recorder was either turned on or

4   turned off, whether it was actually turned on or off or

5   whether it had because it had lost power or whether it had

6   ended because of some sort of malfunction.

7   Q    In the over 200 recordings that were made as a part of

8   this investigation, did you see any evidence of tampering?

9   A    I did not.

10           MR. CHAN:   Your Honor, may I approach?

11           THE COURT:   Yes.

12           MR. CHAN:   I'm showing you what's marked for

13  identification as Government's Exhibits 106, 107, 108, 109,

14  110, 111, 112, and 113.

15           (Handing.)

16  Q    What are these?

17  A    These are excerpts of recordings that he made throughout

18  the investigation.

19  Q    Eight of them?

20  A    There are eight of them, yes.

21  Q    Have you reviewed these recordings?

22  A    I have, yes.

23  Q    How do you know?

24  A    Because I see my initials on the Government's

25  Exhibit sticker on each of the recordings.

A. Zampogna - Direct / Chan                                719

1          MR. CHAN:  I offer those Exhibits.

2          MR. SOLOWAY:  I take it those are the Exhibits that

3    is we've had discussions about?

4          MR. CHAN:  Yes.

5          MR. SOLOWAY:  I have no objection to those,

6    Your Honor.

7          THE COURT:  Admitted.

8          (Government's Exhibits 106, 107, 108, 109, 110, 111,

9    112, and 113 were received in evidence.)

10          MR. CHAN:  I'm also showing you a binder of

11   transcripts marked from 106-T through 113-T.

12          (Handing.)

13   Q    What's inside this binder?

14   A    These are transcripts that were made of these recordings,

15   and I've reviewed them with those recordings.

16   Q    Have you ensured that the transcripts are accurate as to

17   the recordings?

18   A    I have.

19   Q    Have you also ensured that the voice attributions -- in

20   other words, when it says that so-and-so says X -- that that's

21   really the person who said that?

22   A    I have.

23   Q    How are you familiar with the voices of the speakers on

24   those tapes?

25   A    Throughout the investigation I became familiar with their

A.  Zampogna - Direct / Chan                720

1   voices.   There were times when we were able to identify the

2   individuals who were meeting with Mr. Mergen and from

3   throughout the conversations, they referred to each other by

4   name.  So, I can identify them in that manner.

5          I also have heard their voices live.  And in regard

6   to Mr. Young, I also reviewed a home video that he had made

7   that was recovered from a search of his residence.

8   Q     Is this the home video that he made, 160-B?

9   A     Yes.

10  Q     And 160-A is the excerpt of when he actually does talking

11  on the tape?

12  A     Yes.

13         MR. CHAN:  I offer 160-A and 160-B.

14         MR. SOLOWAY:   160-A I have no objection to.  Can we

15  approach?

16         THE COURT:  Yes.

17         MR. CHAN:  No, that's fine.  I'll only offer 160-A.

18         MR. SOLOWAY:  Okay.

19         THE COURT:  Admitted.

20         (Government's Exhibit 160-A was received in

21  evidence.)

22         MR. CHAN:  And can we publish the transcript as an

23  aide to the jury?

24         THE COURT:  Yes.

25         Ladies and gentlemen, let me explain this to you.

A. Zampogna - Direct / Chan                    721

1         You're going to be getting transcripts of

2    conversations that you are going to be listening to.  The

3    evidence is the tapes.  The evidence is what you will hear.

4    The transcripts will be given to you solely -- excuse me -- as

5    an aide in listening to the tape.  The transcripts are not

6    evidence.  So, if you notice any discrepancy between what you

7    hear and what you see, it is what you hear that is evidence.

8         The only other thing is that when you see

9    attributions that are attributed to "CW" in any of these

10   tapes, those are not being admitted for the truth of the

11   statements.  They're solely being admitted for the context of

12   the statements that other individuals may be making in

13   response, okay?  So, that's just with respect to the CW

14   attributions.

15             MR. CHAN:  Thank you.

16             (Binders distributed to jury.)

17             MR. CHAN:  Starting with Government's Exhibit 109

18   and 109-T.

19             (Pause in the proceedings.)

20             THE COURT:  Is there a problem?

21             MR. CHAN:  I think everyone's on the same page, so.

22             THE COURT:  Okay.

23   Q    Now, 109-T.

24        What's the date of this recording, sir?

25   A    September 3rd 2005, and September 4th, 2005.

1   Q    What's the entire length of the recording?

2   A    It starts at approximately 9:14 p.m. and then runs until

3   2:53 a.m.

4   Q    Where does this conversation take place?

5   A    This is at Fresca's on the Bay.  It's a restaurant on

6   Staten Island, New York.

7   Q    Starting with the first excerpt, which is 21:55:14.

8              (Audio played for jury.)

9              MR. CHAN:   Now, moving on to the second excerpt at

10  23:19:06.

11             (Audio played for jury.)

12             MR. CHAN:   Moving on to the next recording, which is

13  107.

14  Q    What's the date of 107?

15  A    It's Wednesday, September 7th, 2005.

16  Q    How many days is this after the prior recording?

17  A    That was three days.

18  Q    Who was speaking in this recording?

19  A    This is Mr. Mergen and Mr. Young.

20  Q    What's the he entire time range of this recording?

21  A    This one, approximately 12:56 p.m. until approximately

22  5:30 p.m.

23  Q    What is this -- where does this conversation take place?

24  A    This one also takes place at Fresca's on the Bay

25  restaurant.

A. Zampogna - Direct / Chan                    723

1          MR. CHAN:  Starting with the first excerpt on page

2    two, 13:13.

3          (Audio played for jury.)

4          MR. CHAN:  Now, turning back to page three of that

5    excerpt we just listened to, in the middle by the hole punch.

6    Q    The cooperating witness says:  "I was telling him I heard

7    you guys were busy last weekend."  And then, there's the

8    attribution to "JG".

9          Who is JG?

10   A    Jose Garcia.

11   Q    "Last weekend, last might it was, eff-ing busy."  And

12   then that followed by JY.

13         Who is JY?

14   A    Joseph Young.

15   Q    Saying:  "We're just getting back from last night".

16         Now, what was the date of last week weekend in

17   relation to the conversation here?

18   A    That was Saturday the 3rd and Sunday the 4th.

19   Q    That's the same date as the prior recording?

20   A    Yes.

21         MR. CHAN:  We'll continue on with excerpt two

22   starting at page four, at 13:34 and one second.

23         (Audio played for jury.)

24         MR. CHAN:  I'm going to play the third excerpt

25   starting at 15:17.

1          (Audio played for jury.)

2          MR. CHAN:   And the fourth excerpt.

3          (Audio played for jury.)

4    Q    And the person talking last there saying:   "Anyway, you

5    did good last night, Joe", who was speaking?

6    A    It was Michael Maggio.

7          MR. CHAN:   Turning now to the next recording, 106

8    and 106-T.

9    Q    Have you ever heard the term "controlled purchase"?

10   A    I have.

11   Q    What's the controlled purchase?

12   A    That's when law enforcement has an individual, whether

13   it's an undercover agent or a cooperating witness, make a

14   purchase on behalf of the Government, but unknowingly to the

15   individuals that he's dealing with.

16   Q    Typically, are those illegal contraband?

17   A    Usually like drugs or guns.

18   Q    Did you make controlled purchases of guns in this case?

19   A    We did.

20   Q    How many guns?

21   A    Two.

22         MR. CHAN:   I'm going to play now a recording

23   Government's Exhibit 106.

24   Q    Now, this recording, is it a body recording or is it a

25   different kind of recording?

1   A   This is a telephone recording.

2   Q   Of who?  To who?

3   A   This is this is from Mr. Mergen to Joseph Young.

4   Q   On what date?

5   A   The date was Monday, September 12th, 2005.

6   Q   And the time?

7   A   Approximately 4:46 p.m.

8   Q   Are we about to play the entire call?

9   A   Yes.

10              (Audio played for jury.)

11

12              (Continued on following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Zampogna - Direct/Chan

1   DIRECT EXAMINATION (Cont'd.)

2   BY MR. CHAN:

3           (The audiotape is shut off.)

4   Q    Agent Zampogna, following this conversation, did you

5   provide money to the cooperating witness?

6   A    We did.

7   Q    On what date?

8   A    On September 17, 2005.

9   Q    How much money did you give the cooperating witness?

10  A    $700.

11  Q    Why?

12  A    To purchase the gun.

13  Q    Did he go to a meeting after you gave him the money?

14  A    He did.

15  Q    Who did he meet with?

16  A    Mike Maggio.

17  Q    Following that meeting, did you receive anything from

18  the cooperating witness?

19  A    We did.

20  Q    What is that?

21  A    A gun.

22          MR. CHAN:  Your Honor, may I approach?

23          THE COURT:  Yes.

24  Q    Showing you what is marked for identification as

25  Government's Exhibit 114.

Zampogna - Direct/Chan

1          Do you recognize this item?

2     A    I do.

3     Q    What is it?

4     A    It is a gun case.

5     Q    What is inside the gun case?

6     A    There's a gun.  It is a pistol, Taurus PT 111,  9mm,

7     also two magazines, loaded.  There's also an additional box

8     partially full with bullets.

9          MR. CHAN:  Your Honor, I offer Government's Exhibit 114.

10         MR. SOLOWAY:  No objection.

11         THE COURT:  Admitted.

12         (Whereupon, Government's Exhibit 114 was received and

13    marked into evidence, as of this date.)

14    BY MR. CHAN:

15    Q    Did the gun come in the case?

16    A    It did.

17    Q    Can I have the document camera, please.

18         What kind of gun is that?

19    A    That's the 9mm pistol, the Taurus PT 111 you just showed

20    me.

21    Q    It came with two magazines?

22    A    Yes.

23    Q    Loaded or unloaded?

24    A    They are loaded.

25    Q    Came with a box of ammunition?

Zampogna - Direct/Chan

1   A    Yes.

2   Q    What kind?

3   A    Mac Tech.

4   Q    What caliber?

5   A    Those were  9mm.

6   Q    Now, looking at the transcripts, going to page 3 of the

7   recording you just listened to, the fourth line down from the

8   top starting with JY.

9        Who is JY?

10  A    Joseph Young.

11  Q    Joseph Young says:  "Oh.  Yeah I did.  It'll be, ah,

12  probably about between 6 and 7."

13       It continues:  Ah, depending on what exactly you want,

14  if you want the same as we, probably 6.  If you want better,

15  closer to 7.

16       How much money did you give the cooperating witness to

17  buy the gun?

18  A    $700.

19  Q    Continuing down towards the middle.

20       Joseph Young:  "Now, um, you're, you're gonna have to

21  ah, it's gonna be new and boxed."

22       When you received the gun from the cooperating witness,

23  was it boxed?

24  A    Yes, it was.

25  Q    Was it a new gun?

Zampogna - Direct/Chan

1   A      It was.

2   Q      Now, towards the bottom, after beautiful, Joseph Young

3   says:  "But, so you, but you're gonna have to, ah, you know,

4   um, kinda of personalize it because it'll be, you know, from

5   me".

6          And at the bottom the cooperating witness says:  "You

7   mean just take, you mean just like take everything off that?"

8          The next page, Joseph Young says:  "Exactly."

9          Did you examine this gun when you received it for a

10  serial number?

11  A      Yes.

12  Q      Was the serial number visible?

13  A      It was not.

14  Q      What happened to it?

15  A      It appears to have been rubbed off.

16  Q      As a result, did you do anything with the gun?

17  A      We sent it to the F.B.I. laboratory to have the serial

18  number raised.

19  Q      Moving on to the next tab -- actually, before we do

20  that, could I have the camera one more time.  Thank you.

21         Showing you what is in evidence as Government Exhibit

22  58.

23         What is this?

24  A      It is an application to purchase a firearm.

25  Q      What is the date of it?

Zampogna - Direct/Chan

1    A    The date is August 29, 2005.

2    Q    Who is the applicant to purchase the firearm?

3    A    Joseph Britton Young.

4    Q    What address?

5    A    1717 Polo Run, Yardley, Pennsylvania, 19067.

6    Q    From where is the gun being purchased?

7    A    From the Farmers Market Gun Shop in Downingtown,

8    Pennsylvania.

9    Q    What gun was purchased?

10   A    A Taurus PT 111 9mm pistol.

11   Q    What kind of gun is this?

12   A    It is the same.

13   Q    Now, on page 4 of the transcript, in the middle of the

14   recording we just listened to, Joseph Young says:  "And ah

15   even if you wanted to, ah, tag along you could even do that.

16   I gotta go about, ah, about two hours out.  Actually, no,

17   it's only about, only about an hour and a half.  I gotta go

18   about an hour and a half out to get it" .

19        Have you had a chance to drive from New York City to the

20   Farmers Market Gun Shop?

21   A    I have.

22   Q    How long did it take you to drive there?

23   A    Approximately two hours.

24   Q    Let's turn now to the next recording, which is Recording

25   206, Government exhibit 108 and 108T.

Zampogna - Direct/Chan

1        After the first controlled gun purchase, was there a

2   second one?

3   A    There was.

4   Q    What's the date of Recording 108?

5   A    Tuesday, November 15, 2005, and Wednesday November 16,

6   2005.

7   Q    The time?

8   A    Starts at approximately at 1:00 p.m. on the 15th and

9   ends approximately at 12:25 a.m. on the 16th.

10  Q    Where does this conversation take place?

11  A    It takes place at a restaurant by the name of Bella Roma

12  on Long Island.

13  Q    And who are the speakers in this conversation?

14  A    It is Mr. Mergen and Michael Maggio.

15  Q    I will play it beginning at 19:52:14.

16       (The audiotape is played at this time.)

17       (The audiotape is shut off.)

18  Q    I'm now going to play the second portion.

19       (The audiotape is played at this time.)

20       (The audiotape is shut off.)

21  Q    Now, on page 3, three lines up from the bottom, Michael

22  Maggio says:  Yeah -- well, before that the cooperating

23  witness says:  "Okay.  And then he's gonna, he's gonna take

24  the numbers off, right" .

25       Maggio says:  "Yeah, I'm gonna tell him to, but I'm not

Zampogna - Direct/Chan

1  telling him I'm not sending it overseas.  I'm gonna tell him

2  it's for me" .

3      Did you arrange a cover story with the cooperating

4  witness as to what he was doing with the guns he was buying?

5  A    Yes.  He was telling the individuals he was dealing with

6  that he was shipping these items oversees to Turkey.

7  Q    To whom in Turkey?

8  A    To other individuals who were involved in selling stolen

9  or illegal items.

10 Q    May I have the document camera, please.

11     Showing you what is in evidence as Government Exhibit

12 60.

13     First let me ask you, after this reporting, did you

14 provide money to the cooperating witness?

15 A    We did.

16 Q    How much money?

17 A    $450.

18 Q    What date?

19 A    November 26, 2005.

20 Q    Thereafter, did the cooperating witness meet with

21 anybody?

22 A    He did.

23 Q    With who?

24 A    Mike Maggio.

25 Q    On what date?

Zampogna - Direct/Chan

1   A      I think it was on November 29th.

2   Q      Did you retrieve something from the cooperating witness

3   afterwards?

4   A      Afterwards we retrieved a vehicle and a gun, and we

5   submitted the gun into evidence control on November 30th.

6          MR. CHAN:  May I approach?

7          THE COURT:  Yes.

8   Q      Showing you Government Exhibit 115.

9          Do you recognize this?

10  A      I do.

11  Q      What is it?

12  A      It is a gun case.

13  Q      What's inside the gun case?

14  A      It is also a gun, a pistol, a CZ 40 P, .40 caliber

15  pistol.

16  Q      Is that the gun you received that day?

17  A      We did.

18  Q      Is there anything with the gun?

19  A      There is.  There is a magazine, also a magazine inside

20  the gun.

21  Q      Are they loaded or unloaded?

22  A      Unloaded.

23         MR. CHAN:  I offer Exhibit 15.

24         MR. SOLOWAY:  No objection.

25             THE COURT:  Admitted.

Zampogna - Direct/Chan

```
 1              (Whereupon, Government's Exhibit 115 was received

 2    and marked into evidence, as of this date.)

 3    BY MR. CHAN:

 4    Q    What kind of gun is that?

 5    A    That is the CZ .40 caliber pistol.

 6    Q    It came with this magazine and a magazine inside the

 7    gun?

 8    A    Yes.

 9    Q    Unloaded?

10    A    Unloaded.

11    Q    You said you submitted the gun for analysis.

12         What kind of analysis?

13    A    I said that we submitted it into evidence control, but

14    later sent it to the F.B.I. laboratory for a ballistics

15    analysis to raise the serial number.

16    Q    There's no serial number on that gun either?

17    A    There's none.

18    Q    Turning to page 2 of that transcript we just listened to

19    where Mike Maggio says in the middle:  "Now Joe's in

20    Pennsylvania, I don't know what the f he was doing there, but

21    I am going to have him get it on his ID in Pennsylvania."

22         Showing you what is in evidence as Government's Exhibit

23    60.

24         What is that?

25    A    That's a gun purchase application.
```

Zampogna - Direct/Chan

1    Q    By whom?

2    A    Joseph Britton Young.

3    Q    What is the date of the application?

4    A    November 28, 2005.

5    Q    Is that before or after the recording you just listened

6    to?

7    A    It was after.

8    Q    What kind of gun was purchased or guns?

9    A    There were two guns on this application, a CZ, it is a

10   .40 caliber pistol, then also a Taurus PT 908, a 908 pistol.

11   Q    Is this gun one of those two guns?

12   A    Yes.

13   Q    Which one?

14   A    The CZ .40 caliber pistol.

15   Q    Where was the gun purchased?

16   A    At the Farmers Market Gun Shop in Downingtown,

17   Pennsylvania.

18        MR. CHAN:  Your Honor, may I approach?

19        THE COURT:  Yes.

20   Q    Showing you what is marked for identification as

21   Government's Exhibit 117.

22        Do you recognize this item?

23   A    I do.  This is one of the applications to purchase a

24   weapon.

25   Q    Is it one or both?

Zampogna - Direct/Chan

1   A     It is one page of two that we just looked at.

2              MR. CHAN:  I offer 117.

3              MR. SOLOWAY:  Those aren't in evidence already, 117?

4              MR. CHAN:  It is the first page of the other two

5   that are already in evidence on one picture.

6              MR. SOLOWAY:  May I see it?

7              MR. CHAN:  Sure.

8              (Pause)

9

10             MR. SOLOWAY:  No objection

11             THE COURT:  Admitted.

12             (Whereupon, Government's Exhibit 117 was received

13   and marked into evidence, as of this date.)

14   BY MR. CHAN:

15   Q     This is the first page of the August 2005 gun form?

16   A     Yes.

17   Q     This is the first page of the November 2005 gun form?

18   A     It is, yes.

19   Q     Zooming in on box 2 of the August form.

20         What is the address listed for Joseph Young?

21   A     1717 Polo Run, Yardley, Pennsylvania, 19067, Bucks

22   County.

23   Q     Same for line 2 of the November form?

24   A     Yes.

25             MR. CHAN:  Your Honor, may I approach?

Zampogna - Direct/Chan

1        THE COURT:  Yes.

2   Q    Showing you what is marked for identification as

3   Government's Exhibits 119, 120, and 39.

4        What is 119?

5   A    Exhibit 119 is an affidavit from the Polo Run apartments

6   identifying who resided at the apartments at 1717 Polo Run

7   Drive.

8   Q    What is attached to the affidavit?

9   A    Lease agreements.

10  Q    For that property?

11  A    Yes, for that property.

12  Q    And what about Government Exhibit 120?

13  A    Exhibit 120 is the lease records.

14  Q    For what?

15  A    Joseph Young for Polo Run, the 1717 apartment.

16       MR. CHAN:  I offer 119 and 120.

17       MR. SOLOWAY:  No objection.

18          THE COURT:  Admitted.

19          (Whereupon, Government's Exhibits 119 and 120 were

20  received and marked into evidence, as of this date.)

21  BY MR. CHAN:

22  Q    Finally, Government's Exhibit 39.

23  A    This is a lease agreement for Joseph Young for 5113

24  Amboy Road.

25          MR. CHAN:  I offer it.

1          MR. SOLOWAY:  No objection.

2          THE COURT:  Admitted.

3          (Whereupon, Government's Exhibit 39 was received and

4    marked into evidence, as of this date.)

5    BY MR. CHAN:

6    Q    Now, focusing your attention on the September -- sorry,

7    the August 2005 gun form here.

8          According to those lease records, who lived at 1717 Polo

9    Run in August of 2005?

10   A    Nick Mess, M-e-s-s.

11   Q    According to those lease records, who lived at 1717 Polo

12   Run in November of 2005?

13   A    Richard Kohler.

14   Q    According to those lease records, when did Joseph Young

15   live at 1717 Polo Run?

16   A    Starting August 1, 2000 and ending July 31, 2001.

17   Q    Not 2005?

18   A    No.

19   Q    According to the lease records, where was Joseph Young

20   living in 2005?

21   A    The lease date is June 1, 2005, and that is 5113 Amboy

22   Road.

23         MR. CHAN:  May I approach?

24         THE COURT:  Yes.

25   Q    Government Exhibit 118.  What is this?

Zampogna - Direct/Chan

1    A    This is a certified document from the Bureau of Alcohol

2    Tobacco and Firearms.

3    Q    What does it certify?

4    A    It certifies that Joseph Britton Young does not have a

5    firearms dealer's license, and the period that is reviewed is

6    January 1, 2005 to September 18, 2008.

7         MR. CHAN:  Your Honor I offer it.

8         MR. SOLOWAY:  No objection.

9         THE COURT:  Admitted.

10         (Whereupon, Government's Exhibit 118 was received

11    and marked into evidence, as of this date.)

12    BY MR. CHAN:

13    Q    Turning now to the next recording, which is Government

14    Exhibits 110 and 110T.

15         What is the date of that recording, Agent?

16    A    Friday, January 6, 2006.

17    Q    Time?

18    A    Approximately starting at 9 a.m., approximately ending

19    at 7:05 p.m.

20    Q    Who are the speakers in this recording?

21    A    Mr. Mergen, Michael Maggio and Daryl Rosenblatt.

22    Q    Daryl Rosenblatt is DR and Mike Maggio is MM?

23    A    Yes.

24    Q    Playing 9:02 a.m., excerpt one.

25         Now, the next segment they enter a restaurant.

Zampogna - Direct/Chan

```
 1         What restaurant is that?

 2    A    I believe that's Fresca's on the Bay.

 3         (The audiotape is played at this time.)

 4         (The audiotape is shut off.)

 5    Q    Now, for the next segment do they leave the restaurant?

 6    A    They do.

 7    Q    Do they get in the car?

 8    A    Yes.

 9    Q    I will play that segment starting at 10:49 a.m.

10         (The audiotape is played at this time.)

11         (The audiotape is shut off.)

12    Q    Continuing on to 11:38.

13         (The audiotape is played at this time.)

14         (The audiotape is shut off.)

15         MR. CHAN:  May I approach, your Honor?

16         THE COURT:  Yes.

17    Q    Government Exhibit 239.  Do you recognize this?

18    A    I do.

19    Q    What is it?

20    A    It's a map of the vicinity of 215 Hamden Avenue in

21    Staten Island, New York.

22         MR. CHAN:  I offer it.

23         MR. SOLOWAY:  No objection.

24         THE COURT:  Admitted.

25         (Whereupon, Government's Exhibit 239 was received
```

Zampogna - Direct/Chan

1    and marked into evidence, as of this date.)

2    BY MR. CHAN:

3    Q    What is identified at location A?

4    A    That's approximately where 215 Hamden Avenue is located.

5    Q    What happened at 215 Hamden Avenue on January 27th?

6    A    There was an arson.

7    Q    What is the date of the recording that we just listened

8    to?

9    A    It is Friday, January 6, 2006.

10   Q    Turning to page 6 of that recording.

11        There's a reference to McDonald's.  Is there a

12   McDonald's in the vicinity of 215 Hamden Avenue?

13   A    Yes.

14   Q    Where?

15   A    At the corner of Hylan Boulevard and Midland Avenue.

16   Q    And Midland?

17   A    Yes.

18   Q    This corner here?

19   A    Yes.

20   Q    There's a reference to a White Castle.

21        Is there a White Castle in that neighborhood?

22   A    There is a White Castle in the corner of Mincon Avenue

23   and Hylan Boulevard.

24   Q    This corner here?

25   A    Yes.

1    Q    There's a reference to a Blockbuster's.

2         Is that in this area?

3    A    It is on Hylan Boulevard between Lincoln and Midland.

4    Q    Somewhere right here?

5    A    Exactly, right.

6    Q    On page 7, there's a reference at the top, the second

7    attribution for DR, where he says:  "He did, but he just did

8    a f'n roof raise and it's like Fort Knox" .

9         Have you been to the area of 215 Hamden Avenue?

10   A    I have.

11   Q    Was there a house that had a roof raised?

12   A    There is.

13   Q    Whose house?

14   A    Join Jonason.

15   Q    Is there security around that house?

16   A    There is.  There's a fence.

17   Q    What else?

18   A    Also a video security system.

19   Q    All right.

20        Turning now to the next recording, which is recording

21   111.

22        What is the date of that recording?

23   A    Tuesday, January 24, 2006.

24   Q    What time?

25   A    It starts at approximately 9:10 a.m. and ends at

Zampogna - Direct/Chan

1    approximately 7:02 p.m.

2    Q    Who are the participants in this conversation?

3    A    Mr. Mergen, Joseph Young, and Michael Maggio.

4    Q    Approximately how many days is this conversation prior

5    to the arson at 215 Hamden Avenue?

6    A    Three days.

7    Q    The first excerpt at 11:02 a.m., where does that take

8    place?

9    A    This is in a vehicle as they are driving in Staten

10   Island.

11        MR. CHAN:  I will play 11:02:50.

12        (The audiotape is played at this time.)

13        (The audiotape is shut off.)

14   Q    Now, that excerpt, the fourth attribution up from the

15   end, MM.  Who is that?

16   A    Michael Maggio.

17   Q    He says:  "I know the things that he's done with me,

18   and, and he's, if he was a Fed well then he's gotta go down

19   with me."

20        Did you do a record check of the F.B.I. to see if Joseph

21   Young ever applied to be an agent?

22   A    We did.

23   Q    Was there any such application?

24   A    We did not find one.

25   Q    The next excerpt, where does that take place?

Zampogna - Direct/Chan

1   A    At Fresca's on the Bay Restaurant in Staten Island.

2   Q    I will play 16:00:28.

3        Who is talking?

4   A    Michael Maggio and John Mergen and Joseph Young.

5        (The audiotape is played at this time.)

6        (The audiotape is shut off.)

7   Q    Agent Zampogna, at the time that you started this

8   investigation, was it a murder investigation?

9   A    It was not.

10  Q    Did it later become a murder investigation?

11       MR. SOLOWAY:  Objection?

12          THE COURT:  Side bar.

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDE BAR

1          (Side bar)

2          MR. SOLOWAY:  I don't know where that is going, and

3    I don't know what the relevance of it is, but I can't really

4    see the relevance of asking him questions like that, when he

5    is going to make some type of interpretation

6          THE COURT:  That is what is concerning me.  There's

7    an implicit interpretation in that

8          MR. CHAN:  As a result of what is said on that

9    recording, they give a different direction to a cooperating

10   witness what to do.

11         THE COURT:  Okay.

12         Did you hear what Mr. Chan said?

13         MR. SOLOWAY:  Yes.

14         THE COURT:  They change the direction of the

15   investigation based and what was said in that recording.

16         MR. SOLOWAY:  What was said after the admission.

17         MR. CHAN:  I think it is this one.  If it is not

18   this statement, I won't ask the follow-up question.

19         THE COURT:  Okay.

20         (Side bar ends)

21

22

23

24

25

1   BY MR. CHAN:

2   Q    According to the transcript at page 3, the bottom of the

3   segment we just listened to where defendant says:  "I can

4   imagine journal, uh journal entry:  Can't seem to get the

5   smell out of my clothes."  Ha ha ha."

6        After you reviewed this recording, did you take

7   different investigative steps in your case?

8   A    I think that by the time I heard this segment of this

9   recording, I was already taking other steps in my

10  investigation.

11  Q    What were those other steps -- well, we'll get to that

12  later.

13       Let's move on to the next segment, 17:23:11.

14       (The audiotape is played at this time.)

15       (The audiotape is shut off.)

16  Q    Where did they go in the next segment?

17  A    They got in the car.

18  Q    They got in the car and?

19  A    And they were driving to a location in Staten Island

20  that we looked on the AP.

21  Q    Prior to going to that location, did they stop

22  somewhere, on page 6 of the transcript?

23  A    I believe they stopped at Joseph Young's residence, 5113

24  Amboy Road.

25       MR. CHAN:  Play that segment, 17:26:26.

Zampogna - Direct/Chan

1         (The audiotape is played at this time.)

2             (The audiotape is shut off.)

3   Q   Moving on to the next segment, starting time 17:45:35.

4         (The audiotape is played at this time.)

5         (The audiotape is shut off.)

6         MR. CHAN:  And the last segment.

7         (The audiotape is played at this time.)

8         (The audiotape is shut off.)

9   Q   Finally, the last segment at 18:13.

10        (The audiotape is played at this time.)

11        (The audiotape is shut off.)

12        (Continued on the next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

A. Zampogna - Direct / Chan                748

```
 1   DIRECT EXAMINATION
 2   BY MR. CHAN:  (Continued)
 3             MR. CHAN:   Moving to the next recording.
 4   Government's Exhibit 112, transcript 112-E.
 5             MR. SOLOWAY:   May we approach?
 6             THE COURT:   Yes.
 7             (Sidebar.)
 8
 9             (Continued on following page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              (Sidebar.)

2              MR. SOLOWAY:  I wanted to ask you, Judge, what time

3    we're working until today.

4              THE COURT:  I assume we'll finish at --

5              MR. CHAN:  That's fine with us.

6              THE COURT:  We'll just go through the type and I

7    assume cross, you will cross in the morning.

8              MR. SOLOWAY:  Why can't we break now, Judge?  It's

9    5:00 o'clock and I'm tired and we have another cooperating

10   witness tomorrow.  And we have another long time.

11             THE COURT:  It's just another half-hour.

12             MR. SOLOWAY:  Why can't we do the half-hour in the

13   morning, Judge?

14             THE COURT:  What's going on tomorrow?  Is it a full

15   day; is it not a full day?

16             MR. CHAN:  Tomorrow is a full day.

17             THE COURT:  Then I'd rather just go for another

18   half-hour.

19             MR. SOLOWAY:  Judge, we're moving so rapidly here,

20   we're going to be done.  I am tired, Judge.

21             THE COURT:  I understand, but there's really not

22   much for you to do.  We're just listening to the tape.

23             MR. SOLOWAY:  I know, but I could be in my office

24   for another half-hour working before I go to sleep.

25             We're not doing anything here, we're like jumping

1   jacks Judge, but I could be in my office.  The number of hours

2   in my office is the issue.  I don't really see what, you

3   know --

4          THE COURT:  Mr. Soloway, let me just say, we've all

5   been trying to bend obvious backwards here.  The Government

6   gave you the material very early, they told you about the

7   witness two days in advance.  I mean --

8          MR. SOLOWAY:  Okay, Judge.  Why do we have -- I

9   guess I'm just -- I'm really not understanding what the

10  urgency of playing this last tape is tonight.

11         THE COURT:  My lack of understanding, candidly, is

12  that there's so little you have to do except sit there.

13         But if you feel that strongly about it, Mr. Soloway,

14  we'll break.

15         MR. SOLOWAY:  I can't --

16         MR. CHAN:  I oppose that.

17         THE COURT:  Okay.

18         MR. CHAN:  The Court day has already been announced

19  as being 9:30 to 5:30.

20         MR. SOLOWAY:  All right.

21         THE COURT:  Okay.

22         (Sidebar end.)

23

24         (Continued on following page.)

25

A. Zampogna - Direct / Chan          751

1          (In open court.)

2     Q    The next recording is at what date?

3     A    It's Thursday, January 26th, 2006.

4     Q    And the time?

5     A    It starts at approximately 11:28 a.m. and ends at

6     approximately 5:36 p.m.

7     Q    This conversation we're about to listen to, where does it

8     take place?

9     A    It's in Staten Island, New York.

10    Q    Inside anything in particular?

11    A    Let me...

12         It's in a vehicle.

13    Q    Starting at 12:55?

14         (Audio played for jury.)

15         MR. CHAN:   Finally, the last recording.

16    Government's Exhibit 113 and 113-T.

17    Q    Now, we were talking about in reference -- well.

18         At some time point, did you give the cooperating

19    witness instructions if conversations about murder came up in

20    the context of the recordings?

21    A    We did.

22    Q    What was the instruction you gave the cooperating

23    witness?

24    A    We advised him that to keep that conversation going, that

25    he should offer to the person he's speaking with that he's

1  also been involved in a crime that serious; that he was also

2  involved in a murder, but to get clear in his mind as to a

3  scenario that he would explain to people without enough detail

4  that someone would actually check his story.

5          Since we knew we were dealing with people primarily

6  in Staten Island and out to Long Island, I advised him to pick

7  an area like the Bronx, an area where we don't think they

8  spend much time, and say it was something personal where no

9  one else was around when it happened so they couldn't check

10 his story.

11         MR. CHAN:  I am playing the first segment of this

12 recording, which is dated January 26th.

13 Q    At 21:07, which is nine p.m. approximately?

14 A    Approximately, yes.

15         (Audio played for jury.)

16         MR. CHAN:  Continuing with the next segment.

17         (Audio played for jury.)

18         MR. CHAN:  Special Agent Zampogna, directing your

19 attention to page 12.

20 Q    The people we just listened to.  "JY", who is that?

21 A    Joseph Young.

22 Q    He says at the top, the second attribution to him:  "All

23 I want is some coin so I can get the gear I need.  And then

24 after I get the gear I need, after we hit the one-year mark,

25 I'll fucking whack the whole world if I need to.  I don't give

A. Zampogna - Direct / Chan                753

1   a shit."

2            What's the date of this recording?

3   A    January 26th, 2006.

4   Q    What month and year did Robert McKelvey go missing?

5   A    It was March 2005.

6            MR. CHAN:   Turning to the next segment, the bottom

7   of page 12, 21:19.

8            (Audio played for jury.)

9            MR. CHAN:   Next segment.

10  Q    Where does that conversation take place, the next

11  segment?

12  A    Joseph Young's residence.   5113 Amboy Road.

13            (Audio played for jury.)

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CHAN:  Your Honor, if you want to break for the

2     day, it is possible.

3          THE COURT:  I think that's advisable.

4          Ladies and gentlemen, have a nice evening.

5          Please let me remind you again, do not allow

6     yourself to be exposed to media coverage in the case.

7          Have a nice evening and we'll see you tomorrow.

8          MR. CHAN:  Your Honor, they should leave their

9     binders on the chairs.

10         THE COURT:  Yes, leave the binders here.

11         (The jury leaves the courtroom for the evening at

12     5:35 p.m.)

13         THE COURT:  I think we'll leave the charge until

14     tomorrow.

15         MR. CHAN:  That's fine.

16         THE COURT:  Will we be getting another list tonight?

17         MR. CHAN:  Yes, sure.

18         THE COURT:  All right.

19         MR. SOLOWAY:  Is that a witness list?

20         MR. CHAN:  Yes.  I have already disclosed who the

21     cooperating witness is for tomorrow.

22         (The trial is adjourned for the evening at 5:35

23     p.m.)

24

25

1                           I N D E X

2      WITNESS                                    PAGE

3

4           A L F O N S O   B U O N I N F A N T E      492

5           DIRECT EXAMINATION

6           BY MR. DENNEHY:                          492

7           J O H N     T U F A R E L L I             498

8           DIRECT EXAMINATION

9           BY MR. CHAN:                             498

10          CROSS-EXAMINATION

11          BY MR. SOLOWAY:                          571

12          REDIRECT EXAMINATION

13          BY MR. CHAN                              605

14

15     A N T H O N Y    B R A N D E F I N E

16          DIRECT EXAMINATION

17          BY MR. SCHAEFFER                         608

18

19     S T E V E N    T A Y L O R

20          DIRECT EXAMINATION

21          BY MR. SCHAEFFER                         618

22          J A M E S     W I T T E                  626

23          DIRECT EXAMINATION

24          BY MR. SCHAEFFER:                        626

25          E L I Z A B E T H     R O S A T O        633

1        DIRECT EXAMINATION

2        BY MR. SCHAEFFER:                                633

3        M A R T H A     B E R D O T E                    643

4        DIRECT EXAMINATION

5        BY MR. SCHAEFFER:                                643

6        C H A R L E S     M O U L D E R                  648

7        DIRECT EXAMINATION

8        BY MR. CHAN:                                     648

9        CROSS-EXAMINATION

10       BY MR. SOLOWAY:                                  654

11       T I M O T H Y   D I N N A N                      656

12       DIRECT EXAMINATION

13       BY MR. CHAN:                                     656

14       V A L E R I E     N I E V E S                    663

15       DIRECT EXAMINATION

16       BY MR. DENNEHY:                                  664

17

18   G R E G O R Y     B R U N O

19       DIRECT EXAMINATION

20       BY MR. DENNEHY                                   675

21

22   P A U L     M c M A N U S

23       DIRECT EXAMINATION

24       BY MR. DENNEHY                                   691

25

1          CROSS-EXAMINATION

2          BY MR. SOLOWAY                                705

3          REDIRECT EXAMINATION

4          BY MR. DENNEHY                                707

5          RECROSS-EXAMINATION

6          BY MR. SOLOWAY                                708

7

8     A N T H O N Y   Z A M P O G N A

9          DIRECT EXAMINATION

10         BY MR. CHAN                                   710

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        E X H I B I T S

2

3

4       Government's Exhibits 22 and 23 were

5       received and marked into evidence                509

6

7       Government's Exhibits 16 and 17 were

8       received and marked into evidence                543

9

10      Government's Exhibit 18 was received and

11      marked into evidence                             554

12

13      Government's Exhibit 3500-JT-6 was received

14      and marked into evidence                         566

15

16      Government's Exhibit 52                           615

17

18      Government's Exhibit 197                          622

19

20      Government's Exhibit 53 was received and

21      marked into evidence                             629

22

23      Government's Exhibits 62 through 67

24      were received and marked into evidence           639

25

1

2      Government's Exhibit 68 was received and

3      marked into evidence                           647

4

5      Government's Exhibit 97 was received and

6      marked into evidence                           661

7

8      Government's Exhibit 102-E was received and

9      marked into evidence                           667

10

11     Government's Exhibit 31                        668

12

13     Government's Exhibit 102-A and 102-B           685

14

15     Government's Exhibits 102-A, B, C, D and E

16     and F                                          695

17

18     Government's Exhibits 98 and 99                708

19

20     Government's Exhibits 106, 107, 108, 109,

21     110, 111, 112, and 113                         719

22

23     Government's Exhibit 160-A                     720

24

25

1

2      Government's Exhibit 114 was received and

3      marked into evidence              727

4

5      Government's Exhibit 115 was received and

6      marked into evidence              734

7

8      Government's Exhibit 117 was received and

9      marked into evidence              736

10

11     Government's Exhibits 119 and 120 were

12     received and marked into evidence     737

13

14     Government's Exhibit 39 was received and

15     marked into evidence              738

16

17     Government's Exhibit 118 was received and

18     marked into evidence              739

19

20     Government's Exhibit 239 was received and

21     marked into evidence              740

22

23

24

25

## $

**$10,000** [2] - 510:5, 528:5
**$1500** [2] - 546:19, 546:24
**$25,000** [2] - 587:18, 587:23
**$30,000** [3] - 511:4, 521:14, 521:17
**$450** [1] - 732:17
**$50** [1] - 524:3
**$500** [4] - 586:21, 615:5, 615:14, 615:17
**$700** [2] - 726:10, 728:18

## '

**'03** [1] - 521:2
**'04** [2] - 519:11, 535:18
**'05** [6] - 519:11, 535:18, 538:20, 548:15, 629:16
**'06** [3] - 537:1, 537:2, 562:21
**'80** [1] - 571:13
**'83** [1] - 531:20
**'98** [1] - 508:12
**'99** [2] - 508:12, 581:13

## 0

**02:50:08** [1] - 699:21
**03:00** [1] - 695:5

## 1

**1** [5] - 512:17, 515:5, 738:16, 738:21, 739:6
**10** [2] - 516:22, 528:10
**102** [1] - 667:9
**102-a** [9] - 685:13, 685:25, 686:4, 687:3, 695:12, 695:20, 695:23, 759:13, 759:15
**102-b** [4] - 685:25, 687:8, 697:8, 759:13
**102-c** [3] - 697:18, 702:10, 702:25
**102-d** [2] - 698:3, 698:11
**102-e** [8] - 666:21, 667:8, 667:13, 668:19, 672:15, 673:14, 698:21, 759:8
**102-f** [1] - 700:8
**1020** [1] - 632:1
**106** [5] - 718:13, 719:8, 724:7, 724:23, 759:20
**106-t** [2] - 719:11, 724:8
**107** [5] - 718:13, 719:8, 722:13, 722:14, 759:20
**108** [5] - 718:13, 719:8, 730:25, 731:4, 759:20
**108t** [1] - 730:25
**109** [4] - 718:13, 719:8, 721:17, 759:20
**109-t** [2] - 721:18, 721:23
**10:49** [1] - 740:9
**10:50** [1] - 568:5
**11** [5] - 517:18, 562:21, 590:9, 664:22, 712:16

**110** [4] - 718:14, 719:8, 739:14, 759:21
**110t** [1] - 739:14
**111** [7] - 718:14, 719:8, 727:6, 727:19, 730:10, 742:21, 759:21
**112** [5] - 653:14, 718:14, 719:9, 748:4, 759:21
**112-e** [1] - 748:4
**113** [4] - 718:14, 719:9, 751:16, 759:21
**113-t** [2] - 719:11, 751:16
**114** [5] - 692:7, 726:25, 727:9, 727:12, 760:2
**115** [3] - 733:8, 734:1, 760:5
**117** [5] - 735:21, 736:2, 736:3, 736:12, 760:8
**118** [4] - 692:7, 738:25, 739:10, 760:17
**119** [6] - 737:3, 737:4, 737:5, 737:16, 737:19, 760:11
**11:02** [1] - 743:7
**11:02:50** [1] - 743:11
**11:05** [1] - 571:1
**11:08** [1] - 571:5
**11:28** [1] - 751:5
**11:30** [1] - 539:5
**11:38** [1] - 740:12
**11:45** [3] - 650:15, 650:16, 650:17
**11th** [2] - 605:2, 692:3
**12** [7] - 494:3, 494:15, 516:25, 710:6, 717:16, 752:19, 753:7
**120** [6] - 737:3, 737:12, 737:13, 737:16, 737:19, 760:11
**12:00** [1] - 539:5
**12:25** [1] - 731:9
**12:30** [4] - 569:12, 569:13, 624:2, 624:3
**12:51** [2] - 650:19, 650:20
**12:55** [1] - 751:13
**12:56** [1] - 722:21
**12th** [1] - 725:5
**13** [1] - 515:18
**13:13** [1] - 723:2
**13:34** [1] - 723:22
**14** [1] - 515:22
**15** [5] - 522:2, 576:8, 628:6, 731:5, 733:23
**159** [1] - 682:15
**15:17** [1] - 723:25
**15th** [3] - 611:1, 614:11, 731:8
**16** [13] - 491:8, 501:7, 543:12, 543:16, 543:21, 543:23, 544:1, 650:12, 651:12, 651:25, 652:9, 731:5, 758:7
**160-a** [6] - 720:10, 720:13, 720:14, 720:17, 720:20, 759:23
**160-b** [2] - 720:8, 720:13
**165** [2] - 681:9, 681:11
**16:00:28** [1] - 744:2
**16th** [1] - 731:9
**17** [7] - 543:13, 543:18, 543:21, 543:23, 544:17, 726:8, 758:7
**1717** [7] - 730:5, 736:21, 737:6,

**737:15, 738:8, 738:11, 738:15
**17:23:11** [1] - 746:13
**17:26:26** [1] - 746:25
**17:45:35** [1] - 747:3
**17th** [1] - 614:14
**18** [9] - 504:11, 554:11, 554:14, 554:18, 653:7, 665:1, 702:5, 739:6, 758:10
**18:13** [1] - 747:9
**18th** [1] - 614:14
**19** [2] - 535:3, 664:17
**19067** [2] - 730:5, 736:21
**197** [3] - 622:12, 622:24, 758:18
**1980** [1] - 571:11
**1981** [2] - 571:11, 692:3
**1999** [1] - 681:5
**19:52:14** [1] - 731:15
**19th** [2] - 605:6, 614:16
**1:00** [1] - 731:8
**1:30** [1] - 626:2
**1:35** [1] - 626:4
**1:50** [1] - 660:10
**1:52** [2] - 651:2, 651:3
**1st** [1] - 692:13

## 2

**2** [6] - 511:21, 515:12, 566:2, 734:18, 736:19, 736:23
**20** [5] - 514:9, 551:7, 649:14, 656:25, 692:5
**200** [1] - 718:7
**2000** [6] - 493:19, 513:14, 581:13, 586:11, 586:12, 738:16
**2001** [2] - 692:13, 738:16
**2002** [3] - 513:14, 513:19, 513:20
**2003** [5] - 504:13, 513:19, 513:20, 513:22, 586:12
**2004** [1] - 504:13
**2005** [44] - 493:20, 493:23, 494:3, 542:15, 545:3, 576:20, 583:2, 583:5, 611:1, 619:13, 628:6, 628:19, 649:14, 656:25, 665:8, 665:10, 666:11, 670:17, 670:25, 713:1, 715:6, 715:11, 715:12, 721:25, 722:15, 725:5, 726:8, 730:1, 731:5, 731:6, 732:19, 735:4, 736:15, 736:17, 738:7, 738:9, 738:12, 738:17, 738:20, 738:21, 739:6, 753:5
**2006** [30] - 513:22, 553:24, 571:18, 575:24, 576:1, 576:20, 583:3, 584:7, 589:10, 589:18, 589:21, 590:9, 605:2, 605:6, 634:16, 635:11, 644:21, 644:23, 659:8, 667:6, 668:13, 673:4, 681:19, 693:21, 713:1, 739:16, 741:9, 742:23, 751:3, 753:3
**2008** [2] - 491:8, 739:6
**206** [1] - 730:25
**20th** [3] - 614:17, 631:21, 631:25
**2110** [1] - 555:24
**215** [10] - 682:3, 694:10, 694:11,

694:17, 740:20, 741:4, 741:5, 741:12, 742:9, 743:5
**21:07** [1] - 752:13
**21:19** [1] - 753:7
**21:55:14** [1] - 722:7
**21st** [2] - 631:22, 632:1
**22** [6] - 508:22, 508:24, 509:5, 509:7, 509:11, 758:4
**225** [1] - 491:21
**22nd** [4] - 614:10, 614:11, 614:16, 615:19
**23** [9] - 504:11, 508:23, 509:3, 509:5, 509:7, 509:15, 528:16, 659:8, 758:4
**239** [3] - 740:17, 740:25, 760:20
**23:19:06** [1] - 722:10
**23rd** [2] - 631:22, 632:3
**24** [1] - 742:23
**25** [5] - 521:14, 521:17, 522:1, 551:15, 653:14
**2500** [1] - 522:2
**26** [2] - 561:21, 732:19
**26th** [3] - 751:3, 752:12, 753:3
**27** [1] - 548:1
**275** [1] - 713:3
**27th** [3] - 681:19, 693:21, 741:5
**28** [2] - 523:5, 735:4
**29** [2] - 522:10, 730:1
**29th** [1] - 733:1
**2:31** [2] - 651:17, 651:23
**2:40** [2] - 651:23, 651:24
**2:44** [1] - 652:4
**2:52** [1] - 652:24
**2:53** [1] - 722:3
**2:59** [1] - 660:13

---

## 3

**3** [4] - 516:9, 728:6, 731:21, 746:2
**30** [1] - 569:3
**30,000** [2] - 511:5, 522:1
**300** [1] - 523:15
**3067** [1] - 681:3
**30th** [1] - 733:5
**31** [8] - 628:6, 668:4, 668:15, 668:18, 668:23, 701:14, 738:16, 759:11
**32** [1] - 523:7
**3500** [1] - 610:16
**3500-cm-1** [1] - 650:5
**3500-jt-6** [3] - 566:10, 566:19, 758:13
**3500-td-1** [1] - 660:7
**36** [1] - 598:21
**380** [2] - 538:5, 540:16
**39** [4] - 737:3, 737:22, 738:3, 760:14
**3:00** [2] - 695:5, 699:22
**3:03** [1] - 681:21
**3rd** [2] - 721:25, 723:18

---

## 4

**4** [2] - 516:15, 730:13

**40** [6] - 633:24, 733:14, 734:5, 735:10, 735:14
**40,000** [1] - 672:1
**400** [1] - 693:9
**45** [1] - 569:3
**4500** [3] - 609:16, 610:25, 619:15
**47** [1] - 598:21
**492** [2] - 755:4, 755:6
**498** [2] - 755:7, 755:9
**4:14** [1] - 653:6
**4:46** [1] - 725:7
**4:47** [1] - 653:10
**4th** [2] - 721:25, 723:18

---

## 5

**5** [5] - 517:3, 527:6, 634:16, 635:11, 644:23
**5-k** [1] - 599:24
**500** [2] - 634:17, 693:9
**509** [1] - 758:5
**5113** [4] - 737:23, 738:21, 746:23, 753:12
**52** [3] - 614:20, 615:9, 758:16
**53** [3] - 628:8, 629:1, 758:20
**543** [1] - 758:8
**546-1067** [1] - 715:2
**55** [1] - 559:23
**554** [1] - 758:11
**566** [1] - 758:14
**571** [1] - 755:11
**58** [1] - 729:22
**5:00** [1] - 749:9
**5:30** [2] - 722:22, 750:19
**5:35** [2] - 754:12, 754:22
**5:36** [1] - 751:6
**5k1** [5] - 567:4, 567:5, 567:6, 567:14, 567:23

---

## 6

**6** [6] - 728:12, 728:14, 739:16, 741:9, 741:10, 746:22
**60** [2] - 732:12, 734:23
**605** [1] - 755:13
**608** [1] - 755:17
**615** [1] - 758:16
**618** [1] - 755:21
**62** [4] - 638:20, 639:12, 639:15, 758:23
**622** [1] - 758:18
**626** [2] - 755:22, 755:24
**629** [1] - 758:21
**63** [2] - 640:2
**633** [2] - 755:25, 756:2
**639** [1] - 758:24
**64** [1] - 640:12
**643** [2] - 756:3, 756:5
**646** [1] - 715:2
**647** [1] - 759:3
**648** [2] - 756:6, 756:8

**65** [2] - 641:4, 641:5
**654** [1] - 756:10
**656** [2] - 756:11, 756:13
**66** [2] - 641:23, 641:24
**661** [1] - 759:6
**663** [1] - 756:14
**664** [1] - 756:16
**667** [1] - 759:9
**668** [1] - 759:11
**67** [4] - 638:20, 639:12, 642:6, 758:23
**675** [1] - 756:20
**68** [4] - 646:19, 647:6, 648:12, 759:2
**685** [1] - 759:13
**691** [1] - 756:24
**695** [1] - 759:16
**6:31** [2] - 653:12, 653:13
**6:33** [2] - 653:22, 654:12

---

## 7

**7** [4] - 516:19, 728:12, 728:15, 742:6
**70** [1] - 632:8
**702** [1] - 693:17
**705** [1] - 757:2
**707** [1] - 757:4
**708** [2] - 757:6, 759:18
**710** [1] - 757:10
**718-330-7687** [1] - 491:22
**719** [1] - 759:21
**720** [1] - 759:23
**727** [1] - 760:3
**734** [1] - 760:6
**736** [1] - 760:9
**737** [1] - 760:12
**738** [1] - 760:15
**739** [1] - 760:18
**740** [1] - 760:21
**7:02** [1] - 743:1
**7:05** [1] - 739:19
**7th** [1] - 722:15

---

## 8

**8** [1] - 517:6
**85** [1] - 681:9
**8:58** [3] - 653:24, 654:10, 654:11

---

## 9

**9** [2] - 517:13, 739:18
**9/11** [1] - 681:6
**900** [1] - 632:3
**908** [2] - 735:10
**911** [3] - 494:1, 494:2, 494:10
**97** [4] - 661:5, 661:10, 661:13, 759:5
**98** [5] - 704:22, 708:1, 708:2, 708:6, 759:18
**99** [5] - 705:4, 708:1, 708:2, 708:6, 759:18
**9:02** [1] - 739:24

**9:10** [1] - 742:25
**9:12** [1] - 654:20
**9:14** [1] - 722:2
**9:30** [5] - 491:9, 492:2, 494:4, 494:9, 750:19
**9:32** [1] - 492:9
**9:40** [1] - 497:22
**9:47** [1] - 497:25
**9mm** [8] - 537:16, 537:18, 537:20, 538:2, 727:6, 727:19, 728:5, 730:10

---

# A

**a,n** [1] - 497:22
**ability** [1] - 642:20
**able** [8] - 569:5, 588:16, 637:10, 655:2, 706:3, 708:16, 708:18, 720:1
**above-referred** [19] - 597:16, 615:12, 623:3, 668:5, 668:24, 672:17, 686:2, 687:9, 696:14, 697:9, 697:19, 698:4, 698:23, 700:9, 701:4, 701:15, 702:6, 702:12, 712:17
**Absolutely** [2] - 602:21, 643:6
**accelerants** [1] - 698:6
**accepted** [1] - 715:6
**accepting** [1] - 630:18
**access** [1] - 699:7
**accident** [3] - 502:13, 502:16, 715:14
**accidental** [4] - 703:15, 703:20, 703:21, 703:23
**accordance** [1] - 631:9
**According** [5] - 738:8, 738:11, 738:14, 738:19, 746:2
**according** [2] - 567:3, 600:7
**account** [1] - 507:20
**accounted** [1] - 654:14
**accredited** [1] - 676:21
**accuracy** [1] - 599:8
**accurate** [1] - 719:16
**accurately** [4] - 667:5, 668:12, 685:19, 695:17
**accused** [1] - 678:19
**acted** [2] - 670:12, 670:14
**activities** [1] - 656:3
**activity** [3] - 650:18, 715:23, 716:4
**Activity** [2] - 628:14, 629:5
**actual** [7] - 521:3, 547:9, 634:10, 645:18, 660:9, 686:14, 698:18
**add** [2] - 645:17, 645:25
**addict** [1] - 556:24
**addition** [1] - 705:9
**additional** [3] - 644:17, 654:14, 727:7
**address** [4] - 664:21, 682:1, 730:4, 736:20
**adjacent** [1] - 665:17
**adjourned** [1] - 754:22
**adjust** [1] - 689:23
**administered** [1] - 496:14
**admission** [1] - 745:16
**admit** [2] - 564:20, 564:24

**Admitted** [23] - 509:6, 543:22, 554:17, 566:18, 615:8, 628:25, 639:11, 647:5, 661:12, 667:12, 668:17, 685:24, 695:22, 708:5, 719:7, 720:19, 727:11, 733:25, 736:11, 737:18, 738:2, 739:9, 740:24
**admitted** [4] - 617:8, 622:23, 721:10, 721:11
**advance** [4] - 528:23, 557:10, 614:13, 750:7
**advanced** [2] - 676:18, 687:2
**advisable** [1] - 754:3
**advise** [1] - 716:13
**advised** [2] - 751:24, 752:6
**advisory** [2] - 598:3, 598:13
**affidavit** [2] - 737:5, 737:8
**Afternoon** [1] - 625:6
**afternoon** [10] - 608:22, 618:19, 626:15, 633:11, 664:8, 664:9, 676:1, 676:2, 691:23, 691:24
**Afterwards** [2] - 530:3, 733:4
**afterwards** [1] - 733:3
**age** [4] - 501:1, 501:11, 613:7, 662:2
**Age** [1] - 707:19
**Agency** [1] - 644:14
**Agent** [14] - 632:25, 638:11, 648:14, 648:25, 655:1, 656:10, 657:4, 709:11, 710:3, 711:4, 726:4, 739:15, 744:7, 752:18
**agent** [7] - 633:12, 644:1, 644:2, 644:4, 644:9, 724:13, 743:21
**agents** [2] - 564:11, 576:17, 656:1
**Agents** [1] - 634:4
**aggravated** [1] - 546:22
**agree** [3] - 511:6, 558:7, 558:9
**agreed** [6] - 558:10, 575:13, 613:20, 711:23, 712:21
**agreeing** [2] - 575:2, 575:4
**agreement** [36] - 510:7, 511:10, 566:6, 566:14, 566:24, 572:1, 572:2, 572:11, 572:13, 573:1, 573:14, 573:17, 573:23, 574:3, 574:9, 574:15, 574:24, 575:14, 575:16, 575:18, 577:1, 577:5, 577:9, 590:5, 595:12, 596:3, 596:15, 599:6, 600:8, 604:23, 605:1, 605:5, 605:16, 605:20, 737:23
**agreements** [3] - 627:7, 627:23, 737:9
**aide** [2] - 720:23, 721:5
**air** [3] - 616:6, 652:20, 652:21
**Air** [1] - 609:1
**airway** [3] - 684:3, 684:7, 684:10
**alarm** [1] - 681:22
**Alcohol** [1] - 739:1
**alert** [1] - 617:11
**Alfonso** [3] - 492:13, 492:20
**alleyway** [1] - 545:23
**allow** [4] - 588:23, 598:2, 598:12, 754:5
**allowing** [1] - 540:8
**Allyne** [1] - 491:11

**Almost** [1] - 693:12
**almost** [10] - 654:2, 658:18, 663:7, 678:21, 685:7, 696:12, 697:1, 697:14, 697:15, 702:22
**alone** [2] - 511:1, 513:12
**altered** [1] - 538:10
**Amboy** [9] - 525:11, 536:14, 652:21, 659:15, 661:18, 737:24, 738:21, 746:24, 753:12
**Ambu** [2] - 684:15, 687:23
**ambulance** [3] - 493:24, 494:7, 685:5
**Ambulance** [1] - 495:4
**America** [2] - 491:3, 492:1
**Amg** [1] - 559:23
**ammunition** [1] - 727:25
**amount** [10] - 493:15, 511:10, 548:17, 575:8, 587:22, 587:23, 594:8, 594:19, 616:6, 693:12
**analysis** [7] - 636:15, 637:14, 643:1, 646:14, 734:11, 734:12, 734:15
**analyzed** [2] - 684:22, 684:23
**anatomy** [1] - 676:22
**Andros** [1] - 494:15
**Angela** [4] - 523:4, 523:8, 523:12, 523:18
**Angelo** [3] - 514:5, 514:6, 514:11
**angle** [1] - 687:14
**announced** [1] - 750:18
**Anthony** [9] - 509:23, 510:11, 510:18, 510:24, 608:3, 608:14, 619:18, 709:12, 709:22
**Anytime** [1] - 561:2
**anytime** [1] - 565:13
**Anyway** [1] - 724:4
**anyway** [1] - 596:8
**Ap** [1] - 746:20
**apart** [1] - 647:19
**apartment** [1] - 737:15
**apartments** [2] - 737:5, 737:6
**apneic** [1] - 683:19
**Apneic** [2] - 683:22
**appear** [1] - 613:2
**appearances** [1] - 563:17
**Appearances** [1] - 491:12
**appeared** [6] - 613:12, 658:8, 658:17, 658:21, 709:3, 709:4
**applicant** [1] - 730:2
**application** [6] - 599:2, 729:24, 734:25, 735:3, 735:9, 743:23
**applications** [1] - 735:23
**applied** [1] - 743:21
**apply** [1] - 598:14
**applying** [3] - 598:2, 598:12, 676:17
**appointments** [2] - 519:3, 519:5
**appreciate** [1] - 617:6
**approach** [22] - 508:20, 511:19, 543:10, 554:12, 566:8, 596:11, 660:4, 661:3, 666:18, 676:24, 685:9, 695:9, 704:19, 718:10, 720:15, 726:22, 733:6,

735:18, 736:25, 738:23, 740:15, 748:5
**approval** [1] - 520:17
**approved** [1] - 503:21
**April** [4] - 634:16, 635:11, 644:21, 644:23
**Archwood** [1] - 651:15
**area** [30] - 496:22, 498:22, 630:16, 635:13, 635:16, 635:21, 636:18, 638:3, 638:13, 641:9, 645:9, 650:20, 651:3, 652:8, 658:17, 673:25, 686:8, 686:13, 687:17, 696:16, 696:17, 697:3, 697:5, 697:23, 698:19, 704:13, 742:2, 742:9, 752:7
**areas** [5] - 635:8, 635:15, 636:4, 638:12, 638:17
**arm** [1] - 497:2
**armed** [3] - 547:2, 547:21, 553:14
**arms** [2] - 495:10, 495:15
**arrange** [1] - 732:3
**arrest** [1] - 674:21
**arrested** [28] - 500:23, 501:4, 501:16, 501:22, 504:6, 560:3, 562:16, 571:19, 571:21, 571:25, 572:7, 575:23, 576:1, 576:24, 583:3, 589:10, 589:21, 590:8, 590:13, 591:15, 591:20, 591:25, 592:3, 592:6, 592:7, 593:3, 605:3, 605:6
**arresting** [1] - 559:6
**arrival** [1] - 702:3
**arrive** [3] - 650:20, 650:24, 694:24
**arrived** [17] - 494:22, 550:23, 551:3, 556:14, 556:15, 650:25, 651:4, 651:5, 651:16, 651:23, 651:24, 660:25, 682:15, 685:5, 688:3, 703:5, 705:12
**arson** [15] - 532:21, 553:25, 557:10, 559:1, 561:4, 561:25, 562:7, 565:3, 591:25, 678:3, 678:6, 679:17, 696:20, 741:6, 743:5
**arsons** [2] - 520:14, 533:6
**Arthur** [7] - 536:12, 609:16, 610:25, 619:15, 621:25, 622:17, 634:17
**assault** [16] - 501:14, 501:16, 501:18, 502:5, 528:14, 528:23, 529:17, 529:19, 531:22, 539:15, 542:16, 543:1, 544:5, 564:2, 564:3, 564:4
**Assault** [1] - 528:13
**assaulted** [1] - 528:21
**assaults** [1] - 529:14
**assemble** [1] - 617:4
**assess** [1] - 683:5
**assessment** [1] - 599:7
**assigned** [11] - 633:14, 635:23, 643:25, 644:21, 644:23, 645:12, 649:10, 656:23, 657:1, 681:10, 710:7
**assignment** [1] - 650:10
**assist** [1] - 693:11
**assistance** [2] - 511:12, 599:5
**assistant** [2] - 634:1, 646:7
**Assistant** [2] - 491:16, 564:10
**associate** [11] - 505:25, 506:19, 516:16, 516:20, 516:23, 517:1, 517:4,

517:7, 517:14, 517:19, 583:15
**Associate** [5] - 507:23, 509:18, 515:21, 515:25, 516:12
**associate's** [1] - 507:16
**associated** [6] - 508:6, 508:10, 508:13, 509:21, 513:21, 518:25
**Associates** [1] - 505:16
**associates** [4] - 506:14, 506:16, 507:4, 710:24
**association** [2] - 520:12, 540:10
**assume** [2] - 749:4, 749:7
**assuming** [1] - 630:24
**ate** [1] - 550:24
**attached** [1] - 737:8
**attack** [3] - 669:25, 678:9, 679:3
**attempt** [1] - 711:10
**attend** [1] - 563:13
**attention** [11] - 494:3, 542:15, 545:3, 553:24, 597:21, 619:13, 649:14, 656:25, 659:8, 738:6, 752:19
**attic** [1] - 634:22
**Attorney** [2] - 491:14, 564:11
**attorney** [1] - 564:13
**Attorneys** [1] - 491:16
**attributed** [1] - 721:9
**attribution** [4] - 723:8, 742:7, 743:14, 752:22
**attributions** [3] - 719:19, 721:9, 721:14
**Audio** [13] - 689:14, 722:8, 722:11, 723:3, 723:23, 724:1, 724:3, 725:10, 751:14, 752:15, 752:17, 753:8, 753:13
**audio** [1] - 690:15
**audiotape** [25] - 726:3, 731:16, 731:17, 731:19, 731:20, 740:3, 740:4, 740:10, 740:11, 740:13, 740:14, 743:12, 743:13, 744:5, 744:6, 746:14, 746:15, 747:1, 747:2, 747:4, 747:5, 747:7, 747:8, 747:10, 747:11
**August** [7] - 589:17, 730:1, 736:15, 736:19, 738:7, 738:9, 738:16
**Authority** [1] - 670:24
**authorization** [2] - 716:11, 716:12
**authorized** [2] - 716:9, 716:10
**auto** [2] - 494:21, 715:16
**Auto** [1] - 545:2
**Avenue** [18] - 664:24, 666:1, 672:19, 682:2, 682:3, 685:18, 687:5, 694:8, 694:17, 698:17, 740:20, 741:4, 741:5, 741:12, 741:15, 741:22, 742:9, 743:5
**aware** [2] - 592:11, 630:17

## B

**backwards** [1] - 750:5
**backyard** [1] - 687:20
**backyards** [1] - 525:22
**bad** [2] - 495:8, 530:2
**badly** [1] - 530:1
**bag** [6] - 642:24, 684:15, 687:23,

699:23, 704:24, 705:6
**bail** [1] - 562:24
**ballistics** [1] - 734:14
**bar** [7] - 568:7, 569:1, 569:16, 579:7, 744:12, 745:1, 745:20
**bars** [1] - 583:9
**base** [1] - 704:5
**based** [13] - 604:16, 604:19, 614:4, 622:6, 636:4, 659:24, 659:25, 660:7, 670:12, 703:24, 708:22, 715:3, 745:15
**Based** [3] - 630:1, 635:12, 699:24
**basement** [2] - 537:24, 611:11, 620:10, 620:11, 620:19, 620:23, 620:24, 621:4, 634:22, 635:16, 635:20, 638:2, 638:3, 638:9, 638:13, 638:15, 642:2, 642:13, 645:8, 672:13, 673:23, 702:9
**basements** [2] - 618:25, 619:1
**basic** [2] - 575:1, 637:20
**bat** [2] - 531:5, 531:9
**battery** [1] - 717:18
**Bay** [6] - 534:20, 534:23, 722:5, 722:24, 740:2, 744:1
**beat** [9] - 510:22, 529:23, 538:25, 539:1, 539:3, 539:4, 540:24, 542:20, 558:14
**beaten** [3] - 495:7, 495:9, 532:3
**beating** [4] - 530:20, 578:18, 579:11, 579:18
**beautiful** [1] - 729:2
**became** [2] - 509:21, 719:25
**become** [2] - 508:10, 744:10
**becoming** [1] - 676:10
**bedroom** [1] - 671:23
**begin** [2] - 636:3, 685:4
**Beginning** [1] - 513:20
**beginning** [7] - 576:14, 583:12, 617:9, 669:21, 678:6, 715:7, 731:15
**behalf** [1] - 724:14
**behind** [5] - 502:15, 621:18, 623:19, 658:20, 658:22
**Behind** [1] - 547:20, 621:17
**Bella** [4] - 653:19, 653:21, 653:23, 731:11
**below** [3] - 598:13, 696:16, 700:13
**bend** [1] - 750:5
**Benton** [1] - 491:13
**Berdote** [4] - 638:11, 643:13, 643:19
**best** [2] - 701:22, 708:19
**better** [2] - 642:25, 728:14
**between** [10] - 531:12, 534:5, 535:18, 554:7, 569:3, 614:11, 711:16, 721:6, 728:12, 742:3
**big** [11] - 495:15, 497:3, 587:25, 588:2, 611:13, 611:18, 612:6, 612:24, 612:25, 616:8
**bigger** [1] - 700:25
**Bilco** [4] - 621:2, 622:19, 622:25, 623:6
**bill** [2] - 588:1, 588:2
**billing** [1] - 610:8

**binder** [2] - 719:10, 719:13
**Binders** [1] - 721:16
**binders** [2] - 754:9, 754:10
**binding** [1] - 599:8
**biological** [5] - 635:14, 635:24, 636:2, 637:18, 642:23
**birthday** [1] - 694:1
**birthdays** [1] - 507:7
**Bistro** [1] - 534:20
**bit** [2] - 596:7, 653:25
**Black** [1] - 523:17
**black** [5] - 630:7, 650:25, 651:6, 651:20, 652:13, 652:15, 714:17
**blade** [1] - 619:7
**bleach** [1] - 643:7
**bled** [1] - 642:20
**bleeding** [5] - 495:11, 495:14, 496:11, 496:13
**block** [10] - 541:8, 562:12, 621:25, 658:18, 667:6, 668:20, 669:4, 673:25, 698:17, 698:22
**Blockbuster's** [1] - 742:1
**blocked** [1] - 700:25
**blocks** [1] - 620:7
**blood** [22] - 507:24, 529:24, 635:14, 635:24, 636:2, 636:16, 636:18, 637:11, 637:18, 638:5, 642:15, 642:19, 642:21, 642:23, 643:2, 643:8, 645:12, 645:14, 645:16, 645:19, 646:3, 647:22
**blow** [4] - 668:19, 671:7, 671:8, 695:25
**blow-ups** [1] - 695:25
**blows** [1] - 495:15
**blowup** [6] - 639:15, 640:2, 640:11, 641:5, 641:24, 642:7
**Blue** [2] - 536:24, 660:18
**bluish** [1] - 636:20
**blunt** [1] - 495:15
**Bmw** [3] - 536:20, 660:16, 662:7
**board** [12] - 496:5, 496:10, 496:12, 565:19, 636:7, 639:15, 640:10, 640:11, 641:24, 642:6, 642:7, 668:19
**boards** [1] - 695:25
**Bobby** [3] - 528:22, 532:9, 534:13
**bodies** [1] - 654:15
**Body** [1] - 545:2
**body** [14] - 494:21, 495:13, 496:18, 542:19, 542:23, 543:4, 544:18, 544:25, 686:25, 711:16, 713:5, 715:16, 717:24, 724:24
**boiler** [2] - 621:11, 631:10
**boilers** [4] - 614:2, 618:24, 619:1, 627:24
**bomb** [2] - 532:16, 532:18
**bombed** [1] - 532:7
**Bonanno** [13] - 505:7, 512:10, 512:11, 512:12, 513:2, 513:6, 516:12, 516:13, 710:15, 710:17, 710:20, 710:24, 714:6
**Bonannos** [16] - 504:20, 504:21, 508:7, 515:10, 515:17, 515:21, 515:25, 516:16, 516:20, 516:23, 517:1, 517:4,

517:7, 517:14, 517:19, 531:21
**born** [3] - 498:18, 498:19, 571:11
**borough** [1] - 664:18
**borrow** [2] - 537:4, 669:19
**boss** [2] - 554:24, 560:13
**Boss** [1] - 505:15
**bottle** [1] - 532:19
**bottom** [28] - 597:5, 597:6, 597:10, 597:21, 612:19, 639:23, 640:24, 642:4, 662:14, 662:17, 663:6, 667:1, 667:2, 667:3, 672:16, 673:11, 673:19, 687:3, 687:16, 697:12, 697:18, 698:15, 729:2, 729:6, 731:21, 746:2, 753:6
**Boulevard** [9] - 534:1, 554:4, 557:25, 560:12, 581:5, 666:5, 741:15, 741:23, 742:3
**bound** [1] - 599:13
**box** [10] - 547:14, 547:18, 547:19, 627:14, 646:19, 646:20, 727:7, 727:25, 736:19
**boxed** [2] - 728:21, 728:23
**boxer** [1] - 534:5
**brain** [1] - 495:23
**brakes** [1] - 674:1
**branch** [1] - 710:15
**Brandefine** [5] - 608:4, 608:14, 608:15, 610:23, 619:18
**break** [17] - 492:7, 497:19, 568:2, 569:6, 569:9, 573:12, 606:3, 607:3, 607:5, 624:4, 674:7, 688:14, 688:16, 688:18, 749:8, 750:14, 754:1
**Break** [2] - 525:16, 525:25
**Breaking** [1] - 524:20
**breaking** [1] - 525:14
**breathe** [1] - 687:24
**breathing** [2] - 683:20, 683:24
**Brh-7521** [1] - 652:16
**brick** [1] - 621:10
**bricks** [5] - 620:7, 621:14, 623:13, 623:16, 623:19
**bridge** [1] - 530:12
**brief** [4] - 497:18, 497:21, 568:2, 568:7
**briefcase** [2] - 585:7, 585:8
**briefly** [4] - 629:7, 630:9, 651:9, 694:22
**bring** [4] - 492:7, 621:22, 627:8, 627:10, 627:15, 628:17, 628:18, 630:21, 679:24, 715:16, 715:25
**brings** [4] - 628:16, 629:10, 630:9, 631:17
**Britton** [3] - 730:3, 735:2, 739:4
**broke** [4] - 526:6, 563:25, 671:15, 674:12
**broken** [6] - 496:22, 529:25, 613:6, 633:25, 647:19, 671:21
**Bronx** [1] - 752:7
**Brooklyn** [7] - 491:6, 491:22, 520:25, 537:24, 546:15, 692:7, 692:8
**Brooklyn/queens** [1] - 644:13
**Brother** [1] - 512:24

**brother** [5] - 503:12, 537:25, 580:24, 581:3, 581:10
**brother's** [4] - 502:22, 503:1, 503:6, 503:7
**Brother-in-laws** [1] - 512:24
**brought** [9] - 522:3, 540:14, 540:17, 540:19, 540:20, 580:1, 629:16, 629:23, 630:3
**Bruno** [4] - 675:9, 675:19, 675:20, 688:10
**Brush** [2] - 555:3, 665:24
**Bucks** [1] - 736:21
**build** [1] - 587:22
**building** [14] - 623:19, 665:16, 692:21, 694:24, 695:2, 696:3, 696:6, 696:8, 697:15, 700:15, 703:1, 703:9
**built** [3] - 587:25, 588:2, 613:9
**bull** [1] - 534:5
**bulletproof** [2] - 537:16, 537:18
**bullets** [1] - 727:8
**Bunch** [1] - 619:5
**bunch** [3] - 506:3, 572:8, 577:6
**Buoninfante** [3] - 492:14, 492:20, 492:21
**Bureau** [4] - 588:20, 692:19, 710:4, 739:1
**burglary** [2] - 500:8, 500:18
**burn** [12] - 526:20, 527:11, 527:16, 539:22, 558:17, 558:20, 696:11, 703:10, 704:6, 704:11, 704:13, 704:15
**burned** [10] - 526:14, 526:22, 555:13, 557:4, 560:21, 696:11, 697:12, 700:22, 701:8, 702:11
**burner** [3] - 612:18, 620:6, 620:7
**burning** [7] - 524:20, 558:11, 558:12, 612:11, 696:23, 697:24, 703:22
**Burns** [1] - 646:7
**bus** [2] - 563:22, 670:20
**business** [11] - 511:15, 560:17, 561:3, 618:23, 618:24, 627:2, 627:20, 628:5, 628:16, 631:7, 665:21
**businesses** [1] - 627:6
**busy** [2] - 723:7, 723:11
**button** [1] - 689:13
**buy** [6] - 507:15, 522:18, 523:9, 627:7, 714:12, 728:17
**buying** [1] - 732:4
**bye** [1] - 669:4

**C**

**C-10** [1] - 710:15
**C-35** [2] - 644:16, 644:22
**cab** [2] - 670:2, 671:14
**Cadillac** [3] - 522:23, 549:22, 651:6
**Cadman** [1] - 491:21
**caliber** [5] - 728:4, 733:14, 734:5, 735:10, 735:14
**Camacho** [4] - 495:1, 495:5, 497:1, 497:7

camera [21] - 561:13, 661:16, 666:15, 666:25, 698:22, 699:1, 699:4, 699:8, 699:24, 700:14, 700:19, 700:20, 701:2, 705:25, 708:20, 709:3, 709:5, 727:17, 729:20, 732:10

cameras [4] - 547:15, 547:17, 673:17, 673:20

Campbell [1] - 491:13

camping [1] - 698:10

Campizzo [1] - 510:2

candidly [1] - 750:11

candles [1] - 703:22

canister [1] - 698:8

canvass [1] - 698:19

canvassing [2] - 673:25, 698:25

capacity [1] - 684:20

Captain [2] - 509:14, 705:13

captain [7] - 505:20, 506:13, 507:1, 507:12, 683:5, 705:13

Captains [1] - 505:15

car [51] - 500:23, 501:3, 502:13, 523:13, 523:14, 524:20, 525:16, 525:25, 526:5, 526:7, 526:9, 526:20, 526:22, 529:25, 531:6, 532:12, 536:18, 536:25, 537:4, 541:4, 545:25, 546:19, 550:2, 556:15, 559:14, 559:16, 559:20, 560:5, 560:9, 562:12, 581:18, 650:24, 652:6, 660:19, 663:1, 663:3, 666:7, 667:2, 671:3, 673:13, 674:1, 709:1, 709:2, 714:16, 715:14, 715:16, 740:7, 746:17, 746:18

Carbone [3] - 521:4, 521:7, 522:2

card [1] - 502:13

care [8] - 493:15, 493:25, 497:10, 506:17, 509:25, 510:5, 510:6, 541:23

career [1] - 649:20

cars [23] - 499:19, 500:16, 500:21, 526:14, 539:23, 549:19, 549:20, 549:21, 549:24, 550:11, 579:16, 579:18, 579:21, 652:8, 652:9, 653:9, 670:20, 670:21, 714:11, 714:15, 714:18

case [43] - 497:12, 501:8, 502:1, 503:3, 519:1, 519:3, 563:3, 563:5, 564:6, 577:22, 593:4, 595:5, 604:20, 630:13, 630:14, 630:20, 630:24, 634:6, 634:7, 635:12, 636:4, 649:16, 659:15, 671:18, 674:20, 694:15, 694:23, 694:25, 695:1, 696:10, 697:6, 703:24, 704:12, 712:22, 724:18, 727:4, 727:5, 727:15, 733:12, 733:13, 746:7, 754:6

Case [1] - 492:1

cases [5] - 633:22, 634:15, 649:10, 649:12, 712:4

cash [2] - 521:15, 521:18

casing [1] - 612:10

cassette [1] - 716:22

cast [4] - 612:14, 630:7, 630:8

Castle [3] - 741:20, 741:21, 741:22

Casual [1] - 658:3

Cat [1] - 491:25

catch [1] - 670:1

catches [1] - 696:20

Catskills [1] - 523:19

caught [11] - 532:25, 600:17, 600:21, 600:22, 601:1, 601:6, 602:16, 602:18, 605:19, 700:17, 716:25

caused [5] - 495:23, 527:8, 678:19, 703:3, 703:18

causing [1] - 678:12

cell [4] - 523:12, 523:13, 714:24, 715:1

cellular [2] - 660:23, 661:16

center [1] - 585:9

certain [8] - 493:14, 496:25, 506:19, 511:10, 573:18, 594:19, 643:6, 716:11

certification [1] - 493:11

certified [1] - 739:1

certifies [1] - 739:4

certify [1] - 739:3

cervical [1] - 496:5

cetera [1] - 632:19

chair [1] - 647:9

chairs [1] - 754:9

Chan [128] - 491:14, 492:4, 492:12, 498:1, 498:2, 498:13, 508:20, 509:5, 509:9, 509:10, 512:1, 516:7, 516:8, 540:12, 540:13, 543:10, 543:21, 543:25, 554:16, 554:20, 555:16, 566:8, 566:17, 566:21, 566:22, 568:1, 569:7, 596:19, 597:19, 605:12, 605:14, 605:23, 607:12, 648:14, 648:24, 654:21, 656:7, 656:10, 656:19, 660:4, 661:3, 661:10, 661:15, 663:19, 689:5, 689:9, 689:12, 689:16, 689:20, 689:24, 690:7, 690:10, 709:11, 709:24, 710:2, 712:15, 718:10, 718:12, 719:1, 719:4, 719:10, 720:13, 720:17, 720:22, 721:15, 721:17, 721:21, 722:9, 722:12, 723:1, 723:4, 723:21, 723:24, 724:2, 724:7, 724:22, 726:2, 726:22, 727:9, 727:14, 733:6, 733:23, 734:3, 735:18, 736:2, 736:4, 736:7, 736:14, 736:25, 737:16, 737:21, 737:25, 738:5, 738:23, 739:7, 739:12, 740:15, 740:22, 741:2, 743:11, 745:8, 745:12, 745:17, 746:1, 746:25, 747:6, 748:2, 748:3, 749:5, 749:16, 750:16, 750:18, 751:15, 752:11, 752:16, 752:18, 753:6, 753:9, 754:1, 754:8, 754:15, 754:17, 754:20, 755:9, 755:13, 756:8, 756:13, 757:10

chance [3] - 527:15, 701:25, 730:19

change [11] - 513:13, 576:21, 601:12, 603:2, 604:16, 645:17, 645:22, 645:23, 646:1, 646:5, 745:14

changed [9] - 557:21, 558:15, 558:16, 601:11, 602:25, 604:5, 604:11, 605:2, 714:17

changing [1] - 604:21

characteristics [1] - 704:6

characterize [1] - 495:17

charge [7] - 524:2, 565:3, 591:1,

591:6, 609:9, 694:14, 754:13

charged [7] - 540:7, 561:25, 578:4, 592:7, 592:10, 593:16, 594:19

charges [10] - 502:2, 519:8, 562:2, 562:22, 590:13, 590:16, 590:18, 591:4, 591:11, 593:23

Charles [3] - 648:15, 648:21, 657:4

charring [1] - 704:7

charts [1] - 701:22

chase [1] - 531:23

check [7] - 615:2, 615:16, 619:22, 659:21, 743:20, 752:4, 752:9

checking [1] - 637:21

Cheese [7] - 520:21, 520:22, 521:20, 577:16, 586:23, 590:24, 591:2

cheese [2] - 587:12, 587:15

chemical [2] - 645:22, 645:23

chemicals [1] - 630:23

Chief [1] - 535:24

chief [1] - 694:14

Christmas [3] - 507:7, 520:9, 556:13

Chrysler [1] - 523:15

Cicale [13] - 516:10, 516:13, 539:6, 541:4, 549:16, 551:11, 563:22, 582:11, 582:13, 583:5, 584:6, 584:16, 593:10

Cicale's [3] - 585:19, 603:14

circle [2] - 641:1, 641:13

circles [1] - 647:24

circling [1] - 623:5

circumstances [2] - 642:17, 643:4

City [7] - 493:2, 493:17, 676:5, 676:11, 691:25, 705:10, 730:19

claim [1] - 502:15

claimed [1] - 669:23

clarify [1] - 555:16

classified [1] - 630:4

Clean [1] - 613:6

clean [1] - 613:10

cleaned [1] - 636:19

clear [2] - 666:3, 752:2

clearly [1] - 586:21

Clerk [11] - 492:18, 498:7, 498:11, 626:10, 633:4, 643:17, 648:19, 656:15, 689:11, 689:15, 690:8

client [6] - 628:15, 628:16, 629:10, 629:14, 630:14, 630:15

clients [2] - 627:8, 630:20

clinical [1] - 676:22

close [8] - 518:1, 578:24, 624:2, 642:11, 653:19, 659:4, 676:3, 691:18

close-up [1] - 642:11

closer [2] - 686:11, 728:15

closest [5] - 530:12, 682:16, 682:18, 682:20, 682:21

clothes [1] - 746:5

Clothing [1] - 707:23

Cls [1] - 559:23

club [1] - 555:24

clubs [1] - 583:9

clue [1] - 706:13
Cmv-3448 [1] - 652:1
co [3] - 593:4, 593:14, 609:13
Co [1] - 626:18
co-defendants [2] - 593:4, 593:14
co-owners [1] - 609:13
cocaine [1] - 563:12
Cocaine [2] - 500:11, 504:5
codefendants [1] - 563:15
coin [1] - 752:23
collar [3] - 496:5, 496:9, 496:11
collect [10] - 528:8, 548:6, 548:18, 635:25, 636:8, 636:14, 636:24, 637:4, 642:21, 711:10
collected [3] - 527:3, 544:14, 642:12
collecting [2] - 548:25, 642:25
collection [1] - 551:25
college [1] - 676:21
Colombo [4] - 505:7, 508:11, 509:13, 513:6
Colombos [5] - 504:20, 504:21, 508:6, 508:9, 508:14
color [7] - 522:24, 536:23, 636:14, 636:20, 645:18, 646:2, 660:17
Color [2] - 523:16, 559:24
column [2] - 629:7, 629:18
combust [1] - 697:25
combustible [1] - 696:25
coming [8] - 514:15, 541:10, 560:16, 575:11, 620:9, 658:11, 674:6, 682:11
commence [3] - 657:6, 659:20, 660:8
commenced [1] - 635:18, 660:10
Commercial [1] - 619:2
commisary [1] - 507:18
Commissary [1] - 520:4
commissary [4] - 507:7, 507:13, 507:14, 507:17
commit [6] - 501:14, 504:14, 524:14, 716:9, 716:10, 716:11
committed [6] - 507:11, 520:13, 576:7, 576:22, 577:7, 578:10
committing [2] - 500:3, 584:3
commodities [2] - 632:13, 632:17
commodity [6] - 629:12, 629:18, 629:20, 630:4, 631:6, 632:15
commotion [2] - 559:6, 559:8
companies [3] - 664:14, 681:8, 703:5
Company [6] - 681:12, 681:13, 681:14, 681:16, 682:13, 682:20
company [13] - 554:25, 555:1, 609:10, 610:7, 610:9, 614:2, 615:1, 627:21, 628:6, 664:11, 665:23, 681:10, 684:1
company's [1] - 628:20
Companys [1] - 681:17
completely [2] - 612:10, 631:20
completeness [1] - 599:8
complied [1] - 599:6
complies [1] - 647:12
computer [6] - 623:2, 628:21, 629:4,

640:3, 642:8, 689:25
computerized [1] - 706:11
concern [1] - 657:16
concerning [1] - 745:6
conclude [2] - 671:20, 688:6
conclusion [1] - 704:3
concrete [3] - 697:22, 697:24, 697:25
condition [7] - 495:19, 530:7, 613:5, 613:8, 613:12, 613:13, 647:14
Conditioning [1] - 609:1
conditions [1] - 630:1
conduct [2] - 650:12, 659:11
conducted [2] - 646:8, 646:10
conducting [1] - 657:12
confess [1] - 576:22
conjugate [1] - 658:17
connection [2] - 599:1, 675:1
connections [1] - 713:19
consciousness [2] - 495:22, 496:17
consensual [4] - 711:18, 711:20, 712:9, 712:11
consent [3] - 711:25, 712:1, 712:5
consider [1] - 598:13
Consigliere [1] - 505:15
consist [1] - 502:14
consistent [1] - 704:11
console [1] - 585:9
Construction [1] - 499:16
construction [4] - 555:1, 672:24, 692:21, 699:3
Cont'd [1] - 726:1
contacted [1] - 675:1
contacts [1] - 713:19
contained [1] - 640:7
container [4] - 627:11, 627:12, 698:13, 704:25
contention [1] - 679:17
context [2] - 721:11, 751:20
continue [6] - 550:21, 565:6, 653:9, 670:6, 688:4, 723:21
continued [1] - 703:10
Continued [20] - 570:2, 592:13, 593:2, 606:5, 607:14, 616:23, 617:16, 624:7, 625:6, 667:15, 668:2, 677:3, 680:5, 688:21, 690:17, 725:12, 747:12, 748:2, 748:9, 750:24
continues [1] - 728:13
continuing [2] - 678:18, 678:22
Continuing [3] - 728:19, 740:12, 752:16
contraband [1] - 724:16
contract [2] - 604:16, 611:23
contracted [1] - 619:14
contractor [2] - 573:23, 631:15
contracts [1] - 631:7
control [9] - 496:11, 547:16, 598:9, 616:2, 689:18, 689:19, 689:21, 733:5, 734:13
controlled [5] - 496:13, 724:9, 724:11,

724:18, 731:1
convenient [1] - 628:2
conversation [18] - 547:13, 557:13, 658:22, 711:22, 711:24, 712:6, 722:4, 722:23, 723:17, 726:4, 731:10, 731:13, 743:2, 743:4, 751:7, 751:24, 753:10
conversations [11] - 560:22, 560:25, 711:11, 711:14, 711:15, 711:16, 715:24, 716:23, 720:3, 721:2, 751:19
convicted [1] - 594:18
convince [1] - 595:17
cooler [1] - 642:24
Cooperate [1] - 564:9
cooperate [7] - 589:8, 589:13, 589:15, 590:1, 590:9, 591:14, 594:16
cooperated [1] - 599:5
cooperating [22] - 492:6, 492:7, 594:11, 712:12, 723:6, 724:13, 726:5, 726:9, 726:18, 728:16, 728:22, 729:6, 731:22, 732:3, 732:14, 732:20, 733:2, 745:9, 749:9, 751:18, 751:22, 754:24
cooperation [11] - 572:1, 572:10, 572:13, 573:1, 590:5, 594:10, 594:14, 596:14, 599:8, 605:15, 605:20
Cooperation [1] - 566:14
coordinate [1] - 634:16
coordinator [3] - 633:17, 634:10, 646:7
coordinators [1] - 633:25
cop [1] - 542:13
copper [1] - 632:18
cops [4] - 527:15, 559:6, 560:3, 560:16
copy [5] - 596:14, 596:17, 615:2, 629:14, 706:3
Coram [1] - 653:14
cord [1] - 496:7
corner [14] - 562:14, 666:6, 666:7, 667:2, 673:13, 697:15, 697:18, 698:15, 699:2, 741:15, 741:18, 741:22, 741:24
Correct [21] - 580:25, 581:1, 581:4, 581:7, 587:24, 588:17, 588:22, 589:9, 592:9, 594:9, 594:17, 595:11, 599:25, 601:20, 604:1, 604:8, 605:9, 616:10, 644:20, 680:1, 703:2
correct [17] - 578:2, 580:10, 583:21, 611:19, 615:15, 615:18, 632:14, 639:25, 640:4, 640:19, 641:3, 641:6, 641:25, 642:9, 662:16, 701:1, 707:5
Cosa [1] - 710:24
count [1] - 678:3
counter [3] - 547:20, 658:16, 710:8
counter-terrorism [1] - 710:8
counterfeit [1] - 500:8
County [1] - 736:22
Couple [1] - 669:17
couple [15] - 526:19, 539:2, 544:14, 549:4, 605:12, 612:16, 631:18, 654:23, 674:10, 693:2, 705:24
course [9] - 493:14, 499:25, 500:12, 502:9, 504:1, 649:19, 676:21, 678:6,

692:19
  courses [1] - 692:22
  Court [169] - 491:1, 491:21, 492:3, 492:8, 492:10, 492:12, 492:18, 497:16, 497:18, 498:1, 498:7, 498:11, 508:21, 509:6, 511:20, 516:6, 540:5, 543:11, 543:22, 554:13, 554:17, 566:9, 566:18, 568:2, 568:7, 569:2, 569:5, 569:8, 569:13, 569:15, 571:2, 571:6, 596:13, 596:16, 596:20, 598:2, 598:12, 599:3, 606:1, 607:4, 607:6, 607:11, 608:2, 608:18, 609:21, 610:10, 610:16, 615:8, 616:14, 616:16, 616:20, 617:5, 617:9, 617:12, 618:14, 618:16, 622:23, 623:24, 624:2, 625:3, 626:3, 626:5, 626:10, 628:25, 632:22, 633:4, 633:8, 639:11, 643:11, 643:17, 643:21, 647:5, 648:9, 648:13, 648:19, 650:13, 651:13, 651:17, 651:25, 652:10, 652:18, 654:22, 656:8, 656:15, 660:5, 661:4, 661:12, 663:21, 664:2, 666:19, 667:12, 668:17, 675:6, 675:23, 676:25, 679:6, 679:11, 679:14, 679:23, 680:2, 685:11, 685:24, 688:12, 688:14, 688:16, 688:18, 689:3, 689:6, 689:18, 690:5, 690:11, 691:3, 693:19, 695:10, 695:22, 696:2, 699:15, 699:18, 704:20, 705:20, 707:10, 708:2, 708:5, 708:10, 709:7, 709:9, 709:25, 718:11, 719:7, 720:16, 720:19, 720:24, 721:20, 721:22, 726:23, 727:11, 733:7, 733:25, 735:19, 736:11, 737:1, 737:18, 738:2, 738:24, 739:9, 740:16, 740:24, 744:12, 745:6, 745:11, 745:14, 745:19, 748:6, 749:4, 749:6, 749:11, 749:14, 749:17, 749:21, 750:4, 750:11, 750:17, 750:18, 750:21, 754:3, 754:10, 754:13, 754:16, 754:18
  court [16] - 503:3, 503:5, 519:3, 519:5, 563:13, 563:17, 563:21, 574:4, 590:6, 607:10, 618:1, 664:3, 681:1, 693:13, 712:7, 751:1
  Courthouse [1] - 491:5
  Courtroom [19] - 608:6, 608:12, 608:16, 618:3, 618:9, 675:11, 675:17, 675:21, 689:11, 689:15, 689:22, 689:25, 690:3, 690:8, 691:7, 691:13, 691:17, 709:14, 709:20
  courtroom [13] - 492:2, 492:9, 497:21, 497:23, 497:25, 516:1, 568:5, 571:1, 571:5, 626:2, 626:4, 689:14, 754:11
  Cousins [1] - 535:10
  cover [4] - 713:9, 713:12, 714:2, 732:3
  coverage [1] - 754:6
  covered [1] - 704:13
  covering [1] - 547:17
  Cpr [2] - 684:5, 684:16
  Cr-06-285 [1] - 491:4
  created [3] - 659:23, 659:24, 708:17
  Credit [1] - 502:13
  crew [40] - 506:2, 506:10, 506:12,

506:16, 507:3, 507:4, 507:12, 507:21, 508:13, 508:18, 509:22, 512:3, 512:5, 512:12, 513:16, 516:13, 516:17, 517:2, 517:15, 517:25, 518:5, 518:9, 528:12, 528:18, 533:22, 534:17, 535:7, 535:11, 542:9, 582:14, 583:15, 583:18, 710:24, 712:8, 713:6, 713:10, 713:20, 715:6, 715:10
  crews [1] - 512:7
  crime [35] - 500:1, 501:2, 501:12, 504:14, 504:22, 505:3, 505:11, 507:11, 507:22, 507:25, 515:3, 520:12, 529:19, 540:7, 562:1, 571:15, 571:22, 578:9, 598:10, 633:20, 633:21, 635:14, 678:12, 679:9, 705:11, 705:14, 706:21, 707:1, 710:15, 714:1, 716:3, 716:9, 716:10, 716:11, 752:1
  Crime [3] - 710:16, 710:17, 714:6
  Crimes [1] - 564:18
  crimes [30] - 500:4, 500:6, 500:7, 504:14, 511:16, 520:13, 524:14, 524:17, 528:11, 533:22, 564:18, 564:20, 564:24, 566:25, 567:7, 567:8, 576:7, 576:13, 576:22, 577:6, 578:10, 582:17, 583:8, 584:3, 593:18, 598:23, 600:13, 600:16, 716:6, 716:14
  criminal [5] - 519:1, 712:22, 714:8, 715:23, 716:4
  Criminal [2] - 506:6, 506:7
  Cross [7] - 571:7, 593:1, 654:24, 705:22, 755:10, 756:9, 757:1
  cross [2] - 749:7
  Cross-examination [6] - 571:7, 654:24, 705:22, 755:10, 756:9, 757:1
  crowbar [1] - 495:9
  Csr [1] - 491:21
  cul [2] - 518:22, 651:15
  cul-de-sac [2] - 518:22, 651:15
  current [2] - 664:21, 681:2
  custody [1] - 705:16
  customer [3] - 627:19, 627:22, 628:13
  customers [1] - 627:1
  cut [5] - 615:2, 619:7, 620:9, 631:12, 642:19
  cuts [1] - 619:11
  Cvw-2183 [1] - 654:16
  Cw [2] - 721:9, 721:13
  cylinder [4] - 698:9, 705:7, 705:8, 708:3
  Cz [4] - 733:14, 734:5, 735:9, 735:14
  Czt-9451 [1] - 652:16

---

## D

  damage [6] - 694:25, 696:5, 696:7, 697:3, 702:19, 703:4
  damaged [1] - 702:16
  damages [1] - 527:25
  dark [3] - 636:20, 652:16, 700:2
  Daryl [28] - 517:1, 525:7, 529:8,

535:14, 549:9, 549:15, 549:25, 552:4, 552:6, 552:10, 552:11, 552:14, 552:21, 552:23, 553:2, 554:24, 555:6, 555:18, 556:15, 557:24, 559:19, 560:11, 560:14, 586:15, 586:18, 739:21, 739:22
  Daryl's [2] - 552:12, 586:13
  date [41] - 509:8, 543:24, 554:19, 566:20, 629:2, 629:8, 629:17, 634:8, 639:6, 639:13, 647:7, 650:9, 659:9, 661:14, 667:14, 721:24, 722:14, 723:16, 723:19, 725:4, 725:5, 726:7, 727:13, 729:25, 730:1, 731:4, 732:18, 732:25, 734:2, 735:3, 736:13, 737:20, 738:4, 738:21, 739:11, 739:15, 741:1, 741:7, 742:22, 751:2, 753:2
  dated [1] - 752:12
  dates [1] - 631:21
  dating [2] - 539:18, 578:21
  daughter [1] - 522:5
  Daw-6781 [1] - 652:15
  day-to-day [1] - 627:3
  days [7] - 614:13, 631:19, 722:16, 722:17, 743:4, 743:6, 750:7
  Dc [2] - 710:9, 710:12
  de [2] - 518:22, 651:15
  deactivate [1] - 717:13
  deal [1] - 539:11
  dealer's [1] - 739:5
  dealership [2] - 499:17, 499:18
  dealing [4] - 505:6, 724:15, 732:5, 752:5
  deals [1] - 713:14
  debris [2] - 621:12, 623:18
  debt [3] - 509:24, 510:20, 551:23
  December [13] - 611:1, 614:10, 619:13, 628:6, 628:19, 629:16, 631:21, 665:10, 666:11, 670:17, 670:25, 692:13
  Decent [1] - 613:12
  decent [1] - 613:13
  decide [9] - 563:3, 564:5, 564:8, 576:21, 589:7, 590:1, 595:9, 599:18, 599:23
  decided [2] - 584:7, 584:12, 589:11, 589:13, 589:14, 590:9, 591:14
  decides [2] - 600:6, 674:4
  decision [6] - 575:16, 575:17, 595:21, 595:24, 599:13, 646:12
  decisions [1] - 631:7
  declared [2] - 705:14, 706:21
  decorative [1] - 640:22
  defendant [20] - 491:8, 516:6, 536:15, 537:12, 538:15, 540:7, 542:16, 545:4, 545:20, 546:25, 547:8, 553:25, 563:15, 563:17, 599:4, 662:7, 663:14, 663:15, 678:19, 746:3
  Defendant [1] - 491:17
  defendant's [1] - 540:10
  defendants [2] - 593:4, 593:14
  defending [1] - 678:4
  defib [1] - 684:23

**defibrillator** [1] - 684:16
**deformed** [2] - 496:24
**deformities** [1] - 496:25
**degrade** [1] - 642:22
**deli** [1] - 520:23
**deliberately** [1] - 587:21
**deliver** [1] - 499:23
**delivered** [1] - 521:10
**Delivery** [1] - 499:22
**delivery** [5] - 513:25, 520:20, 521:6, 521:18, 577:15
**denied** [1] - 562:24
**Denied** [1] - 562:25
**Dennehy** [64] - 491:15, 492:13, 492:23, 497:14, 569:11, 663:22, 664:7, 666:18, 667:8, 667:10, 668:2, 668:3, 668:15, 668:22, 670:3, 672:15, 675:3, 675:9, 675:22, 675:25, 678:16, 679:4, 679:7, 679:12, 679:15, 680:1, 685:9, 685:12, 685:22, 686:4, 687:7, 688:9, 688:17, 690:2, 690:13, 691:3, 691:4, 691:18, 691:22, 693:17, 693:20, 695:9, 695:11, 695:20, 695:25, 697:8, 697:17, 698:2, 699:16, 700:7, 701:13, 702:10, 704:18, 704:21, 705:3, 705:19, 707:9, 707:12, 707:25, 755:6, 756:16, 756:20, 756:24, 757:4
**Dennis** [2] - 568:3, 690:12
**depart** [1] - 652:2
**departed** [6] - 651:3, 651:11, 651:16, 652:4, 652:11, 652:24
**Department** [9] - 493:18, 640:8, 674:20, 676:5, 676:6, 691:25, 692:2, 705:10, 705:16
**department** [3] - 493:2, 633:21, 637:1
**depict** [9] - 666:24, 667:5, 668:12, 685:19, 686:8, 687:4, 687:11, 695:17, 697:21
**depicted** [7] - 661:21, 662:17, 665:2, 673:12, 685:17, 698:11, 702:4
**Depot** [2] - 653:13, 653:20
**Deputy** [16] - 608:6, 608:12, 608:16, 618:3, 618:9, 675:11, 675:17, 675:21, 689:22, 689:25, 690:3, 691:7, 691:13, 691:17, 709:14, 709:20
**Describe** [1] - 682:9
**describe** [32] - 495:5, 516:3, 611:2, 611:9, 612:5, 612:17, 613:5, 615:19, 619:6, 619:24, 627:20, 629:7, 630:10, 634:6, 634:20, 635:1, 635:10, 635:17, 636:10, 636:21, 637:17, 638:1, 639:19, 640:5, 641:8, 645:5, 645:10, 658:15, 694:22, 701:22, 703:7, 708:18
**described** [7] - 571:14, 576:6, 583:12, 591:14, 592:1, 632:17, 687:23
**description** [1] - 627:3
**descriptions** [1] - 629:22
**designated** [1] - 630:16
**designed** [2] - 632:15, 717:21
**detail** [4] - 547:8, 612:5, 645:10, 752:3

**Detail** [2] - 628:14, 629:5
**detailed** [1] - 689:21
**detective** [1] - 705:13
**detectives** [2] - 672:4, 705:13
**determination** [2] - 540:9, 599:4
**determine** [3] - 567:20, 692:21, 703:24
**determining** [2] - 692:20, 696:8
**developed** [1] - 670:6
**development** [2] - 518:22, 525:22
**device** [12] - 616:2, 684:11, 712:2, 712:21, 716:21, 717:8, 717:9, 717:12, 717:13, 717:17, 717:20, 717:21
**diagonally** [2] - 665:25, 669:2
**Diana** [1] - 513:9
**Diane** [1] - 701:12
**died** [2] - 678:21, 679:19
**difference** [1] - 631:2
**different** [12] - 505:11, 583:14, 598:23, 627:13, 632:7, 645:14, 689:16, 703:13, 711:13, 724:25, 745:9, 746:7
**Different** [1] - 598:23
**differently** [1] - 564:5
**difficult** [1] - 716:24
**digital** [2] - 717:25, 718:1
**dining** [2] - 639:22, 658:7
**Dinnan** [3] - 656:11, 656:17
**Direct** [29] - 492:22, 498:12, 608:20, 618:17, 626:13, 633:9, 643:22, 648:23, 656:18, 664:6, 668:1, 675:24, 691:21, 710:1, 726:1, 748:1, 755:5, 755:8, 755:16, 755:20, 755:23, 756:1, 756:4, 756:7, 756:12, 756:15, 756:19, 756:23, 757:9
**direct** [10] - 494:3, 571:14, 573:11, 575:4, 576:8, 586:16, 588:15, 595:7, 603:19, 619:13
**directed** [1] - 629:11
**directing** [3] - 597:21, 656:25, 752:18
**direction** [4] - 693:5, 700:14, 745:9, 745:14
**directly** [3] - 455:14, 700:13, 702:21
**Dirty** [1] - 613:6
**disclosed** [1] - 754:20
**disconnect** [1] - 620:4
**Disconnect** [1] - 620:5
**discover** [1] - 638:6
**discovery** [1] - 563:5
**discrepancy** [1] - 721:6
**discuss** [12] - 507:2, 542:16, 545:4, 551:18, 556:21, 560:13, 563:18, 574:14, 574:17, 574:23, 634:7, 670:15
**Discuss** [1] - 574:17
**discussed** [6] - 556:17, 557:18, 564:17, 579:13, 579:14, 600:1
**discussing** [2] - 547:1, 715:23
**discussion** [4] - 545:18, 546:6, 546:8, 556:18
**discussions** [3] - 558:12, 715:21, 719:3

**dismissed** [5] - 501:1, 501:9, 502:2, 564:22, 709:9
**distance** [3] - 653:8, 699:24, 700:2
**distilled** [2] - 645:16, 645:25
**distributed** [1] - 721:16
**district** [1] - 565:4
**District** [3] - 491:1, 491:1, 491:11
**division** [2] - 493:3, 710:8
**Division** [1] - 626:17
**Dix** [1] - 519:15
**dizzy** [1] - 495:22
**Dna** [1] - 645:12
**document** [7] - 566:11, 628:9, 631:21, 637:12, 727:17, 732:10, 739:1
**documents** [4] - 609:22, 610:7, 610:23, 690:14
**dogs** [3] - 534:2, 534:4, 665:19
**dollars** [5] - 524:2, 557:24, 558:1, 669:19, 669:20
**Dominick** [8] - 668:11, 669:1, 674:16, 678:15, 701:11, 701:18, 701:20
**Dominick's** [1] - 673:7
**Don** [2] - 621:23, 622:5
**Don-john** [2] - 621:23, 622:5
**done** [22] - 531:16, 546:16, 556:25, 557:18, 564:18, 566:25, 567:7, 584:16, 587:20, 593:18, 601:19, 611:7, 614:7, 614:16, 630:24, 641:20, 649:19, 679:17, 717:11, 743:17, 749:20
**Done** [1] - 557:19
**Donjon** [2] - 626:17, 626:19, 627:19, 630:3, 630:9
**Donjon's** [1] - 628:5
**Donuts** [1] - 557:25
**door** [31] - 518:18, 531:4, 531:5, 551:11, 556:16, 559:21, 579:5, 612:19, 612:21, 612:24, 612:25, 639:4, 639:20, 639:24, 640:18, 640:21, 641:2, 655:17, 665:7, 669:16, 671:21, 674:4, 674:5, 674:7, 674:11, 686:15, 686:20, 700:25, 702:11
**doors** [9] - 621:2, 621:3, 622:18, 622:19, 622:25, 623:5, 623:6
**doorway** [1] - 640:16
**doubt** [2] - 573:6, 602:21
**doubts** [1] - 574:23
**Doug** [1] - 581:22
**down** [50] - 503:20, 505:14, 506:13, 506:24, 506:25, 507:2, 510:3, 510:7, 511:1, 511:3, 511:4, 514:14, 514:15, 521:12, 526:19, 528:3, 532:11, 539:22, 541:10, 541:11, 542:20, 547:12, 549:22, 550:24, 551:4, 553:6, 553:9, 553:13, 556:3, 556:16, 562:14, 563:21, 576:14, 618:13, 621:25, 646:13, 647:9, 673:24, 674:7, 683:7, 699:21, 700:15, 701:21, 708:20, 718:1, 728:7, 728:19, 743:18
**Downingtown** [2] - 730:7, 735:16
**download** [3] - 706:10, 717:25, 718:2

downs [1] - 506:23
downstairs [1] - 638:5
Dr [3] - 679:4, 739:22, 742:7
drain [3] - 641:14, 641:18, 641:21
drains [1] - 637:21
draw [1] - 679:24
dressed [1] - 658:2
dressing [1] - 497:4
drinks [1] - 714:13
drive [6] - 536:19, 550:11, 662:22, 714:11, 730:19, 730:22
Drive [1] - 737:7
driven [1] - 580:3
driver [8] - 499:22, 513:25, 520:20, 521:7, 521:18, 531:11, 544:23, 577:16
driveway [8] - 532:11, 635:3, 670:20, 670:21, 671:4, 699:22, 700:16, 708:20
Driving [1] - 541:7
driving [5] - 541:10, 660:15, 660:16, 743:9, 746:19
drop [3] - 627:11, 645:16, 645:25
dropped [4] - 542:1, 542:2, 557:24, 561:22
drove [17] - 501:3, 519:5, 519:12, 542:1, 549:18, 549:22, 553:9, 559:7, 560:8, 560:9, 561:21, 562:3, 562:6, 562:11, 591:17, 651:8, 662:8
drug [4] - 500:8, 504:6, 505:6, 556:24
drugs [8] - 504:2, 504:4, 504:12, 565:3, 580:24, 581:2, 670:11, 724:17
drums [1] - 630:21
dryer [1] - 642:25
duct [2] - 620:4
due [1] - 671:13
Due [1] - 635:19
duly [13] - 492:16, 498:5, 608:9, 618:6, 626:8, 633:2, 643:15, 648:17, 656:13, 663:25, 675:14, 691:10, 709:17
Dump [2] - 622:3
dumped [4] - 621:14, 623:11, 631:1, 631:3
Dunkin' [1] - 557:25
Dunrite [5] - 542:24, 542:25, 543:4, 544:3, 544:24
During [7] - 518:25, 519:18, 546:25, 557:13, 562:5, 563:17, 665:10
during [12] - 502:9, 520:8, 520:9, 562:7, 565:13, 638:17, 678:6, 681:6, 693:6, 694:3, 715:9, 717:22
duties [1] - 493:22
dwelling [4] - 682:11, 685:6, 685:18, 686:5

E

Eagle [7] - 520:20, 520:22, 521:20, 577:16, 586:23, 590:24, 591:2
early [4] - 576:20, 669:8, 673:2, 750:6
earn [1] - 499:25
earthquake [1] - 703:19

easel [1] - 640:11
easily [1] - 499:11
East [1] - 491:21
Eastern [1] - 491:1
easy [1] - 642:15
eating [1] - 658:25
Eddie [1] - 667:10
edges [1] - 655:8
eff [1] - 723:11
eff-ing [1] - 723:11
effect [1] - 642:20
eight [9] - 498:17, 571:10, 596:22, 596:23, 596:25, 652:8, 653:17, 658:1, 718:20
Eight [1] - 718:19
eighteenish [1] - 581:14
Either [1] - 711:15
either [9] - 553:13, 557:6, 630:6, 634:4, 669:6, 706:10, 711:25, 718:3, 734:16
Electric [2] - 619:9, 619:10
electrical [2] - 692:22, 703:21
element [3] - 678:11, 679:9, 714:1
elicit [1] - 716:7
eliminate [1] - 642:15
Elizabeth [2] - 632:25, 633:6
Emergency [1] - 493:6
emergency [6] - 493:8, 493:9, 496:2, 669:24, 676:14, 676:16
emphasize [1] - 679:24
employed [2] - 493:1, 676:4
Ems [4] - 493:4, 493:18, 676:11, 688:3
encouraged [1] - 715:24
end [2] - 497:12, 522:3, 528:3, 567:20, 572:23, 577:21, 578:7, 578:9, 578:13, 595:5, 595:12, 604:19, 617:14, 651:14, 678:6, 680:3, 689:5, 689:6, 697:15, 743:15, 750:22
ended [5] - 530:19, 530:22, 551:23, 555:4, 718:6
ending [2] - 738:16, 739:18
ends [6] - 569:16, 577:20, 731:9, 742:25, 745:20, 751:5
enforcement [1] - 724:12
engaged [2] - 502:9, 522:15
Engine [7] - 681:9, 681:11, 681:12, 681:14, 682:13, 682:15, 682:20
enquire [4] - 608:17, 618:15, 675:22, 709:24
ensured [2] - 719:16, 719:19
entail [1] - 493:13
enter [3] - 575:17, 653:21, 739:25
entered [7] - 572:1, 572:25, 577:5, 595:13, 657:24, 659:3, 662:6
entering [3] - 574:24, 653:19, 658:4
enterprise [2] - 540:10, 540:11
enters [2] - 492:2, 492:9, 497:23, 497:25, 571:1, 571:5, 607:13, 608:5, 618:2, 626:2, 626:4, 630:10, 675:10,

691:1, 691:6, 709:13
entire [5] - 682:12, 704:13, 722:1, 722:20, 725:8
entirety [1] - 678:14
entrance [5] - 630:12, 635:3, 639:20, 687:21
entry [2] - 639:4, 746:4
environment [1] - 642:17
equal [1] - 693:12
equipment [9] - 611:4, 611:5, 611:8, 611:9, 615:19, 619:4, 626:25, 684:2, 684:13
Escalade [15] - 522:23, 549:22, 651:6, 651:18, 651:19, 651:21, 651:22, 651:24, 651:25, 652:2, 652:5, 652:17, 653:6, 653:10, 653:16
escape [1] - 553:18
Escobar [3] - 516:16, 541:1, 541:4
especially [1] - 518:1
Esq [5] - 491:13, 491:14, 491:15, 491:15, 491:18
establish [1] - 634:8
estate [2] - 664:11, 664:14
estimate [6] - 609:16, 610:25, 611:3, 611:6, 614:5, 662:2
et [2] - 632:19
evening [5] - 671:9, 754:4, 754:7, 754:11, 754:22
event [2] - 496:7, 707:3
evidence [99] - 509:8, 512:2, 512:16, 518:4, 522:9, 535:2, 540:8, 543:24, 548:1, 554:19, 563:18, 563:24, 565:14, 566:20, 573:10, 596:18, 615:6, 615:9, 617:7, 622:21, 622:24, 628:23, 629:2, 635:14, 635:23, 635:25, 636:2, 637:8, 637:19, 637:23, 638:5, 638:13, 639:9, 639:13, 642:21, 642:23, 643:5, 647:3, 647:7, 661:14, 664:25, 667:14, 668:18, 668:22, 672:16, 678:14, 678:20, 678:24, 679:1, 679:22, 686:1, 686:4, 687:7, 695:24, 697:17, 698:2, 698:6, 701:13, 703:25, 705:17, 708:7, 712:15, 718:8, 719:9, 720:21, 721:3, 721:6, 721:7, 727:13, 729:21, 732:11, 733:5, 734:2, 734:13, 734:22, 736:3, 736:5, 736:13, 737:20, 738:4, 739:11, 741:1, 758:5, 758:8, 758:11, 758:14, 758:21, 758:24, 759:3, 759:6, 759:9, 760:3, 760:6, 760:9, 760:12, 760:15, 760:18, 760:21
Evidence [7] - 633:17, 633:19, 633:23, 644:18, 644:19, 644:23, 645:6
evidentiary [2] - 636:25, 637:5
ex [1] - 501:20
ex-girlfriend [1] - 501:20
exact [4] - 652:25, 659:22, 663:5, 697:4
Exactly [2] - 729:8, 742:5
exactly [5] - 591:9, 614:18, 649:17, 659:21, 728:13

**Examination** [34] - 492:22, 498:12, 593:1, 605:13, 608:20, 618:17, 626:13, 633:9, 643:22, 648:23, 656:18, 664:6, 668:1, 675:24, 691:21, 707:11, 710:1, 726:1, 748:1, 755:5, 755:8, 755:12, 755:16, 755:20, 755:23, 756:1, 756:4, 756:7, 756:12, 756:15, 756:19, 756:23, 757:3, 757:9

**examination** [11] - 571:7, 571:14, 573:11, 654:24, 692:14, 705:22, 708:12, 755:10, 756:9, 757:1, 757:5

**examine** [3] - 638:8, 692:23, 729:9

**examined** [6] - 608:9, 618:6, 675:14, 691:10, 696:3, 709:17

**example** [3] - 630:20, 703:17, 703:20

**except** [2] - 633:21, 750:12

**excerpt** [12] - 720:10, 722:7, 722:9, 723:1, 723:5, 723:21, 723:24, 724:2, 739:24, 743:7, 743:14, 743:25

**excerpts** [1] - 718:17

**exclusively** [1] - 649:8

**excuse** [2] - 695:1, 721:4

**Excuse** [2] - 506:11, 622:4

**excused** [18] - 497:16, 605:25, 606:4, 616:16, 616:17, 623:24, 624:1, 624:5, 632:22, 648:9, 656:8, 661:23, 675:6, 675:8, 688:12, 688:15, 688:19, 709:10

**exhibit** [20] - 597:16, 615:12, 623:3, 668:5, 668:24, 672:17, 686:2, 687:9, 696:14, 697:9, 697:19, 698:4, 698:23, 700:9, 701:4, 701:15, 702:6, 702:12, 712:17, 730:25

**Exhibit** [107] - 509:11, 509:15, 511:21, 512:1, 512:16, 514:8, 515:5, 515:12, 515:18, 515:22, 516:9, 516:15, 517:13, 517:18, 522:9, 523:5, 523:7, 527:6, 528:10, 528:16, 535:2, 544:17, 548:1, 554:11, 554:14, 554:18, 566:19, 614:20, 615:9, 617:7, 622:12, 622:24, 628:8, 629:1, 639:15, 640:2, 640:12, 641:4, 641:5, 641:23, 641:24, 646:19, 647:6, 661:5, 661:10, 661:13, 664:25, 666:21, 667:13, 668:4, 668:18, 668:23, 673:11, 685:25, 698:21, 699:2, 700:8, 701:14, 702:5, 702:10, 704:22, 705:4, 712:16, 718:25, 720:20, 721:17, 724:23, 726:25, 727:9, 727:12, 729:21, 732:11, 733:8, 733:23, 734:1, 734:22, 735:21, 736:12, 737:5, 737:12, 737:13, 737:22, 738:3, 738:25, 739:10, 740:17, 740:25, 748:4, 751:16, 758:10, 758:13, 758:16, 758:18, 758:20, 759:2, 759:5, 759:8, 759:11, 759:13, 759:23, 760:2, 760:5, 760:8, 760:14, 760:17, 760:20

**Exhibits** [24] - 508:22, 509:7, 543:12, 543:23, 638:20, 639:12, 695:23, 704:18, 708:1, 708:6, 718:13, 719:1, 719:2, 719:8, 737:3, 737:19, 739:14, 758:4, 758:7, 758:23, 759:15, 759:18, 759:20, 760:11

**existence** [1] - 540:9

**existing** [2] - 630:14, 713:19

**exit** [1] - 653:23

**Exit** [1] - 653:7

**exited** [2] - 653:24, 654:11

**exiting** [2] - 662:19, 663:8

**expect** [2] - 632:5, 689:4

**expedited** [1] - 497:6

**expensive** [1] - 714:15

**experience** [3] - 532:17, 676:14, 716:2

**expert** [1] - 693:13

**explain** [5] - 531:1, 565:21, 717:3, 720:25, 752:3

**explained** [2] - 510:3, 552:13

**explaining** [1] - 545:10

**export** [1] - 631:15

**exposed** [1] - 754:6

**exposure** [1] - 642:22

**extension** [1] - 703:9

**exterior** [2] - 642:22, 695:1

**extort** [1] - 526:24

**extortion** [6] - 520:14, 562:23, 565:3, 591:4, 591:6, 591:11

**extremely** [1] - 495:22

# F

**f'n** [1] - 742:8

**face** [4] - 501:20, 513:10, 562:2, 565:22

**faced** [1] - 541:15

**facility** [5] - 627:1, 627:4, 628:1, 630:11, 631:17

**facing** [10] - 510:21, 575:8, 577:2, 590:14, 590:19, 590:22, 590:24, 591:1, 591:4, 594:8

**fact** [9] - 580:20, 581:8, 584:2, 584:6, 635:19, 678:19, 679:1, 679:19, 685:4

**fair** [7] - 579:13, 579:25, 583:2, 587:17, 589:17, 600:12, 601:9

**fairly** [4] - 667:5, 668:12, 685:19, 695:17

**faith** [3] - 596:5, 599:3, 599:7

**fake** [1] - 502:19

**falsified** [1] - 503:20

**familiar** [4] - 627:16, 663:4, 719:23, 719:25

**families** [4] - 504:19, 504:22, 505:7, 505:12

**Family** [5] - 710:16, 710:17, 714:3, 714:5, 714:6

**family** [21] - 504:15, 504:17, 505:3, 507:24, 507:25, 508:4, 508:11, 509:13, 512:11, 512:12, 512:20, 513:3, 513:6, 515:16, 516:12, 516:13, 557:7, 582:1, 710:24

**far** [7] - 499:3, 557:10, 577:22, 592:10, 697:15, 700:2, 702:20

**Farmers** [3] - 730:7, 730:20, 735:16

**father** [6] - 514:7, 669:25, 678:7,

**Fbi** [31] - 561:20, 562:2, 562:6, 562:19, 564:11, 571:19, 571:21, 571:25, 576:17, 576:23, 632:24, 633:12, 633:22, 643:25, 644:1, 644:9, 646:14, 649:1, 649:2, 655:21, 656:21, 675:1, 710:5, 710:8, 710:13, 716:12, 716:16, 717:2, 729:17, 734:14, 743:20

**February** [1] - 493:19

**Fed** [1] - 743:18

**Federal** [2] - 561:21, 710:4

**federal** [2] - 565:4, 628:4

**feeled** [1] - 684:3

**feet** [4] - 612:8, 612:9, 697:16, 704:10

**fellow** [1] - 705:25

**fence** [1] - 742:16

**fencing** [1] - 713:15

**Ferrara** [9] - 517:4, 526:21, 527:5, 527:6, 527:11, 527:14, 527:17, 527:18, 527:24

**Ferrards** [1] - 527:23

**few** [5] - 497:19, 564:16, 636:11, 668:13, 690:14

**fiancee** [2] - 530:9, 587:7

**fibrillation** [1] - 684:18

**fibula** [1] - 696:19

**field** [2] - 693:2, 693:3

**fight** [2] - 563:3, 683:4

**fighter** [7] - 676:7, 676:8, 676:10, 679:7, 692:4, 692:5, 696:19

**fighters** [1] - 682:23

**fighting** [1] - 679:19

**figure** [1] - 569:10

**figured** [1] - 598:23

**figuring** [1] - 539:11

**filed** [1] - 538:11

**fill** [1] - 627:13

**filled** [2] - 636:22, 640:25

**Finally** [3] - 737:22, 747:9, 751:15

**financial** [2] - 544:9, 558:11

**fine** [11] - 492:8, 566:1, 569:8, 596:13, 596:16, 610:22, 629:18, 696:2, 720:17, 749:5, 754:15

**fines** [3] - 503:6, 503:9, 503:10

**finish** [1] - 749:4

**finished** [1] - 693:1

**fire** [89] - 532:7, 532:16, 532:18, 532:20, 532:25, 561:12, 562:15, 580:6, 637:1, 676:7, 676:8, 676:10, 678:19, 679:2, 679:7, 679:8, 679:10, 679:20, 681:15, 681:17, 681:24, 682:6, 682:16, 682:19, 682:22, 682:23, 683:1, 683:4, 685:18, 685:20, 686:13, 686:25, 687:2, 687:12, 688:2, 688:4, 688:7, 692:4, 692:5, 692:13, 692:17, 692:24, 693:4, 693:6, 694:6, 694:7, 694:12, 694:13, 694:14, 694:20, 694:25, 695:4, 696:5, 696:9, 696:19, 696:21, 696:25, 697:1, 697:2, 697:5, 697:13, 698:7, 698:18, 700:14, 700:17, 701:23,

702:17, 702:18, 702:20, 702:23, 703:3, 703:4, 703:5, 703:10, 703:14, 703:17, 703:18, 703:20, 703:21, 703:23, 704:1, 704:3, 705:9, 707:13

**Fire**[8] - 493:2, 493:18, 640:8, 676:5, 676:6, 691:25, 692:2, 692:20

**fire-fighter** [7] - 676:7, 676:8, 676:10, 679:7, 692:4, 692:5, 696:19

**fire-fighters** [1] - 682:23

**firearm** [2] - 729:24, 730:2

**Firearms**[1] - 739:2

**firearms** [1] - 739:5

**fired** [2] - 579:9, 580:9

**firehouse** [3] - 681:2, 681:7, 681:8

**Fireman**[1] - 688:9

**fireman** [1] - 536:4

**firemen** [2] - 569:11, 684:1

**fires** [7] - 692:9, 692:21, 692:24, 693:7, 693:10, 693:18, 696:19

**first** [47] - 492:16, 495:5, 498:5, 500:3, 500:6, 508:8, 508:10, 532:9, 532:10, 535:17, 536:11, 539:4, 555:25, 556:2, 585:6, 589:4, 589:16, 608:9, 618:6, 626:8, 626:24, 633:2, 636:22, 643:15, 648:17, 656:13, 663:25, 669:3, 675:14, 682:18, 682:21, 684:22, 684:23, 691:10, 693:2, 709:17, 714:16, 716:12, 722:7, 723:1, 731:1, 736:4, 736:15, 736:17, 743:7, 752:11

**First**[2] - 637:19, 732:13

**firstly** [1] - 552:8

**five** [9] - 524:2, 541:12, 557:12, 606:3, 607:3, 612:8, 634:1, 688:14, 693:6

**Five**[1] - 669:19

**five-minute** [2] - 607:3, 688:14

**fixed** [1] - 709:4

**flame** [2] - 612:20, 682:11

**flammable** [2] - 696:17, 704:14

**flashlight** [1] - 645:13

**flashy** [1] - 714:11

**flood** [1] - 703:19

**floor** [7] - 529:25, 547:17, 547:20, 636:7, 641:11, 671:22, 683:11

**Florida**[1] - 671:13

**flow** [1] - 616:6

**fly** [1] - 671:13

**focus** [2] - 649:8, 678:23

**focusing** [1] - 738:6

**folks** [1] - 627:23

**follow** [5] - 513:15, 599:10, 660:12, 660:21, 745:18

**follow-up** [1] - 745:18

**followed** [6] - 492:6, 578:17, 630:25, 658:6, 660:14, 723:12

**Following**[2] - 542:8, 726:17

**following** [26] - 527:14, 541:7, 552:12, 553:12, 559:2, 561:21, 606:5, 607:1, 607:14, 608:1, 616:23, 617:16, 624:7, 625:1, 625:6, 677:3, 680:5, 688:21, 689:1, 690:17, 691:2, 717:5, 725:12,

726:4, 748:9, 750:24

**follows** [13] - 492:17, 498:6, 608:10, 618:7, 626:9, 633:3, 643:16, 648:18, 656:14, 664:1, 675:15, 691:11, 709:18

**food** [2] - 503:25, 507:15

**foremost** [1] - 626:25

**forensic** [3] - 633:22, 634:7, 636:1

**form** [6] - 572:13, 736:15, 736:17, 736:19, 736:23, 738:7

**Fort**[1] - 742:8

**forward** [1] - 635:24

**fought** [1] - 679:10

**four** [12] - 541:12, 559:21, 582:23, 590:20, 612:9, 626:22, 639:18, 652:4, 652:7, 681:6, 704:10, 723:22

**Four**[1] - 697:16

**four-door** [1] - 559:21

**fourth** [3] - 724:2, 728:7, 743:14

**foyer** [2] - 639:21, 639:23

**fracture** [1] - 496:19

**frame** [1] - 671:21

**Frank**[10] - 535:1, 535:5, 535:6, 540:24, 542:13, 578:18, 578:21, 578:24, 579:10, 609:13

**frank** [1] - 678:3

**Frankie**[4] - 531:4, 531:8, 531:13, 532:9

**Franks**[1] - 538:25

**fraud** [3] - 502:9, 502:13, 502:14

**Fraud**[1] - 644:16

**fraudulent** [1] - 713:14

**Frederick**[1] - 491:21

**freeway** [1] - 652:23

**Fresca**[10] - 535:1, 535:5, 535:6, 538:25, 540:20, 542:13, 547:13, 578:18, 578:21, 578:24

**Frescas**[17] - 534:20, 534:23, 535:11, 535:15, 536:1, 539:22, 542:2, 545:8, 552:15, 579:1, 579:10, 580:1, 580:5, 722:5, 722:24, 740:2, 744:1

**Friday**[2] - 739:16, 741:9

**friend** [9] - 509:23, 510:10, 510:18, 510:21, 514:15, 542:14, 543:9, 544:8, 582:25

**friendly** [1] - 583:6

**friends** [3] - 501:19, 510:2, 531:14

**front** [27] - 521:6, 526:10, 526:14, 526:23, 529:24, 529:25, 532:24, 532:25, 539:23, 545:9, 612:16, 623:2, 639:4, 639:20, 639:21, 639:23, 639:24, 652:9, 655:12, 655:14, 669:8, 673:9, 673:16, 674:4, 674:11, 686:5, 699:1

**Ft**[1] - 519:15

**fucking** [1] - 752:25

**full** [11] - 558:1, 618:9, 633:25, 668:10, 675:17, 691:13, 709:20, 727:8, 749:14, 749:15, 749:16

**full-time** [1] - 633:25

**fully** [1] - 599:5

**functioning** [1] - 684:19

**functions** [1] - 681:12

**funeral** [2] - 527:21, 527:22

**funny** [3] - 560:15, 560:20

**furnace** [45] - 563:25, 611:10, 611:17, 611:24, 612:4, 612:7, 612:12, 612:13, 612:16, 612:22, 613:2, 613:8, 613:9, 613:10, 613:21, 614:6, 615:4, 615:20, 615:23, 619:15, 619:20, 619:25, 620:11, 620:18, 621:6, 621:20, 622:1, 622:4, 622:5, 622:6, 623:8, 630:3, 630:9, 630:10, 631:4, 631:17, 632:6, 632:9, 632:13, 632:18, 638:5, 638:6, 638:7, 642:5

**Furnaces**[1] - 630:19

**furnaces** [9] - 614:3, 615:21, 615:22, 615:24, 616:3, 616:8, 627:24, 630:21, 632:7

**furthermore** [1] - 679:12

**future** [1] - 716:6

---

# G

**gained** [1] - 699:7

**Galante**[6] - 509:24, 510:4, 510:15, 510:16, 510:19, 510:25

**Galestro**[36] - 512:15, 512:19, 513:2, 513:7, 513:21, 514:5, 514:6, 514:11, 515:7, 516:14, 516:18, 516:21, 516:24, 517:5, 517:8, 517:20, 518:14, 519:1, 519:7, 519:18, 519:25, 524:13, 524:15, 525:20, 526:24, 527:9, 527:18, 527:24, 528:4, 531:24, 543:9, 544:7, 593:6, 710:23, 712:8

**Galestro's** [9] - 513:16, 514:7, 517:15, 517:25, 518:8, 520:16, 525:23, 534:17, 583:15

**Gambino** [2] - 714:3, 714:5

**Gambinos** [3] - 504:25, 508:5, 510:17

**garbage** [5] - 636:22, 636:23, 637:2, 637:4, 640:7

**Garcia**[11] - 516:20, 541:3, 542:19, 545:9, 545:24, 549:16, 550:1, 563:23, 580:3, 593:12, 723:10

**Garcia's** [1] - 541:3

**garden** [1] - 688:1

**gas** [10] - 532:19, 562:11, 562:14, 612:11, 620:5, 620:7, 652:19, 652:24

**gas-burning** [1] - 612:11

**gasoline** [5] - 679:9, 686:19, 698:13, 704:9, 704:16

**gate** [1] - 635:3

**Gate**[1] - 546:15

**Gbr-4046** [1] - 660:20

**gear** [2] - 752:23, 752:24

**general** [3] - 533:22, 626:24, 687:16

**Generally**[2] - 657:10, 696:25

**generally** [4] - 630:4, 634:15, 637:10, 697:5

**generated** [2] - 628:13, 631:13

**Genovese**[1] - 504:25

gentleman [5] - 614:1, 683:7, 683:18, 684:14, 702:8

gentlemen [8] - 492:10, 497:18, 540:5, 568:3, 606:2, 624:3, 720:25, 754:4

Getty [1] - 652:19

Gill [1] - 679:4

Gino [46] - 512:15, 512:19, 513:2, 513:6, 513:10, 513:15, 513:21, 514:5, 514:7, 515:7, 516:14, 516:18, 516:20, 516:23, 517:4, 517:7, 517:14, 517:19, 517:25, 518:8, 518:10, 518:14, 518:25, 519:7, 519:18, 519:25, 520:16, 524:13, 524:14, 525:20, 525:23, 526:24, 527:9, 527:18, 527:24, 528:4, 531:24, 533:13, 534:17, 543:9, 544:7, 583:15, 593:6, 710:23, 712:8

Gino's [2] - 517:1, 522:3

girl [2] - 523:4

girlfriend [5] - 501:20, 545:10, 547:14, 588:18, 717:1

girlfriend's [3] - 503:20, 547:23, 584:19

given [9] - 540:2, 580:10, 590:5, 629:13, 631:1, 692:19, 694:4, 716:11, 721:4

glass [2] - 532:19, 637:20

glasses [1] - 516:5

glow [1] - 636:19

goal [2] - 505:3, 531:22

Golden [1] - 546:15

gonna [7] - 728:20, 728:21, 729:3, 731:23, 731:25, 732:1

good-bye [1] - 669:4

goods [1] - 713:15

gotta [3] - 730:16, 730:17, 743:18

government [23] - 492:13, 498:2, 564:24, 565:7, 567:2, 567:17, 572:8, 573:10, 573:15, 573:19, 574:12, 576:12, 576:15, 577:11, 577:14, 578:11, 589:24, 626:6, 632:24, 643:13, 648:14, 656:10, 663:22

Government [45] - 508:22, 515:5, 517:18, 528:10, 594:11, 595:8, 595:9, 595:13, 595:18, 595:21, 599:13, 599:23, 600:3, 600:6, 601:18, 601:24, 604:17, 604:24, 605:1, 605:5, 608:3, 608:8, 616:18, 617:7, 618:5, 638:20, 639:15, 664:25, 675:9, 675:13, 678:2, 691:5, 691:9, 709:11, 709:16, 724:14, 729:21, 730:25, 732:11, 733:8, 737:12, 738:25, 739:13, 740:17, 750:5

Government's [93] - 509:7, 509:11, 511:21, 512:1, 512:16, 514:8, 515:12, 515:22, 516:9, 517:13, 522:9, 523:5, 523:7, 527:6, 528:16, 535:2, 543:12, 543:23, 544:17, 548:1, 554:11, 554:14, 554:18, 566:19, 614:20, 615:9, 622:11, 622:24, 628:8, 629:1, 639:12, 646:19, 647:6, 661:5, 661:10, 661:13, 666:20, 667:13, 668:18, 685:25, 695:23,

701:14, 702:4, 702:10, 704:21, 705:3, 708:6, 712:16, 718:13, 718:24, 719:8, 720:20, 721:17, 724:23, 726:25, 727:9, 727:12, 734:1, 734:22, 735:21, 736:12, 737:3, 737:19, 737:22, 738:3, 739:10, 740:25, 748:4, 751:16, 758:4, 758:7, 758:10, 758:13, 758:16, 758:18, 758:20, 758:23, 759:2, 759:5, 759:8, 759:11, 759:13, 759:15, 759:18, 759:20, 759:23, 760:2, 760:5, 760:8, 760:11, 760:14, 760:17, 760:20

grab [1] - 684:2

grade [2] - 499:4, 627:9

graded [2] - 629:13, 629:23, 632:16

grading [3] - 629:21, 629:23, 631:1

granted [1] - 562:24

Greg [2] - 526:4, 675:9

Gregory [2] - 675:19

ground [3] - 683:7, 696:12, 702:23

grounds [1] - 536:17

Group [2] - 649:3, 649:5

grout [2] - 636:7, 637:21

guard [3] - 551:14, 552:18, 716:25

Guerino [1] - 491:21

guess [7] - 538:14, 610:11, 663:9, 674:4, 678:22, 689:16, 750:9

guidelines [7] - 598:3, 598:4, 598:7, 598:13, 598:20, 599:2

guilty [23] - 501:12, 502:5, 564:15, 565:2, 565:6, 565:18, 565:21, 566:6, 567:24, 572:20, 573:2, 574:4, 574:20, 575:2, 577:10, 577:18, 577:20, 577:21, 577:24, 578:3, 589:17, 589:23, 590:1

gun [61] - 537:16, 537:18, 537:20, 538:4, 538:14, 539:25, 540:14, 540:15, 540:17, 540:20, 542:1, 547:7, 550:3, 551:19, 553:15, 565:3, 579:9, 580:1, 580:5, 580:6, 580:10, 580:12, 586:11, 586:13, 586:18, 591:1, 726:12, 726:21, 727:4, 727:5, 727:6, 727:15, 727:18, 728:17, 728:22, 728:25, 729:9, 729:16, 730:6, 730:9, 730:11, 731:1, 733:4, 733:5, 733:12, 733:13, 733:14, 733:16, 733:18, 733:20, 734:4, 734:7, 734:11, 734:16, 734:25, 735:8, 735:11, 735:15, 736:15, 736:17, 738:7

Gun [3] - 730:7, 730:20, 735:16

guns [16] - 538:2, 538:6, 538:10, 539:24, 539:25, 542:12, 579:21, 580:16, 586:8, 724:17, 724:18, 724:20, 732:4, 735:8, 735:9, 735:11

guy [51] - 507:1, 507:12, 510:17, 510:25, 521:9, 524:25, 525:18, 525:19, 525:21, 528:18, 531:4, 531:12, 533:2, 540:25, 542:21, 543:17, 544:16, 544:19, 550:24, 551:5, 551:9, 551:18, 551:22, 552:16, 553:11, 554:6, 554:7, 554:8, 554:9, 555:7, 555:10, 555:12, 556:22, 556:23, 556:24, 557:2, 557:3, 557:17, 557:20, 558:5, 581:2, 581:9,

582:8, 582:13, 582:17, 582:19, 582:21, 583:14, 583:15, 586:15

Guyana [1] - 531:20

guys [12] - 506:3, 507:2, 507:3, 507:21, 511:6, 511:12, 539:2, 540:17, 542:20, 549:4, 579:10, 723:7

## H

hacksaw [1] - 619:7

half [16] - 541:8, 551:15, 559:13, 624:4, 626:22, 654:2, 658:11, 659:4, 710:11, 717:15, 730:17, 730:18, 749:11, 749:12, 749:18, 749:24

half-hour [9] - 551:15, 559:13, 658:11, 659:4, 717:15, 749:11, 749:12, 749:18, 749:24

hallway [3] - 551:11, 658:15, 658:16

Hamden [20] - 664:24, 666:1, 666:3, 666:6, 672:19, 682:2, 682:3, 685:18, 687:5, 694:8, 694:10, 694:11, 694:17, 698:17, 740:20, 741:4, 741:5, 741:12, 742:9, 743:5

hand [23] - 518:6, 518:7, 596:21, 608:6, 609:22, 618:3, 619:5, 620:25, 621:7, 636:23, 636:25, 637:4, 637:7, 658:7, 673:11, 673:19, 675:11, 686:11, 687:16, 691:7, 697:18, 699:2, 709:14

Hand [1] - 620:20

Hand-truck [1] - 620:20

hand-truck [2] - 620:25, 621:7

Handing [11] - 596:24, 609:24, 610:21, 614:21, 622:13, 685:14, 695:13, 704:23, 705:5, 718:15, 719:12

handle [1] - 506:17, 506:20, 554:9

hands [3] - 557:21, 636:6, 637:20

handwriting [1] - 647:25

handwritten [1] - 650:8

hang [1] - 533:15

hanging [3] - 547:12, 583:22, 715:10

hangouts [1] - 534:17

happy [1] - 582:8

hard [1] - 701:21

harder [1] - 623:16

hazardous [1] - 630:23

head [9] - 495:9, 495:14, 496:11, 496:16, 497:3, 506:10, 507:3, 507:4, 531:8

headquarters [2] - 643:25, 710:8

heads [2] - 506:12, 506:15

hear [12] - 540:8, 542:16, 542:18, 545:4, 545:7, 545:20, 664:12, 689:17, 721:3, 721:7, 745:12

heard [10] - 542:6, 546:25, 556:1, 556:2, 678:10, 711:18, 720:5, 723:6, 724:9, 746:8

hearing [1] - 563:21

heart [4] - 669:25, 678:9, 679:3, 684:19

Heat [1] - 642:22

**heat** [10] - 611:14, 611:16, 611:18, 616:5, 616:6, 616:7, 687:1, 702:17, 702:20, 704:8

**heated** [2] - 612:11, 613:15

**heater** [1] - 696:20

**heaters** [4] - 613:16, 613:17, 613:18, 613:19

**Heating** [2] - 609:1, 609:12

**heavy** [4] - 682:10, 682:12, 686:25, 696:5

**height** [1] - 612:8

**Height** [1] - 707:21

**Heights** [1] - 692:7

**hello** [1] - 669:4

**help** [12] - 511:6, 513:11, 514:2, 514:12, 526:24, 528:8, 548:6, 620:15, 650:1, 660:2, 674:7, 714:7

**helped** [2] - 522:4, 567:7

**helping** [2] - 620:14, 620:16

**helps** [2] - 496:16

**hem** [1] - 603:2

**Hemastix** [2] - 645:24, 646:5

**hemastix** [1] - 636:11, 646:1

**Hi** [1] - 618:20

**high** [6] - 495:23, 499:5, 499:9, 689:22, 690:3, 704:7

**higher** [1] - 676:18

**highlight** [1] - 678:18

**highly** [1] - 716:3

**Highway** [2] - 550:14, 653:14

**highway** [1] - 559:16

**himself** [12] - 561:20, 561:23, 562:1, 562:6, 591:16, 591:19, 592:12, 661:22, 674:8, 713:13, 716:1

**Hips** [1] - 534:20, 534:21

**hired** [2] - 542:13, 692:3

**hit** [4] - 502:15, 532:11, 532:24, 752:24

**hitting** [1] - 531:8

**hmm** [1] - 683:17

**Hms** [5] - 630:7, 630:8, 631:5, 631:22, 631:23

**Hoboken** [1] - 715:5

**hold** [1] - 701:21

**holding** [1] - 637:2

**hole** [2] - 630:22, 723:5

**holiday** [1] - 671:9

**holidays** [2] - 520:8, 520:9

**Home** [2] - 653:13, 653:20

**home** [26] - 500:19, 541:19, 541:22, 542:3, 611:4, 612:11, 634:21, 635:2, 635:13, 635:15, 666:12, 669:14, 670:18, 670:22, 671:16, 674:13, 685:20, 686:16, 687:12, 687:21, 699:24, 701:23, 706:1, 720:6, 720:8

**homeowner** [5] - 611:24, 613:20, 699:9, 705:15

**homogenous** [1] - 631:14

**honest** [2] - 583:25, 655:7

**Honor** [45] - 492:4, 497:15, 508:20,
509:5, 516:7, 540:12, 543:10, 554:12, 566:8, 566:17, 608:17, 616:15, 618:15, 623:23, 632:21, 633:7, 643:10, 643:20, 648:8, 661:3, 663:20, 663:22, 666:18, 667:8, 668:15, 675:4, 679:5, 685:10, 685:22, 691:4, 693:17, 704:19, 705:19, 707:9, 707:25, 718:10, 719:6, 726:22, 727:9, 735:18, 736:25, 739:7, 740:15, 754:1, 754:8

**honor** [1] - 567:2

**Honorable** [1] - 491:11

**hook** [1] - 615:25

**hooked** [2] - 684:16, 684:17

**hope** [3] - 575:7, 602:17, 630:25

**hoped** [2] - 602:16, 638:8

**Hopefully** [1] - 567:13

**hoping** [4] - 594:14, 601:24, 602:10, 602:12

**horizontal** [2] - 696:10, 697:7

**hose** [3] - 683:1, 683:2, 688:1

**hospital** [8] - 495:20, 496:2, 497:6, 497:7, 530:7, 530:10, 530:11, 670:2

**hospitalized** [1] - 678:9

**hotel** [1] - 546:15

**hour** [15] - 551:15, 559:13, 576:7, 576:8, 624:4, 625:3, 658:11, 659:4, 717:15, 730:17, 730:18, 749:11, 749:12, 749:18, 749:24

**hours** [10] - 493:15, 653:25, 654:1, 669:7, 669:9, 676:22, 717:16, 730:16, 730:23, 750:1

**house** [140] - 522:3, 525:17, 526:9, 526:10, 526:15, 526:23, 529:23, 529:24, 530:6, 532:7, 532:24, 532:25, 533:23, 533:25, 536:6, 536:10, 536:11, 536:14, 536:15, 537:23, 539:8, 539:23, 539:25, 540:14, 540:20, 540:24, 541:7, 541:8, 541:9, 541:10, 541:12, 541:13, 541:15, 541:16, 542:1, 542:7, 552:12, 553:8, 553:12, 554:5, 556:25, 557:4, 557:7, 558:3, 558:4, 558:5, 558:11, 558:13, 558:17, 558:19, 558:20, 559:5, 560:8, 560:9, 560:21, 561:12, 561:19, 562:15, 564:1, 579:9, 579:15, 579:22, 579:25, 580:3, 580:7, 580:9, 580:20, 581:3, 581:5, 584:19, 609:16, 610:25, 611:9, 611:14, 611:18, 612:2, 613:7, 613:9, 613:14, 613:15, 616:4, 619:25, 620:18, 620:24, 621:5, 621:17, 622:16, 623:12, 630:3, 632:6, 634:25, 635:4, 665:11, 665:15, 665:17, 666:16, 667:4, 670:18, 671:5, 671:12, 671:14, 671:18, 671:19, 672:22, 672:23, 672:24, 672:25, 673:1, 673:16, 678:7, 679:8, 679:19, 681:24, 682:12, 686:8, 686:20, 687:4, 687:17, 687:19, 697:12, 699:1, 699:3, 699:7, 700:17, 700:22, 700:25, 701:7, 702:11, 702:15, 702:19, 702:23, 703:12, 703:22, 708:20, 742:11, 742:13, 742:15

**housed** [1] - 681:8

**houses** [4] - 500:16, 500:17, 536:8, 580:17

**human** [3] - 605:2, 638:4

**hundred** [2] - 655:9, 706:14

**hung** [2] - 511:14, 669:12

**hurt** [1] - 530:1

**hydrant** [6] - 682:15, 682:16, 682:17, 682:19, 682:20, 682:21

**Hylan** [12] - 534:1, 554:4, 557:25, 560:12, 581:5, 666:5, 666:6, 672:20, 741:15, 741:23, 742:3

**I**

**Icu** [1] - 530:17

**Id** [1] - 734:21

**idea** [8] - 492:4, 513:11, 579:14, 579:20, 579:24, 585:25

**identification** [12] - 554:10, 650:4, 660:6, 666:21, 668:4, 685:13, 704:22, 705:4, 718:13, 726:24, 735:20, 737:2

**identified** [4] - 582:14, 586:15, 610:3, 741:3

**identify** [9] - 630:13, 637:11, 637:12, 699:25, 707:14, 708:14, 718:3, 720:1, 720:4

**identifying** [1] - 737:6

**iffy** [1] - 529:12

**ignite** [1] - 704:10

**illegal** [6] - 504:1, 504:12, 545:15, 713:15, 724:16, 732:9

**image** [4] - 699:22, 700:14, 700:15, 706:4

**images** [2] - 706:4, 708:17

**imagine** [1] - 746:4

**imitation** [1] - 584:10

**immediately** [1] - 495:25

**immobilized** [1] - 496:3

**immobilizing** [1] - 497:4

**implicit** [1] - 745:7

**important** [1] - 567:10

**in-between** [1] - 534:5

**Inc** [1] - 626:18

**incarcerated** [1] - 503:15

**inch** [1] - 640:24

**incident** [3] - 540:19, 557:7, 614:5

**including** [4] - 587:15, 634:25, 638:13, 654:13

**Including** [2] - 588:9, 588:10

**inclusive** [1] - 695:20

**incoming** [1] - 716:24

**incorporate** [1] - 714:1

**increase** [1] - 690:6

**indicate** [4] - 648:2, 648:3, 648:11, 686:24

**Indicating** [1] - 516:6

**indicating** [2] - 647:23, 697:11

**indication** [1] - 631:22, 632:12

**indicator** [1] - 495:23

**indictment** [4] - 590:18, 593:3, 593:23, 678:4
**individual** [8] - 613:16, 627:16, 662:1, 662:3, 663:13, 678:7, 678:8, 724:12
**individuals** [16] - 514:12, 654:3, 658:6, 658:14, 659:7, 659:14, 659:17, 714:13, 716:21, 717:11, 717:19, 720:2, 721:12, 724:15, 732:5, 732:8
**industry** [2] - 627:12, 629:20
**infiltrate** [1] - 713:10
**Infiniti** [16] - 650:21, 651:3, 651:5, 651:7, 651:8, 651:9, 651:10, 651:12, 652:2, 652:5, 652:17, 652:20, 653:7, 653:17, 714:16, 714:19
**infinity** [1] - 549:23
**information** [8] - 610:8, 610:9, 611:6, 635:12, 636:5, 694:5, 716:8, 717:25
**ing** [1] - 723:11
**initial** [2] - 662:11, 709:22
**initials** [1] - 718:24
**initiate** [1] - 717:8
**injured** [2] - 493:16, 493:25
**injuries** [7] - 495:9, 495:17, 495:21, 496:8, 497:1, 502:16, 524:5
**injury** [6] - 494:13, 497:2, 678:12, 678:13, 678:14, 705:14
**innocuous** [1] - 658:24
**inquire** [2] - 633:7, 643:20
**Inside** [2] - 666:16, 751:10
**inside** [22] - 493:24, 521:7, 527:20, 531:7, 545:10, 547:14, 621:11, 630:22, 642:25, 646:18, 646:20, 654:3, 654:6, 657:14, 657:18, 657:23, 658:23, 719:13, 727:5, 733:13, 733:19, 734:6
**inspect** [1] - 612:20
**inspection** [1] - 635:24
**installed** [1] - 673:17
**instructed** [2] - 684:24, 716:20
**instruction** [2] - 540:6, 751:22
**instructions** [3] - 715:21, 716:5, 751:19
**insurance** [3] - 502:13, 502:14, 527:10
**intense** [1] - 702:20
**intensity** [1] - 704:8
**interactions** [1] - 716:17
**interest** [1] - 636:9
**interim** [1] - 558:24
**interior** [1] - 639:21
**interpretation** [2] - 745:5, 745:7
**intersection** [1] - 661:18
**interview** [3] - 701:7, 701:20, 701:25
**interviewed** [2] - 701:10, 701:11
**introduced** [3] - 533:8, 535:19, 556:16
**inventory** [2] - 631:18, 631:19
**investigate** [6] - 649:10, 692:23, 693:8, 694:19, 694:23, 705:11
**investigated** [1] - 695:18
**investigating** [3] - 702:18, 705:10, 713:7

**investigation** [19] - 710:19, 710:22, 710:23, 711:1, 711:7, 711:9, 711:10, 711:12, 712:8, 715:9, 716:18, 718:8, 718:18, 719:25, 744:8, 744:10, 745:15, 746:10
**Investigation** [1] - 710:4
**investigations** [2] - 644:6, 716:2
**Investigations** [1] - 692:20
**investigative** [1] - 746:7
**investigator** [2] - 693:9, 696:20
**invoice** [2] - 615:1, 615:14
**invoiced** [1] - 614:10
**involved** [27] - 523:20, 528:11, 538:15, 548:25, 553:25, 579:10, 580:16, 582:15, 587:3, 587:7, 593:17, 659:14, 706:14, 706:20, 706:24, 706:25, 713:13, 713:15, 732:8, 752:1, 752:2
**involvement** [2] - 497:12, 688:6
**Iron** [3] - 626:17, 626:19, 627:19
**iron** [6] - 612:14, 626:20, 627:7, 627:13, 630:7, 635:3
**Island** [50] - 493:21, 494:16, 498:25, 499:2, 499:7, 501:3, 501:25, 518:18, 525:11, 530:12, 531:23, 533:7, 534:1, 538:18, 546:18, 548:9, 548:10, 549:5, 552:16, 554:4, 556:10, 562:12, 609:3, 609:17, 626:18, 627:5, 628:2, 634:18, 634:23, 634:24, 645:4, 650:13, 655:6, 657:7, 659:12, 661:19, 664:19, 681:3, 694:8, 710:25, 712:9, 722:6, 731:12, 740:21, 743:10, 744:1, 746:19, 751:9, 752:6
**issue** [1] - 750:2
**it'll** [1] - 729:4
**It'll** [1] - 728:11
**Italian** [3] - 505:24, 520:23, 556:9
**item** [4] - 636:14, 661:23, 727:1, 735:22
**items** [4] - 636:9, 637:5, 732:6, 732:9
**itself** [8] - 612:4, 634:25, 635:4, 660:1, 661:2, 696:8, 698:18, 704:16

---

# J

**Jack** [3] - 491:15, 533:2, 533:4
**Jacks** [1] - 533:3
**jacks** [1] - 750:1
**jail** [9] - 575:8, 577:2, 577:3, 588:16, 589:14, 594:7, 594:10, 594:19, 605:7
**James** [2] - 626:6, 626:12
**January** [17] - 553:24, 584:6, 659:8, 667:6, 681:19, 693:21, 713:1, 715:6, 739:6, 739:16, 741:5, 741:9, 742:23, 751:3, 752:12, 753:3
**Jayson** [11] - 517:14, 529:8, 549:9, 549:15, 549:25, 553:2, 553:4, 553:8, 553:14, 553:15, 553:21
**Jersey** [11] - 519:17, 545:17, 545:23, 559:17, 562:11, 650:23, 651:1, 652:14, 714:19, 714:22, 715:5

**jewelry** [6] - 555:8, 556:24, 557:6, 671:22, 671:24, 674:23
**Jg** [2] - 723:8, 723:9
**Jiffy** [2] - 666:8, 666:9
**job** [13] - 514:2, 514:12, 514:15, 514:18, 514:20, 527:10, 527:20, 554:8, 623:20, 634:9, 650:12, 669:12, 694:4
**jobs** [1] - 499:15
**Joe** [45] - 515:23, 517:10, 517:12, 526:4, 526:21, 527:5, 527:6, 527:11, 527:14, 527:17, 527:18, 527:23, 527:24, 529:22, 531:20, 540:1, 540:2, 541:3, 541:10, 545:8, 545:10, 545:23, 546:3, 547:5, 549:16, 550:1, 550:6, 550:10, 551:10, 551:17, 552:4, 552:10, 552:16, 553:3, 553:4, 553:8, 553:15, 553:18, 559:3, 562:10, 562:13, 562:14, 563:22, 724:5
**Jods** [2] - 559:5, 734:19
**Joey** [1] - 513:9
**John** [44] - 497:23, 498:2, 498:9, 498:15, 515:19, 517:19, 537:12, 537:18, 549:15, 549:22, 549:25, 554:8, 554:15, 554:23, 555:4, 555:5, 555:10, 556:1, 556:8, 556:16, 556:17, 556:18, 556:22, 557:11, 557:14, 557:17, 558:5, 560:13, 560:14, 560:22, 561:8, 562:10, 562:13, 562:12, 571:3, 584:12, 665:5, 670:15, 672:6, 672:8, 713:23, 744:4
**john** [2] - 621:23, 622:5
**Johrls** [9] - 550:2, 554:21, 556:24, 557:2, 557:3, 562:13, 667:4, 672:25, 673:16
**Join** [1] - 742:14
**join** [2] - 644:23, 692:2
**Jonason** [5] - 665:5, 665:10, 665:21, 666:11, 742:14
**Jose** [12] - 516:20, 541:3, 542:19, 545:9, 545:24, 549:16, 550:1, 563:22, 580:3, 593:12, 723:10
**Joseph** [42] - 491:7, 516:1, 517:4, 517:7, 535:14, 535:17, 535:21, 535:25, 536:18, 563:15, 578:24, 579:1, 580:6, 580:9, 592:3, 593:8, 659:18, 660:13, 661:22, 662:19, 723:14, 725:3, 728:10, 728:11, 728:20, 729:2, 729:8, 730:3, 730:14, 735:2, 736:20, 737:15, 737:23, 738:14, 738:19, 739:4, 743:3, 743:20, 744:4, 746:23, 752:21, 753:12
**journal** [2] - 746:4
**Jr** [1] - 648:22
**judge** [8] - 503:7, 503:12, 565:4, 567:6, 567:18, 567:21, 577:21, 712:7
**Judge** [23] - 491:11, 492:2, 571:1, 596:11, 597:15, 610:12, 610:22, 616:19, 617:3, 626:2, 648:11, 656:7, 675:5, 678:2, 688:11, 708:9, 749:2, 749:8, 749:13, 749:19, 749:20, 750:1, 750:8
**July** [4] - 692:3, 715:11, 715:12, 738:16

**jumping** [1] - 749:25
**June** [1] - 738:21
**Junior** [1] - 701:11
**Jury** [6] - 492:11, 606:4, 607:13, 624:5, 688:19, 691:1
**jury** [60] - 491:11, 492:9, 495:6, 497:19, 497:21, 497:25, 509:21, 568:5, 571:5, 597:17, 607:2, 608:1, 611:2, 615:13, 619:24, 623:4, 625:2, 626:4, 627:3, 634:20, 645:5, 668:6, 668:25, 672:18, 676:4, 682:9, 686:3, 687:10, 688:17, 689:2, 689:3, 691:2, 694:22, 696:15, 697:10, 697:20, 698:5, 698:24, 700:10, 701:5, 701:16, 702:7, 702:13, 712:18, 717:3, 720:23, 721:16, 722:8, 722:11, 723:3, 723:23, 724:1, 724:3, 725:10, 751:14, 752:15, 752:17, 753:8, 753:13, 754:11
**Jy** [5] - 723:12, 723:13, 728:8, 728:9, 752:20

## K

**keep** [7] - 610:1, 628:17, 629:13, 629:17, 632:17, 715:24, 751:24
**keeper** [1] - 536:17
**kept** [2] - 585:15, 642:24
**keys** [1] - 531:7
**kick** [1] - 507:12
**kicking** [2] - 507:8, 507:10
**Kicking** [1] - 507:11
**kid** [4] - 509:24, 558:7, 558:13, 561:6
**kill** [2] - 581:24, 582:1
**Kill** [7] - 536:12, 609:17, 610:25, 619:15, 621:25, 622:17, 634:17
**kilo** [1] - 563:12
**kind** [38] - 496:13, 499:18, 510:19, 518:21, 520:3, 522:22, 523:14, 534:4, 536:18, 536:21, 540:15, 545:12, 548:16, 554:25, 559:20, 573:23, 580:16, 587:7, 600:16, 601:8, 623:11, 627:20, 641:1, 662:23, 663:1, 678:17, 684:4, 693:4, 696:17, 697:23, 713:4, 724:25, 727:18, 728:2, 730:11, 734:4, 734:12, 735:8
**kinda** [1] - 729:4
**kinds** [5] - 499:15, 504:4, 506:4, 644:6, 708:17
**King** [1] - 581:5
**kitchen** [11] - 503:25, 635:16, 635:20, 637:17, 637:18, 637:24, 640:17, 640:18, 640:21, 641:9, 641:14
**kits** [1] - 636:8
**knee** [2] - 496:21
**knees** [2] - 636:6, 637:20
**knock** [5] - 510:7, 511:1, 511:3, 511:4, 669:16
**knocked** [1] - 531:4
**knowledge** [1] - 711:22
**known** [2] - 498:14, 564:18

**Knox** [1] - 742:8
**Kohler** [1] - 738:13
**Kreischer** [2] - 639:3, 645:2

## L

**lab** [2] - 636:15, 637:14
**laboratory** [4] - 637:15, 646:14, 729:17, 734:14
**lacerations** [2] - 495:15, 497:3
**lack** [1] - 750:11
**Ladder** [6] - 681:9, 681:13, 681:16, 681:17, 692:7
**ladies** [3] - 492:10, 568:3, 624:2
**Ladies** [5] - 497:18, 540:5, 606:2, 720:25, 754:4
**Lamattina** [4] - 517:7, 526:4, 526:21, 529:22
**landscaping** [2] - 635:5, 635:7
**lantern** [1] - 698:10
**Lanza** [13] - 508:19, 509:4, 509:16, 509:19, 510:3, 510:25, 511:6, 511:13, 513:8, 528:15, 530:1, 532:3, 533:5
**Lanzas** [1] - 512:5
**laptop** [3] - 553:18, 689:11, 689:12
**large** [5] - 587:23, 615:24, 616:4, 631:11, 635:22
**larger** [2] - 615:23, 616:7, 637:19
**largest** [2] - 615:21, 633:24
**Last** [1] - 723:11
**last** [25] - 504:12, 521:24, 536:18, 536:25, 554:21, 573:11, 597:12, 632:11, 635:6, 642:6, 690:14, 709:22, 710:19, 717:14, 717:15, 723:7, 723:11, 723:15, 723:16, 724:4, 724:5, 747:6, 747:9, 750:10, 751:15
**late** [5] - 535:18, 538:20, 545:3, 553:10, 689:4
**Late** [1] - 521:2
**laundry** [1] - 643:7
**Lauren** [1] - 711:4
**law** [1] - 724:12
**lawn** [1] - 737:9
**laws** [1] - 512:24
**lawyer** [3] - 574:15, 574:20, 574:24
**laying** [1] - 697:24
**lead** [3] - 571:15, 641:15, 693:9
**leader** [2] - 634:1, 634:2
**leaders** [1] - 635:23
**leading** [6] - 638:15, 639:21, 640:17, 640:21, 642:2, 717:5
**leads** [2] - 640:18, 641:16
**learn** [7] - 494:25, 529:16, 542:4, 558:17, 559:1, 683:12, 698:21
**learned** [4] - 539:4, 584:9, 678:7, 699:6
**learning** [1] - 692:20
**Lease** [1] - 737:9
**lease** [7] - 737:13, 737:23, 738:8, 738:11, 738:14, 738:19, 738:21

**leave** [11] - 511:1, 539:9, 560:1, 560:3, 659:1, 670:23, 717:10, 740:5, 754:8, 754:10, 754:13
**leaves** [3] - 497:21, 568:5, 754:11
**leaving** [3] - 551:22, 559:14, 631:17
**led** [2] - 645:8, 686:15
**left** [40] - 497:2, 499:13, 513:12, 527:14, 527:25, 546:1, 552:16, 556:20, 558:21, 559:6, 559:16, 621:10, 621:12, 621:13, 623:11, 629:7, 640:15, 641:7, 641:12, 652:8, 652:9, 652:11, 652:17, 653:10, 653:11, 654:13, 659:5, 659:7, 661:20, 662:1, 662:18, 663:15, 667:1, 667:2, 670:18, 670:21, 673:11, 686:11, 687:11, 703:22
**Left** [1] - 499:13
**left-hand** [2] - 673:11, 686:11
**legal** [1] - 628:15
**legalese** [1] - 596:8
**legs** [2] - 495:10, 495:14
**Lemon** [1] - 517:10
**lend** [1] - 523:23
**length** [1] - 722:1
**less** [5] - 594:7, 594:10, 594:15, 594:24, 595:1
**lesser** [1] - 567:18
**letter** [19] - 567:4, 567:5, 567:6, 567:10, 567:14, 567:17, 567:23, 572:2, 572:14, 572:16, 595:6, 595:7, 595:10, 595:15, 595:19, 599:19, 599:24, 600:2, 600:7
**level** [2] - 636:3, 676:18
**license** [8] - 502:25, 650:22, 660:19, 663:1, 714:18, 714:19, 714:22, 739:5
**lie** [5] - 567:1, 567:22, 603:13, 605:16, 605:18
**lied** [2] - 603:18, 603:20
**lies** [1] - 604:4
**life** [20] - 498:22, 499:25, 500:12, 502:10, 504:1, 564:20, 567:8, 571:15, 571:22, 576:2, 576:4, 576:21, 577:3, 600:12, 601:5, 601:9, 602:14, 603:5, 604:3, 605:22, 684:20
**Life** [1] - 565:25
**light** [4] - 532:19, 631:2, 670:23, 671:5
**lightning** [1] - 703:19
**lights** [1] - 670:22
**likelihood** [1] - 642:25
**likely** [2] - 506:13, 623:20
**Lincoln** [2] - 652:16, 742:3
**line** [12] - 526:19, 528:3, 547:12, 597:12, 620:5, 681:14, 683:6, 697:16, 728:7, 736:23
**lined** [1] - 635:8
**lines** [1] - 731:21
**liquid** [4] - 696:18, 697:23, 704:9, 704:14
**list** [2] - 754:16, 754:19
**listed** [1] - 736:20
**listen** [1] - 751:7

**listened** [10] - 563:7, 684:3, 723:5, 728:7, 730:14, 734:18, 735:5, 741:7, 746:3, 752:20
**listening** [3] - 721:2, 721:5, 749:22
**lists** [1] - 577:6
**lit** [1] - 562:15
**Literally** [1] - 665:15
**literally** [3] - 665:17, 692:9, 702:23
**live** [9] - 499:1, 518:17, 518:19, 523:18, 525:21, 557:8, 711:16, 720:5, 738:15
**lived** [8] - 498:22, 531:14, 540:25, 664:20, 665:25, 710:25, 738:8, 738:11
**lives** [1] - 669:2
**living** [8] - 571:22, 576:2, 601:9, 618:21, 715:4, 717:1, 738:20
**load** [1] - 718:2
**loaded** [3] - 727:7, 727:24, 733:21
**Loaded** [1] - 727:23
**loans** [2] - 524:7, 524:10
**Loansharking** [4] - 505:6, 520:14, 523:23, 544:12
**loansharking** [7] - 500:8, 509:24, 510:20, 523:21, 523:22, 524:10, 562:23
**Located** [1] - 645:4
**located** [9] - 505:7, 609:2, 611:10, 619:15, 621:24, 660:13, 661:17, 661:18, 741:4
**location** [19] - 494:14, 494:18, 494:20, 629:12, 630:16, 634:13, 634:17, 634:20, 635:10, 635:13, 642:17, 653:15, 655:1, 655:22, 682:6, 683:10, 741:3, 746:19, 746:21
**locations** [2] - 580:17, 662:12
**locked** [6] - 501:21, 502:25, 507:21, 559:3, 589:5, 589:7
**log** [5] - 650:9, 659:21, 659:23, 659:24, 659:25
**look** [23] - 529:13, 563:5, 596:22, 612:21, 614:8, 614:22, 628:9, 629:4, 630:22, 632:14, 635:14, 636:1, 636:4, 638:8, 638:20, 640:11, 641:12, 646:18, 650:7, 696:23, 706:1, 714:7
**looked** [17] - 495:6, 561:13, 585:2, 593:23, 645:15, 652:21, 667:6, 670:14, 671:19, 671:22, 673:1, 684:3, 698:9, 706:6, 736:1, 746:20
**Looking** [1] - 631:21
**looking** [17] - 495:4, 496:23, 552:9, 636:6, 638:4, 639:19, 645:10, 645:12, 655:11, 655:12, 655:16, 672:19, 687:4, 687:20, 694:24, 728:6
**looks** [3] - 622:15, 697:22
**loose** [1] - 623:18
**loosen** [1] - 623:15
**lose** [1] - 703:12
**loss** [1] - 626:25
**lost** [3] - 495:22, 496:17, 718:5
**loud** [1] - 689:24
**louder** [1] - 689:15

**low** [3] - 690:5, 702:22
**lower** [3] - 600:3, 686:11, 699:2
**lowest** [2] - 605:7, 696:12
**loyal** [1] - 583:22
**Lube** [2] - 666:8, 666:9
**Luchese** [1] - 505:2
**luminescent** [1] - 636:20
**luminol** [3] - 636:17, 637:5, 637:7
**lunch** [5] - 568:4, 569:6, 569:9, 624:3, 624:4
**lying** [3] - 603:10, 603:15, 605:19

# M

**ma'am** [1] - 497:17
**Mac** [1] - 728:3
**Macconnell** [8] - 517:14, 529:8, 549:9, 549:15, 549:25, 553:2, 553:4, 553:21
**machine** [1] - 684:24
**macral** [1] - 636:3
**mad** [1] - 584:17
**magazine** [4] - 733:19, 734:6
**magazines** [2] - 727:7, 727:21
**Maggio** [95] - 511:25, 512:3, 513:5, 513:8, 513:9, 513:10, 513:15, 514:5, 515:13, 518:4, 518:13, 518:14, 519:6, 519:13, 519:19, 521:4, 522:2, 522:12, 522:18, 523:1, 524:13, 527:17, 529:4, 529:18, 530:3, 530:25, 531:15, 533:11, 533:12, 534:13, 535:8, 535:20, 540:1, 541:4, 541:7, 543:9, 544:14, 545:8, 546:5, 546:11, 548:24, 549:2, 549:10, 549:16, 550:10, 551:4, 551:9, 551:18, 551:19, 552:6, 555:18, 555:21, 556:7, 556:17, 556:18, 557:24, 558:7, 558:19, 561:16, 579:14, 585:20, 585:22, 586:3, 586:6, 586:8, 586:11, 586:18, 588:11, 591:16, 591:19, 592:6, 592:8, 592:10, 593:14, 593:17, 593:25, 603:13, 603:18, 659:19, 662:9, 662:13, 662:21, 713:23, 724:6, 726:16, 731:14, 731:22, 731:25, 732:24, 734:19, 739:21, 739:22, 743:3, 743:16, 744:4
**Maggio's** [9] - 514:7, 518:5, 530:9, 537:25, 544:25, 546:21, 559:19, 587:7, 715:16
**magnifying** [1] - 637:20
**main** [3] - 530:12, 639:4, 681:17
**major** [1] - 666:4
**male** [8] - 650:20, 650:25, 651:4, 651:5, 651:10, 651:15, 654:14, 683:10
**malfunction** [1] - 718:6
**mall** [1] - 655:5
**man** [9] - 505:17, 505:19, 505:20, 505:21, 506:8, 518:6, 518:7, 665:25, 669:1
**man's** [2] - 494:25, 683:12
**manage** [1] - 627:4
**Management** [3] - 664:11, 664:13, 664:14

**management** [3] - 627:1, 627:2, 628:13
**manager** [3] - 609:7, 626:24, 629:23
**managing** [1] - 609:10
**Manhattan** [1] - 681:5
**manner** [1] - 720:4
**mansion** [3] - 621:17, 621:18, 622:17
**Mansion** [10] - 536:12, 536:15, 638:13, 638:16, 639:3, 639:20, 640:14, 641:10, 642:3, 645:2
**map** [1] - 740:20
**March** [1] - 753:5
**Margaret** [8] - 521:23, 522:8, 522:11, 522:18, 523:1, 530:8, 587:7, 651:10
**Margaret's** [2] - 530:6, 558:19
**Maria** [3] - 523:4, 523:6, 523:12
**Marijuana** [1] - 504:9
**Marine** [2] - 621:23, 626:18
**Marines** [1] - 536:4
**mark** [1] - 752:24
**marked** [50] - 508:22, 509:8, 543:12, 543:24, 554:10, 554:19, 566:10, 566:20, 614:20, 629:2, 639:13, 647:7, 648:12, 650:4, 660:6, 661:14, 666:20, 667:14, 668:4, 685:13, 695:11, 704:21, 718:12, 719:11, 726:24, 727:13, 734:2, 735:20, 736:13, 737:2, 737:20, 738:4, 739:11, 741:1, 758:5, 758:8, 758:11, 758:14, 758:21, 758:24, 759:3, 759:6, 759:9, 760:3, 760:6, 760:9, 760:12, 760:15, 760:18, 760:21
**market** [3] - 630:1, 631:8, 631:14
**Market** [3] - 730:7, 730:20, 735:16
**markings** [1] - 647:24
**married** [3] - 512:25, 522:16, 578:21
**marshal** [6] - 561:12, 692:13, 692:17, 692:25, 693:4, 693:7
**marshals** [2] - 694:13, 705:9
**Martha** [3] - 638:11, 643:13, 643:19
**mask** [1] - 564:4
**massage** [5] - 545:13, 545:14, 545:16, 545:21, 547:23
**Mastrioanni** [4] - 509:23, 510:11, 510:18, 510:24
**material** [5] - 629:10, 629:12, 631:9, 697:1, 750:6
**materials** [6] - 626:20, 627:6, 627:9, 627:10, 628:3, 630:23
**maxed** [1] - 689:20
**maximum** [3] - 565:21, 566:1, 631:19
**Mazzola** [2] - 587:8, 588:11
**Mcdonald's** [2] - 741:11, 741:12
**Mckelvey** [13] - 516:23, 528:10, 528:20, 529:16, 530:19, 531:10, 531:12, 533:8, 533:12, 534:6, 534:11, 553:14, 753:4
**Mckelvey's** [2] - 533:16, 533:23
**Mcmanus** [5] - 691:5, 691:15, 691:16, 693:18, 696:3
**mean** [35] - 496:4, 506:2, 510:8,

532:15, 533:14, 560:2, 561:24, 572:5, 574:2, 574:17, 599:12, 599:17, 600:16, 602:2, 602:14, 603:2, 609:8, 611:10, 611:12, 612:7, 612:11, 613:11, 614:14, 623:15, 623:17, 632:7, 646:3, 682:17, 683:23, 684:23, 692:11, 711:20, 729:7, 750:7

**meaning** [1] - 580:16

**Meaning** [1] - 594:14

**means** [7] - 614:10, 629:8, 645:18, 683:19, 684:19, 686:25, 703:7

**meant** [2] - 620:23, 646:2

**meantime** [1] - 529:14

**mechanical** [1] - 491:24

**media** [1] - 754:6

**Medical** [1] - 493:6

**medical** [6] - 493:8, 495:24, 676:16, 676:18, 678:25, 684:2

**medically** [1] - 495:17

**medicine** [2] - 493:10, 676:15

**meet** [20] - 527:18, 535:17, 537:25, 549:10, 552:15, 554:23, 555:6, 555:19, 556:4, 556:8, 556:19, 560:12, 564:15, 565:6, 669:1, 669:3, 717:7, 717:12, 726:15, 732:20

**meeting** [21] - 510:3, 510:6, 511:9, 555:4, 557:10, 557:14, 560:14, 561:8, 562:5, 572:22, 589:24, 663:11, 663:12, 717:4, 717:5, 717:6, 717:7, 717:10, 720:2, 726:13, 726:17

**meetings** [7] - 564:10, 564:17, 565:13, 572:10, 576:12, 590:4, 717:14

**melted** [1] - 687:1

**member** [7] - 493:17, 506:14, 507:1, 513:4, 515:9, 515:15, 644:19

**members** [4] - 633:25, 713:20, 715:10, 716:2

**memory** [2] - 495:3, 699:16

**mentioned** [7] - 507:13, 515:5, 523:20, 525:14, 613:14, 621:9, 660:24

**mentor** [1] - 693:3

**Mercedes** [4] - 559:21, 662:24, 663:4

**merely** [1] - 684:1

**Mergen** [18] - 517:19, 549:15, 549:25, 562:10, 563:12, 584:12, 585:16, 712:12, 712:20, 713:6, 714:3, 720:2, 722:19, 725:3, 731:14, 739:21, 743:3, 744:4

**Mergens's** [1] - 549:23

**Mess** [2] - 738:10

**message** [4] - 525:1, 545:5, 679:18, 679:21

**met** [24] - 513:8, 525:22, 528:4, 533:8, 533:12, 536:11, 546:18, 548:19, 549:12, 552:15, 555:5, 560:17, 561:2, 561:7, 561:19, 565:18, 572:8, 576:14, 662:8, 662:11, 662:12, 662:15, 713:23, 716:20

**metal** [7] - 619:11, 621:3, 626:20, 627:7, 627:13, 629:19, 630:4

**Metal** [4] - 621:23, 626:17, 626:19, 627:19

**metals** [2] - 629:20, 631:20

**Metropolitan** [1] - 644:13

**Michael** [15] - 510:2, 512:3, 592:6, 593:14, 659:18, 662:9, 662:21, 715:16, 724:6, 731:14, 731:21, 739:21, 743:3, 743:16, 744:4

**microphone** [3] - 664:12, 676:3, 691:18

**mid** [1] - 535:18

**middle** [4] - 661:24, 663:6, 709:22, 717:22, 723:5, 728:19, 730:13, 734:19

**Midland** [3] - 741:15, 741:16, 742:3

**might** [9] - 600:22, 601:1, 601:6, 636:7, 657:16, 689:24, 697:4, 703:4, 723:11

**Mike** [118] - 511:25, 513:5, 513:8, 513:9, 513:10, 513:15, 514:5, 514:7, 515:13, 518:4, 518:5, 518:13, 518:14, 519:6, 519:13, 519:19, 521:4, 522:2, 522:12, 522:18, 523:1, 524:13, 524:18, 524:24, 527:17, 528:22, 529:4, 529:12, 529:18, 530:3, 530:9, 530:19, 530:25, 531:1, 531:15, 533:11, 533:12, 534:13, 535:8, 535:20, 537:25, 539:8, 539:9, 540:1, 540:2, 541:4, 541:7, 543:9, 544:14, 544:25, 545:8, 545:10, 546:5, 546:11, 546:13, 546:18, 546:21, 548:24, 549:2, 549:10, 549:16, 550:1, 550:10, 551:4, 551:9, 551:17, 551:19, 552:6, 552:7, 552:9, 554:7, 554:8, 555:18, 555:20, 556:7, 556:17, 556:18, 556:19, 556:21, 557:5, 557:13, 557:24, 558:7, 558:18, 559:3, 559:4, 559:8, 559:10, 559:19, 560:1, 560:17, 560:23, 560:25, 561:2, 561:16, 562:12, 579:14, 585:19, 585:22, 586:3, 586:8, 586:11, 588:11, 591:16, 591:19, 592:8, 592:10, 593:18, 593:24, 603:18, 646:7, 713:23, 726:16, 732:24, 734:19, 739:22

**Mike's** [1] - 558:5

**military** [1] - 540:4

**mill** [1] - 631:15

**Millie** [5] - 521:23, 587:10, 587:12, 587:20, 588:11

**million** [1] - 566:2

**Mincon** [1] - 741:22

**mind** [2] - 602:21, 752:2

**mine** [1] - 509:23

**minute** [5] - 607:3, 607:5, 688:14, 688:16, 688:18

**minutes** [10] - 497:19, 551:7, 551:15, 569:4, 576:8, 606:3, 607:6, 607:7, 652:4, 674:10

**missed** [1] - 553:11

**missing** [1] - 753:4

**mistake** [1] - 542:5

**mix** [1] - 631:14

**Model** [1] - 559:22

**model** [2] - 663:3, 663:5

**modernized** [1] - 635:7

**Monday** [2] - 519:22, 725:5

**money** [54] - 499:25, 500:8, 502:17, 505:4, 505:5, 507:6, 507:7, 507:14, 507:18, 510:4, 510:15, 510:19, 511:1, 511:5, 520:9, 520:20, 521:12, 521:13, 523:23, 524:9, 526:24, 527:8, 547:14, 547:18, 547:19, 548:6, 548:16, 548:18, 548:25, 551:18, 551:25, 555:8, 556:23, 557:6, 557:14, 557:21, 588:5, 669:19, 669:21, 669:24, 670:1, 670:7, 670:9, 670:10, 674:18, 714:12, 716:14, 726:5, 726:9, 726:13, 728:16, 732:14, 732:16

**Money** [1] - 500:16

**money-wise** [1] - 507:6

**monitors** [1] - 613:1

**month** [5] - 493:14, 628:19, 670:25, 692:19, 753:4

**months** [8] - 526:19, 557:12, 589:4, 589:16, 598:21, 598:23, 605:7, 636:23

**morning** [21] - 492:5, 492:10, 492:11, 492:24, 492:25, 494:4, 525:9, 527:14, 539:11, 539:12, 541:18, 546:12, 546:14, 552:12, 559:2, 561:21, 669:7, 669:9, 681:21, 749:7, 749:13

**most** [7] - 495:21, 499:1, 621:14, 623:20, 628:1, 694:25

**Most** [1] - 506:13

**mother** [3] - 527:20, 527:22, 587:10

**motion** [5] - 597:7, 597:22, 598:2, 598:12, 599:3

**Moulder** [6] - 648:15, 648:21, 648:22, 648:25, 655:1, 657:4

**mouth** [1] - 551:20

**move** [6] - 543:5, 622:20, 654:5, 710:12, 714:6, 746:13

**Move** [2] - 640:10, 664:12

**moved** [6] - 543:2, 543:3, 544:3, 658:15, 669:16, 685:6

**Moving** [6] - 641:4, 641:23, 722:12, 729:19, 747:3, 748:3

**moving** [5] - 533:7, 638:1, 649:6, 722:9, 749:19

**multi** [1] - 634:22

**multi-room** [1] - 634:22

**multiple** [1] - 652:13

**murder** [5] - 534:15, 744:8, 744:10, 751:19, 752:2

**must** [1] - 679:9

**Mustang** [1] - 652:15

---

# N

**name** [48] - 492:18, 494:25, 495:1, 498:7, 502:19, 502:22, 502:24, 503:1, 503:6, 503:7, 503:20, 521:24, 522:7, 530:11, 535:21, 542:23, 543:8, 548:4, 548:12, 554:21, 555:2, 555:12, 557:20, 580:21, 582:10, 608:12, 608:14,

613:24, 618:9, 626:10, 633:4, 643:17, 648:19, 648:21, 656:15, 664:2, 665:4, 665:23, 668:10, 675:17, 683:12, 691:13, 701:10, 709:20, 709:22, 712:12, 720:4, 731:11

**named** [7] - 523:4, 580:13, 580:23, 581:22, 627:16, 669:1

**names** [1] - 515:2

**natural** [2] - 703:15, 703:17

**Natural** [1] - 703:18

**nature** [2] - 627:24, 682:5

**near** [1] - 653:7

**nearest** [2] - 666:4, 671:17

**nearly** [1] - 679:19

**necessary** [1] - 650:7

**neck** [4] - 495:10, 496:9, 496:12, 497:4

**need** [11] - 492:6, 494:23, 507:14, 576:10, 611:18, 664:12, 670:4, 682:19, 752:23, 752:24, 752:25

**needed** [11] - 495:24, 611:7, 611:15, 616:5, 616:6, 616:7, 669:24, 670:1, 674:7, 683:6

**needs** [1] - 634:8

**neglected** [1] - 707:25

**negotiate** [1] - 611:23

**neighbor** [6] - 525:24, 526:11, 665:7, 665:8, 670:15, 672:6

**neighbor's** [5] - 525:16, 526:9, 526:22, 702:14, 702:19

**neighborhood** [1] - 741:21

**neighbors** [4] - 518:18, 582:5, 698:20, 698:22

**never** [3] - 561:7, 572:19, 574:3

**Nevertheless** [1] - 501:12

**New** [47] - 491:1, 491:6, 491:22, 493:2, 493:11, 493:17, 498:22, 499:16, 499:20, 513:23, 514:13, 514:14, 544:21, 609:3, 618:22, 627:5, 633:15, 633:24, 634:5, 649:3, 650:23, 651:1, 651:25, 652:14, 652:15, 652:16, 653:6, 653:14, 654:15, 663:2, 676:5, 676:11, 681:3, 691:25, 705:10, 710:13, 710:14, 710:25, 713:16, 714:19, 714:22, 715:5, 722:6, 730:19, 740:21, 751:9

**new** [7] - 544:18, 611:17, 626:25, 638:7, 642:5, 728:21, 728:25

**Newspapers** [1] - 499:24

**Next** [2] - 645:24, 753:9

**next** [36] - 518:18, 532:23, 544:24, 546:11, 551:4, 570:2, 592:13, 640:10, 646:6, 646:11, 665:7, 667:15, 670:3, 670:8, 686:20, 700:25, 702:11, 722:12, 724:7, 729:8, 729:19, 730:24, 739:13, 739:25, 740:5, 742:20, 743:25, 746:13, 746:16, 747:3, 747:12, 748:3, 751:2, 752:16, 753:6, 753:10

**next-door** [2] - 686:20, 702:11

**nice** [2] - 754:4, 754:7

**Nick** [7] - 509:24, 510:4, 510:15, 510:16, 510:19, 510:25, 738:10

**nickname** [5] - 509:19, 517:16, 517:21, 533:3, 712:13

**nicknames** [2] - 498:14, 517:9

**Nicky** [21] - 508:17, 508:19, 509:2, 509:4, 509:12, 509:16, 509:19, 509:20, 510:2, 510:25, 511:6, 511:12, 512:5, 513:8, 528:15, 529:22, 530:1, 531:5, 531:7, 532:3, 533:5

**Nieves** [6] - 663:23, 664:4, 664:5, 664:8, 675:4, 675:5

**night** [9] - 527:13, 539:5, 546:12, 550:3, 555:5, 584:20, 671:7, 723:15, 724:5

**Nine** [1] - 676:9

**nine** [2] - 636:23, 752:13

**Nineteen** [1] - 581:16

**Ninth** [1] - 499:4

**nonaccidental** [2] - 703:16, 704:4

**none** [2] - 684:4, 734:17

**normal** [2] - 514:22, 545:14

**normally** [1] - 694:12

**Normally** [1] - 694:14

**Nostra** [1] - 710:24

**notation** [1] - 699:14

**note** [1] - 611:12

**noted** [2] - 652:11, 652:12

**notes** [2] - 699:13, 699:14

**Nothing** [1] - 592:12, 709:6

**nothing** [6] - 586:1, 605:11, 605:24, 613:12, 656:6, 707:7

**notice** [7] - 496:25, 669:11, 683:18, 686:20, 696:7, 702:14, 721:6

**noticed** [3] - 613:6, 683:6, 698:25

**notification** [1] - 671:11

**notified** [1] - 674:21

**November** [9] - 731:5, 732:19, 733:1, 733:5, 735:4, 736:17, 736:23, 738:12

**number** [19] - 605:7, 629:8, 629:9, 629:15, 630:6, 630:8, 631:5, 635:22, 647:24, 651:4, 651:5, 663:5, 715:1, 729:10, 729:12, 729:18, 734:15, 734:16, 750:1

**Number** [2] - 614:20, 622:12

**numbers** [8] - 538:11, 538:13, 538:14, 610:10, 610:13, 610:17, 647:24, 731:24

**Nypd** [1] - 705:13

## O

**o'clock** [2] - 541:18, 749:9

**object** [2] - 678:21, 678:22

**objection** [22] - 615:7, 622:22, 628:24, 639:10, 647:4, 661:11, 667:11, 668:16, 679:13, 685:23, 695:21, 708:2, 708:4, 719:5, 720:14, 727:10, 733:24, 736:10, 737:17, 738:1, 739:8, 740:23

**Objection** [2] - 555:14, 744:11

**obligates** [3] - 572:2, 572:5, 573:17

**obligation** [2] - 572:6, 595:14

**obligations** [2] - 566:23, 567:3

**Obnoxious** [1] - 533:17

**observance** [1] - 658:18

**observe** [3] - 669:5, 696:4, 699:11

**observed** [3] - 657:23, 658:4, 658:11

**obtain** [2] - 706:3, 712:7

**obtained** [2] - 645:22, 706:22

**obvious** [2] - 636:4, 750:5

**obviously** [1] - 629:17

**occasion** [1] - 692:23

**occasions** [1] - 693:15

**occupants** [1] - 701:7

**occur** [1] - 529:14

**occurred** [2] - 547:9, 694:7

**occurring** [1] - 711:22

**occurs** [5] - 607:1, 608:1, 625:1, 689:1, 691:2

**October** [3] - 491:8, 649:14, 656:25

**odd/end** [1] - 614:1

**off-guard** [1] - 716:25

**offer** [27] - 509:5, 512:1, 543:21, 554:16, 566:17, 615:6, 628:23, 639:9, 647:3, 661:10, 667:8, 668:15, 685:22, 693:18, 695:20, 707:25, 719:1, 720:13, 720:17, 727:9, 733:23, 736:2, 737:16, 737:25, 739:7, 740:22, 751:25

**offers** [1] - 617:7

**office** [11] - 599:4, 633:15, 633:24, 634:4, 634:5, 649:4, 710:13, 710:14, 749:23, 750:1, 750:2

**office's** [1] - 599:7

**officer** [1] - 503:1

**Often** [1] - 519:21

**oil** [3] - 618:24, 619:1, 620:6

**Oil** [3] - 609:12, 615:16, 619:14

**old** [12] - 498:16, 500:3, 501:6, 502:7, 571:9, 576:4, 608:23, 613:5, 613:21, 615:20, 616:9, 632:5

**older** [4] - 611:10, 613:8, 634:21, 635:2

**once** [4] - 539:13, 578:3, 630:10, 685:5

**Once** [8] - 497:9, 521:7, 631:13, 636:5, 684:17, 684:22, 685:5, 688:3

**one** [94] - 492:5, 502:8, 504:17, 504:18, 508:8, 513:11, 526:14, 529:16, 530:12, 532:11, 532:15, 532:21, 536:11, 538:12, 539:20, 541:18, 542:20, 555:5, 557:1, 563:6, 563:15, 563:21, 569:11, 576:9, 576:20, 577:1, 584:20, 584:24, 586:9, 587:21, 588:14, 588:24, 590:1, 591:6, 591:12, 593:14, 596:17, 600:25, 601:6, 608:24, 611:18, 612:25, 615:23, 616:9, 616:11, 616:19, 620:9, 620:16, 622:9, 630:6, 630:8, 631:5, 632:11, 649:22, 651:4, 652:21, 654:14, 659:15, 659:18, 661:22, 662:8, 663:7, 666:7, 666:25, 674:3, 684:1, 694:4, 698:16, 698:21, 701:21, 703:7, 704:11, 705:1, 705:2, 711:21, 714:4, 722:21, 722:24, 723:22, 729:20, 731:2, 735:11, 735:13, 735:23, 735:25, 736:1,

736:5, 739:24, 743:24, 745:17, 752:9, 752:24

**One**[11] - 532:11, 542:22, 545:22, 615:1, 630:6, 636:11, 645:14, 645:24, 659:15, 659:18, 669:25

**one-year** [1] - 752:24

**ones** [3] - 504:24, 564:22, 654:12

**open** [12] - 607:10, 612:21, 618:1, 621:3, 630:20, 631:8, 631:14, 655:8, 681:1, 684:10, 751:1

**opened** [1] - 684:3

**opening** [2] - 612:18, 703:8

**openings** [2] - 612:15, 612:16

**operated** [1] - 612:6

**operational** [1] - 613:2

**operations** [1] - 627:4

**Operations**[3] - 649:3, 649:5, 656:24

**opportunity** [5] - 572:16, 574:2, 574:14, 574:22, 661:2

**oppose** [1] - 750:16

**order** [3] - 599:24, 601:4, 712:7

**orders** [2] - 568:3, 631:8

**organized** [11] - 504:14, 504:22, 505:3, 505:11, 507:22, 507:25, 515:3, 520:12, 710:15, 714:1, 716:3

**origin** [9] - 692:21, 693:18, 694:19, 696:8, 697:3, 697:5, 702:18, 703:13, 704:1

**original** [2] - 629:14, 654:12

**originally** [2] - 613:9, 713:6

**originated** [1] - 697:3

**oropharyngeal** [1] - 684:7

**Oropharyngeal**[1] - 684:9

**otherwise** [2] - 598:14, 599:6

**Outside**[2] - 621:18, 666:17

**outside** [10] - 607:1, 611:12, 620:24, 621:5, 621:7, 625:1, 642:20, 666:16, 669:8, 689:1

**overall** [2] - 639:3, 639:22, 641:9

**Overhaul**[1] - 703:8

**overhauled** [1] - 703:5

**overheard** [1] - 545:18

**overseas** [1] - 732:1

**oversees** [1] - 732:6

**owe** [4] - 507:4, 511:12, 527:8, 548:16

**owed** [8] - 510:4, 510:15, 510:18, 511:2, 511:4, 556:23, 587:22, 588:1

**own** [8] - 506:18, 506:20, 507:24, 586:8, 649:10, 697:25, 716:9, 716:10

**owned** [2] - 534:25, 678:7

**owner** [5] - 521:19, 521:20, 544:2, 587:12, 587:15

**owners** [2] - 544:19, 609:13

**owns** [1] - 609:12

**Ox**[1] - 517:17

**oxygen** [2] - 496:14, 496:17

**Ozone**[1] - 498:25

## P

**package** [1] - 637:13

**pads** [2] - 684:22, 684:23

**Page** [3] - 597:5, 661:18, 755:2

**page** [48] - 570:2, 592:13, 596:22, 596:25, 597:5, 597:6, 597:10, 597:18, 606:5, 607:14, 615:1, 615:2, 615:14, 616:23, 617:16, 624:7, 625:6, 628:9, 634:5, 667:15, 677:3, 680:5, 688:21, 690:17, 721:21, 723:1, 723:4, 723:22, 725:12, 728:6, 729:8, 730:13, 731:21, 734:18, 736:1, 736:4, 736:15, 736:17, 741:10, 742:6, 746:2, 746:22, 747:12, 748:9, 750:24, 752:19, 753:7

**pages** [1] - 614:22

**paid** [11] - 503:6, 511:4, 587:21, 619:19, 619:22, 622:4, 622:5, 629:15, 631:2, 716:14

**painting** [1] - 555:1

**Painting**[1] - 665:22

**paperwork** [5] - 560:17, 561:2, 609:20, 614:4, 637:13

**paramedic** [5] - 676:13, 676:17, 676:20, 676:23, 683:9

**Paravano**[1] - 683:15

**Park**[2] - 498:25, 692:8

**parked** [5] - 521:6, 556:15, 562:13, 652:9, 652:14

**parking** [5] - 513:8, 531:19, 552:17, 552:18, 559:16

**Parkway** [2] - 653:3, 653:5

**parlor** [10] - 545:5, 545:13, 545:14, 545:16, 545:21, 547:24, 657:6, 657:25, 658:5, 658:23

**part** [23] - 496:21, 504:14, 504:17, 519:3, 520:12, 521:3, 541:13, 541:15, 577:9, 596:3, 634:23, 645:5, 645:7, 649:2, 687:11, 687:19, 700:22, 707:1, 710:14, 710:20, 713:6, 714:4, 718:7

**Part** [1] - 711:8

**partial** [1] - 558:1

**Partial** [1] - 558:3

**partially** [1] - 727:8

**participants** [1] - 743:2

**participate** [1] - 657:3

**participated** [1] - 578:17

**particular** [24] - 508:13, 512:12, 518:23, 534:17, 540:6, 584:16, 598:10, 620:16, 632:13, 636:13, 642:17, 649:2, 653:15, 656:2, 659:13, 688:6, 694:5, 696:10, 703:24, 704:12, 705:9, 706:4, 707:4, 751:10

**partner** [2] - 494:7, 494:22

**partners** [1] - 543:19

**parts** [3] - 495:13, 496:18, 498:24

**party** [4] - 556:13, 671:9, 711:21

**passed** [4] - 531:8, 541:7, 545:25, 653:8

**passenger's** [2] - 521:9, 541:11

**past** [3] - 678:18, 715:23, 716:4

**patient** [5] - 497:9, 684:15, 684:18, 687:24, 688:3

**Patient** [1] - 685:3

**patient's** [2] - 497:10, 684:19

**patrol** [1] - 550:14

**pattern** [4] - 696:23, 697:1, 697:11, 704:6

**Paul** [3] - 691:5, 691:15

**Pause** [9] - 610:15, 614:9, 616:12, 622:10, 638:22, 695:15, 699:20, 721:19, 736:8

**Pavarno** [1] - 683:15

**Pavaro** [1] - 683:15

**pay** [21] - 503:8, 503:10, 510:1, 510:7, 510:23, 511:1, 519:25, 523:23, 524:3, 524:4, 524:6, 528:1, 557:15, 557:16, 557:17, 566:3, 588:2, 601:1, 614:2, 627:9, 629:25

**paying** [3] - 527:20, 527:22, 551:23

**payment** [5] - 558:1, 558:2, 558:3, 558:6, 629:13

**payments** [4] - 520:1, 520:3, 527:3, 528:8

**Pd** [1] - 706:14

**peach** [1] - 516:4

**Pearl** [1] - 522:25

**peddler** [1] - 627:22

**penalties** [1] - 565:22

**pending** [2] - 519:1, 712:22

**Pennsylvania** [9] - 536:22, 538:9, 660:16, 730:5, 730:8, 734:20, 734:21, 735:17, 736:21

**people** [47] - 496:16, 500:19, 500:21, 514:25, 517:25, 527:19, 529:2, 529:13, 533:22, 542:6, 543:14, 547:16, 547:17, 549:12, 579:9, 583:13, 583:18, 583:21, 584:3, 587:6, 588:9, 588:10, 588:11, 602:15, 602:17, 603:5, 603:8, 604:3, 635:21, 652:6, 652:7, 652:8, 652:13, 653:18, 653:19, 654:11, 655:16, 655:21, 658:21, 679:18, 679:21, 706:21, 711:17, 716:3, 752:3, 752:5, 752:20

**people's** [1] - 579:18

**percent** [2] - 655:9, 706:14

**perfectly** [1] - 678:3

**performed** [2] - 614:11, 698:19

**performing** [1] - 665:11

**period** [7] - 587:22, 588:7, 589:24, 610:24, 657:22, 712:24, 739:5

**person** [34] - 494:23, 506:15, 508:24, 511:22, 548:2, 548:6, 548:16, 548:18, 549:1, 583:14, 620:16, 665:2, 668:7, 674:3, 686:17, 699:14, 699:22, 699:25, 700:3, 700:15, 701:17, 702:4, 704:9, 707:14, 707:16, 708:19, 708:23, 708:25, 712:3, 717:4, 719:21, 724:4, 751:25

**person's** [3] - 548:4, 707:16, 712:2

**personal** [1] - 752:8
**personality** [1] - 533:16
**personalize** [1] - 729:4
**personally** [5] - 524:14, 524:17, 587:3, 587:6, 655:2
**Personally** [2] - 524:18, 693:9
**personnel** [2] - 626:25, 635:23
**Peter** [1] - 580:13
**pets** [1] - 582:3
**phenolphthalein** [2] - 636:12, 645:17
**phone** [17] - 514:14, 523:12, 523:13, 539:10, 555:6, 555:14, 555:17, 555:18, 555:20, 555:25, 556:4, 559:2, 660:23, 714:24, 715:1, 716:25
**photo** [3] - 660:9, 700:13, 701:3
**photograph** [28] - 511:18, 622:14, 623:2, 637:12, 641:1, 642:11, 662:5, 663:6, 665:2, 668:3, 668:8, 668:12, 668:22, 672:16, 673:6, 673:12, 673:14, 673:19, 686:7, 687:3, 687:14, 687:16, 687:19, 697:8, 700:6, 700:12, 700:19, 702:11
**photographed** [1] - 646:15
**photographs** [21] - 515:1, 638:16, 638:19, 638:21, 639:6, 642:7, 656:3, 659:24, 660:25, 661:1, 661:9, 662:10, 662:14, 666:21, 666:24, 667:5, 668:20, 685:12, 685:17, 695:7, 695:14
**photography** [1] - 649:7
**photos** [2] - 639:3, 641:9
**physical** [3] - 649:6, 678:12
**physiology** [1] - 676:22
**pick** [4] - 559:17, 559:20, 560:5, 752:6
**picked** [2] - 527:17, 553:8
**Picked** [1] - 560:11
**pickup** [2] - 650:25, 652:13
**picture** [11] - 640:14, 640:20, 641:2, 641:12, 661:20, 661:21, 661:24, 686:11, 687:22, 736:5
**pictures** [6] - 639:18, 639:23, 640:5, 641:7, 642:4, 660:24
**piece** [1] - 646:13
**pieces** [5] - 631:13, 646:23, 646:25, 647:11, 647:17
**pills** [2] - 500:11, 504:5
**pipe** [6] - 542:20, 584:22, 584:24, 620:9, 620:10, 632:18
**pistol** [9] - 727:6, 727:19, 730:10, 733:14, 733:15, 734:5, 735:10, 735:14
**pit** [1] - 534:5
**pizza** [16] - 525:10, 654:4, 654:6, 654:12, 655:3, 655:12, 655:15, 655:17, 655:22, 656:4, 657:6, 657:13, 657:25, 658:4, 658:16, 658:23
**Pizza** [2] - 653:21, 653:23
**pizzeria** [7] - 524:21, 524:22, 524:25, 548:11, 548:12, 655:2, 655:3
**Pizzeria** [1] - 653:19
**place** [40] - 524:25, 525:10, 534:22, 539:2, 539:24, 545:11, 545:12, 545:23,

545:24, 546:15, 550:23, 551:25, 552:9, 559:1, 560:12, 615:10, 623:1, 629:12, 654:4, 654:7, 654:12, 655:3, 655:12, 655:15, 655:17, 655:22, 656:4, 657:13, 659:13, 672:8, 701:21, 722:4, 722:23, 722:24, 731:10, 731:11, 743:8, 743:25, 751:8, 753:10
**placed** [2] - 615:21, 683:6
**places** [1] - 630:16
**Plaintiff** [2] - 491:4, 491:13
**plan** [4] - 539:19, 539:21, 558:17, 635:10
**planned** [3] - 587:14, 588:7, 609:11
**plant** [1] - 627:15
**plastic** [2] - 642:24, 684:11
**Plastic** [1] - 698:14
**plate** [11] - 650:22, 652:1, 652:14, 652:15, 652:16, 654:16, 660:19, 663:1, 714:19, 714:22
**plates** [2] - 536:21, 714:18
**Play** [1] - 746:25
**play** [8] - 723:24, 724:22, 725:8, 731:15, 731:18, 740:9, 743:11, 744:2
**played** [24] - 722:8, 722:11, 723:3, 723:23, 724:1, 724:3, 725:10, 731:16, 731:19, 740:3, 740:10, 740:13, 743:12, 744:5, 746:14, 747:1, 747:4, 747:7, 747:10, 751:14, 752:15, 752:17, 753:8, 753:13
**playing** [2] - 690:9, 750:10, 752:11
**Playing** [1] - 739:24
**plays** [1] - 689:14
**plaza** [3] - 653:15, 653:20, 655:8
**Plaza** [4] - 491:21, 560:12, 561:22, 653:13
**plea** [2] - 567:24, 577:20
**plead** [6] - 565:2, 566:6, 577:10, 577:18, 578:3, 590:1
**pled** [14] - 564:15, 565:6, 565:18, 565:21, 572:20, 573:2, 574:4, 574:20, 575:2, 577:20, 577:24, 589:17, 589:23, 590:6
**plug** [1] - 613:17
**plug-in** [1] - 613:17
**Plumber** [1] - 533:4
**plus** [2] - 628:15, 633:25
**Pm** [21] - 626:2, 626:4, 651:2, 651:24, 653:6, 653:10, 653:12, 653:13, 653:22, 654:20, 722:2, 722:21, 722:22, 725:7, 731:8, 739:19, 743:1, 751:6, 752:13, 754:12, 754:23
**podium** [2] - 647:10, 689:9
**point** [36] - 516:3, 519:7, 524:1, 534:6, 561:16, 589:2, 591:19, 612:1, 613:15, 613:20, 621:9, 631:16, 646:9, 647:21, 650:24, 652:2, 652:23, 653:1, 653:9, 653:11, 655:24, 658:14, 659:1, 661:22, 662:8, 671:11, 683:3, 685:7, 692:12, 693:5, 694:3, 694:4, 696:12, 697:4, 708:23, 751:18

**pointed** [2] - 541:8, 709:4
**pointing** [1] - 700:14
**points** [2] - 524:2, 697:5
**pole** [5] - 666:25, 673:15, 673:16, 673:20, 699:1
**Police** [3] - 674:20, 705:10, 705:16
**police** [6] - 503:1, 550:19, 576:23, 633:20, 672:2, 672:4
**policy** [1] - 630:18
**Polo** [8] - 730:5, 736:21, 737:5, 737:6, 737:15, 738:8, 738:11, 738:15
**pond** [1] - 640:22
**pool** [1] - 640:22
**pooling** [2] - 696:17, 697:23
**portion** [3] - 631:5, 634:24, 731:18
**Position** [5] - 515:8, 515:14, 515:20, 515:24, 516:11
**position** [9] - 493:7, 495:7, 507:22, 509:13, 509:17, 513:2, 515:3, 656:22, 709:4
**positioned** [2] - 655:21, 658:12
**positions** [2] - 505:11, 505:14
**positive** [6] - 641:20, 641:22, 643:1, 643:8, 647:22, 648:5
**possess** [1] - 586:8
**possession** [1] - 504:6
**possibilities** [1] - 600:25
**possible** [8] - 595:3, 605:7, 638:4, 657:16, 699:25, 707:14, 715:13, 754:2
**possibly** [3] - 495:23, 645:19, 709:3
**Post** [7] - 499:16, 499:20, 513:23, 514:13, 514:14, 543:19, 544:21
**pot** [2] - 500:11, 504:5
**potential** [1] - 698:6
**potentially** [3] - 495:19, 703:11, 703:12
**pounds** [3] - 632:1, 632:3, 632:8
**pour** [1] - 704:9
**poured** [1] - 562:14
**Poveromo** [3] - 678:15, 701:11, 701:12
**Poveromo's** [1] - 678:24
**power** [1] - 718:5
**practice** [1] - 670:17
**pre** [1] - 713:19
**pre-existing** [1] - 713:19
**precautions** [1] - 542:8
**precinct** [1] - 501:5
**preclude** [1] - 678:14
**preexisting** [1] - 512:20
**prehospital** [2] - 493:15, 493:24
**premise** [1] - 702:17
**premises** [2] - 708:21
**prepare** [5] - 609:16, 611:3, 611:20, 631:8, 649:24
**prepared** [4] - 610:24, 611:6, 631:11, 631:22
**preparing** [1] - 614:5
**prescription** [2] - 500:11, 504:5
**presence** [6] - 607:1, 608:1, 625:1,

689:1, 691:2, 694:12
**present** [2] - 537:19, 564:13
**presented** [2] - 678:20, 678:24
**presents** [1] - 661:2
**preserved** [2] - 706:17, 706:22
**press** [1] - 502:2
**presumptive** [6] - 636:8, 636:10, 636:13, 641:20, 645:14, 645:24
**presumptively** [1] - 647:22
**pretended** [1] - 503:12
**Pretty** [1] - 530:2
**pretty** [8] - 495:7, 495:19, 583:6, 590:8, 600:7, 601:8, 681:14, 687:1
**prevent** [1] - 496:7
**price** [1] - 611:21
**primarily** [2] - 710:25, 752:5
**Primarily** [1] - 657:16
**primary** [2] - 638:3, 681:12
**printout** [1] - 628:20
**prison** [10] - 503:17, 507:14, 519:7, 519:12, 519:14, 519:18, 563:1, 567:13, 605:21
**Prisons** [1] - 588:21
**private** [2] - 634:21, 634:22
**proactive** [2] - 711:7, 711:9
**problem** [13] - 507:2, 510:12, 510:14, 510:21, 554:8, 557:2, 557:3, 557:5, 580:23, 603:11, 603:15, 603:24, 721:20
**procedure** [3] - 630:19, 630:25, 717:5
**proceed** [2] - 564:5, 693:19
**Proceedings** [1] - 491:24
**proceedings** [8] - 563:13, 610:15, 614:9, 616:12, 622:10, 695:15, 699:20, 721:19
**process** [6] - 627:9, 627:15, 629:10, 631:9, 631:14, 703:8
**processed** [1] - 629:19
**processor** [1] - 632:16
**produced** [1] - 491:25
**products** [1] - 713:15
**professional** [1] - 540:4
**profit** [1] - 626:25
**progress** [1] - 604:15
**promoted** [3] - 692:12, 692:13, 692:17
**promotion** [1] - 692:15
**propane** [2] - 698:9, 705:8
**proper** [2] - 629:11, 630:16
**properties** [2] - 619:2
**property** [10] - 631:3, 634:25, 635:3, 635:4, 635:9, 635:19, 639:5, 640:6, 737:10, 737:11
**prosecute** [2] - 577:12, 577:15
**prosecuted** [3] - 577:25, 578:3, 578:11
**prosecutor** [2] - 583:13, 708:15
**prosecutors** [1] - 576:17
**protocol** [3] - 518:9, 628:16, 716:17
**prove** [1] - 679:9
**provide** [7] - 493:15, 524:9, 598:20, 649:15, 717:9, 726:5, 732:14

**provided** [4] - 493:24, 599:5, 715:15, 716:22
**proving** [1] - 678:3
**Pt** [4] - 727:6, 727:19, 730:10, 735:10
**public** [1] - 627:6
**publish** [1] - 720:22
**published** [19] - 597:16, 615:12, 623:3, 668:5, 668:24, 672:17, 686:2, 687:9, 696:14, 697:9, 697:19, 698:4, 698:23, 700:9, 701:4, 701:15, 702:6, 702:12, 712:17
**puddle** [1] - 704:15
**pulled** [7] - 502:24, 550:12, 652:19, 653:6, 653:13, 682:10, 682:24
**pulse** [2] - 684:4, 685:3
**pulseless** [1] - 683:19
**pump** [1] - 652:20
**punch** [1] - 723:5
**punched** [1] - 513:9
**punching** [1] - 501:20
**punished** [1] - 601:1
**purchase** [10] - 627:6, 724:9, 724:11, 724:14, 726:12, 729:24, 730:2, 731:1, 734:25, 735:23
**purchased** [4] - 730:6, 730:9, 735:8, 735:15
**purchases** [1] - 724:18
**purified** [1] - 496:17
**purpose** [4] - 540:8, 616:4, 632:15, 681:17
**purposes** [1] - 689:3
**pursuant** [3] - 566:6, 628:4, 693:17
**push** [1] - 684:11
**pushing** [1] - 682:10
**Put** [1] - 496:5
**put** [29] - 496:5, 496:9, 496:11, 496:12, 551:19, 553:2, 573:10, 579:24, 597:14, 611:15, 612:10, 613:9, 616:2, 621:6, 623:19, 638:7, 642:23, 643:7, 645:16, 647:10, 652:20, 679:2, 684:7, 684:22, 684:23, 688:1, 689:22, 690:3
**puts** [1] - 681:15

---

# Q

**Q-tip** [3] - 645:15, 645:18, 645:25
**Q-tips** [1] - 645:13
**Quanico** [1] - 637:16
**Queens** [4] - 498:21, 498:25, 501:3, 501:4
**questions** [31] - 497:14, 497:15, 568:1, 574:14, 574:18, 574:23, 605:12, 605:23, 616:13, 623:22, 623:23, 632:20, 632:21, 643:9, 643:10, 648:7, 648:8, 654:21, 654:23, 656:7, 660:7, 663:19, 663:20, 675:3, 675:5, 688:9, 688:11, 705:19, 705:24, 715:25, 745:4
**quickly** [3] - 514:20, 615:10, 617:13
**Quite** [1] - 564:16
**quote** [3] - 610:8, 611:21, 679:18

---

# R

**race** [3] - 700:3, 707:17, 708:14
**Racketeering** [1] - 562:23
**racketeering** [1] - 590:22
**radiant** [2] - 687:1, 702:17
**radiated** [1] - 702:21
**Rafael** [1] - 495:1
**rafters** [2] - 702:25, 703:10
**rag** [2] - 532:19, 532:20
**rain** [1] - 553:10
**raise** [8] - 608:6, 618:3, 665:14, 675:11, 691:7, 709:14, 734:15, 742:8
**raised** [2] - 729:18, 742:11
**raising** [1] - 665:15
**ran** [1] - 532:2
**range** [9] - 598:13, 598:14, 598:17, 598:18, 598:20, 632:5, 632:9, 714:21, 722:20
**Range** [2] - 714:17, 714:22
**ranges** [1] - 598:23
**rank** [1] - 692:12
**rapidly** [1] - 749:19
**rather** [2] - 617:8, 749:17
**rea** [1] - 698:12
**reaction** [1] - 546:21
**read** [4] - 499:11, 563:9, 595:25, 596:8
**reads** [1] - 629:5
**ready** [5] - 492:3, 571:2, 607:11, 626:3, 690:11
**real** [4] - 664:11, 664:14, 711:11, 711:14
**real-time** [2] - 711:11, 711:14
**realized** [1] - 684:22
**really** [18] - 533:19, 561:14, 563:6, 591:9, 595:23, 619:21, 642:16, 655:10, 658:21, 689:24, 706:17, 715:10, 719:21, 745:3, 749:21, 750:2, 750:9
**rear** [17] - 622:15, 635:4, 639:4, 640:6, 655:17, 655:22, 682:10, 682:12, 683:5, 685:6, 686:8, 686:14, 687:4, 687:20, 695:3, 696:6
**reason** [3] - 539:15, 539:17, 679:18
**receipts** [2] - 560:18, 561:2
**receive** [3] - 494:9, 634:3, 726:17
**received** [50] - 493:9, 509:8, 543:24, 554:18, 555:20, 555:25, 566:20, 615:9, 622:24, 629:1, 639:13, 646:1, 646:5, 647:6, 661:13, 667:13, 668:18, 682:5, 685:25, 695:24, 708:6, 716:16, 719:9, 720:20, 727:12, 728:22, 729:9, 733:16, 734:1, 736:12, 737:20, 738:3, 739:10, 740:25, 758:5, 758:8, 758:10, 758:13, 758:20, 758:24, 759:2, 759:5, 759:8, 760:2, 760:5, 760:8, 760:12, 760:14, 760:17, 760:20
**recently** [1] - 499:1
**Recess** [3] - 607:8, 625:4, 689:7
**recess** [3] - 497:21, 568:5, 570:1
**recognize** [28] - 508:24, 511:22, 515:2,

543:14, 543:19, 548:2, 566:11, 614:23, 614:25, 622:14, 628:10, 628:12, 638:25, 639:2, 646:20, 646:22, 661:6, 668:7, 685:17, 695:14, 701:17, 702:4, 704:24, 705:6, 727:1, 733:9, 735:22, 740:17

**recollection** [3] - 610:24, 660:2, 708:22

**record** [25] - 492:19, 495:2, 498:8, 608:13, 618:10, 626:11, 628:17, 629:9, 632:18, 633:5, 643:18, 648:11, 648:20, 656:16, 666:3, 675:18, 691:14, 709:21, 711:11, 711:16, 712:6, 714:3, 716:23, 716:24, 743:20

**recorded** [1] - 491:24

**recorder** [10] - 711:16, 716:22, 717:24, 717:25, 718:1, 718:2, 718:3

**recorders** [1] - 713:5

**recording** [55] - 678:5, 689:16, 711:15, 711:18, 711:20, 711:22, 711:23, 712:1, 712:2, 712:21, 716:21, 717:4, 717:8, 717:9, 717:12, 717:13, 717:17, 717:20, 717:21, 717:23, 721:24, 722:1, 722:12, 722:16, 722:18, 722:20, 723:19, 724:7, 724:22, 724:24, 724:25, 725:1, 728:7, 730:14, 730:24, 735:5, 739:13, 739:15, 739:20, 741:7, 741:10, 742:20, 742:22, 745:9, 745:15, 746:6, 746:9, 748:3, 751:2, 751:15, 752:12, 753:2

**Recording** [2] - 730:24, 731:4

**recordings** [14] - 712:9, 712:11, 712:25, 713:2, 713:4, 713:5, 718:7, 718:17, 718:21, 718:25, 719:14, 719:15, 719:17, 751:20

**records** [7] - 628:5, 678:25, 737:13, 738:8, 738:11, 738:14, 738:19

**recovered** [3] - 637:8, 637:23, 720:7

**Recross** [2] - 708:12, 757:5

**Recrossexamination** [2] - 708:12, 757:5

**recycler** [2] - 626:20, 632:16

**recycling** [1] - 630:11

**red** [2] - 705:1, 705:2

**Redirect** [4] - 605:13, 707:11, 755:12, 757:3

**reduction** [1] - 575:7

**reentered** [1] - 662:7

**refer** [1] - 609:20

**reference** [5] - 741:11, 741:20, 742:1, 742:6, 751:17

**referred** [21] - 597:16, 598:17, 615:12, 623:3, 668:5, 668:24, 672:17, 686:2, 687:9, 696:14, 697:9, 697:19, 698:4, 698:23, 700:9, 701:4, 701:15, 702:6, 702:12, 712:17, 720:3

**referring** [2] - 623:6, 699:18

**refers** [1] - 629:19

**refresh** [4] - 495:2, 610:23, 660:2, 699:16

**refrigerator** [1] - 632:18

**regard** [2] - 627:12, 720:5

**regarding** [2] - 540:9, 670:18

**Regarding** [1] - 599:2

**registration** [1] - 538:14

**Regucci** [1] - 711:4

**regular** [4] - 519:25, 520:3, 601:8

**relate** [1] - 716:8

**related** [2] - 609:14, 633:22

**relates** [1] - 678:12

**relating** [1] - 628:5

**relation** [3] - 526:9, 613:7, 723:17

**relationship** [10] - 512:21, 518:17, 522:12, 531:12, 535:6, 544:7, 544:9, 544:17, 547:23, 717:1

**released** [1] - 501:4

**relevance** [2] - 745:3, 745:4

**relevant** [1] - 679:21

**Reliable** [1] - 517:12

**remains** [3] - 638:4, 698:13

**remember** [21] - 546:7, 574:6, 583:16, 586:21, 587:1, 590:18, 591:9, 611:9, 612:6, 614:4, 649:17, 649:22, 650:2, 655:7, 655:10, 655:11, 682:2, 683:14, 698:8, 706:10, 708:19

**remind** [1] - 754:5

**removal** [1] - 614:13

**removals** [1] - 627:24

**remove** [10] - 613:21, 614:2, 614:3, 615:4, 618:24, 619:1, 619:14, 619:25, 627:14, 646:13

**removed** [5] - 614:6, 628:3, 647:18, 702:3, 703:5

**removing** [2] - 646:15, 703:8

**repaired** [1] - 715:17

**repeat** [1] - 630:15

**replace** [5] - 611:13, 611:24, 614:7, 615:20, 616:9

**Report** [1] - 495:4

**report** [6] - 628:13, 650:1, 664:3, 672:2, 716:19

**reported** [1] - 695:4

**Reporter** [1] - 491:21

**reporting** [1] - 732:13

**reports** [1] - 649:24

**represent** [1] - 714:6

**representation** [1] - 714:5

**representative** [1] - 611:23

**represented** [3] - 588:20, 713:13, 713:14

**request** [7] - 628:4, 634:3, 634:5, 634:11, 634:13, 634:17, 694:12

**required** [5] - 566:3, 567:18, 572:6, 632:17, 645:15

**requirement** [1] - 628:15

**requires** [1] - 573:17

**researching** [1] - 635:20

**resembles** [2] - 704:25, 705:7

**reside** [1] - 664:18

**resided** [1] - 737:6

**Residence** [1] - 644:14

**residence** [8] - 634:21, 634:22, 640:7, 640:16, 652:3, 720:7, 746:23, 753:12

**resident** [1] - 639:22

**residential** [1] - 619:2

**respect** [5] - 507:16, 584:6, 656:2, 678:23, 721:13

**respiration** [1] - 685:3

**respirations** [1] - 684:4

**respond** [7] - 494:18, 579:21, 633:21, 634:13, 672:4, 682:7, 694:17

**responded** [2] - 679:7, 692:9

**responding** [1] - 581:8

**response** [7] - 538:21, 634:11, 634:16, 635:22, 635:23, 648:3, 721:13

**Response** [7] - 633:17, 633:19, 633:23, 644:18, 644:19, 644:24, 645:6

**responsibilities** [9] - 493:22, 609:6, 626:23, 633:16, 644:3, 644:5, 644:11, 644:17, 645:1

**responsibility** [2] - 506:15, 507:16

**responsible** [3] - 579:18, 626:24, 645:7

**rest** [1] - 577:3

**Restaurant** [1] - 744:1

**restaurant** [14] - 525:12, 534:24, 534:25, 542:12, 555:5, 555:19, 556:9, 556:12, 722:5, 722:25, 731:11, 739:25, 740:1, 740:5

**restitution** [1] - 566:3

**result** [9] - 511:12, 524:5, 558:11, 564:10, 594:15, 637:7, 678:21, 729:16, 745:8

**resulted** [2] - 572:10, 716:14

**results** [1] - 636:21

**resume** [1] - 624:4

**resumes** [1] - 571:3

**resuscitate** [1] - 679:15

**retail** [1] - 627:22

**retaliate** [2] - 539:14, 539:19

**retaliatory** [1] - 578:17

**retired** [2] - 542:13, 691:25

**retrieve** [1] - 733:2

**retrieved** [2] - 661:23, 733:4

**return** [1] - 507:3

**returned** [1] - 651:14

**reverse** [1] - 687:14

**review** [4] - 609:23, 628:4, 699:14, 703:25

**reviewed** [6] - 699:11, 718:21, 719:15, 720:6, 739:5, 746:6

**revived** [1] - 678:10

**reweighed** [1] - 622:4

**Rhett** [1] - 651:10

**Richard** [1] - 738:13

**Richmond** [3] - 555:19, 556:9, 681:3

**Rico** [1] - 565:3

**rid** [2] - 623:14, 623:16

**ride** [1] - 693:3

**right-hand** [6] - 518:6, 518:7, 658:7, 673:19, 687:16, 697:18

**Rights** [1] - 578:19

**Rigiman** [7] - 650:13, 651:12, 651:17, 651:25, 652:10, 652:18, 659:16

**risk** [4] - 600:20, 600:22, 601:6, 603:18

**risked** [1] - 604:4

**risks** [1] - 603:9

**risky** [1] - 603:22

**Rizzo** [3] - 508:17, 509:2, 509:12

**Road** [17] - 525:11, 536:12, 536:14, 555:19, 556:9, 609:17, 610:25, 619:15, 621:25, 634:17, 652:22, 659:15, 681:3, 737:24, 738:22, 746:24, 753:12

**road** [3] - 634:22, 653:2, 653:9

**roadside** [1] - 653:8

**rob** [6] - 500:15, 545:11, 545:24, 552:1, 552:9, 552:16

**robbed** [3] - 500:17, 520:20, 556:24

**Robbery** [1] - 500:8

**robbery** [26] - 500:14, 505:6, 520:14, 520:15, 520:16, 520:19, 521:3, 521:5, 522:4, 546:11, 546:20, 547:1, 547:9, 552:24, 553:2, 553:19, 553:22, 562:23, 565:3, 577:15, 577:16, 586:23, 587:14, 588:3, 590:24, 591:2

**Robert** [16] - 491:18, 516:23, 528:10, 528:20, 529:16, 529:18, 530:19, 531:10, 533:8, 533:9, 533:12, 533:16, 533:23, 534:6, 534:11, 753:4

**role** [1] - 518:5

**roles** [1] - 583:14

**Rolex** [1] - 584:10

**roll** [1] - 627:10

**rolled** [1] - 541:11

**rolling** [1] - 715:18

**Roma** [4] - 653:19, 653:21, 653:23, 731:11

**Ron** [1] - 541:1

**Ronnie** [2] - 516:16, 541:4

**roof** [8] - 637:1, 637:2, 637:3, 665:14, 665:15, 702:25, 742:8, 742:11

**room** [12] - 497:20, 613:16, 634:22, 636:20, 639:22, 658:7, 658:8, 658:14, 658:15, 658:19, 697:2

**rooms** [2] - 616:7

**Rosato** [3] - 632:25, 633:6

**Rosenblatt** [10] - 517:1, 525:7, 529:8, 535:14, 549:9, 549:15, 552:4, 559:19, 739:21, 739:22

**Rosenblatts** [1] - 554:24

**Ross** [4] - 491:11, 492:2, 571:1, 626:2

**rotations** [1] - 676:22

**Rothman** [1] - 491:17

**roughly** [3] - 581:12, 653:18, 681:6

**route** [1] - 652:25

**Route** [1] - 653:14

**routes** [1] - 553:18

**Rover** [2] - 714:17, 714:22

**rover** [1] - 714:21

**rub** [3] - 645:16, 645:25, 646:1

**rubbed** [1] - 729:15

**Rule** [1] - 693:17

**rule** [2] - 518:9, 716:18

**rules** [4] - 503:17, 588:23, 598:8, 598:9

**run** [4] - 496:5, 496:12, 616:3, 717:18

**Run** [8] - 730:5, 736:21, 737:5, 737:6, 737:15, 738:9, 738:12, 738:15

**runaround** [1] - 551:13

**running** [2] - 552:18, 690:8

**runs** [2] - 543:17, 722:2

**Rxe67d** [2] - 651:1, 652:14

## S

**Saa-77y** [2] - 650:23, 714:20

**sac** [2] - 518:22, 651:15

**safe** [1] - 569:12

**safely** [1] - 637:3

**sale** [1] - 531:6

**sales** [3] - 500:9, 609:7, 609:9

**sat** [7] - 510:3, 550:24, 551:4, 556:2, 556:16, 576:14, 612:18

**satisfied** [2] - 595:13, 595:18

**Saturday** [1] - 723:18

**saw** [29] - 495:5, 536:25, 572:19, 573:1, 574:3, 593:3, 612:9, 613:3, 645:15, 647:21, 650:20, 653:18, 654:15, 663:11, 670:12, 674:10, 682:9, 682:10, 682:11, 683:10, 698:20, 699:13, 700:15, 704:11, 706:4, 708:17, 708:19

**Sawzall** [3] - 619:5, 619:6, 619:7

**scale** [3] - 622:3, 631:1, 642:11

**Scaran** [2] - 609:1, 609:12, 615:16, 619:14

**Scarangello** [1] - 609:13

**scenario** [1] - 752:3

**scene** [19] - 494:22, 496:1, 529:19, 633:20, 678:10, 682:13, 694:24, 695:7, 695:17, 698:17, 702:3, 703:6, 703:25, 704:25, 705:7, 705:11, 705:14, 706:21, 707:1

**scenes** [2] - 633:22, 685:19

**Schaeffer** [50] - 491:15, 569:10, 569:12, 569:14, 608:2, 608:3, 608:17, 608:19, 608:21, 609:22, 610:5, 610:13, 610:19, 614:19, 615:6, 615:10, 616:11, 616:13, 616:18, 618:15, 618:18, 622:9, 622:11, 622:20, 623:1, 623:5, 623:22, 626:6, 626:14, 628:23, 629:3, 632:20, 632:24, 633:7, 633:10, 639:9, 639:14, 643:9, 643:13, 643:20, 643:23, 647:3, 647:8, 648:7, 648:11, 755:17, 755:21, 755:24, 756:2, 756:5

**schedule** [1] - 612:1

**Schneider** [1] - 491:17

**school** [8] - 499:3, 499:5, 499:9, 499:10, 499:13, 676:17, 676:20, 693:1

**scoop** [2] - 545:11, 547:14

**scrap** [12] - 623:14, 626:20, 627:7, 628:3, 628:17, 629:12, 629:22, 629:24, 630:21, 631:6, 632:14, 632:16

**Scrap** [1] - 621:23

**screen** [2] - 597:15, 615:11, 623:2, 629:4, 640:3, 678:8

**seal** [1] - 637:14

**sealed** [2] - 630:18, 630:19

**search** [24] - 633:21, 634:11, 634:13, 634:17, 635:10, 635:17, 636:4, 636:6, 636:16, 636:21, 637:7, 637:17, 637:19, 637:23, 638:1, 638:3, 638:9, 638:12, 638:17, 639:7, 645:2, 645:7, 681:18, 720:7

**searched** [5] - 637:18, 638:9, 639:5, 641:10, 641:18

**searches** [1] - 633:22

**searching** [1] - 645:8

**seat** [4] - 498:11, 608:16, 675:21, 691:17

**seated** [2] - 495:7, 618:14

**second** [16] - 532:24, 585:9, 585:10, 615:2, 615:16, 616:11, 616:19, 622:9, 662:14, 665:16, 722:9, 723:22, 731:2, 731:18, 742:6, 752:22

**Securities** [1] - 644:16

**security** [12] - 499:16, 552:18, 561:9, 666:12, 672:8, 673:22, 698:22, 699:1, 699:3, 700:23, 742:15, 742:18

**Security** [2] - 535:16, 579:3

**sedan** [1] - 654:15

**see** [69] - 494:23, 509:25, 516:1, 531:6, 538:2, 539:10, 561:16, 572:16, 596:8, 596:25, 597:8, 597:13, 597:23, 598:15, 611:14, 615:14, 631:24, 632:2, 634:7, 636:25, 639:21, 641:8, 642:1, 642:10, 650:16, 651:22, 652:24, 653:16, 654:6, 655:3, 655:14, 655:22, 657:19, 658:13, 658:20, 658:22, 660:11, 662:24, 669:8, 672:12, 673:20, 673:22, 673:24, 674:1, 674:5, 674:6, 674:9, 686:22, 687:19, 697:13, 697:22, 702:16, 702:21, 702:25, 703:9, 708:16, 708:18, 708:22, 708:25, 718:8, 718:24, 721:7, 721:8, 736:6, 743:20, 745:4, 750:2, 754:7

**See** [1] - 625:3

**seeing** [3] - 534:6, 650:1, 698:8

**seem** [1] - 669:12, 701:19, 746:4

**segment** [16] - 739:25, 740:5, 740:9, 746:3, 746:8, 746:13, 746:16, 746:25, 747:3, 747:6, 747:9, 752:11, 752:16, 753:6, 753:9, 753:11

**Seguine** [1] - 652:22

**sell** [5] - 500:10, 586:20, 631:8, 631:14

**selling** [1] - 732:8

**send** [3] - 525:1, 646:13, 679:21

**sending** [2] - 679:18, 732:1

**sensitive** [1] - 716:3

**sent** [5] - 530:6, 547:16, 552:10,

729:17, 734:14
**sentence** [6] - 567:18, 567:20, 575:7, 598:9, 600:3, 703:7
**sentenced** [4] - 577:24, 594:4, 594:7, 595:6
**sentences** [1] - 598:20
**sentencing** [2] - 566:4, 598:17
**Sentencing** [1] - 598:7
**separate** [2] - 549:20, 591:1
**separately** [1] - 522:16
**September** [7] - 721:25, 722:15, 725:5, 726:8, 738:6, 739:6
**serial** [5] - 729:10, 729:12, 729:17, 734:15, 734:16
**series** [2] - 572:10, 590:4
**serious** [5] - 495:19, 495:21, 495:24, 679:20, 752:1
**serve** [2] - 578:12, 578:13
**Service** [1] - 615:16
**service** [2] - 627:11
**Services** [1] - 493:6
**services** [1] - 634:6
**Session** [1] - 625:7
**set** [8] - 510:5, 521:19, 522:4, 583:18, 633:23, 634:10, 634:21, 635:4
**setting** [1] - 714:14
**seven** [4] - 597:5, 597:10, 710:18
**Several** [1] - 658:6
**several** [3] - 495:9, 638:19, 645:21
**severely** [1] - 496:24
**sewer** [1] - 641:16
**shadow** [1] - 561:13
**shall** [1] - 599:8
**shape** [1] - 613:7
**shears** [1] - 631:12
**shed** [11] - 635:8, 635:13, 635:21, 636:17, 636:21, 636:22, 637:2, 637:8, 639:4, 640:6, 640:8
**sheet** [1] - 615:16
**shell** [2] - 620:3, 620:4
**shin** [1] - 496:22
**shipping** [1] - 732:6
**shirt** [1] - 516:4
**shit** [1] - 753:1
**shock** [2] - 684:24, 684:25
**shoot** [2] - 524:25, 579:21
**shooter** [1] - 540:4
**shooting** [14] - 524:20, 524:22, 538:15, 538:21, 538:24, 541:2, 541:12, 541:17, 541:25, 542:4, 542:8, 578:17, 580:16, 580:20
**shootings** [1] - 520:14
**Shop** [3] - 730:7, 730:20, 735:16
**shop** [11] - 494:21, 542:19, 542:23, 543:4, 543:9, 543:17, 543:20, 544:2, 544:18, 544:25, 715:16
**shorr** [2] - 637:1, 640:8
**shorred** [1] - 637:3
**short** [3] - 492:5, 653:8, 657:22

**shortly** [4] - 590:8, 613:10, 652:11, 705:12
**Shortly** [2] - 652:19, 659:7
**shot** [3] - 537:23, 639:22, 709:3
**shots** [1] - 581:3
**show** [16] - 515:1, 550:25, 596:12, 614:19, 622:11, 628:8, 638:19, 666:20, 668:3, 672:15, 685:12, 697:2, 700:7, 700:20, 700:23, 704:18
**showed** [7] - 538:11, 560:15, 560:16, 561:1, 584:9, 668:19, 727:19
**showing** [6] - 686:4, 695:11, 697:17, 705:3, 718:12, 719:10
**Showing** [5] - 508:22, 511:18, 512:16, 514:8, 522:9, 535:2, 543:12, 548:1, 554:10, 566:10, 650:4, 660:6, 661:5, 664:25, 668:22, 687:7, 698:2, 701:13, 712:15, 726:24, 729:21, 732:11, 733:8, 734:22, 735:20, 737:2
**shown** [2] - 565:13, 590:13
**shows** [1] - 575:16
**shut** [14] - 539:10, 726:3, 731:17, 731:20, 740:4, 740:11, 740:14, 743:13, 744:6, 746:15, 747:2, 747:5, 747:8, 747:11
**sick** [2] - 493:16, 493:25
**side** [29] - 521:9, 531:5, 541:11, 541:14, 541:16, 568:7, 618:23, 618:24, 640:16, 640:21, 640:22, 641:2, 658:8, 670:23, 671:5, 671:21, 673:11, 673:20, 674:5, 682:12, 686:11, 687:1, 687:11, 695:2, 696:5, 697:11, 697:14, 698:11
**Side** [5] - 569:1, 569:16, 744:12, 745:1, 745:20
**Sidebar** [9] - 616:21, 617:1, 617:14, 677:1, 678:1, 680:3, 748:7, 749:1, 750:22
**sidewalk** [5] - 685:7, 696:12, 696:16, 704:7, 704:10
**siding** [4] - 686:20, 696:13, 702:16, 702:22
**sign** [4] - 531:6, 604:23, 605:1, 605:5
**signals** [1] - 674:2
**signed** [10] - 572:25, 573:4, 573:14, 574:9, 574:15, 575:14, 600:8, 604:16, 605:15
**signing** [1] - 573:7
**silver** [1] - 652:14
**Silver** [1] - 559:25
**similar** [2] - 631:6, 633:20
**simple** [1] - 636:12
**simply** [1] - 668:19
**single** [1] - 576:9
**sink** [1] - 637:21
**sister** [4] - 557:8, 588:21, 588:23, 671:13
**sister's** [3] - 503:20, 556:24, 557:7
**sisters** [1] - 513:1
**sit** [8] - 506:23, 506:24, 506:25, 507:2, 547:12, 591:9, 685:8, 750:12

**Sit** [3] - 618:13, 676:3, 691:18
**sit-down** [3] - 506:24, 506:25, 507:2
**sit-downs** [1] - 506:23
**sitting** [3] - 516:4, 589:14, 655:15
**situation** [20] - 501:19, 506:25, 509:23, 510:4, 513:9, 513:12, 524:24, 525:17, 525:19, 531:19, 547:17, 549:5, 551:18, 554:7, 555:7, 555:9, 556:17, 579:15, 582:7, 707:4
**situations** [2] - 506:17, 506:19
**six** [5] - 493:14, 612:8, 636:23, 644:10, 681:7
**six-month** [1] - 493:14
**Sixteen** [1] - 500:5
**size** [2] - 615:21, 635:19
**slashed** [1] - 526:6
**sleep** [1] - 749:24
**slow** [1] - 674:2
**slowly** [1] - 673:25
**small** [3] - 627:22, 698:9, 698:13
**smaller** [1] - 631:13
**smell** [3] - 686:18, 686:19, 746:5
**smelled** [1] - 679:9
**smoke** [2] - 682:10, 682:12
**so-and-so** [1] - 719:20
**social** [1] - 714:13
**socialized** [2] - 582:19, 714:12
**socializing** [1] - 584:3
**Socially** [1] - 713:24
**softer** [1] - 689:15
**software** [1] - 718:1
**sold** [6] - 537:12, 580:13, 586:9, 586:11, 586:18, 630:1
**Soldier** [1] - 506:9
**soldier** [1] - 710:23
**Soldiers** [1] - 505:16
**solely** [2] - 721:4, 721:11
**Soloway** [97] - 491:17, 491:18, 497:15, 555:14, 569:3, 571:6, 571:8, 593:2, 596:11, 596:14, 596:17, 596:21, 597:14, 597:18, 597:20, 605:11, 605:24, 607:3, 607:5, 610:3, 610:11, 610:22, 615:7, 616:15, 616:19, 617:3, 617:6, 617:11, 617:13, 622:22, 623:23, 628:24, 632:21, 639:10, 643:10, 647:4, 648:8, 654:22, 654:23, 654:25, 656:6, 661:11, 663:20, 667:9, 667:11, 668:16, 675:5, 676:24, 678:2, 678:17, 679:13, 685:23, 688:11, 695:21, 705:20, 705:21, 705:23, 705:24, 707:7, 708:4, 708:8, 708:11, 708:13, 709:6, 719:2, 719:5, 720:14, 720:18, 727:10, 733:24, 736:3, 736:6, 736:10, 737:17, 738:1, 739:8, 740:23, 750:4, 750:8, 750:13, 750:15, 750:20, 754:19, 755:11, 756:10, 757:2, 757:6
**solved** [1] - 674:20
**someone** [16] - 518:9, 524:4, 580:13,

580:23, 581:20, 582:14, 583:5, 671:11, 674:1, 678:20, 703:22, 712:5, 713:13, 715:22, 717:22, 752:4

**Someone** [1] - 581:22
**Sometime** [2] - 548:15, 663:18
**sometime** [9] - 519:11, 546:14, 571:25, 575:23, 580:13, 589:6, 592:6, 658:1, 674:25
**sometimes** [3] - 579:7, 649:7, 717:19
**somewhere** [5] - 540:18, 540:21, 561:14, 695:5, 746:22
**Somewhere** [3] - 534:1, 554:4, 742:4
**Sonny's** [1] - 545:2
**sorry** [8] - 597:5, 600:21, 609:3, 610:16, 617:3, 620:6, 651:20, 738:6
**sort** [4] - 618:23, 636:6, 693:3, 718:6
**sought** [1] - 678:14
**sound** [1] - 689:25
**southern** [1] - 634:24
**Southern** [2] - 653:3, 653:4
**Space** [1] - 613:18
**space** [3] - 544:3, 613:19, 696:20
**Spanish** [1] - 495:8
**Spanish-speaking** [1] - 495:8
**speakers** [3] - 719:23, 731:13, 739:20
**speaking** [6] - 495:8, 495:18, 637:10, 722:18, 724:5, 751:25
**special** [2] - 644:1, 644:2
**Special** [12] - 632:24, 638:11, 648:14, 648:25, 649:3, 649:5, 656:10, 656:23, 657:3, 709:11, 711:4, 752:18
**specialize** [1] - 649:6
**specialized** [2] - 493:9, 692:18
**specific** [2] - 635:15, 636:9
**specifically** [2] - 655:23, 678:23
**specification** [1] - 631:10
**specifics** [1] - 657:9
**Spell** [2] - 683:21, 684:8
**spell** [13] - 492:18, 498:7, 608:12, 618:10, 626:10, 633:4, 643:17, 648:19, 656:15, 664:2, 675:18, 691:14, 709:21
**spend** [2] - 714:13, 752:8
**spending** [5] - 507:19, 577:2, 601:15, 601:23, 714:11
**spent** [1] - 600:13
**spinal** [1] - 496:7
**split** [3] - 522:1, 585:16, 635:21
**spoken** [3] - 554:7, 561:20, 565:18
**spontaneous** [1] - 685:3
**spooked** [1] - 545:25
**spot** [8] - 543:5, 645:15, 645:16, 645:21, 646:1, 646:2, 646:4, 648:4
**spots** [1] - 645:21
**spray** [1] - 636:18
**spread** [1] - 636:24
**spring** [1] - 542:15
**squad** [3] - 656:23, 710:17, 710:20
**Squad** [3] - 644:16, 644:22, 710:15
**St** [3] - 497:8, 497:10, 676:20

**staff** [2] - 497:10, 630:25
**stain** [11] - 636:7, 636:13, 637:11, 637:12, 637:13, 642:11, 642:19, 642:21, 642:24, 643:1, 647:21
**stains** [3] - 636:4, 642:15, 643:2
**stair** [2] - 646:23, 647:14
**staircase** [2] - 645:13, 645:20, 646:13, 647:18, 648:5
**stairs** [5] - 621:1, 638:10, 642:2, 642:13, 645:8
**stairway** [1] - 638:15
**stand** [8] - 497:24, 551:10, 571:3, 608:5, 618:2, 675:10, 691:6, 709:13
**standard** [3] - 629:22, 631:9, 631:11
**standardized** [1] - 629:21
**standing** [1] - 545:22
**stands** [2] - 493:5, 498:3
**start** [8] - 511:16, 520:15, 650:14, 690:5, 694:23, 698:7, 715:9, 715:18
**started** [22] - 500:3, 500:6, 511:14, 531:8, 541:10, 541:12, 571:15, 599:17, 621:20, 650:17, 650:18, 683:2, 684:5, 685:7, 686:9, 686:13, 697:2, 701:23, 702:23, 715:22, 716:5, 744:7
**Starting** [9] - 524:22, 641:7, 661:20, 662:17, 721:17, 722:7, 723:1, 738:16, 751:13
**starting** [10] - 505:14, 650:12, 659:14, 687:2, 723:22, 723:25, 728:8, 739:18, 740:9, 747:3
**Starts** [1] - 731:8
**starts** [3] - 722:2, 742:25, 751:5
**state** [14] - 492:18, 493:11, 498:7, 608:12, 618:9, 626:10, 633:4, 643:17, 648:19, 656:15, 664:2, 675:17, 691:13, 709:20
**State** [4] - 493:11, 653:3, 653:4, 653:7
**statement** [1] - 745:18
**statements** [2] - 721:11, 721:12
**Staten** [42] - 493:21, 494:16, 498:25, 499:2, 499:7, 501:3, 501:25, 518:18, 525:11, 530:12, 531:23, 533:7, 534:1, 538:18, 546:18, 554:4, 556:10, 562:11, 609:3, 609:17, 626:18, 627:5, 628:2, 634:18, 634:23, 634:24, 645:4, 650:13, 659:12, 661:19, 664:19, 681:3, 694:8, 710:25, 712:9, 722:6, 740:21, 743:9, 744:1, 746:19, 751:9, 752:6
**states** [1] - 629:8
**States** [8] - 491:1, 491:3, 491:5, 491:11, 491:14, 491:16, 492:1, 505:9
**station** [2] - 652:19, 652:24
**stay** [4] - 542:13, 658:23, 671:13, 671:17
**stayed** [2] - 539:8, 657:22
**steal** [3] - 584:2, 584:7, 584:12
**stealing** [1] - 500:23
**steel** [3] - 612:14, 627:12, 631:11
**Stefan** [7] - 516:10, 516:13, 539:5, 541:4, 549:16, 550:1, 551:11, 563:22,

582:10, 583:5, 584:6, 593:10
**stenography** [1] - 491:24
**step** [1] - 557:1
**stepfather** [1] - 508:3
**steps** [6] - 496:1, 620:1, 647:10, 746:7, 746:9, 746:11
**Stern** [1] - 491:17
**Steve** [3] - 614:1, 615:3, 615:17
**Steven** [10] - 613:24, 614:12, 616:18, 618:11, 627:16, 628:5, 628:18, 629:5, 631:17
**sticker** [1] - 718:25
**sticks** [1] - 496:24
**still** [6] - 502:5, 521:10, 537:11, 643:5, 643:7, 671:18
**stix** [1] - 646:2
**stock** [1] - 713:14
**stole** [5] - 500:21, 501:3, 555:7, 557:6
**stolen** [3] - 537:7, 713:15, 732:8
**stood** [4] - 503:7, 542:12, 700:19, 701:2
**stoop** [1] - 669:6
**stop** [6] - 499:9, 510:9, 534:6, 538:1, 708:23, 746:21
**stopped** [5] - 651:9, 651:14, 653:8, 717:20, 746:23
**stopping** [1] - 674:1
**Store** [1] - 586:24
**store** [5] - 521:10, 521:19, 587:12, 587:15, 660:23, 660:25, 661:16, 662:1, 671:17
**stores** [2] - 580:17, 655:8
**story** [8] - 665:16, 713:9, 713:12, 714:2, 714:4, 732:3, 752:4, 752:10
**straight** [4] - 696:13, 697:14, 697:16, 704:15
**street** [17] - 518:19, 518:20, 518:21, 518:23, 519:24, 527:15, 541:15, 542:6, 553:11, 582:13, 664:23, 666:1, 666:3, 669:2, 669:6, 670:21, 706:1
**Street** [1] - 581:5
**stretch** [1] - 683:2
**stretcher** [1] - 685:6
**stretches** [1] - 681:14
**stretching** [1] - 683:1
**strike** [2] - 670:24, 671:3
**strip** [1] - 583:9, 655:5
**Strokes** [2] - 555:3, 665:24
**strongly** [1] - 750:13
**Structural** [1] - 682:6
**stuff** [4] - 521:9, 575:22, 620:8, 623:15
**subject** [4] - 660:22, 662:1, 663:15, 708:21
**subjects** [2] - 711:11, 711:14
**submission** [1] - 637:14
**submit** [1] - 636:15
**submitted** [4] - 643:1, 733:5, 734:11, 734:13
**subpoena** [1] - 628:4

subsequent [1] - 611:20
substance [1] - 645:18
substantial [1] - 599:5
success [1] - 567:14
successful [1] - 714:8
suffer [1] - 497:1
suffered [2] - 678:9, 679:3
sufficiently [1] - 611:15
suggest [1] - 702:19
suggested [1] - 715:15
Sunday[1] - 723:18
sunlight [1] - 642:22
Sunset [1] - 692:8
supervise [2] - 644:4, 644:6
supervising [1] - 693:4
supervision [1] - 692:24
supervisor [1] - 644:2
supervisory [1] - 644:11
supplier [1] - 588:1
suppliers [1] - 587:21
supply [1] - 714:24
support [2] - 649:12, 649:15
supposed [10] - 533:19, 546:13,
558:14, 573:18, 573:19, 574:11,
574:12, 619:19, 715:22, 716:15
surfaces [1] - 643:2
surgery [1] - 530:18
surrounding [2] - 638:17, 655:8
surveillance [38] - 553:16, 553:17,
649:7, 649:8, 649:12, 649:15, 649:18,
649:24, 650:1, 650:8, 650:11, 650:12,
650:14, 652:12, 654:17, 655:13, 656:2,
656:23, 657:1, 657:3, 657:6, 657:9,
657:13, 659:6, 659:9, 659:11, 659:20,
659:23, 659:25, 660:8, 660:9, 661:1,
663:17, 666:15, 672:12, 672:13, 673:15
surveillance-wise [1] - 650:11
surveillances [2] - 649:6, 649:19
survey [3] - 611:4, 611:20, 698:17
surveyed [3] - 611:5, 611:8, 613:14
suspended [1] - 502:25
suspicion [2] - 674:12, 716:1
suspicious [2] - 692:24, 693:7
sustain [2] - 642:16, 684:20
Suv[3] - 651:6, 652:14, 673:24
swab [3] - 636:13, 637:13, 638:15
swabbed [1] - 642:12
swelling [1] - 495:24
switch [6] - 512:7, 512:9, 512:11,
513:5, 627:14, 690:13
switched [2] - 512:11, 531:20
sworn [14] - 492:16, 498:5, 591:12,
608:9, 618:6, 626:8, 633:2, 643:15,
648:17, 656:13, 663:25, 675:14,
691:10, 709:17
system [14] - 494:1, 494:2, 494:10,
524:1, 628:14, 628:21, 666:12, 672:8,
673:22, 689:21, 699:9, 699:11, 706:12,
742:18

**T**

tab [2] - 587:25, 729:19
table [2] - 551:4, 711:5
tag [4] - 660:16, 662:25, 663:2, 730:15
taillight [1] - 550:16
talks [1] - 577:6
tampered [1] - 717:22
tampering [1] - 718:8
tandem [2] - 652:5, 653:11
tanks [2] - 618:24, 619:1
tape [13] - 496:9, 563:6, 563:7, 563:11,
641:2, 678:5, 699:12, 707:13, 707:14,
720:11, 721:5, 749:22, 750:10
tapes [3] - 719:24, 721:3, 721:10
targeting [1] - 635:15
targets [1] - 716:18
tarps [1] - 636:24
Taurus[4] - 727:6, 727:19, 730:10,
735:10
Taylor[11] - 613:24, 616:18, 618:11,
618:12, 618:19, 627:16, 628:18, 629:6,
629:16, 630:14, 631:17
Taylor's [2] - 614:1, 628:5
team [12] - 633:24, 634:1, 634:2,
634:3, 635:21, 635:22, 635:23, 644:4,
644:6, 645:7, 652:12, 662:14
Team[7] - 633:18, 633:19, 633:23,
644:18, 644:19, 644:24, 645:6
teams [1] - 634:1
Tech[1] - 728:3
technician [2] - 493:8, 676:16
techniques [3] - 636:1, 645:11, 711:13
teenager [1] - 571:23
teens [1] - 571:16
telephone [4] - 661:16, 666:25,
673:15, 673:16, 673:20, 699:1, 711:15,
712:1, 716:23, 725:1
telephonic [1] - 713:5
television [1] - 613:1
temporary [1] - 662:25
Temporary[1] - 663:2
Ten[1] - 609:5
ten [10] - 607:5, 607:6, 607:7, 653:18,
653:19, 669:19, 688:16, 688:18,
699:21, 717:15
ten-minute [3] - 607:5, 688:16, 688:18
tend [1] - 579:7
term [6] - 505:17, 506:2, 507:8,
518:23, 711:18, 724:9
terminate [2] - 654:17, 663:17
terminated [1] - 659:6
terms [7] - 501:2, 506:8, 599:6, 614:5,
655:11, 678:5, 716:17
terrorism [1] - 710:8
Terrorist[1] - 644:8
test [7] - 636:8, 636:12, 636:18,
645:24, 646:8, 646:10, 689:10
tested [3] - 647:1, 648:3, 648:4
testified [9] - 513:23, 576:8, 601:16,

608:9, 618:6, 675:14, 691:10, 693:13,
709:17
testifies [8] - 492:17, 498:6, 626:9,
633:3, 643:16, 648:18, 656:14, 664:1
testify [1] - 567:15
testifying [1] - 588:14
testimony [6] - 540:6, 583:13, 583:16,
602:25, 679:1, 679:4
testing [2] - 641:20, 645:20
tests [7] - 636:10, 636:13, 636:16,
643:6, 645:14, 647:1, 647:22
themselves [1] - 658:8
Thereafter[3] - 614:17, 663:17, 732:20
thereafter [1] - 659:7
thinking [1] - 575:22
third [5] - 546:8, 662:5, 663:9, 665:16,
723:24
Thirty[1] - 608:24
thirty [1] - 631:19
Thirty-one [1] - 608:24
Thomas[1] - 609:13
thoroughfare [1] - 666:4
thousand [5] - 524:2, 524:3, 557:24,
558:1, 676:22
Thousands[2] - 649:21, 692:11
thousands [1] - 692:11
threaten [1] - 551:20
threatening [1] - 510:1
threats [2] - 524:6
Three[1] - 743:6
three [21] - 493:14, 497:3, 582:23,
589:4, 589:16, 612:9, 614:12, 639:23,
646:23, 647:10, 647:11, 647:17,
666:21, 666:24, 681:6, 692:19, 703:15,
704:10, 722:17, 723:4, 731:21
three-month [1] - 692:19
throughout [2] - 718:17, 720:3
Throughout[1] - 719:25
Thursday[1] - 751:3
tibia [1] - 496:19
ticket [8] - 503:10, 629:8, 629:9,
629:13, 629:14, 629:15, 631:1, 694:5
tie [1] - 516:4
tile [2] - 637:21, 641:10
tiles [1] - 636:7
timing [2] - 552:19, 553:11
Timothy[2] - 656:11, 656:17
tin [1] - 620:3
tip [3] - 645:15, 645:18, 645:25
tips [1] - 645:13
tired [2] - 749:9, 749:20
tires [2] - 526:6, 652:21
Tobacco[1] - 739:2
today [1] - 499:11, 516:1, 564:22,
567:22, 591:10, 660:2, 689:4, 749:3
together [14] - 518:15, 531:14, 539:20,
541:2, 549:5, 555:23, 556:20, 583:19,
612:10, 615:22, 616:1, 647:10, 647:11,
652:5

**Tom** [6] - 580:21, 580:23, 581:2, 581:9, 581:24, 582:8

**Tommy** [6] - 521:4, 521:7, 521:10, 521:11, 522:2, 537:25

**tomorrow** [5] - 749:10, 749:14, 754:7, 754:14, 754:21

**Tomorrow** [1] - 749:16

**tongue** [1] - 684:11

**tonight** [2] - 750:10, 754:16

**took** [29] - 521:3, 522:2, 547:16, 553:2, 554:8, 559:1, 573:12, 581:3, 584:22, 584:24, 585:7, 585:13, 600:20, 600:22, 603:18, 611:5, 621:14, 621:20, 622:18, 652:25, 660:25, 661:9, 671:14, 682:15, 682:17, 688:3, 700:19, 705:16, 715:8

**tools** [1] - 619:5

**top** [21] - 497:3, 505:14, 596:25, 597:4, 612:19, 615:1, 629:5, 639:22, 641:7, 641:12, 661:20, 662:5, 666:25, 673:14, 686:7, 687:11, 687:14, 697:12, 728:8, 742:6, 752:22

**topless** [1] - 534:22

**torch** [2] - 579:15, 579:21

**torches** [1] - 631:12

**total** [1] - 652:9

**Tottenville** [1] - 499:6

**tough** [2] - 600:7, 701:20

**tour** [3] - 694:3, 694:4

**towards** [11] - 541:10, 658:17, 672:20, 686:8, 686:17, 687:4, 694:25, 695:2, 696:6, 728:19, 729:2

**town** [2] - 560:3, 641:16

**trachea** [1] - 684:12

**trade** [1] - 627:22

**traffic** [1] - 658:18

**train** [1] - 671:3

**training** [5] - 493:9, 676:14, 676:18, 676:19, 692:18

**transaction** [2] - 629:9, 629:16

**Transcript** [1] - 491:10

**transcript** [9] - 491:24, 650:8, 690:8, 720:22, 730:13, 734:18, 746:2, 746:22, 748:4

**transcripts** [8] - 563:9, 719:11, 719:14, 719:16, 721:1, 721:4, 721:5, 728:6

**Transit** [2] - 618:22, 670:24

**translator** [1] - 495:8

**transmission** [4] - 543:8, 543:17, 543:20, 544:2

**transport** [1] - 497:6

**transported** [1] - 496:2

**traps** [1] - 637:22

**trauma** [2] - 495:23, 496:16

**travel** [1] - 697:6

**tread** [1] - 646:24

**treat** [1] - 496:18

**treatment** [2] - 494:23, 495:24

**tree** [1] - 635:7

**Trial** [1] - 491:10

**trial** [4] - 492:1, 565:14, 567:15, 754:22

**tribute** [1] - 520:10

**tried** [4] - 552:1, 643:5, 654:6, 679:2

**troopers** [3] - 653:7, 653:10, 653:11

**trouble** [2] - 527:19, 604:4

**truck** [32] - 499:22, 520:20, 521:6, 521:8, 521:11, 522:21, 522:22, 527:12, 527:13, 527:14, 527:25, 529:23, 541:5, 542:3, 550:1, 562:13, 584:25, 585:2, 585:19, 620:20, 620:25, 621:7, 621:8, 621:21, 622:1, 623:9, 627:11, 630:13, 651:1, 652:13, 674:6

**true** [14] - 586:6, 600:1, 602:3, 602:4, 602:5, 602:9, 602:12, 602:16, 602:17, 603:6, 603:9, 604:5, 655:4, 670:8

**truth** [18] - 572:2, 575:5, 575:14, 575:18, 595:14, 595:18, 599:14, 599:18, 599:23, 600:4, 601:16, 601:18, 602:7, 602:8, 603:3, 604:7, 604:9, 721:10

**truthfulness** [1] - 599:7

**try** [8] - 503:21, 548:6, 589:11, 617:11, 617:13, 685:8, 688:1, 698:20

**trying** [6] - 502:15, 581:24, 582:1, 600:13, 601:14, 750:5

**Tuesday** [2] - 731:5, 742:23

**Tufarelli** [15] - 497:23, 498:2, 498:9, 498:10, 498:14, 509:11, 515:19, 571:3, 571:9, 594:2, 596:12, 599:12, 602:15, 605:15, 713:23

**Turk** [4] - 517:22, 517:23, 537:13, 712:14

**Turkey** [4] - 713:16, 713:17, 732:6, 732:7

**Turkish** [1] - 517:24

**turn** [8] - 561:20, 562:6, 591:16, 631:18, 689:9, 689:12, 716:16, 730:24

**turnaround** [1] - 631:16

**turned** [10] - 541:9, 563:23, 564:3, 591:19, 592:12, 631:20, 636:14, 718:3, 718:4

**turning** [5] - 561:23, 562:1, 717:8, 723:4

**Turning** [12] - 542:15, 545:3, 553:24, 649:14, 659:8, 673:11, 724:7, 734:18, 739:13, 741:10, 742:20, 753:6

**Twelve** [1] - 633:13

**twenties** [1] - 662:4

**Twenty** [3] - 498:17, 502:8, 571:10

**Twenty-eight** [2] - 498:17, 571:10

**Twenty-one** [1] - 502:8

**Twice** [2] - 685:1, 693:16

**twinned** [1] - 615:22

**twinning** [2] - 615:25, 616:2

**two** [39] - 512:20, 528:3, 530:13, 535:15, 589:4, 589:16, 614:12, 614:22, 615:21, 615:24, 616:7, 623:5, 627:8, 628:9, 630:6, 633:25, 640:5, 642:4, 645:14, 651:5, 652:8, 653:9, 653:25,

654:2, 659:14, 704:18, 723:2, 723:21, 727:7, 727:21, 730:16, 730:23, 735:9, 735:11, 736:1, 736:4, 750:7

**Two** [4] - 525:9, 536:9, 549:20, 724:21

**two-page** [1] - 628:9

**type** [19] - 494:12, 494:20, 613:17, 629:19, 629:22, 629:24, 630:4, 630:7, 631:6, 634:7, 636:6, 664:10, 665:13, 665:21, 666:11, 669:23, 684:13, 745:5, 749:6

**types** [7] - 500:6, 560:18, 627:13, 645:14, 703:13, 703:15, 716:11

**typical** [2] - 532:17, 627:12

**typically** [3] - 630:6, 630:8, 697:25

**Typically** [1] - 724:16

## U

**Uce-60d** [1] - 714:23

**ultimately** [3] - 533:5, 564:5, 580:12

**Ultimately** [1] - 651:12

**unaware** [1] - 717:1

**uncle** [1] - 586:13

**uncles** [1] - 609:15

**under** [11] - 496:21, 501:1, 503:6, 566:24, 606:3, 631:7, 672:24, 692:24, 699:3, 700:19, 701:2

**Under** [1] - 501:11

**Underboss** [1] - 505:15

**undercover** [1] - 724:13

**underline** [1] - 631:25

**underneath** [2] - 505:20, 513:6

**understood** [4] - 596:5, 596:7, 596:10, 599:3

**unduly** [1] - 679:24

**unfortunately** [1] - 678:8

**unhappy** [1] - 714:4

**unidentified** [4] - 660:22, 661:25, 662:2, 663:13

**unit** [2] - 633:20, 644:15

**United** [7] - 491:1, 491:3, 491:5, 491:11, 491:14, 491:16, 492:1

**united** [1] - 505:9

**units** [1] - 630:18

**unknowingly** [1] - 724:14

**unknown** [5] - 650:20, 650:25, 651:4, 651:5, 654:13

**unloaded** [2] - 727:23, 733:21

**Unloaded** [3] - 733:22, 734:9, 734:10

**unprepared** [3] - 630:7, 631:12, 631:23

**up** [114] - 495:7, 495:9, 501:20, 501:21, 502:25, 503:7, 507:8, 507:10, 507:11, 507:12, 507:21, 510:5, 510:6, 510:22, 511:9, 521:12, 521:19, 522:1, 522:4, 524:21, 524:25, 527:11, 527:17, 529:23, 529:25, 530:19, 530:22, 532:3, 533:7, 538:25, 539:1, 539:3, 539:4, 540:24, 546:14, 547:13, 549:4, 549:10, 549:12, 550:25, 551:9, 551:22, 551:23,

553:8, 553:9, 553:12, 555:4, 556:19,
558:14, 559:3, 559:17, 559:20, 560:5,
560:11, 560:15, 576:20, 583:18,
585:16, 587:22, 587:25, 588:2, 589:5,
589:7, 595:9, 595:21, 595:23, 596:20,
600:10, 612:21, 615:25, 616:19, 617:4,
621:3, 633:23, 633:25, 634:10, 636:19,
637:1, 637:2, 637:3, 639:22, 640:8,
642:11, 643:8, 646:23, 662:8, 668:19,
673:24, 676:3, 682:10, 682:24, 684:10,
684:16, 684:17, 685:8, 691:18, 696:12,
696:13, 697:6, 697:14, 697:16, 702:25,
703:4, 703:8, 703:10, 704:15, 713:9,
717:5, 731:21, 743:14, 745:18, 751:19

**Up** [2] - 605:22, 621:1

**ups** [1] - 695:25

**upstairs** [1] - 645:9

**upwards** [1] - 658:10

**urgency** [1] - 750:10

**uses** [1] - 610:7

**utilities** [1] - 641:10

## V

**Valerie** [3] - 663:23, 664:4

**value** [2] - 599:7, 637:1

**various** [3] - 494:1, 627:23, 629:21

**vehicle** [15] - 651:16, 652:7, 653:18,
661:23, 662:1, 662:6, 662:19, 662:20,
662:21, 662:23, 663:8, 663:15, 733:4,
743:9, 751:12

**Vehicles** [1] - 669:15

**vehicles** [3] - 652:23, 654:13, 669:14

**Vendor** [2] - 628:14, 629:5

**ventilate** [2] - 681:18, 684:15

**ventricular** [1] - 684:18

**versus** [1] - 681:13

**vest** [2] - 537:16, 537:18

**vicinity** [4] - 651:9, 651:24, 740:20,
741:12

**victim** [2] - 561:4, 679:16

**victims** [2] - 566:3, 681:18

**Victorian** [2] - 634:21, 635:2

**video** [10] - 561:9, 649:7, 699:7,
700:13, 702:9, 706:8, 708:16, 720:6,
720:8, 742:18

**view** [7] - 640:14, 640:16, 672:19,
687:4, 700:23, 702:9, 706:12

**viewed** [5] - 673:22, 699:7, 700:5,
706:16, 707:13

**viewing** [2] - 495:2, 706:16

**vig** [3] - 523:24, 523:25, 524:1

**vigorously** [1] - 678:4

**Vincent's** [3] - 497:8, 497:11, 676:20

**vinyl** [1] - 702:16

**violated** [1] - 503:17

**violence** [2] - 524:6, 657:17

**Virginia** [1] - 637:16

**visible** [3] - 682:11, 700:22, 729:12

**visibly** [1] - 630:22

**visit** [6] - 503:22, 503:23, 519:19,
588:16, 588:24, 588:25

**visits** [1] - 588:15

**visual** [3] - 635:24, 636:3, 637:19

**voice** [1] - 719:19

**voices** [3] - 719:23, 720:1, 720:5

**Volkan** [2] - 712:12, 712:20

**volume** [2] - 689:21, 690:1

## W

**wait** [1] - 653:8

**waited** [1] - 617:9

**waiting** [5] - 521:6, 530:17, 550:24,
552:17, 654:5

**wake** [1] - 576:20

**walk** [3] - 611:14, 634:9, 697:2

**walked** [6] - 529:24, 545:9, 551:10,
562:14, 623:11, 669:13

**walking** [7] - 561:14, 669:6, 674:10,
686:17, 699:22, 700:15, 708:19

**wall** [1] - 696:21

**walls** [2] - 703:8, 704:7

**wants** [2] - 688:17, 697:6

**warped** [1] - 686:21

**warrants** [1] - 633:21

**wash** [5] - 643:4, 643:5, 666:7, 667:2,
673:13

**washed** [2] - 643:2, 643:7

**Washington** [1] - 710:9

**watch** [1] - 699:9

**watched** [1] - 672:13

**watches** [7] - 584:7, 584:10, 585:2,
585:10, 585:15, 585:19, 603:14

**water** [6] - 640:23, 641:16, 645:16,
645:25, 670:3, 682:19

**ways** [1] - 627:8

**weapon** [2] - 552:21, 735:24

**wear** [1] - 712:21

**wearing** [3] - 516:3, 658:3, 712:2

**web** [1] - 634:5

**wedding** [2] - 548:22, 548:23

**Wednesday** [2] - 722:15, 731:5

**wee** [1] - 669:7

**week** [4] - 510:7, 524:3, 528:3, 723:16

**weekend** [4] - 671:14, 723:7, 723:11,
723:16

**weekly** [1] - 511:10

**weeks** [2] - 631:18, 693:2

**weigh** [3] - 540:9, 629:11, 632:6

**weighed** [1] - 622:3

**weighs** [1] - 631:2

**weight** [4] - 622:6, 629:21, 629:24,
631:25

**weights** [1] - 632:8

**welcome** [1] - 623:25

**whack** [1] - 752:25

**wheeled** [1] - 623:9

**whereby** [1] - 629:11

**White** [3] - 741:20, 741:21, 741:22

**white** [22] - 516:4, 522:25, 640:18,
650:21, 651:3, 651:7, 651:12, 651:18,
651:21, 651:22, 651:24, 651:25, 652:5,
652:20, 653:7, 653:10, 654:15, 673:24,
674:6, 714:16

**whole** [2] - 498:22, 577:6, 671:21,
703:12, 752:25

**wide** [3] - 697:16, 704:10, 704:15

**width** [1] - 612:9

**wife** [2] - 539:18, 559:19

**Wildchuck** [1] - 526:4

**William** [2] - 491:15, 621:23

**window** [4] - 541:11, 655:14, 662:25,
697:14

**windows** [6] - 524:20, 525:14, 525:16,
525:25, 526:6, 584:24

**Winston** [1] - 491:14

**wise** [2] - 507:6, 650:11

**withdraw** [1] - 567:24

**witness** [42] - 492:5, 492:6, 492:7,
492:16, 497:24, 498:5, 571:3, 610:3,
610:5, 626:8, 633:2, 643:15, 647:9,
647:12, 648:17, 656:13, 663:25,
666:18, 685:9, 690:14, 695:9, 712:12,
723:6, 724:13, 726:5, 726:9, 726:18,
728:16, 728:22, 729:6, 731:23, 732:4,
732:14, 732:20, 733:2, 745:10, 749:10,
750:7, 751:19, 751:23, 754:19, 754:21

**Witness** [40] - 492:20, 497:17, 498:9,
605:25, 608:5, 608:14, 609:25, 616:17,
618:2, 618:11, 623:7, 623:25, 624:1,
626:12, 632:23, 633:6, 643:12, 643:19,
648:10, 648:21, 656:9, 656:17, 664:4,
670:5, 675:7, 675:8, 675:10, 675:19,
688:13, 688:15, 691:6, 691:15, 691:20,
699:17, 699:19, 709:8, 709:10, 709:13,
709:22, 755:2

**witnesses** [3] - 565:16, 569:6, 569:7

**Witte** [4] - 626:6, 626:12, 626:15

**wives** [1] - 513:1

**woman** [3] - 522:4, 578:22, 588:15

**women** [1] - 523:1

**wood** [2] - 635:8, 646:23, 646:25

**words** [3] - 537:8, 631:10, 719:20

**wore** [1] - 564:4

**worker** [1] - 544:2

**workers** [2] - 542:22, 556:13

**works** [1] - 689:10

**world** [2] - 629:21, 752:25

**worried** [4] - 560:16, 560:18, 560:25,
561:1

**worry** [3] - 561:15, 563:24, 564:4

**worth** [3] - 605:16, 605:18, 636:23

**wound** [9] - 501:20, 510:6, 511:9,
527:11, 533:7, 546:14, 551:22, 553:9,
553:12

**wounds** [1] - 497:4

**write** [3] - 595:7, 595:10, 595:15

**Write** [1] - 567:4

**writes** [1] - 567:17
**written** [5] - 566:6, 575:13, 595:19, 692:14, 699:21
**wrought** [1] - 635:2

## Y

**yard** [4] - 623:14, 631:5, 640:22, 669:8
**Yardley** [2] - 730:5, 736:21
**year** [7] - 508:10, 513:13, 535:17, 710:11, 713:1, 752:24, 753:4
**Year** [2] - 583:1, 583:4
**year-and-a-half** [1] - 710:11
**years** [19] - 582:21, 582:22, 582:23, 605:7, 609:5, 626:22, 630:15, 633:13, 644:10, 664:17, 664:22, 676:9, 681:6, 681:7, 692:5, 693:6, 710:6, 710:18
**yellow** [2] - 629:14, 641:2
**yesterday** [1] - 679:5
**York** [41] - 491:1, 491:6, 491:22, 493:2, 493:12, 493:17, 498:22, 499:16, 499:20, 513:23, 514:13, 514:14, 544:21, 609:3, 618:22, 627:5, 633:15, 633:24, 634:5, 649:4, 651:25, 652:15, 652:16, 653:6, 653:14, 654:15, 663:2, 676:5, 676:11, 681:3, 691:25, 705:10, 710:13, 710:14, 710:25, 713:16, 722:6, 730:19, 740:21, 751:9
**young** [2] - 665:25, 669:1
**Young** [67] - 491:7, 492:1, 515:23, 516:1, 535:14, 535:17, 535:21, 535:25, 536:18, 540:1, 540:3, 541:3, 541:11, 545:8, 545:23, 546:3, 547:5, 549:16, 550:1, 550:6, 551:10, 551:17, 552:4, 552:10, 552:16, 553:3, 553:4, 553:8, 553:15, 553:18, 559:3, 562:10, 562:13, 563:15, 563:22, 578:24, 579:1, 580:6, 580:9, 592:3, 593:8, 659:18, 660:13, 661:22, 662:19, 720:6, 722:19, 723:14, 725:3, 728:10, 728:11, 728:20, 729:2, 729:8, 730:3, 730:14, 735:2, 736:20, 737:15, 737:23, 738:14, 738:19, 739:4, 743:3, 743:21, 744:4, 752:21
**Young's** [3] - 545:10, 746:23, 753:12
**yourself** [9] - 513:15, 559:18, 562:16, 574:19, 577:2, 620:13, 634:14, 642:19, 754:6

## Z

**Zampogna** [7] - 709:12, 709:23, 710:3, 726:4, 744:7, 752:18
**zoom** [1] - 597:18
**Zooming** [1] - 736:19